# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC.,
380 N. Fairway Dr., Vernon Hills, IL 60061;

and

HAND2MIND, INC.,
500 Greenview Court, Vernon Hills, IL 60061,

*Plaintiffs*,

v.

DONALD J. TRUMP, President of the United
States, in his official capacity,
1600 Pennsylvania Avenue NW,
Washington, DC 20500;

KRISTI NOEM, Secretary of the Department of
Homeland Security, in her official capacity,
245 Murray Lane SW, Mail Stop 0485
Washington, DC 20528-0485;

U.S. DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW, Mail Stop 0458
Washington, DC 20528-0485;

SCOTT BESSENT, Secretary of the Treasury, in
his official capacity,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

U.S. DEPARTMENT OF THE TREASURY,
1500 Pennsylvania Avenue NW
Washington, DC 20220;

HOWARD LUTNICK, Secretary of Commerce,
in his official capacity,
1401 Constitution Avenue NW
Washington, DC 20230;

Case No.:

UNITED STATES DEPARTMENT OF
COMMERCE,
1401 Constitution Avenue NW
Washington, DC 20230;

PETE R. FLORES, Acting Commissioner of
Customs & Border Protection, in his official
capacity,
1300 Pennsylvania Avenue NW
Washington, DC 20229;

U.S. CUSTOMS & BORDER PROTECTION,
1300 Pennsylvania Avenue NW
Washington, DC 20229;

JAMIESON GREER, U.S. Trade Representative,
in his official capacity,
600 17th Street NW
Washington, DC 20508; and

THE OFFICE OF THE U.S. TRADE
REPRESENTATIVE,
600 17th Street NW
Washington, DC 20508,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Learning Resources, Inc. and hand2mind, Inc. bring this civil action against

Defendants for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.    This action challenges an extraordinary Executive Branch power grab. The

President has asserted the authority to impose tariffs (essentially, taxes) on imports from any

country, on any schedule, in any amount, and for any policy reason couched as an "emergency."

Neither the Constitution nor the International Emergency Economic Powers Act ("IEEPA") grants

the President tariff-levying authority at all, let alone of the limitless type asserted here. And

because these actions are irreparably harming Plaintiffs Learning Resources, Inc. and hand2mind,

1

Inc.—American family-owned businesses that develop educational products for schools and families—this Court should enjoin Defendants' actions before even more damage is done.

2.      The President unilaterally decided, through a series of unprecedented executive orders invoking IEEPA, to remake America's global trade policy. He began by increasing existing tariffs on America's three largest trading partners: a 10 percent increase on all goods imported from China, and even larger increases on goods imported from Mexico and Canada. In March, the President raised the tariffs on goods imported from China from 10 to 20 percent. In April, the President imposed a 10 percent tariff on nearly *all* goods from *all* countries indefinitely. He also imposed, then within a week paused for ninety days, additional "reciprocal" tariffs of up to 50 percent for all but a handful of our trading partners. Those tariffs included a 34 percent tariff on goods imported from China, and after China retaliated, President Trump increased the reciprocal tariff to 125 percent. The President did not suspend the reciprocal tariffs for China. Because the new rate imposed is added on top of long-existing duties, some tariffs on Chinese goods are now as high as *245 percent*. *Fact Sheet: President Donald J. Trump Ensures National Security and Economic Resilience Through Section 232 Actions on Processed Critical Minerals and Derivative Products*, THE WHITE HOUSE (Apr. 15, 2025).[1]

3.      Altogether, the President has imposed—through executive fiat—tariffs on trillions of dollars of economic activity. The money raised by these tariffs, which the government has estimated at $600 billion per year, will not be paid by foreign governments but by American businesses and consumers. That crushing burden is felt most immediately and acutely by this country's small and mid-size businesses, including Plaintiffs. Indeed, Plaintiffs are already

---

[1]    https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-ensures-national-security-and-economic-resilience-through-section-232-actions-on-processed-critical-minerals-and-derivative-products/.

suffering dire impacts and irreparable harm to their businesses and customers.

4.      Plaintiffs are family-owned businesses, now in their fourth generation, that have created and sold over 2,000 hands-on educational toys and products for children. Their award-winning products are found in toy closets and classrooms across the country and range from Spike the Fine Motor Hedgehog to Peekaboo Learning Farm, from Pretend & Play Teaching Cash Register to Kanoodle (a caboodle of brain-teasing puzzles) and Mirror My Sound Phoneme Set. With the mission to "bring learning to life," they seek to help younger children develop verbal, counting, and fine motor skills, and introduce older children to science, technology, engineering, and math. Plaintiffs have faced and survived significant challenges in the past two decades, including the Great Recession and COVID-19 pandemic, but the President's unilateral tariffs are now posing the greatest challenge of their existence.

5.      No act of Congress comes close to vesting the President with the extraordinary power he asserts. The Constitution vests the power to impose tariffs exclusively in Congress. U.S. CONST. art. I, § 8, cl. 1. Any tariff action taken by the Executive Branch must therefore be authorized by statute and consistent with Congress's instructions. The executive orders at issue here (the "Challenged Orders")[2] and agency action implementing them fail on both fronts.

6.      IEEPA was enacted in 1977 to grant the President specified authority over economic transactions during a national emergency, such as the power to impose sanctions on foreign terrorists or hostile foreign nations responsible for unusual and extraordinary threats to American security. *See* 50 U.S.C. §§ 1701 *et seq*. The statute does not mention tariffs or duties,

---

[2] This Complaint refers to the orders imposing tariffs currently in operation as the "Challenged Orders." For the Court's convenience, the Challenged Orders are listed in Appendix A and grouped as the "China IEEPA Orders" and the "Universal and Reciprocal IEEPA Orders." The Appendix also provides a brief description, short-form citation, and full citation for each order.

and in the five decades and eight administrations since its enactment, no President besides President Trump has ever invoked IEEPA to impose a tariff or a duty. Instead, Congress has formulated—and Presidents have relied on—a plethora of other laws codified in Title 19 of the United States Code that authorize the Executive Branch to take tariff action in limited circumstances and in compliance with various congressionally imposed procedures. There is no textual or historical basis for imposing tariffs under IEEPA, let alone the kind of unmistakable statutory grounding that is required in a case involving executive actions of "vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022). The President's novel claim that he may use IEEPA to impose tariffs of *any* amount, on *any* goods, imported from *any* country, and without *any* process is patently wrong.

7.     Even if IEEPA could be stretched to authorize tariffs, the tariffs adopted in the Challenged Orders violate the terms of the statute. In IEEPA, Congress specified that the statute's authority "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Here, however, the statute has been used to address longstanding issues that are the opposite of "unusual and extraordinary" (like decades-old trade deficits). It has been invoked to adopt tariffs that have no connection to the declared emergencies (like those imposed on goods from countries with whom the United States has a trade surplus). And it has been employed to accomplish goals that are entirely unrelated to any declared national emergency (like raising revenue for the federal government). Far from a limited emergency powers statute, IEEPA has become an all-purpose tool to achieve the President's long-term policy objectives.

8.     The President's novel assertion of power is foreclosed by IEEPA's text. But it should also be rejected because it would render IEEPA unconstitutional under the nondelegation

doctrine. Congress is not permitted to grant legislative authority to the Executive Branch without at least an intelligible principle to guide the Executive's discretion. Under the Challenged Orders' interpretation of IEEPA, however, there is none. The President would have authority to make major policy judgments about tariffs without any instruction from Congress on the amount, the country of origin, or the duration of the tariff, and there would be no need to demonstrate that the action taken has any reasonable relationship to an "unusual and extraordinary" threat. This Court should not adopt an interpretation that so blatantly violates our constitutional structure.

9.    For these reasons and more, the Challenged Orders and the agency actions modifying the Harmonized Tariff Schedule of the United States ("HTSUS") or otherwise implementing those orders are unlawful. This Court should declare as much and enjoin enforcement.

**PARTIES**

10.    Plaintiffs Learning Resources, Inc. and hand2mind, Inc. are private, family-owned American companies, based in Illinois, that develop, market, and sell educational products, educational toys, and pet toys. Plaintiffs market products under brands including LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND, and BRIGHTKINS, and are a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries. Plaintiffs have more than 500 employees and full-time equivalents today, and have offices in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. Plaintiffs develop their products (and perform some manufacturing and assembly) in the United States, but outsource most manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. Plaintiffs import directly from China and those other countries, and both companies thus pay duties and tariffs on such imports.

11.     Defendant Donald J. Trump, in his official capacity, is the President of the United States. He issued the Challenged Orders.

12.     Defendant Kristi Noem, in her official capacity, is the Secretary of Homeland Security. She is responsible for implementing the Challenged Orders. She is also responsible, through the Department of Homeland Security's component, U.S. Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Orders.

13.     Defendant Scott Bessent, in his official capacity, is the Secretary of the Treasury. He is responsible for consulting on implementation of tariffs directed by the Challenged Orders.

14.     Defendant United States Department of the Treasury is responsible for consulting on implementation of tariffs directed by the Challenged Orders.

15.     Defendant United States Department of Homeland Security is responsible for implementing the Challenged Orders. It is also responsible, through its component, U.S. Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Orders.

16.     Defendant Howard Lutnick, in his official capacity, is the Secretary of Commerce. He is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

17.     Defendant United States Department of Commerce is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

18.     Defendant Pete R. Flores, in his official capacity, is the senior official performing the duties of the Commissioner of Customs and Border Protection. He is responsible for administering and collecting tariffs directed by the Challenged Orders.

19.     Defendant United States Customs and Border Protection is responsible for administering and collecting tariffs directed by the Challenged Orders.

20.     Defendant Jamieson Greer, in his official capacity, is the United States Trade Representative. He is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

21.     Defendant the Office of the United States Trade Representative is responsible for implementing tariffs directed by the Universal and Reciprocal IEEPA Order.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346 because this civil action arises under the Constitution of the United States and federal statutes, and does not arise from a law authorizing the imposition of tariffs within the meaning of 28 U.S.C. § 1581(i)(1)(B). The Court is authorized to award the requested relief under 5 U.S.C. §§ 702, 705, 706, and 28 U.S.C. §§ 1361, 2201, 2202, and through the equitable powers of this Court.

23.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because an officer of the United States in his or her official capacity, or an agency of the United States, is a defendant, each defendant officer and agency resides in this District, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## STANDING

24.     To establish Article III standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Both Plaintiffs are harmed by the challenged tariff action because each directly imports goods from China and other countries subject to the Challenged Orders, and each thus must pay additional tariffs to the federal government because of the Challenged Orders and corresponding revisions to the HTSUS. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article

III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury"). Declaratory and injunctive relief will redress these injuries because Plaintiffs will no longer be required to pay the tariff or make harmful changes to their business operations to account for increased costs.

## BACKGROUND

### A.    The President Has Limited Tariff Authority Only As Delegated By Congress.

25.    The Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States," U.S. Const. art. I, § 1, including the power to "lay and collect . . . Duties," *id.* art. I, § 8, cl. 1. Because the Constitution vests the tariff power in Congress, Congress is "the principal venue in which trade policy is determined." Douglas A. Irwin, Clashing Over Commerce: A History of U.S. Trade Policy, 2 (2017) ("Clashing Over Commerce"). To the extent the President is involved in tariffs through a delegation of congressional authority, it is either to impose tariffs in defined circumstances under Title 19 of the United States Code or to negotiate trade agreements subject to Congress's approval. In either form, the President's power is necessarily circumscribed by the Constitution and limits enacted by Congress.

26.    On multiple occasions, Congress has delegated limited authority to the President or members of the Executive Branch to impose tariffs—including, under Section 232 of the Trade Expansion Act of 1962, for the explicit purpose of "[s]afeguarding national security." 19 U.S.C. § 1862. But where Congress has delegated this authority, it has done so expressly and has limited the President's or Executive Branch's authority to specific situations so that Congress retains its essential legislative function. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (Executive Branch may exercise delegated authority "subject to limitations which [Congress] imposes"); *see, e.g.*, 19 U.S.C. § 1338(a) (authorizing President to "declare new or additional duties" of up to 50 percent on imports from countries that have imposed "unreasonable" charges, exactions,

regulations, or limitations that are "not equally enforced upon the like articles of every foreign country" or "[d]iscriminat[ed] in fact against the commerce of the United States"); *id.* § 1862 (authorizing President to impose tariffs in response to a specific finding that certain imports impair national security, subject to numerous procedural requirements and limitations); *id.* § 2132(a) (authorizing President to impose "duties" "not to exceed 15 percent ad valorem . . . on articles imported into the United States" in order "to deal with large and serious United States balance-of-payments deficits," subject to a 150-day expiration unless Congress enacts legislation to extend them); *id.* §§ 2411-2419 (directing U.S. Trade Representative to "impose duties or other import restrictions on the goods of" a foreign country to remedy "unfair and inequitable" foreign trade practices, subject to numerous procedural requirements and limitations).

27.    Absent an authorization such as these, "the President [can] not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country, or impose mandatory import quotas." *Consumers Union of U. S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974). This ensures that Congress "retains ultimate authority over trade policy." IRWIN at 21, *supra* ¶ 25.

28.    With respect to trade negotiations, Congress enacted the Bipartisan Congressional Trade Priorities and Accountability Act of 2015, Pub. L. No. 114-26, 129 Stat. 319, 320 (codified at 19 U.S.C. § 4201 *et seq*.), which made clear that any trade agreements the President negotiated would have to be approved and implemented by Congress and set forth certain limitations and priorities for the President in such negotiations. Insofar as the President negotiates agreements outside of this framework, those agreements have no force of law unless and until enacted by Congress.

**B.    The International Emergency Economic Powers Act Does Not Grant The President Tariff-Levying Authority**

29.    Through IEEPA, Congress granted the President power to take specified emergency economic measures during a declared emergency. Congress did not authorize the President to impose tariffs.

30.    IEEPA became law in 1977. Both the House and Senate committee reports "expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency" under a different statute—the Trading With the Enemy Act ("TWEA")— "by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency." *Id.* at 7 n.51; H. REP. NO. 95-459 (1977); S. REP. NO. 95-466 (1977).

31.    Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. §1701(a).

32.    Specifically, the President may (1) "investigate, regulate, or prohibit" transactions in foreign exchange, certain transfers of credits or payments, and the importing or exporting of certain currencies or securities; (2) "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving" property in which a foreign country or national has an interest; and (3) confiscate property of foreign persons, organizations, or countries that have "planned, authorized, aided, or engaged in . . . [armed] hostilities or attacks against the United States." 50 U.S.C. § 1702(a)(1). Unlike every statute authorizing the President to impose or adjust tariffs, IEEPA does not mention "tariffs," "duties,"

or any other revenue-raising mechanism. *Compare* 19 U.S.C. § 1338(a) ("new or additional duties"); *id.* § 1862 ("duties or other import restrictions"); *id.* §2132(a) ("temporary import surcharge . . . in the form of duties"); *id.* §§ 2411-19 ("duties or other import restrictions").

33.    The President, moreover, is limited with respect to when he may use these emergency powers. IEEPA provides that the "[t]he authorities granted to the President . . . may *only* be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared . . . and *may not be exercised for any other purpose*." 50 U.S.C. § 1701(b) (emphasis added).

34.    Consistent with these limits, no President has *ever* used IEEPA to impose tariffs before President Trump's recent orders. Since its enactment, past presidents have used IEEPA only to impose tailored sanctions against foreign nationals and governments to address specific and declared threats to American national security. *See id.* at 15. Unlike sanctions, which target threats outside the country, the Challenged Orders impose tariffs—causing massive upheaval and harm to American businesses and the U.S. economy.

## THE PRESIDENT'S IEEPA ORDERS

35.    Since taking office on January 20, 2025, President Trump has issued numerous executive orders that impose, suspend, or modify tariffs under the purported authority of IEEPA.[3]

---

[3] The Challenged Orders also cite three other provisions necessary to impose tariffs under IEEPA if IEEPA in fact authorized tariffs: the National Emergencies Act (50 U.S.C. § 1601 *et seq.*) (authorizing the President to declare a national emergency), section 604 of the Trade Act of 1974, as amended (19 U.S.C. § 2483) (authorizing the president "as appropriate" to "embody in the Harmonized Tariff Schedule of the United States the substance of the relevant provisions of this chapter, and of other Acts affecting import treatment, and actions thereunder, including removal, modification, continuance, or imposition of any rate of duty or other import restriction"), and 3 U.S.C. § 301 (authorizing the President to delegate functions to subordinates).

A.    **The China IEEPA Orders**

36.    On February 1, 2015, the President issued an executive order imposing tariffs on China. Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025) ("February 1 China Order"). The Executive Order asserts that "the sustained influx of synthetic opioids has profound consequences on our Nation," and that China has not only "fail[ed] to stem the ultimate source of many illicit drugs distributed in the United States" but has actually "incentivized" Chinese "chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States." *Id.* at 9,121. The Executive Order "expand[s] the scope of the national emergency" previously declared at the southern border (*i.e.*, with respect to Mexico) to "cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." *Id.* § 1, at 9,122. The Executive Order then invokes the President's authority under "section 1702(a)(1)(B) of IEEPA" to impose "an additional 10 percent ad valorem rate of duty" on "[a]ll articles that are products of [China]." *Id.* §§ 1-2.

37.    The 10 percent additional tariffs on Chinese goods took effect on February 4, 2025. February 1 China Order § 2(a), 90 Fed. Reg. at 9,122. The February 1 China Order states that, should China "retaliate against the United States," the President may "increase or expand in scope the duties imposed under this Executive Order to ensure the efficacy of this action." *Id.* § 2(c). The Order also makes unavailable drawbacks on duties imposed by the Order. *Id.* § 2(f), 90 Fed. Reg. at 9,123. The Order then directs the Secretary of Homeland Security to "determine the modifications necessary to the [HTSUS] in order to effectuate the objectives of this order consistent with law" and to "make such modifications to the HTSUS through notice in the Federal

Register." *Id.* § 2(d). The Order also directs the Secretary of Homeland Security, "in consultation with the Secretary of the Treasury, the Attorney General, and the Secretary of Commerce," to "take such actions, including adopting rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order." *Id.* § 4.

38.    Merely a month after those 10 percent additional tariffs took effect, President Trump issued an executive order—again under IEEPA—that increased the ad valorem tariff imposed by the February 1 China Order from 10 percent to 20 percent. Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025) (the "March 3 China Amendment"). The Order explained that the increase was necessary because the President "determined that [China] has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." *Id.* § 1, 90 Fed. Reg. at 11,463.

39.    On April 2, 2025, the President issued an executive order eliminating duty-free *de minimis* treatment of goods subject to the February 1 China Order and the March 3 China Amendment. Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025) (the "April 2 China Amendment").

40.    The Department of Homeland Security and Customs and Border Protection have implemented these tariffs by modifying and revising the HTSUS. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China Order); *Further Amended Notice of Implementation of Additional*

*Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).[4]

B.      **The Universal and Reciprocal Tariff IEEPA Orders**

41.     On April 2, 2025, the President issued an executive order imposing a 10 percent universal tariff, as well as so-called "reciprocal" tariffs, on virtually all countries. Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025) (the "Universal and Reciprocal Tariff Order"). The express stated goal of these tariffs is "to rebalance global trade flows." *Id.* § 2, 90 Fed. Reg. at 15,045.

42.     The Universal and Reciprocal Tariff Order declares that the "large and persistent annual U.S. goods trade deficits" are a national emergency because they "constitute an unusual and extraordinary threat to the national security and economy of the United States." Universal and Reciprocal Tariff Order, 90 Fed. Reg. at 15,041; *see Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security*, THE WHITE HOUSE (April 2, 2025) ("President Trump is invoking his authority under [IEEPA] to address the national emergency posed by the

---

[4] On February 1, 2025, the President also issued two substantially similar executive orders imposing tariffs on all goods imported from Mexico and Canada, which each rely on IEEPA as the President's sole source of authority. *See Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025); *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025). The President subsequently paused, reinstated, and amended the scope of those tariff orders in ways not relevant here.

large and persistent trade deficit[.]").[5] The Order finds that these deficits are caused by "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." Universal and Reciprocal Tariff Order, 90 Fed. Reg. at 15,041. The Order asserts that "despite a commitment to the principle of reciprocity, the trading relationship between the United States and its trading partners has become highly unbalanced" because of supposed tariff and "non-tariff barriers [that] deprive U.S. manufacturers of reciprocal access to markets." *Id.* at 15,041-15,042. The Order concludes that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* at 15,041.

43.    Based on the newly declared emergency "arising from conditions reflected in large persistent annual U.S. goods trade deficits," the Order imposes a universal tariff. Universal and Reciprocal Tariff Order § 1, 90 Fed. Reg. at 15,044. Specifically, it imposes "an additional ad valorem duty" of 10 percent "on all imports from all trading partners" except as expressly excluded. *Id.* § 2, 90 Fed. Reg. at 15,045. The Order modifies the HTSUS accordingly. *Id.* § 3(k), 90 Fed. Reg. at 15,047.

44.    The only countries exempted from these universal tariffs are Canada and Mexico, because goods from those countries are already subject to additional tariffs imposed under prior IEEPA orders, Universal and Reciprocal Tariff Order § 3(d), (e), 90 Fed. Reg. at 15,046, and Cuba, North Korea, Russia, and Belarus, because the United States lacks permanent normal trading

---

[5]    https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.

relations with these countries, *id*. § 3(b), 90 Fed. Reg. at 15,045-15,046. The Order exempts certain product categories from the universal tariffs on the basis that they are (or may soon be) subject to still other additional tariffs imposed under Section 232 of the Trade Expansion Act of 1962, including certain steel, aluminum, automobiles, and automotive parts, as well as products like copper, pharmaceuticals, semiconductors, lumber articles, certain critical minerals, and energy and energy products. *Id.* § 3(b), Annex II, 90 Fed. Reg. at 15,045, 15,049.

45.     The 10 percent universal tariffs took effect on April 5, 2025. Universal and Reciprocal Tariff Order § 3(a), (k), 90 Fed. Reg. at 15,045, 15,047.

46.     In addition to the universal 10 percent tariff, the Order also imposes a country-specific "reciprocal tariff" on 57 trading partners. Universal and Reciprocal Tariff Order § 2 & Annex I, 90 Fed. Reg. at 15,045, 15,049. The Order modifies the HTSUS accordingly. *Id.* at § 3(k), 90 Fed. Reg. at 15,047. This country-specific "reciprocal" tariff ranges from 11 percent for Cameroon and the Democratic Republic of the Congo to 50 percent for Lesotho. *Id.* at Annex I, 90 Fed. Reg. at 15,049. Key trading partners—including those with congressionally imposed "Most Favored Nation" status—to whom importers within the United States have sought to divert supply chains in recent years are subject to substantial reciprocal rates. *Id.* This includes, for example, Vietnam, which is subject to a 46 percent tariff. *Id.*

47.     Yet these "reciprocal" tariff amounts are not connected to the rates these countries charge the United States. For example, the European Union's total weighted average tariff rate was recently calculated at 2.7 percent, but the Executive Order sets the "reciprocal" rate for the European Union at 20 percent. World Trade Organization, *European Union* Summary.[6] This is

---

[6] https://www.wto.org/english/res_e/statis_e/daily_update_e/tariff_profiles/CE_e.pdf (last visited Apr. 21, 2025).

because the "reciprocal" tariff rates were calculated not by looking at the rates these countries charge the United States or by identifying any specific non-tariff barriers to trade. *See* Office of the U.S. Trade Representative, *Reciprocal Tariff Calculations*.[7] Rather, the "reciprocal" tariff for a specific country is calculated by dividing the United States's trade deficit with that country by total imports from that country, and then dividing by two. *Id.*; *see also* Peter Foster & Sam Fleming, *Donald Trump Baffles Economists with Tariff Formula*, Fin. Times (Apr. 3, 2025).[8] The result is an anomaly where the United States's "reciprocal" rate for a country's imports may be substantially higher than the rate the country imposes on the United States's exported goods.

48.    These "reciprocal" tariffs took effect on April 9, 2025. Universal and Reciprocal Tariff Order § 3(a), 90 Fed. Reg. at 15,045.

49.    The Order also directs the Secretary of Commerce and the United States Trade Representative "to employ all powers granted to the President by IEEPA as may be necessary to implement this order." Universal and Reciprocal Tariff Order § 5, 90 Fed. Reg. at 15,048.

50.    The only asserted authority for imposing tariffs under these orders is IEEPA.

51.    The Order also provides that the tariffs "shall apply until such time" as the President "determine[s] that the underlying conditions . . . are satisfied, resolved, or mitigated." Universal and Reciprocal Tariff Order § 2, 90 Fed. Reg. 15,045. At the same time, however, the President may, at his choosing, raise the tariffs even higher or broaden their scope: "Should any trading partner retaliate against the United States in response to this action through import duties on U.S. exports or other measures, I may further modify the HTSUS to increase or expand in scope the duties imposed under this order to ensure the efficacy of this action." *Id.* § 4(b), 90 Fed. Reg. at

---

[7] https://perma.cc/WB9J-WWNE (last visited Apr. 21, 2025).
[8] https://www.ft.com/content/85d73172-936a-41f6-9606-4f1e17cb74df.

15,047.

52.     Accordingly, when China responded to this order by imposing retaliatory tariffs, the President raised the "[r]eciprocal" tariff rate on China by 50 percentage points—from 34 percent to 84 percent. Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509, 15,509 (Apr. 8, 2025) (the "April 8 Reciprocal China Amendment"). This placed the overall IEEPA tariffs on Chinese goods at 104 percent (84 percent per the April 8 Reciprocal China Amendment plus 20 percent per the February 1 China Order and March 3 China Amendment).

53.     The next day, April 9, 2025, the President suspended for 90 days the "reciprocal" tariffs on most countries—except for China, for which he raised the "reciprocal" tariff again, this time from 84 percent to 125 percent. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* §§ 2, 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025) (the "April 9 Reciprocal Modification"). The 20 percent tariff pursuant to the February 1 China Order remains in place, meaning the current starting tariff on most imports from China is 145 percent, though some rates are as high as 245 percent.

54.     The suspension applies only to the "reciprocal" tariffs listed in Annex I to the Universal and Reciprocal Tariff Order. April 9 Reciprocal Modification § 3, 90 Fed. Reg. at 15,626. It does not apply to the 10 percent universal tariffs from that order. *Id.*

55.     On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the universal and (suspended) reciprocal tariffs. Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11,

18

2025).[9]

56.     Nevertheless, a 10 percent baseline tariff is being applied to most global imports, and products from China are subject to a minimum tariff of 145 percent.

## ECONOMIC IMPACT

57.     The Challenged Orders will increase the cost of trillions of dollars of goods and services imported to the United States every year. Ana Swanson, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025) (United States imported $4.1 trillion in goods and services in 2024).[10]

58.     The President has stated that the tariffs will raise "billions of dollars, even trillions of dollars" in revenue. Bailey Schulz, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (April 3, 2025).[11] Treasury Secretary Scott Bessent estimates the United States will collect up to $600 billion in tariffs per year. Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (April 4, 2025).[12] This money will not be paid by foreign governments; it will be paid primarily by American businesses and consumers. Six hundred billion dollars in annual tariffs would equate to the largest peacetime tax increase in U.S. history. Eric Boehm, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax Increase, but Also*

---

[9]     https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-april-2-2025-as-amended/.

[10]     https://www.nytimes.com/2025/02/05/business/economy/us-trade-deficit-2024-record.html#:~:text=Data%20released%20Wednesday%20morning%20by,and%20food%20from%20other%20countries.

[11]     https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-will-money-go/82792578007/.

[12]         https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt.

*a Tax Cut*, REASON MAG. (March 31, 2025).[13]

59.     Raising revenue from tariffs has substantial collateral consequences for the economy. By some estimates, the IEEPA tariffs on China alone will reduce GDP by 0.3 percent. Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, THE TAX FOUND. (April 11, 2025).[14] The same estimates suggest retaliatory tariffs imposed by other countries will reduce U.S. GDP by at least another 0.2 percent. *Id.*

60.     The new tariffs will more than triple what the United States would expect to collect in tariffs under the status quo. *See* U.S. Customs and Border Protection, *Trade Statistics* (in 2024, CBP collected $88 billion dollars in tariffs).[15] All told, "the imposed tariffs" are projected to amount to an average tax increase of over $1,200 per American household in 2025. York & Durante, *supra* ¶ 59.

61.     The tariffs will severely and irreparably harm Plaintiffs Learning Resources and hand2mind. Because these companies directly import from China (as well as other countries affected by the Challenged Orders), they will be responsible for paying at least the 145 percent duty and tariffs on all products made in China, with certain products assessed total duties and tariffs of 170 percent or more. These rates are so high as to effectively prevent importation.

62.     Having previously planned for sales to increase by 8 percent, Plaintiffs are now planning for a 2025 sales decline of 25 percent to 50 percent year-over-year.

63.     Plaintiffs cannot continue to sell goods to their customers at the same prices prevailing before the challenged tariffs. Instead, Plaintiffs are already making and considering

---

[13]     https://reason.com/2025/03/31/peter-navarro-says-tariffs-will-be-a-6-trillion-tax-increase-but-also-a-tax-cut/.

[14] https://perma.cc/M3LK-SPE2.

[15] https://perma.cc/D3HR-JD4Y (last visited April 21, 2024).

further significant and costly changes to their businesses, while facing the prospect of (among other things) sharply raising prices, major supply disruptions, and having to revamp or eliminate entire product lines. Those changes will result in lost sales, lost profits, lost market share, loss of consumer goodwill—and potentially worse.

## CLAIMS FOR RELIEF

### COUNT I
### ULTRA VIRES ACTS IN VIOLATION OF THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT, 50 U.S.C. § 1702

64.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

65.    "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Accordingly, "[w]hen an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). "Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President act within those limits." *American Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023); *see also Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated.").

66.    The Challenged Orders are *ultra vires* because, even in the face of an actual national emergency, IEEPA does not authorize the President to impose tariffs.

67.    The power to lay and collect duties is "conferred upon the Congress." *United States v. Jacobs*, 306 U.S. 363, 370 (1939). As a result, the President has authority to impose or adjust tariffs only to the extent authorized by Congress. And because the exercise of tariff authority carries "vast economic and political significance"—especially here, where the President has

unilaterally imposed costly tariffs on virtually all goods coming from all countries in what would equate to the largest peacetime tax increase in U.S. history—that statutory authorization must be "clear." *West Virginia*, 597 U.S. at 716; *accord Biden v. Nebraska*, 600 U.S. 477, 505-506 (2023). It is not sufficient that the President's interpretation of the relevant statutory provision is "colorable." *West Virginia*, 597 U.S. at 722. That is doubly true where the "claim of expansive authority" is "unprecedented." *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021).

68.    The plain text of IEEPA does not clearly—or even colorably—authorize the President to impose tariffs at all, much less tariffs of any size, duration, and scope. The statute nowhere mentions "tariffs," "duties," or other revenue-raising mechanisms. And no President has used IEEPA to impose tariffs in the past. Instead, the statute grants the President other defined and limited powers—such as the powers to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of goods. 50 U.S.C. § 1702(a)(1)(B).

69.    The power to "regulate" imports and exports does not encompass the distinct power to raise revenue through tariffs or duties. The word "regulate," in the context of "nullify, void, prevent[], or prohibit," means to directly control the quantity or the quality of imports from one or more foreign countries causing the extraordinary emergency—not to impose tariffs on such imports.

70.    The distinction between *regulating* foreign imports and *imposing tariffs* on foreign imports dates back to our Founding. Article I, Section 8, Clause 1 of the Constitution vests Congress with the "[p]ower to lay and collect Taxes, Duties, Imposts, and Excises." By contrast, Article I, Section 8, Clause 3 empowers the Congress "[t]o regulate Commerce with foreign

Nations." If imposing tariffs was the same thing as regulating foreign commerce, there would be no need for the Constitution to specifically enumerate the power to impose tariffs in Clause 1. The Constitution treats these powers separately because they serve very different functions and are not substitutes for one another.

71.    Indeed, where Congress has granted the President power to impose tariffs and duties, it has done so through highly reticulated statutory schemes that are clear in their authorization and limited in their scope. Laws such as the Tariff Act of 1930 and the Trade Act of 1974 provide authority to the President to impose tariffs, but *no law* provides that authority by saying merely that the President may "regulate" imports and exports. Laws providing authority to impose tariffs instead provide that authority through language that expressly references tariffs and duties that raise revenue.

72.    Moreover, reading IEEPA's grant of authority to "regulate" imports and exports to include the distinct authority to impose tariffs would be inconsistent with other terms of the statute. For example, Section 1702(a)(1)(B) explicitly states that the President may only "regulate . . . importation or exportation of . . . property in which any foreign country or a national thereof has any interest." But at the time tariffs would be levied, most goods are the property of the U.S. persons that have imported them into the country (or whomever takes title when they cross the border), and not of any foreign persons. It is absurd to suggest that Congress intended to grant the President the authority to impose tariffs, yet in the same provision precluded the imposition of tariffs except in a minority of circumstances.

73.    For these reasons, this Court should declare that the Challenged Orders are *ultra vires* because they exceed the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

74.     Because the Challenged Orders are *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, they cannot be enforced by Defendants. This Court should accordingly enjoin Defendants (other than the President) in their official capacities as federal officers  from enforcing them.

75.     If the Challenged Orders are not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

**COUNT II**
**ULTRA VIRES ACTS IN VIOLATION OF THE INTERNATIONAL**
**EMERGENCY ECONOMIC POWERS ACT (IEEPA), 50 U.S.C. § 1701(b)**

76.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

77.     As set forth in Count I, this Court may review *ultra vires* acts and provide equitable relief.

78.     Even if IEEPA authorized the President to impose tariffs, it would not authorize the tariffs directed in the Challenged Orders because they either (a) do not involve an "unusual or extraordinary threat" to the nation, (b) do not "deal with"—or in other words, reasonably relate—to the national emergencies that the President declared, or (c) have been employed to take on numerous, unrelated problems for which no national emergency has been declared in the first place. Had Congress intended to grant the President authority to impose tariffs as a matter of general economic policy—as the President has done here—rather than to combat an emergency, it would have said so clearly. But it did not.

79.     IEEPA grants the President authority to regulate various international economic transactions "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b); *see also id.* § 1701(a) ("Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat.").

80.    IEEPA also expressly provides that the President's authority "may not be exercised for any other purpose" and that "[a]ny exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." 50 U.S.C. § 1701(b). This requirement that IEEPA action be taken only to "deal with" the declared national emergency, and not for any other reason, is echoed in case law. When the government claims "unprecedented" power over a significant portion of the economy, *Alabama Ass'n of Realtors*, 594 U.S. at 765, its actions must be "[]tethered" to the underlying statutory scheme, *National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022); *see also United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975) (holding that tariffs under TWEA must be "reasonably related" to the emergency that the President declared).

81.    ***The Universal and Reciprocal IEEPA Orders***: The tariffs imposed in the Universal and Reciprocal IEEPA Orders do not concern any "emergency" that poses either an "unusual" or an "extraordinary" threat. The President admits as much in that order, as he describes the United States' "annual trade deficits" as "persistent" and rooted in (congressionally approved) trade agreements entered in the first half of the twentieth century. Universal and Reciprocal IEEPA Order, 90 Fed. Reg. at 15,041. If the words "unusual" or "extraordinary" are to bear any meaning, the fact that the United States has had a trade deficit for more than 50 years shows that the United States' current trade deficit does not fit within the IEEPA emergency definition. *See* Brian Reinbold & Yi Wen, *Historical U.S. Trade Deficit*, FED. RES. BANK OF ST. LOUIS (May 17, 2019).[16] Indeed, the United States' exceptional economic growth over the past 50 years affirmatively demonstrates that "the trade balance is a particularly bad measure of national well-

---

[16] https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits.

being." Andrea Freytag & Phil Levy, *The Trade Balance and Winning at Trade*, THE CATO INST. (Oct. 3, 2024).[17] IEEPA requires that there be an "unusual and extraordinary threat," and neither the trade deficit, nor any of the circumstances that the President asserts cause this deficit, meet this standard. 50 U.S.C. § 1701(a).

82.     Nor are the tariffs imposed by the Universal and Reciprocal IEEPA Order "reasonably related" to a national emergency. *Yoshida*, 526 F.2d at 577. The asserted national emergency for these tariffs is "the large and persistent annual U.S. goods trade deficits." Universal and Reciprocal Tariff Order § 1, 90 Fed. Reg. at 15,044. Even if the tariffs could address the trade deficit or the circumstances that cause it, the tariffs the President has imposed are incredibly overbroad, as they apply to countries with whom we run a trade surplus and to countries that do not charge tariffs on American goods.

83.     ***The China IEEPA Orders***: The tariffs imposed by the China IEEPA Orders are likewise not reasonably related to the declared drug trafficking emergencies. Imposing tariffs on *legal* goods has no sufficient connection to combatting *illegal* narcotics. Most critically, the costs of tariffs on legal goods lawfully imported into the United States are primarily borne by *Americans*; there is no reason why such tariffs and the corresponding harm to American business will alter the behavior of the cartels, drug-smuggling rings, and other organizations that bring illegal substances into our country. Doing so is not "regulating importation . . . *by means appropriate* to the emergency involved." *Yoshida*, 526 F.2d at 584 (emphasis added).

84.     The tariffs imposed by the China IEEPA Orders are also unlawful because the President is imposing them for purposes other than the illegal drug trafficking emergency he declared. The President has been clear that these tariffs are simply part of his economic agenda—

---

[17] https://www.cato.org/publications/trade-balance-winning-trade.

their predominant purpose is *not* to address the national fentanyl emergency invoked as the basis for imposing them. *See* Amie Williams et al., *Donald Trump Threatens to Ignite Era of Trade Wars with New Tariffs*, FIN. TIMES (Jan. 31, 2025) (quoting the President as stating, the day before imposing the tariffs, that "It's pure economic. We have big deficits with, as you know, with [China]")[18]; Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Feb. 2, 2025, 8:09 AM) ("The USA has major deficits with Canada, Mexico, and China (and almost all countries!), owes 36 Trillion Dollars, and we're not going to be the 'Stupid Country' any longer. MAKE YOUR PRODUCT IN THE USA AND THERE ARE NO TARIFFS! Why should the United States lose TRILLIONS OF DOLLARS IN SUBSIDIZING OTHER COUNTRIES, and why should these other countries pay a small fraction of the cost of what USA citizens pay for Drugs and Pharmaceuticals, as an example? THIS WILL BE THE GOLDEN AGE OF AMERICA!").[19]

85.    IEEPA is clear, however, that the President's authority "may only be exercised to deal with" a declared national emergency "and may not be exercised for *any other purpose*." 50 U.S.C. § 1701(b) (emphasis added). The President's multi-purpose approach renders IEEPA's text superfluous: If he can exercise powers under IEEPA not for the particular emergency declared but for any purpose he wishes, the textual limit set by Congress has no force.

86.    ***Other Deficiencies Across the Challenged Orders***: The Challenged Orders suffer from at least three other legal deficiencies. *First*, they violate IEEPA because the tariffs they impose apply to imported goods that the statute expressly excludes from coverage. Section 1702(a)(1)(B) permits the President to "regulate" only property "in which any foreign country or a national thereof has any interest." Accordingly, where a U.S. person has taken title to and holds

---

[18] https://www.ft.com/content/ff8116f0-b01f-4687-934a-a1b8a07bd5b0.

[19] https://truthsocial.com/@realDonaldTrump/posts/113934450227067577.

beneficial interest in the imported property, no tariff may be imposed. Despite this, the Challenged Orders impose tariffs on *all* imports from China and almost every other country, even if no foreign country or national retains any interest in the goods. Indeed, tariffs are paid by the "owner or purchaser" of the merchandise, which will be a United States person in most instances. *See* 19 U.S.C. § 1484(a)(2)(B).

87.    *Second*, the China IEEPA Orders disregard other statutory requirements. They provide that "[n]o drawback shall be available with respect to the duties imposed pursuant to this order." February 1 China Order § 2(f), 90 Fed. Reg. at 9,123. But 19 U.S.C. § 1313(a) provides that when goods "manufactured or produced in the United States with the use of imported merchandise" are exported or destroyed, the tariffs paid on the imported merchandise "shall be refunded as drawback." IEEPA provides no authority to supersede this provision, particularly in circumstances where no foreign country or national retains any interest in the drawback. Moreover, regulations implementing duty drawbacks cannot be withdrawn without notice and comment. *Modernized Drawback*, 83 Fed. Reg. 64,942, 64,997 (Dec. 18, 2018); *see Rotinsulu v. Mukasey*, 515 F.3d 68, 72 (1st Cir. 2008) ("An agency has an obligation to abide by its own regulations." (citing *Accardi v. Shaughnessy*, 347 U.S. 260, 265-267 (1954)); *Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564, 569 (D.C. Cir. 2022) ("[O]nce an agency makes a rule—that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing it.").

88.    *Third*, the Challenged Orders also limit duty-free *de minimis* treatment under 19 U.S.C. § 1321. *See, e.g.*, Universal and Reciprocal Tariff Order § 3(h), 90 Fed. Reg. at 15,047. Section 1321, however, states that the Secretary of the Treasury "shall prescribe" regulations admitting goods "free of duty" when their fair retail value does not exceed $800. IEEPA does not

authorize the President to suspend these statutory provisions. Nor can he repeal these regulations without notice and comment.

89.    For these reasons, this Court should declare that the Challenged Orders are *ultra vires* because they exceed the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

90.    Because the Challenged Orders are *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, they cannot be enforced by Defendants. This Court should accordingly enjoin Defendants (other than the President) in their official capacities as federal officers from enforcing them.

91.    If the Challenged Orders are not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable injury.

**COUNT III**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706**
**(IN EXCESS OF STATUTORY AUTHORITY)**

92.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

93.    The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA authorizes judicial review of "final" agency actions. *Id.* § 704. Courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).

94.    Defendants' agency actions implementing the Challenged Orders by modifying the HTSUS or otherwise implementing the Challenged Orders and collecting tariffs, as set forth in paragraphs 12-21, are "final" agency actions because they finally "determine" the "rights or

29

obligations" of parties and are backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).

95.     These actions implementing the Challenged Orders are "in excess of statutory jurisdiction, authority, [and] limitations" because Defendants lack statutory authority to implement, collect, or otherwise demand the payment of tariffs that have not been enacted into law by Congress, have not been duly promulgated pursuant to a lawful delegation from Congress, or have not been authorized by a lawful executive order or proclamation pursuant to a lawful delegation of Congress.

96.     The agency actions modifying the HTSUS explicitly state that they are implementing the Challenged Orders and cite no other authority—because there is no other authority—for these modifications.

97.     Accordingly, these actions fall within Defendants' statutory jurisdiction and authority only to the extent that the Challenged Orders are themselves lawful. But as discussed above and alleged in Counts I and II, the Challenged Orders are *ultra vires* and unlawful because they exceed the President's authority under IEEPA. And, as alleged in Count IV, to the extent IEEPA does authorize these tariffs, IEEPA is an unlawful delegation of legislative authority. The agency actions modifying the HSTUS or otherwise implementing the Challenged Orders are thus themselves unlawful.

98.     Defendants' agency actions are also "contrary to constitutional right, power, privilege or immunity," *id.* § 706(2)(B), because, as set forth in Count IV and incorporated by reference herein, their only purported source of authorization, IEEPA, violates Article I, § 1 of the U.S. Constitution.

99.    For these reasons, this Court should declare that Defendants' agency actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B), set modifications to the HTSUS aside, and enjoin Defendants (other than the President) and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs announced in the Challenged Orders.

100.    If Defendants' agency actions are not declared unlawful, set aside, and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

### COUNT IV
### VIOLATION OF ARTICLE I, § 1 OF
### THE U.S. CONSTITUTION AND SEPARATION OF POWERS
### (NONDELEGATION DOCTRINE)

101.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

102.    To the extent that IEEPA could be interpreted so broadly as to permit the President to impose the tariffs set forth in the Challenged Orders, it violates Article I of the Constitution and the separation of powers.

103.    The Constitution vests "[a]ll legislative Powers" in "Congress." U.S. CONST. art. I, § 1. This includes the power to "lay and collect . . . Duties." *Id.* art. 1, § 8, cl. 1.

104.    Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is . . . vested," whether that function is the imposition of tariffs or revenue raising. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825). Under the nondelegation doctrine, Congress may assign modest administrative tasks to the Executive Branch with little or no guidance. Once the authority granted becomes more significant, Congress must more specifically supply both an object and a route to guide the Executive Branch's discretion. And when it comes

to the most important policy questions, Congress cannot delegate the hard choices at all; instead, it must answer those questions itself. *Cf. Marshall Field & Co. v. Clark*, 143 U.S. 649, 692-693 (1892) (explaining that "Congress itself prescribed, in advance, the duties to be levied, collected, and paid on [enumerated products]"); *see id.* at 680-681 (Congress spent 241 words delineating tariff amounts for specific products in the Tariff Act of October 1, 1890).

105.    As construed by the Challenged Orders, however, Congress did not do that in IEEPA. According to the Challenged Orders, the President has authority to make major policy judgments about tariffs without any guidance from Congress on the amount, the country of origin, the duration of the tariff, or the condition triggering its imposition, and there would be no need to demonstrate that the action taken has any reasonable relationship to the national emergency declared. Because (under the President's interpretation) IEEPA improperly delegates legislative powers to the President, the Challenged Orders are based on an unconstitutional delegation of power.

106.    Moreover, under existing Supreme Court precedent, a statutory delegation to the Executive Branch is constitutional only when "Congress 'lay[s]' down by legislative act an intelligible principle" to cabin the agency's discretion. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). If the interpretation of the statute reflected in the Challenged Orders is correct, however, IEEPA would not provide the "intelligible principle" for the reasons explained above.

107.    Additionally, the President's unconstrained exercise of Congress's power to impose tariffs means he may unilaterally and abruptly suspend and resume tariffs with the stroke of a pen. He has already done that multiple times. This "conception of Presidential authority smacks of the powers that English monarchs claimed prior to the 'Glorious Revolution' of 1688, namely, the

power to suspend the operation of existing statutes, and to grant dispensations from compliance with statutes." *United States v. Texas*, 599 U.S. 670, 732 (2023) (Alito, J., dissenting). That is not consistent with the U.S. Constitution.

108.    For these reasons, to the extent that IEEPA delegates to the President the authority to impose the tariffs set forth in the Challenged Orders, this Court should declare that IEEPA violates Article I, § 1, of the U.S. Constitution; declare that the Challenged Orders and Defendants' implementing actions are unlawful because they are based on an unconstitutional delegation of legislative power; and set Defendants' implementing actions aside and enjoin their enforcement.

109.    If the Challenged Orders and Defendants' implementing actions are not set aside, declared unlawful, and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

## COUNT V
## DECLARATORY RELIEF, 28 U.S.C. § 2201

110.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

111.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

112.    For the reasons stated in the previous counts, there is a real and actual controversy as to whether the tariffs imposed by the Challenged Orders are *ultra vires*, whether the agency action modifying the HTSUS violate the APA and IEEPA, and whether IEEPA violates Article I, § 1 of the U.S. Constitution and the separation of powers.

113.    This Court can and should exercise its equitable power to enter a declaratory judgment that the President's Challenged Orders announcing tariffs are unlawful, that the President's Challenged Orders have no legal effect, and that any actions by Defendants

implementing the President's Challenged Orders also have no legal effect.

114.    This Court should grant declaratory relief and any further necessary and proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201-2202.

## PRAYER FOR RELIEF

Plaintiffs request an order and judgment:

A.  preliminarily and permanently enjoining Defendants (other than the President) and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs announced in the Challenged Orders;

B.  setting aside as unlawful all agency action implementing the Challenged Orders by modifying the Harmonized Tariff Schedule;

C.  postponing the effectiveness of agency action implementing the Challenged Orders pursuant to 5 U.S.C. § 705;

D.  declaring that the Challenged Orders are unlawful;

E.  declaring that IEEPA does not authorize the President to impose the tariffs set forth in the Challenged Orders;

F.  declaring that, to the extent IEEPA authorizes the President unilaterally to impose tariffs, that action violates the Constitution;

G.  setting aside as unlawful all agency action implementing the Challenged Orders;

H.  entering judgment in favor of Plaintiffs;

I.  awarding Plaintiffs their attorneys' fees and costs incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

J.  awarding Plaintiffs all other such relief as the Court deems just and proper.

Dated: April 22, 2025

Respectfully submitted,

/s/ Pratik A. Shah
Pratik A. Shah
  D.C. Bar No. 497108
James E. Tysse
  D.C. Bar No. 978722
Daniel M. Witkowski (*admission pending*)
  D.C. Bar No. 1028791
Kristen E. Loveland
  D.C. Bar No. 1684978
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel:  (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs*

Appendix A:  The "Challenged Orders"

| Date | Title | Short-Form | Description | Short-Form |
|---|---|---|---|---|
| The "China IEEPA Orders" | | | | |
| 2/1/25 | *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China* | February 1 China Order | Imposes 10% tariff on Chinese goods | E.O. 14,195; 90 Fed. Reg. 9,121 |
| 3/3/25 | *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* | March 3 China Amendment | Increases tariff on Chinese goods from 10% to 20% | E.O. 14,228; 90 Fed. Reg. 11,463 |
| The "Universal and Reciprocal IEEPA Orders" | | | | |
| 4/2/25 | *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* | Universal and Reciprocal Tariff Order | Imposes universal 10% tariff on nearly all trading partners; imposes country-specific "reciprocal" tariffs on 57 trading partners | E.O. 14,257; 90 Fed. Reg. 15,041 |
| 4/8/25 | *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China* | April 8 Reciprocal China Amendment | Increases the "reciprocal" tariff on China from 34 percent to 84 percent | E.O. 14259; 90 Fed. Reg. 15,509 |
| 4/9/25 | *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* | April 9 Reciprocal Modification | Pauses for 90 days the imposition of the "reciprocal" tariffs, except as to China, for which the "reciprocal" tariff is increased from 84 percent to 125 percent | E.O. 14,266; 90 Fed. Reg. 15,625 |