## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEARNING RESOURCES, INC., *et al.*, <br><br>        *Plaintiffs*, <br><br>    v. <br><br> DONALD J. TRUMP, President of the United States, in his official capacity, *et al.*, <br><br>        *Defendants*. | Civ. Action No. 25-cv-01248-RC <br><br><br> **ORAL ARGUMENT REQUESTED** |

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Learning Resources, Inc. and hand2mind, Inc. hereby move for a preliminary injunction to prevent agency Defendants from taking any action to implement or enforce against Plaintiffs the tariffs announced in the executive orders and their amendments (the "Challenged Orders") listed in Appendix A to this motion. In support of this motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities and Declaration of Richard Woldenberg. A proposed order is attached.

In accordance with LCvR 7.1(m), undersigned counsel have conferred with counsel for Defendants. To date, the parties have been unable to resolve the underlying dispute that forms the basis for this motion, and Defendants oppose this motion.

Further, under LCvR 65.1(d), Plaintiffs request a hearing on this motion within 21 days of its filing—*i.e.*, by Thursday, May 15, 2025. As explained in the accompanying Memorandum of Points and Authorities and Declaration of Richard Woldenberg, Plaintiffs are suffering ongoing irreparable harm as the result of agency Defendants' implementation of the unlawful Challenged

Orders. Accordingly, Learning Resources, Inc. and hand2mind, Inc. request that the Court hold a

hearing on this motion by May 15, 2025.

Dated: April 24, 2025

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
  D.C. Bar No. 497108
James E. Tysse
  D.C. Bar No. 978722
Matthew R. Nicely
  D.C. Bar No. 430564
Daniel M. Witkowski (*admission pending*)
  D.C. Bar No. 1028791
Kristen E. Loveland
  D.C. Bar No. 1684978
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs*

**Appendix A**

| DATE | TITLE | SHORT-FORM | DESCRIPTION | SHORT-FORM |
|---|---|---|---|---|
| | | **The "China IEEPA Orders"** | | |
| 2/1/25 | *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China* | February 1 China Order | Imposes 10% tariff on Chinese goods | E.O. 14,195; 90 Fed. Reg. 9,121 |
| 3/3/25 | *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* | March 3 China Amendment | Increases tariff on Chinese goods from 10% to 20% | E.O. 14,228; 90 Fed. Reg. 11,463 |
| | | **The "Universal and Reciprocal IEEPA Orders"** | | |
| 4/2/25 | *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* | Universal and Reciprocal Tariff Order | Imposes universal 10% tariff on nearly all trading partners; imposes country-specific "reciprocal" tariffs on 57 trading partners | E.O. 14,257; 90 Fed. Reg. 15,041 |
| 4/8/25 | *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China* | April 8 Reciprocal China Amendment | Increases the "reciprocal" tariff on China from 34% to 84% | E.O. 14,259; 90 Fed. Reg. 15,509 |
| 4/9/25 | *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* | April 9 Reciprocal Modification | Pauses for 90 days the imposition of the "reciprocal" tariffs, except as to China, for which the "reciprocal" tariff is increased from 84% to 125% | E.O. 14,266; 90 Fed. Reg. 15,625 |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEARNING RESOURCES, INC. and HAND2MIND, INC.,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary of the Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; SCOTT BESSENT, Secretary of the Treasury, in his official capacity; U.S. DEPARTMENT OF TREASURY; HOWARD LUTNICK, Secretary of Commerce, in his official capacity; UNITED STATES DEPARTMENT OF COMMERCE; PETE R. FLORES, Acting Commissioner of Customs & Border Protection, in his official capacity; U.S. CUSTOMS & BORDER PROTECTION; JAMIESON GREER, U.S. Trade Representative, in his official capacity; and THE OFFICE OF THE U.S. TRADE REPRESENTATIVE,<br><br>     *Defendants*. | Civ. Action No. 25-cv-01248-RC<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

    A.    The Constitution grants Congress the exclusive power to set tariff policy. ..... 4

    B.    The International Emergency Economic Powers Act ....................................... 6

    C.    This President has bypassed Congress to impose tariffs through IEEPA ......... 8

        1.    *The China IEEPA Orders* .......................................................................... 8

        2.    *The Universal and Reciprocal IEEPA Order* ........................................... 10

    D.    IEEPA tariffs will have major economic and political consequences. ........... 12

    E.    IEEPA tariffs are severely harming Plaintiffs. ............................................... 14

ARGUMENT ................................................................................................................... 15

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...................... 16

    A.    Plain text, context, historical practice, and constitutional principles make clear that IEEPA does not authorize the President to impose tariffs. ............. 17

        1.    *Congress is clear when it delegates its tariff authority to the Executive Branch.* ...................................................................................................... 17

        2.    *IEEPA's plain text and context does not authorize tariffs.* ....................... 17

        3.    *Historical practice confirms that IEEPA does not authorize tariffs.* ......... 21

        4.    *Supreme Court precedent requires a clear, not merely colorable, statutory basis for the challenged tariffs.* .................................................. 27

    B.    Even if IEEPA authorizes the President to impose tariffs, these tariffs are unlawful. ........................................................................................................ 29

        1.    *The Universal and Reciprocal IEEPA Order violates the statute.* ........... 30

        2.    *The China IEEPA Orders violate the statute.* ............................................ 33

        3.    *The Challenged Orders violate the statute as applied to Plaintiffs.* .......... 36

    C.    If IEEPA authorizes these tariffs, it is an unconstitutional delegation of Congress's legislative power. ........................................................................ 36

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM UNLESS THIS COURT ISSUES A PRELIMINARY INJUNCTION. ......................................... 38

    III.    THE REMAINING FACTORS SUPPORT A PRELIMINARY INJUNCTION. ................................................................................................... 42

CONCLUSION ................................................................................................................ 43

# TABLE OF AUTHORITIES

CASES:

*A.L.A. Schecter Poultry Corp. v. United States*,
295 U.S. 495 (1935)................................................................................3, 37, 38

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014).......................................................................42

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012).................................................................38

*Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*,
594 U.S. 758 (2021)....................................................................................16, 28

*American Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023).........................................................................16

*American Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003).................................................................42

*Biden v. Nebraska*,
600 U.S. 477 (2023)..............................................................................27, 28, 29

*Carpenters Indus. Council v. Zinke*,
854 F.3d 1 (D.C. Cir. 2017).............................................................................41

*Chamber of Com. of U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .........................................................................38

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979).........................................................................................20

*Consumers Union of U. S., Inc. v. Kissinger*,
506 F.2d 136 (D.C. Cir. 1974)...........................................................................6

*Diginet, Inc. v. Western Union ATS, Inc.*,
958 F.2d 1388 (7th Cir. 1992) .........................................................................18

*Everglades Harvesting & Hauling, Inc. v. Scalia*,
427 F. Supp. 3d 101 (D.D.C. 2019).............................................................38, 39

*Express One Int'l, Inc. v. U.S. Postal Serv.*,
814 F. Supp. 87 (D.D.C. 1992) ........................................................................39

*Feinerman v. Bernardi*,
558 F. Supp. 2d 36 (D.D.C. 2008)....................................................................38

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..................................................................................29

*Gonzalez v. United States*,
    553 U.S. 242 (2008)..............................................................................36, 37

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013)...............................................................42

*Hartog Foods Int'l, Inc. v. United States*,
    291 F.3d 789 (Fed. Cir. 2002)................................................................41

*Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*,
    448 U.S. 607 (1980)................................................................................37

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018)................................................................................36

*J.W. Hampton, Jr., & Co.*,
    276 U.S. 394 (1928)................................................................................37

*Kalan, Inc. v. United States*,
    944 F.2d 847 (Fed. Cir. 1991).................................................................40

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)................................................................................27

*McGregor Printing Corp. v. Kemp*,
    No. 91-cv-3255(GHR), 1992 WL 118794 (D.D.C. May 14, 1992) .......39

*Mountain States Legal Found. v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002)..............................................................16

*Nalco Co. v. EPA*,
    786 F. Supp. 2d 177 (D.D.C. 2011) ...................................................38, 41

*National Cable Television Ass'n v. United States*,
    415 U.S. 336 (1974)................................................................................20

*National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety &
    Health Admin.*,
    595 U.S. 109 (2022)....................................................................16, 27, 28

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................42

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)................................................................................27

*Ohio v. EPA*,
603 U.S. 279 (2024)..................................................................................38

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935)..................................................................................38

*Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
963 F. Supp. 1 (D.D.C. 1997).................................................................39

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)..............................................................................20, 21

*Sacks v. Office of Foreign Assets Control*,
466 F.3d 764 (9th Cir. 2006) .................................................................24

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012) .........................................................42

*Texas Children's Hosp. v. Burwell*,
76 F. Supp. 3d 224 (D.D.C. 2014) .........................................................38

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994)..................................................................................38

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) .................................................................40

*United States v. Hillie*,
14 F.4th 677 (D.C. Cir. 2021) .................................................................19

*United States v. Jacobs*,
306 U.S. 363 (1939)..................................................................................17

*United States v. Texas*,
599 U.S. 670 (2023)..................................................................................37

*United States v. Williams*,
553 U.S. 285 (2008)..................................................................................19

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) .......................................................25, 32, 34

*Utility Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)..................................................................................28

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009)...................................................................41

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...............................................................................3, 27, 28, 29

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001) ...............................................................................................37

*Winter v. National Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................................16, 42

*Yoshida Int'l, Inc. v. United States*,
    378 F. Supp. 1155 (Cust. Ct. 1974) .......................................................................26

## CONSTITUTION AND STATUTES:

U.S. CONST.
    art. I, § 8, cl. 1 ......................................................................................2, 4, 17, 19
    art. I, § 8, cl. 3 .......................................................................................................19
    art. II, § 3 ..................................................................................................................5

5 U.S.C.
    § 706(2)(C) ..............................................................................................................15

19 U.S.C.
    § 1338(a) ...................................................................................................4, 5, 17, 23
    § 1338(d) ..................................................................................................................23
    § 1338(e) ..................................................................................................................23
    § 1484(a)(2)(B) .......................................................................................................21
    § 1505(a) ..................................................................................................................40
    § 1505(b) ..................................................................................................................40
    § 1862 ...................................................................................................................4, 24
    § 2132(a) .......................................................................................................... *passim*
    § 2411 .................................................................................................4, 22, 23
    § 2411(c) ..................................................................................................................17
    § 2412 .........................................................................................................................4
    § 2413 .........................................................................................................................4
    § 2414 .........................................................................................................................4
    § 2415 .........................................................................................................................4
    § 2416 .........................................................................................................................4
    § 2417 .........................................................................................................................4
    § 2418 .........................................................................................................................4
    § 2419 .........................................................................................................................4

42 U.S.C.
    § 7412 .......................................................................................................................20

50 U.S.C.
    § 1701 ............................................................................................................25
    § 1701(a) ...............................................................................................6, 29, 30
    § 1701(b) ............................................................................................... *passim*
    § 1702 ...................................................................................................6, 7, 25
    § 1702(a)(1) ..............................................................................................6, 20
    § 1702(a)(1)(B) ..................................................................................... *passim*
    § 1703 ............................................................................................................25
    § 1703(a) .......................................................................................................31
    § 1703(b) .......................................................................................................31

Tariff Act of 1930, 46 Stat. 590 (codified at 19 U.S.C. § 1338) ........................4, 22, 23

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) ............................. *passim*

Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872 (codified as
    amended at 19 U.S.C. § 1862) .............................................................22, 23, 24, 26

Trading with the Enemy Act, Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified
    as amended at 50 U.S.C. § 1702) ..................................................................... *passim*

## OTHER AUTHORITIES:

Boehm, Eric, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax Increase, but
    Also a Tax Cut*, REASON MAG. (Mar. 31, 2025) ...................................................13

Casey, Christopher A. & Cathleen D. Cimino-Isaacs, CONG. RSCH. SERV., IF
    10038, TRADE PROMOTION AUTHORITY (2024) .......................................................5

Chang, Agnes, et al., *How Much Are Tariffs on Chinese Goods? It's Trickier
    Than You Think.*, N.Y. TIMES (Apr. 12, 2025) .......................................................12

*China Trade Summary*, OFF. OF THE U.S. TRADE REPRESENTATIVE (last visited
    Apr. 23, 2025) ................................................................................................13

Donald Trump Press Conference with Softbank CEO (Dec. 16, 2024) ........................35

Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten
    International Stabilization Efforts in the Western Balkans*, 66 Fed. Reg.
    34,777 (Jun. 26, 2001) ......................................................................................7

Exec. Order No. 13,224, *Blocking Property and Prohibiting Transactions With
    Persons Who Commit, Threaten To Commit, or Support Terrorism*, 66 Fed.
    Reg. 49,079 (Sept. 23, 2001) ...........................................................................32

Exec. Order No. 13,581, *Blocking Property of Transnational Criminal
    Organizations*, 76 Fed. Reg. 44,757 (Jul. 24, 2011) ..............................................7

Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025) ..........................................10

Exec. Order No. 14,194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025) ..............................................................10

Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025)................8, 9, 34

Exec. Order No. 14,198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 3, 2025) ......................................................................................28

Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025) ......................................................................................................9, 10

Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025) ................................................9

Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025)............................................ *passim*

Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025) ......................................................................................11

Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and* Alignment, 90 Fed. Reg. 15,625 (Apr. 9, 2025) ..................12, 28, 42

*Extraordinary*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH (6th ed. 1976) ......................................................................................................................30

*Extraordinary,* NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE ................................30

*Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security*, THE WHITE HOUSE (Apr. 2, 2025) ....................................................11

*Fact Sheet: President Donald J. Trump Restores Section 232 Tariffs*, THE WHITE HOUSE (Feb. 11, 2025)............................................................................................26

Freytag, Andreas & Phil Levy, *The Trade Balance and Winning at Trade*, THE CATO INST. (Oct. 3, 2024) ......................................................................................5

*Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025)............................................9

H. REP. NO. 95-459 (1977) ................................................................................31

*Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) ................................9

Interview with John Micklethwait, *Former President Trump Interview with the Economic Club of Chicago*, C-SPAN (Oct. 15, 2024) ...........................................12

IRWIN, DOUGLAS A., CLASHING OVER COMMERCE: A HISTORY OF U.S. TRADE POLICY (2017).......................................................................................................4, 5

JACKSON, JAMES K., R45243, CONG. RSCH. SERV., TRADE DEFICITS AND U.S. TRADE POLICY (2018) ...................................................................................32

*Memorandum on the Actions by the United States Related to the Section 301 Investigation*, 2018 DAILY COMP. PRES. DOC. 1. (Mar. 22, 2018) ........................26

Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11, 2025).............................................12

Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971) .....................................22

Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971)......................................22

Proclamation No. 9704, 83 Fed. Reg. 11,619 (Mar. 8, 2018).......................................26

*Regulate*, FUNK & WAGNALLS STANDARD COLLEGE DICTIONARY (1977) .....................18

*Regulate*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975).............18

*Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH (6th ed. 1976) ...............................................................................................................18

Reinbold, Brian & Yi Wen, *Historical U.S. Trade Deficit*, FED. RSRV. BANK OF ST. LOUIS (May 17, 2019).................................................................................31

*Remarks by President Trump at the World Economic Forum*, THE WHITE HOUSE (Jan. 23, 2025)...............................................................................................35

Renshaw, Jared, et al., *Trump push to use tariffs to pay for tax cuts faces opposition in Congress*, REUTERS (Jan. 22, 2025)................................................35

*Revision of the Trading with the Enemy Act: Markup Before the H. Comm. on International Relations*, 95th Cong. (1977) (statement of Hon. C. Fred Bergsten, Assistant Sec'y for Int'l Affs. Dep't of the Treasury) ............................................ 31

Rubin, Richard, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025) ....................................................... 13

Scheer, Steven, *Israel eliminates remaining tariffs on US goods ahead of Trump move*, REUTERS (April 1, 2025) .......................................................... 33

Schulz, Bailey, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (Apr. 4, 2025) ................................................ 13

Special Message to the Congress Proposing Trade Reform Legislation, 1973 PUB. PAPERS 258 (Apr. 10, 1973) .......................................................... 22

Swanson, Ana, U*.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y TIMES (Feb. 5, 2025) ............................................................... 13

*The Contentious U.S.-China Trade Relationship*, COUNCIL ON FOREIGN RELS. (Apr. 14, 2025) ...................................................................... 14

Trump, Donald J. (@realDonaldTrump), TRUTH SOCIAL (Feb. 2, 2025, 8:09 AM) ................. 35

Trump, Donald J. (@realDonaldTrump), TRUTH SOCIAL (Jan. 14, 2025, 11:28 AM) ...................................................................................... 35

U.S. Customs and Border Protection, *Trade Statistics* (last visited Apr. 23, 2025) ................... 13

*U.S. International Trade in Goods and Services, December 2024*, Release Nos. CB 25-17, BEA 25-04 at 5, U.S. DEP'T OF COM. (Feb. 5, 2025) ............................ 32, 33

*Unusual*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975) .......................... 30

*Unusual*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH (6th ed. 1976) ................. 30

Williams, Amie et al., *Donald Trump Threatens to Ignite Era of Trade Wars with New Tariffs*, FIN. TIMES (Jan. 31, 2025) .............................................. 34

York, Erica & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, THE TAX FOUND. (Apr. 11, 2025) .................................... 14, 29

## <u>INTRODUCTION</u>

This case challenges an extraordinary Executive Branch power grab. The President has asserted the authority to impose tariffs (essentially, taxes) on imports from any country, on any schedule, in any amount, for any policy reason couched as an "emergency," no matter if the property is owned by an American or a foreign national. Neither the Constitution nor the International Emergency Economic Powers Act ("IEEPA") grants the President tariff-levying authority at all, let alone of the boundless type asserted here. And because Defendants' actions are irreparably harming Plaintiffs Learning Resources, Inc. and hand2mind, Inc.—American family-owned businesses that develop educational products for schools and families—this Court should enjoin them before even more damage is done.

For five decades and across eight presidential Administrations, no President had ever invoked IEEPA to impose a tariff or duty. That all changed when President Trump unilaterally invoked such authority in a series of unprecedented executive orders imposing—as well as pausing, adjusting, increasing, and reimposing—tariffs worldwide, including an additional 145 percent tariff on China. This disruptive roller coaster of tariffs, which has already had a multi-trillion dollar impact on the stock market, is estimated to cause U.S. GDP to shrink by hundreds of billions of dollars and to cost the typical American family over a thousand dollars a year. It is already having devastating consequences for American businesses like Plaintiffs.

Invoking IEEPA to make such sweeping and drastic changes is not lawful. IEEPA is an emergency powers statute that allows the President to address "unusual and extraordinary threats" to the United States through specified means like sanctions against foreign countries and nationals. It does not authorize the President to impose tariffs, let alone tariffs on nearly all goods from around the globe. Plaintiffs meet every requirement for a preliminary injunction.

1

*First,* Plaintiffs are likely to succeed on the merits of their claims. Since the President began his second Term, he has repeatedly invoked IEEPA to impose tariffs on trillions of dollars of economic activity. But the President's claimed source of support for these far-reaching actions cannot bear their weight. The Constitution vests the power to impose tariffs exclusively in Congress. U.S. CONST. art. I, § 8, cl. 1. And Congress has not authorized the President to exercise that power through IEEPA. IEEPA's silence on the matter of tariffs stands in stark contrast to the many other statutes where Congress *has* clearly delegated tariff authority to the President. Over the years, Congress has crafted a carefully reticulated scheme with respect to tariff policy, including enacting laws that expressly authorize the President or an agency to impose certain tariffs without further congressional approval. But unlike IEEPA, every one of those statutes is codified in Title 19 of the United States Code (governing "Customs Duties") and applies only in limited circumstances after required procedures have been followed. In addition to those statutory authorizations, the President may negotiate tariff agreements, but Congress retains the final say on whether any agreements become law. That process did not occur with IEEPA. Rather, the historical practice surrounding IEEPA's enactment and subsequent use confirm that it is not some limitless font of tariffing authority for the President.

Even if this Court were to conclude that Congress authorized the President to exercise the power to levy tariffs through IEEPA, the tariffs at issue do not satisfy the statutory requirements. IEEPA provides that the President's authorities "may not be exercised *for any other purpose*" but "deal[ing] with an *unusual and extraordinary* threat with respect to which a national emergency has been declared [pursuant to the National Emergencies Act]." 50 U.S.C. § 1701(b) (emphasis added). The trade deficit—to which the President's universal and reciprocal tariffs are addressed— has existed since before IEEPA was even enacted and is the opposite of the kind of "unusual" or

"extraordinary" circumstance that Congress made a prerequisite for action under IEEPA. Nor are the tariffs reasonably related to addressing the declared national emergencies, as required by the statute. And the President's own statements admit that he imposed tariffs for reasons beyond the declared emergencies, even though IEEPA itself bars its powers from being "exercised for any other purpose."

The President's reliance on IEEPA to transform American trade policy and impose massive domestic upheaval across all sectors of the economy is out of step with constitutional principles. Where Congress authorizes the President to take action with such "vast economic and political significance," "both separation of powers principles and a practical understanding of legislative intent" demand that congressional delegation be clear and unmistakable. *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022). IEEPA includes no such delegation. Indeed, it says nothing at all about tariffs or duties. The President's interpretation lacks any "intelligible principle" necessary to make IEEPA constitutional: He claims authority to impose tariffs on any goods from any country, to select any rate he desires, to change that rate at any time and for any reason, to leave the tariffs in place for as long as he wants, to issue and revoke temporary pauses at his discretion, and to use the tariffs to address any policy concern he deems a national emergency. "This is delegation running riot." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935).

*Second*, absent this Court's intervention, the tariffs at issue—posing frankly terrifying consequences for Plaintiffs—will cause them severe and irreparable harm during this litigation. Plaintiffs predict that paying the IEEPA tariffs in 2025 would increase their year-over-year tariff costs over 40-fold (nearly $100 million), thereby forcing Plaintiffs to raise their prices by as much as 70 percent just to survive. And the President's approach of imposing tariffs with little notice, often suspending those same tariffs days later and then carving out various exceptions, is massively

3

destabilizing and detrimental to Plaintiffs' supply chains, customer relationships, and business operations. Plaintiffs' lost sales, profits, and customer goodwill are all forms of consequential damages that cannot be recouped in a refund action. In short, like many small and medium-sized American companies that depend on foreign manufacturing hubs, Plaintiffs face an uncertain and increasingly dim future—including downsizing or worse—if the tariffs are kept in place.

*Finally*, the balance of the equities and the public interest favor an injunction pending the Court's adjudication of this matter. A preliminary injunction would protect Plaintiffs from irreparable harm, and cost the government only a temporary pause of its unlawful policies as directed to Plaintiffs—including policies that the President himself has previously and repeatedly paused voluntarily.

This Court should grant Plaintiffs' motion for a preliminary injunction.

## **BACKGROUND**

### A.    **The Constitution grants Congress the exclusive power to set tariff policy.**

The imposition of tariffs is a distinctly legislative power assigned to Congress. U.S. CONST. art. I, § 8, cl. 1 (granting Congress the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises"). Congress is thus "the principal venue in which trade policy is determined." DOUGLAS A. IRWIN, CLASHING OVER COMMERCE: A HISTORY OF U.S. TRADE POLICY 2 (2017). Presidents may "demand, protest, denounce, and complain all they want," but existing trade policy will not change absent a "majority in Congress." *Id.* Because the Constitution vests the power to impose duties with Congress, the President's ability to impose or alter tariffs is limited to circumstances where Congress provides specific authorization.

Congress did so in a series of statutory enactments, all codified under Title 19 of the U.S. Code, which governs "Customs Duties" and carefully circumscribes the President's authority. *See* 19 U.S.C. §§ 1338(a), 1862, 2132(a), 2411-2419. For example, Section 338 of the Tariff Act of

4

1930 grants the President the authority to "declare new or additional duties" of up to 50 percent on imports, but only from countries that have imposed "unreasonable" charges, exactions, regulations, or limitations that are "not equally enforced upon the like articles of every foreign country" or "[d]iscriminate[d] in fact against the commerce of the United States." 19 U.S.C. § 1338(a). Likewise, Section 122 of the Trade Act of 1974 authorizes the President to impose "duties" "not to exceed 15 percent ad valorem . . . on articles imported into the United States" in order "to deal with large and serious United States balance-of-payments deficits," but those tariffs expire after 150 days unless Congress enacts legislation to extend them. 19 U.S.C. § 2132(a).[1]

Apart from those specific statutory authorizations, the President may negotiate trade agreements and trade policy on behalf of the United States under a Trade Promotion Authority ("TPA"), but no trade agreement becomes law via presidential signature. An agreement's terms become law only through implementing legislation enacted by Congress.  Christopher A. Casey & Cathleen D. Cimino-Isaacs, CONG. RSCH. SERV., IF 10038, TRADE PROMOTION AUTHORITY 1 (2024).[2]

The narrow statutory authorizations and TPA practice illustrate the President's circumscribed role with respect to tariffs. The President has no independent power under Article II of the Constitution to set tariffs, and Congress "retains ultimate authority over trade policy." IRWIN at 21, *supra* p. 4. If Congress in a statute has lawfully authorized the President to make decisions regarding tariffs, he may exercise that power under his duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. But absent such an authorization, "the President

---

[1] The balance-of-payments measures the payments into and out of a country and thus includes the trade balance in goods. *See* Andreas Freytag & Phil Levy, *The Trade Balance and Winning at Trade*, THE CATO INST. (Oct. 3, 2024), https://www.cato.org/publications/trade-balance-winning-trade.

[2] https://www.congress.gov/crs-product/IF10038.

could not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country, or impose mandatory import quotas." *Consumers Union of U. S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974).

**B.    The International Emergency Economic Powers Act**

Under 50 U.S.C. § 1701(a), when the President declares a national emergency pursuant to the National Emergencies Act with respect to an "unusual and extraordinary threat" that has its source in whole or in part outside the United States, the President may use the powers granted in § 1702 to "deal with" that threat. Section 1702 provides that, in those circumstances, the President may:

> under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—
>
> (A)    investigate, regulate, or prohibit—
>
> > (i)    any transactions in foreign exchange,
> >
> > (ii)    transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
> >
> > (iii)    the importing or exporting of currency or securities,
>
> by any person, or with respect to any property, subject to the jurisdiction of the United States;
>
> (B)    investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and
>
> (C)    when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, [take additional actions].

50 U.S.C. § 1702(a)(1) (emphasis applied to language on which Defendants rely).

In bestowing that authority, Congress emphasized in § 1701(b) that the President may exercise § 1702 powers "only" when there is an "unusual and extraordinary threat" for which "a national emergency has been declared," and that § 1702 powers "may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Congress also stipulated that "[a]ny exercise of [§ 1702 powers] to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." *Id*.

Since its enactment in 1977, Presidents have invoked IEEPA to address specific threats by specific countries and persons. To "deal with" these threats, Presidents have imposed different types of sanctions or remedies. Certain IEEPA-based executive orders have targeted the policies and actions of specific foreign governments and resulted in the imposition of comprehensive sanctions against countries or regions, which generally prohibit virtually all economic relations between U.S. persons and the targeted jurisdiction.[3] Presidents have also sanctioned categories of foreign "persons," which may include groups, political parties, terrorist organizations, corporations, and individuals. Some IEEPA actions have focused on persons in identified geographical areas (*e.g.*, the Western Balkans),[4] while others have focused on foreign persons engaged in activities creating emergency conditions regardless of nationality or geographic location.[5] Historically, such sanctions blocked access to assets for designated persons, prevented their utilization of U.S. financial systems or credit, denied visas to or excluded the designated

---

[3] Currently, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") maintains comprehensive sanctions, in part based on IEEPA, against Cuba, Iran, North Korea, Syria, and the Crimea, Donetsk, and Luhansk Regions of Ukraine. Certain other countries have been targeted historically, though the emergencies have since been terminated (*e.g.*, South Africa).

[4] *E.g.,* Exec. Order No. 13,219, *Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans*, 66 Fed. Reg. 34,777 (Jun. 26, 2001).

[5] *E.g.,* Exec. Order No. 13,581, *Blocking Property of Transnational Criminal Organizations*, 76 Fed. Reg. 44,757 (Jul. 24, 2011).

persons from the United States, or prohibited U.S. persons from engaging in transactions with the designated persons.

Before February 1, 2025, however, no President had ever invoked IEEPA to impose a tariff or duty on goods in the statute's 50-year history.

### C.    This President has bypassed Congress to impose tariffs through IEEPA.

Since taking office on January 20, 2025, President Trump, through a series of executive orders (the "Challenged Orders"[6]), has repeatedly bypassed Congress to unilaterally impose tariffs under IEEPA. With the stroke of a pen, he has dramatically changed United States tariff policy while tacitly admitting that none of the 4,732 sections in Title 19 of the U.S. Code—the title governing customs duties—allows him to do so.

#### 1.    The China IEEPA Orders

The President has issued multiple orders specifically imposing tariffs—now at 20 percent—on goods from China based on a crisis involving the flow of fentanyl into the United States. On February 1, 2025, the President issued an executive order imposing 10 percent tariffs on China pursuant to "section 1702(a)(1)(B) of IEEPA." Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025) ("February 1 China Order"). That order asserts that "the sustained influx of synthetic opioids has profound consequences on our Nation," and that China has not only "fail[ed] to stem the ultimate source of many illicit drugs distributed in the United States" but has actually "incentivized" Chinese "chemical companies to export fentanyl and related precursor chemicals that are used to produce synthetic opioids sold illicitly in the United States." *Id.* at 9,121. The order

---

[6] The Challenged Orders, which are the IEEPA orders described below (including amendments), are listed in Appendix A to this memorandum.

"expand[s] the scope of the national emergency" previously declared at the southern border—*i.e.*, the U.S.-Mexico border—to "cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other TCOs, criminals at large, and drugs." *Id.* § 1, 90 Fed. Reg. at 9,122. It then invokes the President's authority under "section 1702(a)(1)(B) of IEEPA" to impose "an additional 10 percent ad valorem rate of duty" on "[a]ll articles that are the product of [China]." *Id.* § 2, 90 Fed. Reg. at 9,122.

Roughly one month later, the President raised these tariffs from 10 percent to 20 percent based on his determination that China "has not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions." Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 3, 2025) (the "March 3 China Amendment"). And a month after that, he ordered the elimination of duty-free *de minimis* treatment for goods subject to these tariffs, ignoring a congressionally enacted statutory program that had permitted duty exemptions for imported goods valued at less than $800. Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14,899 (Apr. 2, 2025). These orders from the President have been implemented by DHS and CBP through modifications to the Harmonized Tariff Schedule of the United States ("HTSUS"). *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China Order); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties To Address the*

*Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).

That 20 percent tariff on goods from China, along with additional tariffs described below, is currently in force.[7]

### 2.    *The Universal and Reciprocal IEEPA Order*

On April 2, 2025, the President took an even more dramatic step under IEEPA, imposing on virtually *all* trading partners (i) a 10 percent universal tariff, and (ii) an additional and higher country-specific "reciprocal" tariff ranging from 11 percent to 50 percent. Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) (the "Universal and Reciprocal Tariff Order"). The order exempted only Canada and Mexico (because they are already subject to 25 percent IEEPA tariffs), as well Russia, North Korea, Cuba, and Belarus. The universal and reciprocal tariffs are in addition to congressionally enacted or authorized tariffs, as well as tariffs imposed by the China IEEPA Orders, among other additional tariff actions.

Because IEEPA requires an "unusual and extraordinary threat" as a predicate for presidential action, the President declared that the "large and persistent annual U.S. goods trade deficits" are a national emergency that "constitute an unusual and extraordinary threat to the national security and economy of the United States." Universal and Reciprocal Tariff Order, 90

---

[7] On February 1, 2025, the President also issued two substantially similar executive orders imposing tariffs on all goods imported from Mexico and Canada. Each relies on IEEPA as the President's sole source of authority. *See* Exec. Order No. 14,194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025); Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025). The President subsequently paused, reinstated, and amended the scope of those tariff orders in ways not relevant here.

Fed. Reg. at 15,041; *see also Fact Sheet: President Donald J. Trump Declares National Emergency to Increase our Competitive Edge, Protect our Sovereignty, and Strengthen our National and Economic Security*, THE WHITE HOUSE (Apr. 2, 2025) ("President Trump is invoking his authority under [IEEPA] to address the national emergency posed by the large and persistent trade deficit[.]").[8] The order finds that those deficits are caused by "a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption." Universal and Reciprocal Tariff Order, 90 Fed. Reg. at 15,041. The order asserts that "despite a commitment to the principle of reciprocity, the trading relationship between the United States and its trading partners has become highly unbalanced" because these trading partners have imposed higher duties than the United States and have employed "non-tariff barriers [that] deprive U.S. manufacturers of reciprocal access to markets." *Id.* at 15,041-15,042. The order concludes that "[l]arge and persistent annual U.S. goods trade deficits have led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains, and rendered our defense-industrial base dependent on foreign adversaries." *Id.* at 15,041.

The 10 percent tariff went into effect on April 5, 2025, with the additional "reciprocal" tariff to take effect on April 9, 2025, as the President's orders modified the HTSUS. But on April 8, 2025, the President responded to retaliatory tariffs from China by raising the "reciprocal" tariff rate on China by *50 percentage* points—from 34 percent to 84 percent. Exec. Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the*

---

[8]    https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/.

*People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025) ("April 8 Reciprocal China Amendment"). The very next day, April 9, 2025, the President suspended for 90 days the "reciprocal" tariff on all countries except for China, for which he raised the "reciprocal" tariff again, this time from 84 percent to 125 percent. Exec. Order No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, §§ 2, 3, 90 Fed. Reg. 15,625, 15,626 (Apr. 9, 2025) (the "April 9 Reciprocal Modification"). The suspension applies only to the "reciprocal" tariffs listed in Annex I to the April 2 Universal and Reciprocal Tariff Order. *Id.* § 3, 90 Fed. Reg. at 15,626. It does not apply to the 10 percent universal tariffs from that order. *Id.*[9] Meanwhile, the 20 percent ad valorem tariff on articles imported from China remains in place, meaning that, combined with the reciprocal tariffs, most imports from China now face a minimum additional 145 percent IEEPA tariff. *Id.*[10]

### D.    IEEPA tariffs will have major economic and political consequences.

As the President himself recognized, these tariffs will dramatically alter the trade and tariff policies developed by Congress over the last century, with "a massive" economic and political effect. Interview with John Micklethwait, *Former President Trump Interview with the Economic Club of Chicago*, C-SPAN at 12:00-12:45 (Oct. 15, 2024).[11]

---

[9] On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the universal and (suspended) reciprocal tariffs. Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/clarification-of-exceptions-under-executive-order-14257-of-april-2-2025-as-amended/.

[10] Agnes Chang, et al., *How Much Are Tariffs on Chinese Goods? It's Trickier Than You Think.*, N.Y. TIMES (Apr. 12, 2025), https://www.nytimes.com/interactive/2025/04/12/business/economy/china-tariff-product-costs.html.

[11]    https://www.c-span.org/program/campaign-2024/former-president-trump-interview-with-the-economic-club-of-chicago/650257.

The financial impact cannot be overstated. The United States imports trillions of dollars of goods every year. Ana Swanson, *U.S. Trade Deficit Hit Record in 2024 as Imports Surged*, N.Y. TIMES (Feb. 5, 2025) (United States imported $4.1 trillion in goods and services in 2024).[12] In 2024, the United States imported $438.9 billion in goods from China alone. *China Trade Summary*, OFF. OF THE U.S. TRADE REPRESENTATIVE.[13] The President has stated that the tariffs will raise "billions of dollars, even trillions of dollars" in revenue. Bailey Schulz, *Trump is rolling out more tariffs this month. Where does the tariff money go?*, USA TODAY (Apr. 4, 2025).[14] Treasury Secretary Scott Bessent estimates the United States will collect up to $600 billion in tariffs per year. Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, WALL ST. J. (Apr. 4, 2025).[15] The new IEEPA tariffs will increase many times over what the United States would expect to collect in tariffs in their absence. *See* U.S. Customs and Border Protection, *Trade Statistics* (in 2024, CBP collected $88 billion dollars in tariffs).[16] This money will not be paid by foreign governments; it will be paid primarily by American businesses and consumers. Six hundred billion dollars in annual tariffs would equate to the largest peacetime tax increase in U.S. history. Eric Boehm, *Peter Navarro Says Tariffs Will Be a $6 Trillion Tax Increase, but Also a Tax Cut*, REASON MAG. (Mar. 31, 2025).[17]

---

[12]        https://www.nytimes.com/2025/02/05/business/economy/us-trade-deficit-2024-record.html.

[13]    https://ustr.gov/countries-regions/china-mongolia-taiwan/peoples-republic-china    (last visited Apr. 23, 2025).

[14]        https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-will-money-go/82792578007/.

[15]            https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt.

[16] https://perma.cc/D3HR-JD4Y (last visited Apr. 23, 2025).

[17]    https://reason.com/2025/03/31/peter-navarro-says-tariffs-will-be-a-6-trillion-tax-increase-but-also-a-tax-cut/.

The President's orders will thus fundamentally alter the American economic landscape. By some projections, the IEEPA tariffs on China alone will reduce GDP by 0.3 percent. Erica York & Alex Durante, *Trump Tariffs: The Economic Impact of the Trump Trade War*, THE TAX FOUND. (Apr. 11, 2025).[18] The same estimates suggest retaliatory tariffs imposed by other countries will reduce U.S. GDP by at least another 0.2 percent. *Id.* Many consumer products will become more expensive for everyday American consumers who are already struggling with effects of high inflation. All told, the imposed tariffs are projected to amount to an average tax increase of over $1,200 per American household in 2025. *Id.* The President's tariffs will also affect workers across the American economy. Significantly, one million American jobs depend on trade with China. *The Contentious U.S.-China Trade Relationship*, COUNCIL ON FOREIGN RELS. (Apr. 14, 2025).[19]

### E.    IEEPA tariffs are severely harming Plaintiffs.

As explained further below, *see infra* Part II, the IEEPA tariffs are also imposing severe and irreparable harms on Plaintiffs Learning Resources and hand2mind.

Plaintiffs are family-owned businesses, now in their fourth generation, that have created and sold over 2,000 hands-on educational toys and products for children. Their award-winning products are found in toy closets and classrooms across the country and range from Spike the Fine Motor Hedgehog to Peekaboo Learning Farm, from Pretend & Play Teaching Cash Register to Kanoodle (a caboodle of brain-teasing puzzles) and Mirror My Sound Phoneme Set. With the mission to "bring learning to life," Plaintiffs seek to help younger children develop verbal, counting, and fine motor skills, and introduce older children to science, technology, engineering, and math.

---

[18] https://perma.cc/M3LK-SPE2.
[19] https://www.cfr.org/backgrounder/contentious-us-china-trade-relationship.

Although distinct legal entities, Plaintiffs are under common control and share certain employees, a single line of credit, and a single supply chain department. Woldenberg Decl. ¶ 2. Today, Plaintiffs employ over 500 people in the United States, with offices in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. *Id.* ¶ 3. Plaintiffs develop their products in the United States and perform some manufacturing and assembly domestically, but outsource most manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. *Id.*

Because Plaintiffs import directly from China (as well as other countries affected by the Challenged Orders), Woldenberg Decl. ¶ 5, they will be responsible for paying at least the 145 percent tariff on all products made in China, with certain products assessed total tariffs of 170 percent or more. Indeed, Plaintiffs have collectively already paid over $1 million based on the new 2025 tariff rates, with both having paid the initial IEEPA tariffs on China as well as the initial universal tariff of 10 percent, and anticipate paying more as additional shipments arrive in the United States. *Id.* ¶ 7. Having previously planned for sales to increase by 8 percent, Plaintiffs are now planning for a 2025 sales decline of 25 percent to 50 percent year-over-year. *Id.* ¶ 11.

Plaintiffs cannot continue to sell goods to their customers at the same price prevailing before the challenged tariffs. Instead, Plaintiffs are already making significant and costly changes to their businesses while facing the prospect of sharply raising prices, eliminating and revamping product lines, and taking other disruptive measures. *See* Woldenberg Decl. ¶¶ 7, 10-11, 21, 27-28. Those actions will result in lost sales, lost profits, loss of consumer goodwill—and potentially worse.

## **ARGUMENT**

This Court should preliminarily enjoin the agency Defendants from taking any action to implement or enforce the tariffs announced in the President's unlawful executive orders. *See* 5

U.S.C. § 706(2)(C) (Courts "shall . . . hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction"); *American Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) ("Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President act within those limits."); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (noting, in case involving review of presidential proclamations, that "Courts remain obligated to determine whether statutory restrictions have been violated"). Plaintiffs are entitled to this relief because they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in the absence of preliminary relief," the "balance of equities tips in [their] favor," and "an injunction is in the public interest." *Winter v. National Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

In the five decades since Congress enacted IEEPA, no President—before this one—has used that law to impose tariffs. That is unsurprising. IEEPA is an emergency powers statute that does not authorize the President to impose any tariffs *at all*. And even if it granted *some* tariffing power, IEEPA does not authorize the President, without any process or input, to impose tariffs that amount to taxes on Americans and will fundamentally refashion the United States' economic relationship with the rest of the world.

At base, the President is using IEEPA to work drastic changes in American economic and trade policy. But Congress must "speak clearly" to delegate "powers of vast economic and political significance" to the Executive Branch. *National Fed'n of Indep. Bus. v. Department of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("NFIB"). Nothing in IEEPA specifically grants the President "breathtaking" and "expansive authority" to impose tariffs unilaterally on essentially all goods from all countries. *Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*, 594 U.S. 758, 764-765 (2021). Under the canon of constitutional

avoidance, this Court has the duty to adopt an interpretation of IEEPA that would not raise grave doubts about whether Congress unconstitutionally delegated its tariff power. Yet if the President is correct about the unbridled scope of his tariffing power, that is exactly what IEEPA would do.

### A. Plain text, context, historical practice, and constitutional principles make clear that IEEPA does not authorize the President to impose tariffs.

#### 1. Congress is clear when it delegates its tariff authority to the Executive Branch.

The power to raise revenue, including through tariffs, is a core legislative power. As the Supreme Court explained nearly a century ago, "No more essential or important power has been conferred upon the Congress" than the "Power to lay and collect Taxes, Duties, and Excises." *United States v. Jacobs*, 306 U.S. 363, 370 (1939) (quoting U.S. CONST. art. I, § 8, cl. 1).

Congress has enacted statutes that authorize the President or an agency to exercise tariff power in specified circumstances. But when it has done so, it has used unmistakable language to grant the Executive Branch that authority. For example, Section 122 of the Trade Act of 1974 authorizes the President to impose an "import surcharge . . . in the form of *duties* . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a) (emphasis added). Section 338 of the *Tariff* Act of 1930 grants the President the authority to "declare new or additional *duties*" on imports where a country has treated the United States in a discriminatory fashion. 19 U.S.C. § 1338(a) (emphasis added). And Section 301 of the Trade Act of 1974 authorizes the United States Trade Representative—who serves under the President—to "impose *duties* or other import restrictions on the goods of" a foreign country in specified circumstances. 19 U.S.C. § 2411(c) (emphasis added).

#### 2. IEEPA's plain text and context does not authorize tariffs.

In contrast to those laws, IEEPA does not even use the word "tariffs" or "duties" (or similar terms). IEEPA is an emergency powers statute that allows the President to take certain specified

actions with respect to foreign persons, goods, and property during a declared national emergency. It provides in pertinent part: "the President may . . . investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of "property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B). The statute does not contain a catchall phrase empowering the President to take additional, unenumerated actions beyond those listed. Noticeably absent from the list is the power to "impose tariffs," "impose duties," add a "surcharge," or take any similar action.

The grant of authority to the President to "regulate" imports and exports is not a substitute. No other statute providing the President with tariff authority does so simply by authorizing the Executive Branch to "regulate." That is because raising revenue by imposing tariffs on imports and exports is fundamentally different from "regulat[ing]" them. To "regulate" an activity is to "control by rule" or "subject to restrictions." *Regulate*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH 943 (6th ed. 1976); *see also Regulate*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 1264 (1975) ("to govern by or subject to certain rules or restrictions"); *Regulate*, FUNK & WAGNALLS STANDARD COLLEGE DICTIONARY 1133 (1977) ("[t]o direct, manage, or control according to certain rules"). Thus, when a statute authorizes an agency to "promulgate regulations" on a topic, it authorizes that agency to implement rules or restrictions about that topic, including characteristics like quantity, quality, or location, within the parameters set by that statute. It does *not* authorize—absent additional and tailored language—the agency to raise revenue for that topic by imposing fees, tariffs, or taxes. *Cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1392, 1399 (7th Cir. 1992) (municipality's power to regulate did not include power to "raise revenue[s]" absent "explicit authority" because "[t]he legal power to regulate is not necessarily the legal power to tax").

18

The Constitution itself recognizes the distinction between the authority to *regulate* imports and the authority to *impose tariffs*. Article I, Section 8, Clause 1 of the Constitution vests the Congress with the "[p]ower [t]o lay and collect Taxes, Duties, Imposts, and Excises." By contrast, Article I, Section 8, Clause 3 empowers the Congress "[t]o regulate Commerce with foreign Nations." If imposing tariffs and duties were included within Clause 3's power to "regulate" foreign commerce, then there would be no need for the Constitution to specifically enumerate the power to impose tariffs. The Constitution, however, treats them separately because they serve different functions and are not substitutes for one another. At a minimum, the Constitution's express grant of authority to lay and collect duties, separate from the authority to regulate Commerce with foreign Nations, confirms that the power to regulate such commerce does not clearly encompass the authority to impose duties upon it.

With Congress legislating against that backdrop, it is no surprise that IEEPA's statutory context confirms the point. *First*, none of the other enumerated powers in Section 1702(a)(1)(B) suggest that the term "regulate" incorporates the power to impose tariffs. The President can "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent[,] or prohibit" the "importation" of property. 50 U.S.C. § 1702(a)(1)(B). All of these authorize non-tariff means of controlling imports—and, specifically, controlling the quantity or quality of them. Given that each of the activities IEEPA authorizes the President to take with respect to imports is a non-tariff action and non-revenue action, the term "regulate" should not be read beyond its ordinary bounds to include raising revenue. *See United States v. Hillie*, 14 F.4th 677, 688 (D.C. Cir. 2021) (A statutory term's "meaning[ ] [is] narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." (alterations in original) (quoting *United States v.*

*Williams*, 553 U.S. 285, 294 (2008))). "Regulate" here means directly controlling the *quantity* or the *quality* of imports, not the revenue raised thereby. Indeed, where Congress intended for the President to have the power to confiscate funds or other property under IEEPA, it said so clearly. 50 U.S.C. § 1702(a)(1) (authorizing President to "confiscate" and sell foreign property under defined circumstances).

     *Second*, a contrary interpretation would mean any statute granting any agency the authority to "regulate" would also give that agency the authority to impose fees, taxes, or other revenue-raising devices upon the American public to achieve its policy goals. *See, e.g.*, 42 U.S.C. § 7412 (authorizing the Environmental Protection Agency to "promulgate regulations establishing emissions standards"). Courts have never understood the term so broadly. *See National Cable Television Ass'n v. United States*, 415 U.S. 336, 337 (1974) (holding that Congress must state clearly its intent to delegate to an agency the authority to impose fees on regulated industries).

     *Third*, interpreting the word "regulate" to grant limitless tariff-levying authority would undermine Congress's trade laws more broadly. Because the tariff power ultimately belongs to Congress, the Executive may exercise delegated authority only "subject to limitations which [Congress] imposes." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). As explained below, every time Congress grants the President the authority to levy "duties" in Title 19, it pairs that permission with various limits on that delegated levying authority. *E.g.*, 19 U.S.C. § 2132(a) (granting the President the power to "deal with" "balance-of-payments deficits" by levying "a temporary import surcharge, not to exceed 15 percent ad valorem," "for a period not exceeding 150 days"). Yet that statutory limitation, and every other, would be rendered meaningless if the President were permitted to bypass the tailored provisions Congress enacted by relying on IEEPA. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (noting the

"commonplace of statutory construction that the specific governs the general"). Especially given that "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions," *id.* (citations omitted), IEEPA cannot be read as effectively subsuming them all.

*Finally*, interpreting the grant of authority to "regulate" imports and exports to include the authority to impose tariffs would be inconsistent with IEEPA's other textual limits. Under the relevant provision, the President may only "regulate . . . importation or exportation of . . . property *in which any foreign country or a national thereof has any interest*." 50 U.S.C. § 1702(a)(1)(B) (emphasis added). In other words, the President's authority is limited to property owned at least in part by foreign countries and citizens; he cannot regulate property wholly owned by an American national. But the Challenged Orders do exactly that: They impose tariffs on property owned alone by American nationals, like Plaintiffs. *See* Woldenberg Decl ¶ 5; *see also* 19 U.S.C. § 1484(a)(2)(B) (defining "importer of record" as the "owner or purchaser of the merchandise"). No surprise, then, that it is frequently American nationals—and not any foreign country or national—that are responsible for paying such tariffs. *See* Woldenberg Decl. ¶ 8 (IEEPA tariffs projected to cost Plaintiffs over $100 million). Because the statute's plain text makes clear that it does not empower the President to tax property held by Americans, IEEPA provides no support for the Challenged Orders' tariffs.

### 3.    *Historical practice confirms that IEEPA does not authorize tariffs.*

Since IEEPA was enacted nearly half a century ago, none of the eight different presidential administrations (four from each major political party) had ever used IEEPA to impose tariffs prior to this one. Instead, those administrations have relied on other statutes (actual tariff statutes) to do so. IEEPA's enactment against that backdrop further demonstrates it was not intended to authorize tariffs.

Trading with the Enemy Act and Trade Act of 1974: The relevant language in IEEPA originated in amendments made to the Trading with the Enemy Act mere days after the attack on Pearl Harbor. Although those wartime amendments were broad in many ways, the relevant language was *not* used by the President to impose or adjust tariffs in the decades that followed its passage. When President Nixon declared a national emergency to "strengthen the international economic position of the United States" in 1971, decoupled the dollar from gold, and imposed a surcharge on imports to address a balance of payments issue, he notably relied upon the Tariff Act of 1930 and the Trade Expansion Act of 1962, *not* the Trading with the Enemy Act. *See* Proclamation No. 4074, 36 Fed. Reg. 15,724, 15,724 (Aug. 17, 1971). He lifted that surcharge after less than five months, Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971), and later asked Congress to give him more authority to negotiate tariffs to address "deficits in our trading balance" and to "raise or lower import restrictions on a temporary basis to help correct deficits or surpluses in our payments position," Special Message to the Congress Proposing Trade Reform Legislation, 1973 PUB. PAPERS 258, 261, 266 (Apr. 10, 1973).

President Nixon's request ultimately led to the passage of the Trade Act of 1974, which set forth new specific authorities for the President to use in negotiating tariff agreements, outlined priorities for those agreements, and explained procedures for obtaining congressional approval of them. Pub. L. No. 93-618, 88 Stat. 1978 (1975). That law gave the President the requested authority to impose tariffs to address "balance-of-payments deficits." *Id.* § 122 (codified at 19 U.S.C. § 2132(a)). In addition, it granted him authority to "respon[d] to certain trade practices of foreign governments," including by imposing "duties or other import restrictions." *Id.* § 301(a) (codified as amended at 19 U.S.C. § 2411). But as noted, those grants of authority came with procedural and substantive limits. The President's authority to impose tariffs with respect to balance-of-payments

deficits was limited to "a temporary import surcharge, not to exceed 15 percent ad valorem" for "a period not exceeding 150 days." *Id.* § 122. And the power to impose duties to respond to foreign trade practices was limited to a *single* country at a time, and only after a determination that the country "maintains unjustifiable or unreasonable tariff or other import restrictions" or "engages in discriminatory" policies that "restrict United States commerce." *Id.* § 301. Moreover, the President was required to provide "an opportunity for the presentation of views" as well as "appropriate public hearings" (if requested by "any interested party") before imposing any tariffs. *Id.*[20]

Such limits were consistent with previous grants of authority for the President to impose duties. The Tariff Act of 1930 granted the President the authority to "declare new or additional duties" on imports, but only from countries that the President "finds" have (a) imposed an "unreasonable charge, exaction, regulation, or limitation" on U.S. products which is "not equally enforced upon the like articles of every foreign country," or (b) "[d]iscriminat[ed] in fact against the commerce of the United States . . . in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country." Tariff Act of 1930, 46 Stat. 590, 704, § 338(a) (codified at 19 U.S.C. § 1338(a)). The tariffs under this provision, moreover, may not exceed fifty percent and cannot take effect for thirty days. *Id.* § 1338(d), (e). Section 232 of the Trade Expansion Act of 1962, titled "Safeguarding national security," likewise limits the President's ability to impose tariffs only against specific *products*. And it, too, imposes procedural hurdles, including requiring the Secretary of Commerce to conduct an "investigation" to determine whether an article of commerce is "being imported into the United States in such quantities . . . as to threaten to impair national security," publish a report regarding that

---

[20] Section 301 has since been amended in numerous ways, but never to remove critical limits on the President's authority to impose tariffs. *See* 19 U.S.C. § 2411.

investigation for the President to consider, and, together with the President, consider "the capacity of domestic industries." Trade Expansion Act of 1962, Pub. L. No. 87-794, § 232, 76 Stat. 872 (codified as amended at 19 U.S.C. § 1862). The statute further requires the President to submit a separate written statement to Congress, explaining the reasons why he has decided to take any action or declined to do so. *Id.* § 226, 76 Stat. at 876.

None of these developments suggests that Congress—or, for that matter, President Nixon—thought the President already had the unilateral and unconstrained power to adjust tariffs under the Trading with the Enemy Act, and certainly not for the purpose of addressing trade deficits. If President Nixon did, there is little reason that he would have asked Congress for the Trade Act or that Congress would have gone to the trouble of passing it.

Congress passes IEEPA to limit emergency authority: Three years later, Congress acted again, this time in response to a separate concern that presidents had been exercising emergency powers based on declarations of national emergency that persisted for too many years. *See Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 776 (9th Cir. 2006) ("The IEEPA was passed by Congress to counter the perceived abuse of emergency controls by presidents to . . . interfere with international trade in non-emergency, peacetime situations."). Congress removed certain national emergency powers under the Trading with the Enemy Act and imposed temporal limitations on actions already taken by the President pursuant to its authorities. Congress then adopted IEEPA. It borrowed language from the Trading with the Enemy Act authorizing the President, "by means of instructions, licenses, or otherwise," to "regulate . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest[,] by any person, or with respect to any property, subject to the jurisdiction of the United States," but

24

it imposed additional restrictions on that language's use. Pub. L. No. 95-223, § 203, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 1702).

For example, Congress provided that IEEPA authority could "only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of th[e] title and may not be exercised for any other purpose"; that such "unusual and extraordinary threat" must "ha[ve] its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States"; and that the exercise of the authorities to deal with any new threat requires a "new declaration of national emergency." Pub. L. No. 95-223, § 202, 91 Stat. 1625 (codified as amended at 50 U.S.C. § 1701). Further, Congress required the President "in every possible instance" to "consult with the Congress before exercising any of the authorities granted by th[e] title," to "consult regularly with the Congress so long as such authorities are exercised," and to file certain reports to Congress about the President's actions. *Id.* § 204 (codified as amended at 50 U.S.C. § 1703). IEEPA was thus an exercise in constraining the statutory powers granted to the President in national emergencies, and it arose *after* Congress had already specifically delineated the President's authority to adjust tariffs in the Trade Act of 1974.

To be sure, between the passage of those two Acts, the government had argued (and the Court of Customs and Patent Appeals had accepted) the proposition that President Nixon's 1971 tariffs could be justified under the Trading with the Enemy Act, despite the fact that no President had previously claimed such authority and President Nixon himself had not cited it as a basis for his authority in the Proclamation (or the Proclamation rescinding the imposition of the tariffs). *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975). For the reasons already explained, that single court's analysis—in conflict with the earlier decision of the three-judge

customs court, *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155, 1171 (Cust. Ct. 1974)—was wrong to conclude that the statutory power to "regulate" encompassed the power to impose tariffs. And as a practical matter, the government's position and the court's decision were overtaken by events. The Trade Act of 1974 was now a specific authorization by Congress for the President to negotiate tariff agreements subject to congressional approval and, as a temporary matter, to impose certain tariffs to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a).

Every President since then accordingly has understood that IEEPA is not a source of tariff-imposing authority. Where Presidents (including, until recently, President Trump) have imposed tariffs, they have done so through laws other than IEEPA. The President himself admits that, historically, Congress has "directed the President to secure reduced reciprocal tariff rates from key trading partners first through bilateral trade agreements," not through emergency tariffs issued under IEEPA. Universal and Reciprocal Tariff Order, 90 Fed. Reg. at 15,041. And the President has repeatedly relied on other laws to impose tariffs on China, steel, and aluminum, including in his second Term. *See, e.g.*, *Fact Sheet: President Donald J. Trump Restores Section 232 Tariffs*, THE WHITE HOUSE (Feb. 11, 2025) (relying on Section 232 of the Trade Expansion Act of 1962)[21]; Proclamation No. 9704, 83 Fed. Reg. 11,619 (Mar. 8, 2018) (same); *Memorandum on the Actions by the United States Related to the Section 301 Investigation*, 2018 DAILY COMP. PRES. Doc. 1. (Mar. 22, 2018) (imposing tariffs on China under Section 301 of the Trade Act of 1974).[22]

---

[21]    https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-restores-section-232-tariffs/.

[22] https://perma.cc/H2NS-QNPQ.

**4.    *Supreme Court precedent requires a clear, not merely colorable, statutory basis for the challenged tariffs.***

Where "the interpretation of [a] provision [is] a question of deep economic and political significance that is central to [the] statutory scheme," courts do "not assume that Congress" delegated that function "without a clear statement to that effect." *Biden v. Nebraska*, 600 U.S. 477, 505-506 (2023) (third alteration in original) (internal quotation marks omitted). Because Defendants have "discover[ed]" a previously "unheralded power" to impose tariffs under IEEPA, the Supreme Court (including through the "major questions" doctrine) requires them to point to a "clear," not merely "colorable," statutory basis for this power. *West Virginia*, 597 U.S. at 722-724. The government cannot make that showing.

As explained, "the Executive Branch interpretation" from the time of "enactment of the statute," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024), uniformly has been that IEEPA authorizes targeted economic sanctions on the persons or governments directly responsible for the external threat to American national security. It has never been invoked to authorize tariffs. That interpretation has "remained consistent over time," establishing a "longstanding practice of the government." *Id.* (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) (internal quotation marks omitted)). The longstanding practice is strong evidence that IEEPA does not, as the government now claims, grant the Executive Branch authority to impose tariffs. Indeed, "the lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *NFIB*, 595 U.S. at 119 (internal quotation marks omitted).

Moreover, "[t]he 'economic and political significance' of the" President's newfound tariff authority is "staggering by any measure." *Biden*, 600 U.S. at 502 (citation omitted). As for economic significance, these tariffs will affect trillions of dollars of imports, lower America's GDP

($27.7 trillion) by almost a full percentage point, put countless jobs in jeopardy, and cost the average American well over $1,000 per year. *See supra* pp. 12-14. And the political significance is equally seismic, given the undisputed lack of limits on the President's asserted authority. These tariffs, if not enjoined, could continue *for years*. Or, alternatively, they could be paused, eliminated, or substantially increased on a moment's notice—which the President has already done multiple times, days after issuing them. *See, e.g.*, April 9 Reciprocal Modification, §§ 2, 3, 90 Fed. Reg. at 15,626; Exec. Order No. 14,198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 3, 2025). This represents an unprecedented and "unheralded power," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014), to inflict billions (if not trillions) of dollars of cumulative economic costs on American businesses and to inject (repeatedly) massive uncertainty and volatility in domestic and global markets. If the Challenged Orders are upheld, the President would "enjoy virtually unlimited power to rewrite" U.S. domestic economic and international trade policy whenever and however he chooses. *Biden*, 600 U.S. at 502.

The assertion of such a "transformative expansion in" the President's "authority" constitutes a "major question[]." *West Virginia*, 597 U.S. at 724 (quotation marks and citation omitted). The Supreme Court has held that the CDC's claim of authority to impose an eviction moratorium with an "economic impact" of approximately "$50 billion" was a major question. *Alabama Ass'n of Realtors*, 594 U.S. at 764; *see also NFIB*, 595 U.S. at 117 (claimed authority to order "84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing" also a major question). In *Biden v. Nebraska*, the Court found that "a new program affecting 43 million Americans and $430 billion in federal debt" "triggered analysis under the major questions doctrine." 600 U.S. at 496, 502-503. The Secretary of Education was claiming authority over "nearly one-third of the Government's $1.7 trillion in annual discretionary

spending," which plainly constituted "a significant portion of the American economy." *Id.* at 503 (citation omitted). And the EPA's rule in *West Virginia*, which would have imposed "billions of dollars in compliance costs" and "reduce[d] GDP by at least a trillion 2009 dollars by 2040" constituted a "major question[]." 597 U.S. at 714-715, 724. The Challenged Orders, which are projected to increase federal revenues by more than $2 *trillion* over the next decade while reducing U.S. GDP by .8 percent, York & Durante, *supra* p. 14, fall comfortably within those precedents.

In short, if ever there were a "major question," this is it. So there must be undeniably "clear congressional authorization," not "a merely plausible textual basis," for the authority claimed. *West Virginia*, 597 U.S. at 723. IEEPA fails that test. Not one word in IEEPA or its history suggests Congress intended to authorize the President to impose hundreds of billions of dollars in tariffs to reshape American trade policy wholesale. And "[i]t would be anomalous," to say the least, "for Congress to have so painstakingly described the [President's] limited authority" on tariffs in so many other statutes, "but to have given him, just by implication," essentially unlimited authority on that topic in another statute. *Gonzales v. Oregon*, 546 U.S. 243, 262 (2006). The President's assertion of authority here would "transform the carefully described limits on the [President's] authority" over tariffs in all those other laws into "mere suggestions." *Id.* at 260-261. It is not plausible Congress made that choice.

B.    **Even if IEEPA authorizes the President to impose tariffs, these tariffs are unlawful.**

When Congress enacted IEEPA, it included four important limits on when and how the President could invoke the statute's authority. *First*, Congress provided that any authority granted to the President under IEEPA may be exercised only to address an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). *Second*, Congress was explicit that the President's action must "deal with"—or in other

29

words, be related to—that threat. *Id. Third*, Congress required that IEEPA authority be exercised only with respect to the national emergency that has been declared "and may not be exercised for any other purpose." *Id.* § 1701(b). "Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat." *Id. Fourth*, Congress made clear that actions taken to regulate the importation of property could only be with respect to "property in which a[] foreign country or a national thereof has an[] interest." *Id.* § 1702(a)(1)(B).

Even if this Court were to conclude that IEEPA authorizes the President to impose tariffs, it should hold that the overall tariffs adopted by President Trump are inconsistent with the first three of these requirements. At the very least, it should hold that as applied to the property of Plaintiffs—who are American nationals—the challenged tariffs are inconsistent with the fourth requirement.

### 1.    *The Universal and Reciprocal IEEPA Order violates the statute.*

The Universal and Reciprocal IEEPA Order violates IEEPA in at least two ways. *First*, it is not based on "any unusual and extraordinary threat" as defined by the statute. 50 U.S.C. § 1701(a). Instead, President Trump declared a national emergency due to "*persistent* annual U.S. goods trade deficits." Universal and Reciprocal Tariff Order § 1, 90 Fed. Reg. at 15,044 (emphasis added). Longstanding trade deficits are neither unusual nor extraordinary. Under common usage, "unusual" means "[n]ot usual" "rare," "exceptional," or "remarkable." *Unusual*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE at 1698, *supra* p. 18; *Unusual*, THE CONCISE OXFORD DICTIONARY OF CURRENT ENGLISH at 1277, *supra* p. 18. "Extraordinary" means" "[b]eyond an ordinary, common, usual, or customary order, method, or course; exceeding a common degree or measure; exceptional." *Extraordinary,* NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE at 548, *supra* p. 18; *see also Extraordinary*, THE CONCISE OXFORD DICTIONARY OF CURRENT

ENGLISH at 368, *supra* p. 18 ("[o]ut of the usual course" or "[e]xceptional, surprising; unusually great"). IEEPA's language "emphasizes that such powers should be available only in true emergencies." *Revision of the Trading with the Enemy Act: Markup Before the H. Comm. on International Relations*, 95th Cong. 12 (1977) (statement of Hon. C. Fred Bergsten, Assistant Sec'y for Int'l Affs. Dep't of the Treasury).

In fact, responding to "true emergencies" was the entire purpose for the enactment of IEEPA. Congress knew that in such emergencies, a President may need to act without waiting for Congress. But when the President has time to "consult with the Congress before exercising" his emergency powers, he must do so. 50 U.S.C. § 1703(a). And, to prevent a President from relying on a national emergency that persists for years, the President must "immediately transmit to Congress a report" explaining why the emergency "necessitate[s] such exercise of authority" and why the actions he chose "are necessary to deal with those circumstances." *Id.* § 1703(b). If there is no unusual or extraordinary emergency—or if the emergency powers are not "necessary to deal with those circumstances"—the President does not have any power under IEEPA.

There is nothing exceptional, uncommon, or rare about the United States's global trade deficit. The President himself admits that "annual trade deficits" are "persistent" and have their roots in post-World War II trade agreements. Universal and Reciprocal Tariff Order, 90 Fed. Reg. at 15,041. In fact, the United States has had a trade deficit for more than 50 years—since before IEEPA's enactment. *See* Brian Reinbold & Yi Wen, *Historical U.S. Trade Deficit*, FED. RSRV. BANK OF ST. LOUIS (May 17, 2019).[23] A "persistent" 50-year-old problem is antithetical to IEEPA's textual requirements for a national emergency. Such "emergencies are by their nature rare and brief, and are not to be equated with normal, ongoing problems." H. REP. NO. 95-459, at

---

[23] https://www.stlouisfed.org/on-the-economy/2019/may/historical-u-s-trade-deficits.

10 (1977). Nor is the trade deficit somehow "exceptionally" high. To the contrary, the recent trade deficit has been less than half the historic high (5.8 percent of GDP) from 2006. JAMES K. JACKSON, R45243, CONG. RSCH. SERV., TRADE DEFICITS AND U.S. TRADE POLICY 3-4 (2018) (citing data published by the Census Bureau and Bureau of Economic Analysis);[24] *U.S. International Trade in Goods and Services, December 2024*, Release Nos. CB 25-17, BEA 25-04 at 5, U.S. DEP'T OF COM. (Feb. 5, 2025) (reporting the 2024 trade deficit was 3.1 percent of GDP, a marginal increase from the 2023 trade deficit of 2.9 percent of GDP).[25]

Given the trade-deficit justification fails to satisfy IEEPA's text at every turn, it is unsurprising that this purported emergency is categorically different from every other emergency used as a predicate for action under IEEPA. IEEPA is typically directed at foreign governments and actors to address terrorism, foreign criminal organizations, and rogue states. *See, e.g.*, Exec. Order No. 13,224, *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism*, 66 Fed. Reg. 49,079 (Sept. 23, 2001). The President's use of IEEPA to address the trade deficit is thus a drastic break from historical practice and any reasonable understanding of its scope.

*Second*, the Universal and Reciprocal IEEPA Order violates IEEPA because the tariffs imposed by it are not "reasonably related" to the trade-deficit emergency the President declared. *Cf. Yoshida Int'l, Inc.*, 526 F.2d at 577 (interpreting similar language under Trading with the Enemy Act); *id*. at 578-579, 583-84 (President has only "the power to regulate importation during declared national emergencies by means appropriate to the emergency involved"). Section 1702 of the statute makes clear that the President's authorities to take IEEPA action are only "to the

---

[24] https://crsreports.congress.gov/product/pdf/R/R45243.
[25] https://perma.cc/VUH7-BWQX.

extent specified in section 1701." Section 1701, in turn, provides that the President may exercise IEEPA authority only to "deal with an unusual and extraordinary threat with respect to which a national emergency has been declared" and not "for any other purpose." Together, those provisions require that the President's actions (here, imposing tariffs) be tailored to address the specific threat identified (trade deficits).

The tariffs imposed by the Universal and Reciprocal IEEPA Order lack that nexus. Even assuming tariffs could reduce the trade deficit, the tariffs the President announced are vastly overbroad. The President has imposed 10 percent tariffs "on all imports from all trading partners." Universal and Reciprocal Tariff Order, § 2, 90 Fed. Reg. at 15,045. But the United States runs a trade *surplus* with over 100 countries. *See* U.S. DEP'T OF COM. at. Ex. 4 (Supplement), *supra* p. 32 (collecting annual data for 2024). For example, the United States had a $55 billion trade surplus with the Netherlands in 2025, a $19 billion trade surplus with the United Arab Emirates, and an $18 billion trade surplus with Australia. *Id.* These countries *reduce* the overall U.S. trade deficit, but the President imposed universal tariffs on them anyway. Relatedly, the President imposed "reciprocal" tariffs on countries, such as Israel, that have dropped all tariffs on the United States. *See* Steven Scheer, *Israel eliminates remaining tariffs on US goods ahead of Trump move*, REUTERS (April 1, 2025).[26]

### 2.    The China IEEPA Orders violate the statute.

The China IEEPA Orders likewise violate IEEPA. The tariffs imposed by those orders are not reasonably related to the declared fentanyl emergency. In those orders, the President relied on

---

[26] https://www.reuters.com/world/middle-east/israel-finmin-seeks-immediate-end-remaining-tariffs-us-imports-2025-04-01/.

the "sustained influx of illicit opioids" as a national emergency requiring the imposition of tariffs.[27] But imposing tariffs on *legal* goods has no sufficient connection to combatting *illegal* narcotics. Most critically, the costs of tariffs on legal goods lawfully imported into the United States are primarily borne by *Americans*; there is no reason why such tariffs and the corresponding harm to American business will alter the behavior of the cartels, drug-smuggling rings, and other organizations that bring illegal substances into our country. Such an indirect and instrumental use of tariffing authority is certainly not "regulat[ing] importation . . . *by means appropriate* to the emergency involved." *Yoshida*, 526 F.2d at 584 (emphasis added).

Nor can the lack of any reasonable connection between the tariffs and drug trafficking be resolved by pointing to other policy objectives that the President may hope to achieve. The statute is explicit that the President can take IEEPA action only with respect to the national emergency that he has declared. 50 U.S.C. § 1701(b) (authorizing the President to take action only to "deal with an unusual and extraordinary threat *with respect to which* a national emergency has been declared" (emphasis added)). And that action "may not be exercised *for any other purpose.*" *Id.* (emphasis added).

But the President has stated repeatedly that his imposition of tariffs under IEEPA serves purposes other than the declared emergency. The day *before* announcing the February 1, 2025, tariffs on China, he described the reasons for the tariffs as: "pure economic. We have big deficits with, as you know, with [China]." Amie Williams et al., *Donald Trump Threatens to Ignite Era of Trade Wars with New Tariffs*, FIN. TIMES (Jan. 31, 2025).[28] The day *after* announcing those tariffs on China, he wrote: "USA has major deficits with . . . China" and the "United States lose[s]

---

[27] February 1 China Order (referencing "the sustained influx of synthetic opioids" when announcing tariffs on China).

[28] https://www.ft.com/content/ff8116f0-b01f-4687-934a-a1b8a07bd5b0.

TRILLION OF DOLLARS IN SUBSIDIZING OTHER COUNTRIES." Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Feb. 2, 2025, 8:09 AM).[29] And these are just some in a long line of statements from the President about how to use tariffs to accomplish economic policy goals, including revenue raising. According to President Trump, "[t]ariffs are going to be a really important part of the tax-cut discussion." Jared Renshaw, et al., *Trump push to use tariffs to pay for tax cuts faces opposition in Congress*, REUTERS (Jan. 22, 2025).[30] They are also ways to make other countries pay "their fair share," Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Jan. 14, 2025, 11:28 AM),[31] while making the United States "rich," Donald Trump Press Conference with Softbank CEO (Dec. 16, 2024).[32] And if companies decide not to make products in America then they "will have to pay a tariff" on their exports, "which will direct hundreds of billions of dollars and even trillions of dollars into our Treasury." *Remarks by President Trump at the World Economic Forum*, THE WHITE HOUSE (Jan. 23, 2025).[33]

The President's multi-purpose approach renders IEEPA's text superfluous. IEEPA expressly limits the President's authority to "deal[ing] with an unusual and extraordinary threat *with respect to which* a national emergency has been declared" and not "for any other purpose." 50 U.S.C. § 1701(b). If he can exercise powers under IEEPA for *any* purpose—*i.e.*, take action *other than* to "deal with" with the declared emergency—the textual limit set by Congress has no force or meaning.

---

[29] https://truthsocial.com/@realDonaldTrump/posts/113934450227067577.
[30] https://www.reuters.com/world/us/trump-push-use-tariffs-pay-tax-cuts-faces-opposition-congress-2025-01-22/.
[31] https://truthsocial.com/@realDonaldTrump/posts/113827650534234057.
[32] https://www.rev.com/transcripts/donald-trump-press-conference-with-softbank-ceo-12-16-24.
[33] https://www.whitehouse.gov/remarks/2025/01/remarks-by-president-trump-at-the-world-economic-forum/.

### 3.    *The Challenged Orders violate the statute as applied to Plaintiffs.*

The Challenged Orders violate IEEPA as applied to Plaintiffs. Under IEEPA, the only property the President may regulate is "property *in which any foreign country or a national thereof has any interest*." 50 U.S.C. § 1702(a)(1)(B); *see supra* p. 21. But no foreign country or national has any interest in Plaintiffs' property at the time that property is subject to challenged tariffs. Plaintiffs, who are American nationals, "purchase and take title to the products in the foreign country and thus own the merchandise at the time of importation." Woldenberg Decl. ¶ 5. Thus, the property is wholly owned by Plaintiff at the time the property is subject to the challenged tariffs. It is a plain violation of IEEPA's text to subject such American-held property to the Challenged Orders.

### C.    **If IEEPA authorizes these tariffs, it is an unconstitutional delegation of Congress's legislative power.**

To the extent any doubt remains regarding the proper interpretation of IEEPA, principles of constitutional avoidance should eliminate it. *See Gonzalez v. United States*, 553 U.S. 242, 251 (2008) ("[W]hen 'a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided,'" the court's "duty is to adopt the latter." (citations omitted)). Even if just "'a *serious doubt*' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (emphasis added) (citation omitted).

The President's interpretation raises far more than a "serious doubt" about its constitutionality. If Congress had truly granted the President the authority to unilaterally impose tariffs that remake the global economy, without any restrictions other than the President's power to declare an "emergency," then that grant of authority would amount to an unconstitutional

delegation of legislative power. Under Supreme Court precedent, any grant of legislative authority to the Executive must be accompanied by an "intelligible principle" to guide the Executive's discretion. *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co.*, 276 U.S. 394, 409 (1928)). As noted above, the Challenged Orders are predicated on the idea that IEEPA authorizes the President "to exercise an unfettered discretion" to take whatever action he believes "may be needed or advisable" on tariffs. *A.L.A. Schechter*, 295 U.S. at 537-538. Under the Executive Branch's view of IEEPA, there is no limiting guidance, instruction, or restrictions from Congress about the products on which the President may impose tariffs; which country or countries the President may target; the permissible amount or range of the tariff; the duration of the tariff; the process that the President must use to make any of those decisions; the nature of the emergency sufficient to invoke the statute; or the relationship between the action taken and the emergency declared. Everything is at the President's discretion.

Worse yet, the President's usurpation of Congress's exclusive tariffing power means he may suspend and resume tariffs at will. The President has repeatedly announced tariffs, then suspended them days (or hours) later. He has also abruptly exempted certain countries or products. This "conception of Presidential authority smacks of the powers that English monarchs claimed prior to the 'Glorious Revolution' of 1688, namely, the power to suspend the operation of existing statutes, and to grant dispensations from compliance with statutes." *United States v. Texas*, 599 U.S. 670, 732 (2023) (Alito, J., dissenting).

In these circumstances, it is the court's "duty" to interpret IEEPA in such a way as to avoid these serious non-delegation doctrine concerns. *Gonzalez*, 553 U.S. at 251; *see, e.g.*, *Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality op.) (rejecting statutory construction that would "make such a sweeping delegation of legislative power

that it might be unconstitutional under the Court's reasoning in" *A.L.A. Schechter Poultry* and

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) (internal quotation marks omitted)).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM UNLESS THIS COURT ISSUES A PRELIMINARY INJUNCTION.

A preliminary injunction is necessary because Plaintiffs will suffer—and are already

beginning to suffer—"certain, imminent, and unrecoverable" losses because of the tariffs pending

completion of this litigation. *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C.

2014). Most of the economic harm caused by the tariffs is also irreparable because "sovereign

immunity will bar recovery" for that harm. *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427

F. Supp. 3d 101, 115 (D.D.C. 2019); *see also Ohio v. EPA*, 603 U.S. 279, 291-292 (2024) (staying

an EPA rule after explaining that government policy will place companies at a "competitive

disadvantage" and impose other "nonrecoverable" costs (citing *Thunder Basin Coal Co. v. Reich*,

510 U.S. 200, 220-221 (1994) (Scalia, J., concurring in part and concurring in judgment));

*Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770-771 (10th Cir. 2010) ("Imposition of

monetary damages that cannot later be recovered for reasons such as sovereign immunity

constitutes irreparable injury"); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)

("[W]here, as here, the plaintiff in question cannot recover damages from the defendant due to the

defendant's sovereign immunity any loss of income suffered by a plaintiff is irreparable *per se*."

(citation omitted)).

The loss of "business opportunities, market share, and customer good-will"—all of which

are unrecoverable from the federal government (including in any potential refund action)—are

irreparable harms. *Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp.

2d 327, 335 (D.D.C. 2012); *see also Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011)

(finding irreparable harm where petitioner would "suffer the loss of '[l]ong-standing

clients . . . [that may be] unwilling, or unable, to do business'" with them absent an injunction (alterations and ellipsis in original)); *Patriot, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("damage to [a company's] business reputation" can be "irreparable harm"); *Everglades Harvesting & Hauling, Inc.*, 427 F. Supp. 3d at 116 (holding that "severe reputational harm" will "almost certainly be irreparable"). "[S]ignificant lay-off, capital, and facility costs" qualify, too. *Express One Int'l, Inc. v. U.S. Postal Serv.*, 814 F. Supp. 87, 91 (D.D.C. 1992); *see McGregor Printing Corp. v. Kemp*, No. 91-cv-3255(GHR), 1992 WL 118794, at *5 (D.D.C. May 14, 1992) ("[I]rretrievable monetary loss to [Plaintiff] in combination with the loss in employment to its employees constitutes a sufficient showing of irreparable harm to warrant a stay.").

Plaintiffs are suffering these forms of irreparable harm. With the announcement of the increased 125 percent reciprocal tariff rate on China, Plaintiffs stopped as many shipments from China as possible because they would be unable to absorb or pass along the costs. Woldenberg Decl. ¶ 7. The tariffs increase the cost of importing the goods Plaintiffs sell by millions of dollars many times over. Plaintiffs predict that attempting to pay the tariffs in 2025 would cost their businesses $100 million in cash expenditures, compared with just $2.3 million in 2024—a *44-fold increase. Id.* ¶ 8. Plaintiffs cannot absorb the costs of these increased tariffs. Even if Plaintiffs cut every expense in their 2025 budget other than salary, they still would not be able to cover the $100 million projected cost of the now-astronomical IEEPA tariffs. *Id.* ¶ 14. Plaintiffs cannot simply shift those high costs on to their customers, who have revolted the few times Plaintiffs have issued unscheduled price increases in the last decade. *Id.* ¶ 18. Nor can Plaintiffs source or manufacture their products domestically as a practical matter. After several years of efforts to date, Plaintiffs

still have not found even one qualified and willing U.S. vendor capable of making their non-print products. *Id.* ¶ 23.

Given that Plaintiffs source roughly 2,400 products from China, it is no surprise that Plaintiffs have *already* lost specific business opportunities, including cancellations and "stop shipment" instructions for direct import orders totaling more than $1 million, as well as customers' refusals to take direct import shipments from China given the tariff risk. Woldenberg Decl. ¶ 10. Those harms are only projected to grow. For 2025, Plaintiffs are now predicting a 25 percent to 50 percent decline in sales year-over-year, compared to their original projection of an 8 percent rise in sales. *Id.* ¶ 11. Plaintiffs are also projecting significant stock outages of their product—a "looming sharp service decline" that will damage the high-service reputation Plaintiffs built up over decades. *Id.* ¶ 10. Devastatingly, Plaintiffs do not have sufficient on-hand inventory to carry them and their customers through the 2025 holiday season, the most important sales season of the year for Plaintiffs. *Id.* ¶ 21. Customers have already inquired about future shortages and price shocks and asked about Plaintiffs' ability to keep them supplied. *Id.* ¶ 10. As a result of such outages, Plaintiffs will suffer a serious loss in the goodwill of their customers, which include parents, teachers, and schools. *Id.* ¶ 20.

Most of Plaintiffs' losses and costs are unrecoverable. An importer may recover from the federal government only the amount of the tariffs that were unlawfully assessed. *See* 19 U.S.C. § 1505(a)-(b) (solely authorizing "refund[s]" of "any excess" tariffs "deposited" with the government); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1317 (Fed. Cir. 2021) (reversing refund of tariffs paid on imported steel bought by steel importer after concluding the president had authority to issue the tariffs); *Kalan, Inc. v. United States*, 944 F.2d 847, 848 (Fed. Cir. 1991) (importer of key tags received refund of import duties because items were originally

and incorrectly classified as jewelry, rather than non-dutiable plastics). Sovereign immunity bars any monetary recovery beyond that narrow refund action. *See Hartog Foods Int'l, Inc. v. United States*, 291 F.3d 789, 791 (Fed. Cir. 2002). Plaintiffs will not be able to recover lost profits, lost customers, or other consequential harms, such as the "additional cost" of finding a "replacement" for high-tariff imports. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017); *see Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) ("[T]he inability to supply a full line of products may irreparably harm a merchant by shifting purchasers to other suppliers."); *Nalco Co.*, 786 F. Supp. 2d at 188 (agency action that would make it "difficult for [the plaintiff] to attract new customers" is "at least some degree of irreparable injury").

None of these harms are speculative. Practically speaking, there is no way to bring goods from China into the United States economically. Without the ability to restock goods made in China this year or instantly go into production on hundreds (or thousands) of products at competitive prices elsewhere, Plaintiffs will experience spectacular losses in the short term. Unless the tariffs are enjoined, the company will be forced to take drastic steps in the near future such as sharply raising prices (and setting off a customer revolt); refinancing loans on unfavorable terms; significantly scaling back operations and product offerings; closing facilities; laying off employees; or even selling businesses now in their third and fourth generation of family ownership. Woldenberg Decl. ¶ 28. These are all enormously harmful to Plaintiffs' long-term financial and corporate health—indeed, their very existence. Although Plaintiffs are taking extraordinary steps to avoid these harms, each day that the tariffs remain in place brings them closer to having to adopt such drastic measures.

41

### III.    THE REMAINING FACTORS SUPPORT A PRELIMINARY INJUNCTION.

Finally, "the balance of the equities tips in [Plaintiffs'] favor," and "an injunction is in the public interest." *Winter*, 555 U.S. at 20. These two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A preliminary injunction would protect Plaintiffs from significant and irreparable harm, *supra* pp. 38-41, while costing the federal Government only a temporary delay of its preferred policy as directed to Plaintiffs. *Cf. Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) ("The primary purpose of a preliminary injunction is . . . to preserve the status quo." (internal quotation marks and citation omitted)). Indeed, the President has—on his own volition—repeatedly paused various tariff orders, including pausing reciprocal tariffs as to over 50 countries for three months. *See, e.g.*, April 9 Reciprocal Modification §§ 2, 3, 90 Fed. Reg. at 15,626 (pausing for 90 days reciprocal tariffs on countries other than China). Without a preliminary injunction, Plaintiffs will be forced to either immediately pay or continue to pay these unlawful tariffs, or restructure their business at significant loss to avoid doing so. Either way, they face ruinous consequences as a result. Injunctive relief is necessary to ensure that Plaintiffs are not forced to sustain significant and unrecoverable losses while the merits of this litigation proceed.

The public interest further favors a preliminary injunction. "The public interest is served when the legislation that Congress has enacted is complied with," *American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 262 (D.D.C. 2003), and when action is taken "to prevent the violation of a party's constitutional rights," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (citation omitted); s*ee also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (it is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest").

## **CONCLUSION**

This Court should preliminarily enjoin the agency Defendants and their agents, employees, and all persons acting under their direction and control, from taking any action to collect tariffs from Plaintiffs under the Challenged Orders.


Dated: April 24, 2025                              Respectfully submitted,

                                                  */s/ Pratik A. Shah*
                                                  Pratik A. Shah
                                                    D.C. Bar No. 497108
                                                  James E. Tysse
                                                    D.C. Bar No. 978722
                                                  Matthew R. Nicely
                                                     D.C. Bar No. 430564
                                                  Daniel M. Witkowski (*admission pending*)
                                                    D.C. Bar No. 1028791
                                                  Kristen E. Loveland
                                                    D.C. Bar No. 1684978
                                                  AKIN GUMP STRAUSS HAUER
                                                    & FELD LLP
                                                  2001 K Street N.W.
                                                  Washington, D.C. 20006
                                                  Tel: (202) 887-4000
                                                  pshah@akingump.com

                                                  *Counsel for Plaintiffs*

## Appendix A

| Date | Title | Short-Form | Description | Short-Form |
|------|-------|-----------|-------------|-----------|
| **The "China IEEPA Orders"** | | | | |
| 2/1/25 | *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China* | February 1 China Order | Imposes 10% tariff on Chinese goods | E.O. 14,195; 90 Fed. Reg. 9,121 |
| 3/3/25 | *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* | March 3 China Amendment | Increases tariff on Chinese goods from 10% to 20% | E.O. 14,228; 90 Fed. Reg. 11,463 |
| **The "Universal and Reciprocal IEEPA Orders"** | | | | |
| 4/2/25 | *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits* | Universal and Reciprocal Tariff Order | Imposes universal 10% tariff on nearly all trading partners; imposes country-specific "reciprocal" tariffs on 57 trading partners | E.O. 14,257; 90 Fed. Reg. 15,041 |
| 4/8/25 | *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China* | April 8 Reciprocal China Amendment | Increases the "reciprocal" tariff on China from 34% to 84% | E.O. 14,259; 90 Fed. Reg. 15,509 |
| 4/9/25 | *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment* | April 9 Reciprocal Modification | Pauses for 90 days the imposition of the "reciprocal" tariffs, except as to China, for which the "reciprocal" tariff is increased from 84% to 125% | E.O. 14,266; 90 Fed. Reg. 15,625 |