UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEARNING RESOURCES, INC. and HAND2MIND, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States, in his official capacity; KRISTI NOEM, Secretary of the Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; SCOTT BESSENT, Secretary of the Treasury, in his official capacity; U.S. DEPARTMENT OF THE TREASURY; HOWARD LUTNICK, Secretary of Commerce, in his official capacity; UNITED STATES DEPARTMENT OF COMMERCE; PETE R. FLORES, Acting Commissioner of Customs & Border Protection, in his official capacity; U.S. CUSTOMS & BORDER PROTECTION; JAMIESON GREER, U.S. Trade Representative; and THE OFFICE OF THE U.S. TRADE REPRESENTATIVE, <br><br> *Defendants*. | Case No.: 1:25-cv-01248 |

**DECLARATION OF RICHARD WOLDENBERG IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Richard Woldenberg, declare as follows:

1.     My name is Richard Woldenberg, and I am the CEO of Learning Resources, Inc. and hand2mind, Inc. (collectively, "LR/h2m" or the "Companies"). I am over the age of eighteen, have personal knowledge of the subject matter, and am competent to testify concerning the matters in this declaration.

2.     LR/h2m are part of a private, family-owned group of companies which develop, market, and sell educational products, educational toys, and pet toys. We market our products

under brands such as LEARNING RESOURCES, EDUCATIONAL INSIGHTS, HAND2MIND and BRIGHTKINS. Learning Resources and hand2mind are related legal entities under common ownership, common control, and common management with various corporate functions managed as "shared services" for the benefit of both companies. The Companies share more than 100 employees, including certain senior officers and managers such as myself, share a single line of credit, and operate with a common supply chain department.

3.    Our family business is now in its fourth generation and dates back to a company purchased by my grandfather more than 100 years ago. LR/h2m is a world leader in the development of experiential, hands-on learning materials which are sold in more than 100 countries. We have more than 500 U.S. employees and full-time equivalents today. Our products are developed in the United States, but we outsource manufacturing to factories in other countries, including (but not limited to) China, Taiwan, Korea, Vietnam, Thailand, and India. We also perform some of our manufacturing and assembly in the United States. Our companies have offices around the country: in Vernon Hills, Illinois; Torrance, California; and Amherst, New York. We also have employees that work remotely in other states. We ship from our warehouses in Vernon Hills, Illinois.

4.    I am providing this declaration in support of Plaintiffs' motion to preliminarily enjoin and set aside the implementation and enforcement of recent Executive Orders that impose additional tariffs under the International Emergency Economic Powers Act (IEEPA) on goods imported from China, Taiwan, Korea, Vietnam, Thailand, India, and other countries from which we import.

5.    LR/h2m directly imports from these countries, and both companies pay duties and tariffs on imports directly. When we import, we purchase and take title to the products in the

foreign country and thus own the merchandise at the time of importation. Specifically, we manufacture toys and other products in China, Taiwan, Korea, Vietnam, Thailand, India, and other countries that we then import into the U.S. and sell to brick-and-mortar retailers, online marketplaces and web merchants, school suppliers and other resellers, schools, teachers, and consumers. We also export our products to customers in other countries.

6.      The scale of the IEEPA tariff burden is unsustainable and threatens our ability to continue those trade streams because we are not able to absorb the additional tariff costs without changing our pricing radically. Approximately 60% of the products we sell or consume as components (by cost) are manufactured in China, and "made-in-China" products represent a similar percentage of our revenue. The new 2025 tariffs are in addition to Section 301 China tariffs in effect since 2018. With the additional IEEPA China tariff of 10% effective February 4, 2025, and 20% effective March 4, 2025, and additional China universal 10% tariff effective April 5th which was later replaced with a reciprocal 34% duty, subsequently increased to 84% (items entered April 9th), and further increased to 125% (items entered April 10th and onward), we are now responsible to pay at least 145% duty and tariffs on all products made in China, with certain products being assessed total duties and tariffs of 170% or more taking into account the additional 25% Section 301 China tariff plus general rate of duty, if applicable. These rates are now so high as to effectively prevent importation.

7.      The Companies have collectively already paid over $1 million based on the new 2025 tariff rates, with both Companies having paid the 10% and 20% initial IEEPA tariffs on China as well as the initial universal "reciprocal" tariff of 10%. Those shipments left port before the increased 125% reciprocal tariff rate on China took effect. When that rate was announced with only a few hours advanced notice, we stopped as many shipments from China as possible to avoid

an unplanned extraordinary expense. However, on such short notice, we were not able to stop 19 shipments for the benefit of both Learning Resources and hand2mind arriving between April 24th and May 13th with more than 75% by value expected to be assessed at the 145% combined tariff rate. We did authorize one air shipment of a small amount of product with an entry date of April 20th subject to the 145% combined tariff rate. The Companies are currently evaluating how to manage the importation (entry) of these pending shipments, but both Companies have an intention to import at least some items subject to the 145% tariff rate from these shipments. We cannot presently estimate the tariff cost each Company will actually incur but the total estimated duties and tariffs on all of the merchandise in those twenty shipments is greater than $1 million and each Company expects to pay a portion of that sum, which constitutes an extraordinary and unplanned expense. For any merchandise within these shipments that we decide to re-export in order to avoid paying duties at a rate of at least 145%, we expect to incur additional losses for transportation charges to ship that merchandise away from the United States and special handling and transaction fees relating to these shipments.

8.      The tariff rates assessed on the countries from which we source our products have been changing frequently in 2025. Inclusive of the universal and reciprocal tariffs announced on April 2nd, 8th, 9th and 10th, but before taking into account the 90-day "pause" in the collection of certain tariffs announced on April 9th, which may affect a small percentage of our products (but not those from China), we currently believe that an "apples-apples" estimate for 2025 duties and tariffs based on our 2025 full-year budget (unadjusted for on-hand inventory or any possible economic downturn) would be more than $100 million in cash expenditures, versus 2024 actuals of $2.3 million in duties and tariffs paid. In other words, given the ever-changing situation with the IEEPA tariffs, considerable uncertainty about future economic conditions and trade rules, and

the as-yet-unknown decisions we will make to survive under these rapidly evolving conditions, I currently project that we would experience an almost 44x year-over-year increase in duties and tariffs using our 2025 plan as the base case. We currently estimate that more than 95% of these tariffs would derive from products made in China now, which is a tacit ban on manufacturing in China in practical effect. Additionally, we are incurring significant unrecoverable costs and expenses, not to mention time lost, dealing with ever-changing tariff rates and massive disruptions in our supply chain, business relations, and business operations.

9.    There is no way to fully offset the costs of current tariffs through vendor concessions or expense reduction—the number is too enormous and many times our projected annual income. LR/h2m may be forced to raise prices as much as 70% (or possibly more) as a matter of pure survival. Some of our customers with urgent programs requiring imports that cannot be delayed are already facing price increases of more than 100%. This level of price inflation is very destabilizing to our business relations and frankly is terrifying.

10.    These tariffs will severely and irreparably harm LR/h2m. Mid-year price increases from tariffs are expected to cause a market shock and an immediate and sustained decline in sales. As of April 21st, we have received cancellations and "stop shipment" instructions for direct import orders totaling more than $1 million because of the new tariffs. We have been notified by certain customers that they will not take any direct import shipments from China so they can avoid paying the tariffs, which places all financial risk on our companies. Customers have also contacted us about their fears of future shortages and price shocks and asked about our ability to keep them supplied. We believe some customers have moved up domestic orders with us to "grab" inventory while they can. Due to the lag time between the imposition of the tariffs and the pending gap in replenishment shipments, we are projecting outages beginning in a matter of weeks, which are

traceable to a halt in import shipments beginning on April 9th. For a company built on high service, the prospect of a looming sharp service decline is very threatening. At present, there is little we can do to stop the stock outage catastrophe from happening owing to supply chain chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to be paid for incorrect logistical judgments.

11.    After the first tariffs were announced in January, we pivoted from planning based on our 2025 budget scenario of sales up 8%, to a scenario with sales down 25%—and now believe the sales decline may be as great as 40% or even 50% year-over-year. Following the substantial tariff increases announced on products from China between April 2 and April 10, 2025, we effectively stopped importing nearly all of the roughly 2,400 products that we source from China. We expect that the IEEPA tariffs on other countries will also substantially harm our sales because of the same factors.

12.    This is a shocking turn of events for our companies, which have been growing faster than the overall toy industry in the period 2019-2024. In other words, I believe these tariffs have likely ended our record of exceptional growth and replaced it with an expectation of an imminent sharp decline in sales.

13.    To address the financial impact of the sudden, unbudgeted and massive tariff cost and to attempt to protect the market for our products, we have been working to cut our operating expenses by 10% since January and will need to cut those expenses even further because of the recently announced new tariffs. Our cost cutting focus has been on cash expenditures like advertising, CapEx, and hiring. We have also considered reducing service levels (such as by increasing delivery times) to lower costs, which would intentionally degrade our operational performance and hurt our brand reputation in a market that expects fast delivery. We are

scrambling to do everything in our power to save jobs. Both Companies have been named a Top Workplace by the Chicago Tribune in each of the last five years – losing our team would be a devastating loss.

14.    Our companies cannot possibly absorb the costs of these increased tariffs. By way of illustration using our 2025 business plan, if we cut **every** expense in our 2025 budget other than salary (*i.e.*, all expenses, including electricity, postage, health insurance benefits and rent), we would still not be able to cover the $100.2 million projected cost of the tariffs. Vendor concessions will also be ineffective at making up a meaningful portion of this loss. If we buy a product from China for $10, new inventory will now cost not less than $24.50 with tariffs before the costs of transport. For the old cost of $10 to be preserved in new inventory, the vendor would have to cut its price to $4.08. Our vendors struggle to give us even a 10% discount and they simply cannot give us a discount of almost 60%.

15.    We have no realistic way to cover these costs, which means the tariffs act as an immediate ban on the products we import. We cannot even risk putting our Chinese-made products on the water for fear of paying 145% tariffs on arrival, which means we are already suffering a major disruption in our replenishment orders from China that grows more urgent by the day. Even considering the very limited positive impact of vendor concessions and expense reductions, our only options to address this increase in costs caused by increased tariffs are (a) to pass the tariff cost to our customers in the form of much higher prices for our goods or (b) reducing the costs by making and selling cheaper, lower-quality products. Both options would cause LR/h2m substantial harm. Continuing to market goods subject to a 145% tariff is infeasible because our dealers and consumers will never pay those prices. We cannot pass along tariffs at rates like 46% (which was the country-specific reciprocal tariff announced for Vietnam) or even 25% (which was the country-

specific reciprocal tariff announced for South Korea) for fear of alienating dealers and consumers who are ill-prepared for the coming deluge of massive price increases. Reducing quality is an unthinkable option for premium brands like ours and is practically infeasible, as it would require us to change the design and/or production of more than 2,000 products at once. That process would take years and cost millions of dollars out of pocket. Alternatively, we must consider discontinuing the import and sale of certain educational products entirely in the U.S., and we have already been forced to pause certain orders and shipments. It is completely unrealistic to avoid the tariffs by shifting our supply chain for more than 2,000 products, which would also take years and cost millions of dollars that we cannot spare. For a company built on a high-service model, this erosion in our operating standards exposes our brands to an uncertain future and the prospect of declining sales and reputation as service levels worsen.

**Passing the tariff costs to our customers will cause the Companies to lose profits, lose sales, and damage their reputation.**

16.     If LR/h2m attempts to pass along all, or substantially all, of the cost of the tariffs to its customers in the form of increased prices, we will sell substantially fewer goods. This is because, when LR/h2m materially increases the price of goods it sells, consumers demand fewer of those goods. Consumers are price-sensitive and will not accept a massive price increase on toys and educational products after the current sustained period of modest inflation in the United States. School accounts are already showing a significant reluctance to order for back-to-school because of funding uncertainty and limited budgets, a factor certain to be exacerbated by large price increases. Our dealer partners which resell our products will be squeezed by a sudden price increase and are highly likely to resist price changes notwithstanding our urgent need to recoup these expenses. I expect that, after massive price increases, our dealers will drop, adjust, or reduce the product ranges they offer to preserve their limited capital, thus shrinking our market and

8

increasing the risk that our brands will be marginalized. We will also be exposed to credit losses on receivables from our customers as their businesses struggle in difficult conditions related to the tariffs, too.

17.    It is notable that more than 10% of LR/h2m's revenue is derived from sales to customers located outside the U.S., but a substantial volume of orders is filled from our U.S. warehouses. Inventory subject to the new tariffs will be completely uncompetitive in the world market; we cannot bear an extra tariff expense of 46% or 145% in our cost of goods when competing against products not subject to those costs in the international market. Certain tariffs imposed against China pursuant to IEEPA are not recoverable through duty drawback procedures, so our foreign customers will need to pay those costs if we fill orders with inventory which has entered the U.S. Consequently, we are planning to avoid using U.S. inventory or U.S. infrastructure (logistics, warehousing, labor) to service export orders, creating a major loss of profit for the company. Sales to customers located outside the U.S. will need to be filled with inventory that never crosses a U.S. border now. The expense of duplicating our infrastructure and avoiding use of our efficient automated U.S. facilities will lead to further losses. Although one of the Administration's stated goals was to bring manufacturing back to the U.S., the tariffs actually force our companies to avoid bringing certain inventory into or using distribution facilities in the U.S. to service our export customers. We believe this change creates an opening for foreign competitors to attack our market share and capitalize on a competitive advantage springing from the new tariffs.

18.    I know that the tariff impact will be severe because previous price disruptions have harmed the Companies. Mid-year price changes are rare in our business because they are received so negatively by our dealers—they are always a last resort. We have issued unscheduled price increases only a few times in the last decade or so, and each time we faced customer revolts. We

have seen examples of customers reconfiguring their buys when dealing with limited budgets. We have some customers who do not accept price increases easily. We have experienced certain key customers refusing to trade for weeks or months, sometimes not replying to our emails or even calling us back, because of price increases of less than 2%. Obviously, we would need to increase prices by a much greater amount than that in order to remain profitable while incurring tariffs at 145%. Some customers have dropped products to resist pricing or to address declining margins or sought substitutions from competitors. In my experience, toy consumers are particularly sensitive to price changes and will trim their buying based on economic conditions and prospects. While toys may be a "necessity" good, in the past consumers have migrated to lower price toys when money is tight as in inflationary periods or during a recession.

19.     When customers demand fewer goods, it lowers the Companies' total profits. Based on my experience, even if LR/h2m were to receive a retroactive duty refund from the federal government for the unlawful tariffs it had to remit, the lost profits from decreased demand for its imported goods will exceed that refund, leaving LR/h2m in a substantially worse financial position than if the challenged tariffs were never imposed. Given the massive scale of the increase in duties and tariffs, the Companies may also face a major cash squeeze. To meet holiday season demand and to preserve our high-service model, we must build up our inventory over a period of months in advance. This creates a situation where we would incur extraordinarily large duty and tariff expenses on imports months before we expect to sell the inventory to recoup those expenses. We pay our bills (such as import duties and tariffs) by borrowing under our revolving line of credit, and we repay our line of credit from receivables collected later from our customers. The cash-to-cash cycle of our business can be six months or longer and the huge new tariffs may lead to far greater peaks in our loan balances. Rising loan balances will raise our interest costs and could

make obtaining financing much more difficult. The Companies' ability to renegotiate its line of credit cannot be evaluated because of the unique circumstances of the new tariffs and the resulting economic uncertainty.

20.    Separately, if LR/h2m raises prices on goods to pass along the cost of the challenged tariffs, it will harm the goodwill and brand reputation that it has built with its dealers, schools, teachers, and consumers over decades. Our brands are considered "premium" brands with a strong reputation for excellent quality, content, and value pricing. Since our products are intended as educational tools, we have always priced our products to be good values and accessible to all children and all families. Sharply higher prices would be perceived as a breach of our brand promise by many consumers. Some customers may stop purchasing from LR/h2m in favor of substitutes or alternatives if our prices rise suddenly or if we stop selling cherished products. Even if the challenged tariffs are ultimately declared unlawful, customers who have already left may not return to buy from the Companies.

21.    Because of the tariffs, we have already had to cancel shipments and delay production in China. At present tariff rates, I cannot foresee bringing in more product from China because the cost is now prohibitive. Our company depends on Christmas sales to survive. We do not have enough on-hand inventory to carry us through the holiday season unscathed and are already projecting stock outages beginning in a matter of just weeks. Without the practical ability to restock our goods made in China this year or instantly go into production on hundreds or thousands of products at competitive prices elsewhere, our Christmas season will likely be significantly impaired or possibly even ruined, leading to spectacular losses. Since the Christmas season is a time of celebration for the American public, it is foreseeable that Christmas will be ruined for many families and countless children, too, and of course, we are not alone in having this

problem. Empty store shelves at Christmas time mean economic disaster for everyone, retailers and suppliers both, and for our economy.

**Off-setting increased costs from the challenged tariffs by using cheaper alternatives will harm the Companies' profits, sales, and brand reputation, and there is no available domestic "reshoring" manufacturing option.**

22.    To fully offset the increased costs caused by the tariffs, I have considered whether LR/h2m could reduce quality, eliminate product features or sell products with fewer components. These less-expensive alternatives, however, would substantially harm LR/h2m's reputation because the quality of the products would disappoint our customers and breach the brand promise. Lower quality products will result in fewer sales as well as substantial harm to customer goodwill and to our corporate reputation. Our industry is subject to strict regulation for toy safety, so in many cases, a downgrade in product quality is not even an option. In any event, we have no practical ability to redesign our many products overnight and relocate production to destinations unknown without it taking years and costing millions of dollars.

23.    I am absolutely certain that LR/h2m cannot source or manufacture its products domestically as a practical matter. Despite strong market and financial incentives to find local manufacturing for our products, our resourcing efforts to date (over several years) have failed to yield even one qualified and willing U.S. vendor capable of making our non-print products. There are many reasons for this: (a) our products are typically made in short runs (production runs of small quantities or durations of only a few days), which is too inefficient for U.S. manufacturers operating in expensive facilities using scarce, high-priced labor; (b) our products typically require assembly and complex packaging, which is very labor-intensive (again, labor is expensive and in short supply); (c) we require a very high finish and many of our products require many different manufacturing functions that are not often found in the United States; (d) the U.S. market is ill-equipped to make our thousands of different products requiring specialized facilities, equipment,

and fixtures; and (e) a geographically concentrated manufacturing hub does not exist to serve the myriad needs and inputs required for efficient manufacturing of our products in the U.S. Despite our years-long experience with sophisticated operational software systems and automated material handling equipment (including warehouse robots), we have searched for and failed to identify any viable automation or technology option to solve the cost problem posed by domestic manufacturing. There is simply no manufacturing market anywhere that can replace China for everyone all at once—at least without years of advance notice. Consequently, the effects of the tariffs on global supply chains will devastate small and medium-sized businesses like ours.

24.    Our Companies have for several years investigated and invested in frontier manufacturing markets to reduce our dependence on our Chinese supply chain. After a lot of effort and roughly $2 million in out-of-pocket costs, we have only been able to move or resource about 16% of our manufacturing from China to other countries (principally, India or Vietnam). The challenges in moving items out of China are myriad: (a) costs are often higher and labor is in short supply; (b) factories have limited capacity and limited manufacturing experience suited to U.S. market needs; (c) factory quality control is often unsophisticated; (d) timelines are often unreliable; (e) critical components may not be available locally or be of unacceptable quality; (f) production is often slow and inefficient, including mold making; (g) certain critical skills may be missing; (h) commitment to cleanliness or other measures of modern factory management may be missing or inadequate; (i) ethical manufacturing standards imposed by our industry require extra surveillance in frontier markets; and (j) experience dealing with key retailers like Walmart and Target may be limited or required certifications have not been obtained. Training new factories to meet the needs and expectations of the U.S. market takes a long time, often years. There is no well-developed, high capacity, high caliber manufacturing hub anywhere standing idle waiting to make

our many products. Moreover, even if we were able to switch our sourcing to countries other than China, the President has imposed IEEPA tariffs on almost every other country. We therefore would not only incur millions of dollars in expenses to shift our production, but we would still face millions more in duty and tariff costs than we experienced previously, even if we could find alternative suppliers in other countries.

25.    It is also worth noting that the process of resourcing from China to other markets can have the effect of destabilizing our Chinese supply chain, which is very dangerous and threatening to our business. We must be very methodical and careful in shifting our production while at the same time preserving the financial health of our factories. It's a delicate process. Triggering a bankruptcy by a key supplier would be financially devastating to our companies, not to mention a catastrophic organizational failure as these factories are often close friends and longtime allies of our companies.

26.    We are also expecting to face massive downstream cost increases because of the tariffs. For instance, we source many low volume Chinese-made products from domestic suppliers focused on other markets (such as paper products supply or food service supply) for use in school science kits. We don't consume enough of these components to tool up and import them directly. We are therefore dependent on the domestic distributors to manage the tariff costs. Those items are facing price hikes reflecting the current 145% tariffs on Chinese goods. Because we are not the importer for these products, even if the tariffs are eventually set aside and importers are provided refunds, we will not be the recipient of refunds for these products. Our ability to meet strained school budgets with much more expensive basic supplies is limited. It is entirely possible that some basic school supplies will cease to be available on the U.S. market.

27.    Other anticipated negative consequences for our Companies directly traceable to the tariffs include: (a) potential widespread job losses if we are unable to make a profit with a transformed business model; (b) an impaired ability to plan and run our business efficiently in an ever-changing environment of oscillating tariffs and changing terms for international trade; (c) a destabilized manufacturing base may force many suppliers into bankruptcy leaving us without critical suppliers or essential manufacturing capacity for a long period of time, thereby triggering further losses; (d) a synchronized bankruptcy crisis faced by many factories simultaneously may cause a "rush for the door" by U.S. importers, leading to manufacturing gridlock lasting years because of the limited ability of alternative markets to absorb the new demand; (e) mounting port congestion resulting from orders cancelled over tariffs could lead to a major spike in ocean freight rates as happened in the pandemic; (f) a combination of these problems could lead to a chain reaction that cannot be stopped causing massive economic damage that cannot be recouped or addressed for many years (such as synchronized bankruptcies of many factories and their U.S. importer customers at the same time); (g) supply chain disruptions could lead to massive business interruption claims on insurance policies and widespread defaults under lines of credit issued by American banks; (h) relief from tariffs may never come from much-hyped rising domestic manufacturing (reshoring) if companies fear that the tariff regime might later be reversed thereby rendering their big reshoring investments obsolete; (i) capital destruction from extraordinary expenses and loss of business is likely permanent and not recoverable; and (j) foreign markets may reduce access to products or services sold by American companies, whether made in the U.S. or not, leading to further business contraction and profit loss.

**The Companies cannot absorb the tariffs pending the outcome of this litigation and a subsequent refund action.**

28.    It is not an option for LR/h2m to sell manufactured goods to its customers at the same price prevailing before the challenged tariffs. If LR/h2m were to maintain its prices, then it would quickly be unable to service its bank debt and mortgages and fall into default. The Companies cannot absorb losses during the pendency of this litigation and will be forced to take drastic steps like: sharply raising prices and sharply reducing spending; refinancing loans on unfavorable terms; significantly scaling back operations and product offerings; closing facilities; laying off employees; or even selling the company after more than 100 years of family ownership. These are all enormously harmful to the Companies' long-term financial and corporate health— indeed, its very existence. We are trying to avoid as many of these measures as possible for as long as possible, but each day that the tariffs remain in place is causing further irreparable harm to the Companies and brings us closer to having to adopt such drastic measures. If tariffs are kept at current levels without relief, we face an increasingly grim future, like all other similarly situated small and medium-sized companies who depend on foreign manufacturing hubs.

* * *

29.    If Plaintiffs obtain a preliminary injunction against collection of the IEEPA tariffs, then these irreparable harms will not occur.

I, Richard Woldenberg, declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

    Dated: April 24, 2025.

                                       Richard Woldenberg