**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LEARNING RESOURCES, INC., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HAND2MIND, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:25-cv-01248-RC |
| | ) | |
| DONALD J. TRUMP, President of the United | ) | |
| States, in his official capacity; KRISTI NOEM, | ) | |
| Secretary of the U.S. Department of Homeland | ) | |
| Security, in her official capacity; U.S. | ) | |
| DEPARMENT OF HOMELAND SECURITY; | ) | |
| SCOTT BESSENT, Secretary of the Treasury, | ) | |
| in his official capacity; U.S. DEPARTMENT | ) | |
| OF THE TREASURY; HOWARD LUTNICK, | ) | |
| Secretary of Commerce, in his official capacity; | ) | |
| U.S. DEPARTMENT OF COMMERCE; | ) | |
| PETE R. FLORES, Acting Commissioner of | ) | |
| U.S. Customs & Border Protection, in his official | ) | |
| capacity; U.S. CUSTOMS & BORDER | ) | |
| PROTECTION; JAMIESON GREER, | ) | |
| U.S. Trade Representative, in his official capacity; | ) | |
| THE OFFICE OF THE U.S. TRADE | ) | |
| REPRESENTATIVE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION......................................................................................................1

BACKGROUND.......................................................................................................2

    I.    The President's Authority Under IEEPA To Regulate Importation During National Emergencies.......................................................................2

    II.   Factual Background...................................................................................5

      A.   Executive Order 14195 And Modification..............................................5

      B.   Executive Order 14257 And Modification..............................................6

      C.   Plaintiffs Sue To Enjoin The Executive Orders.....................................8

STANDARD OF REVIEW .......................................................................................8

ARGUMENT.............................................................................................................9

    I.    Plaintiffs Are Unlikely To Succeed On The Merits....................................9

      A.   This Court Lacks Jurisdiction Because The Court Of International Trade Has Exclusive Jurisdiction Over Challenges To Tariffs.................................9

      B.   IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here......................................................10

         1.  IEEPA Includes Tariff Authority......................................................10

            a.   Text And Context............................................................................11

            b.   History..........................................................................................16

            c.   Purpose.........................................................................................19

            d.   The Major-Questions Doctrine.......................................................20

         2.  IEEPA Is A Valid Delegation Of Congressional Authority.....................25

         3.  The Challenged Orders Do Not Violate IEEPA As Applied To Plaintiffs............29

      C.   The National Emergency Is A Political Question And Valid If Subject To Review...31

    II.   Plaintiffs Cannot Establish The Likelihood of Immediate, Irreparable Harm................36

    III.  The Remaining Injunctive Factors Do Not Favor Plaintiffs............................41

IV.   Any Preliminary Injunction Should Be Limited Only To Plaintiffs And
         Would Require Them To Post A Bond.......................................................................42

CONCLUSION...................................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*American Power & Light Co. v. SEC*,
    329 U.S. 90 (1946) ............................................................................................. 27, 28

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021) ................................................................................................. 23

*Al-Bihani v. Obama*,
    619 F.3d 1 (D.C. Cir. 2010) ...................................................................................... 20

*\*Alcan Sales v. United States*,
    693 F.2d 1089 (Fed. Cir. 1982) ................................................................................ 12

*Am. Inst. for Int'l Steel v. United States*,
    806 F. App'x 982 (Fed. Cir. 2020) ........................................................................... 29

*Am. Int'l Grp., Inc. v. Islamic Republic of Iran*,
    657 F.2d 430 (D.C. Cir. 1981) .................................................................................. 18

*Atari Games Corp. v. Nintendo of America*,
    897 F.2d 1572 (Fed. Cir. 1990) ................................................................................ 40

*Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*,
    280 F. Supp. 3d 59 (D.D.C. 2017) ............................................................................ 43

*Aviation Consumer Action Project v. Washburn*,
    535 F.2d 101 (D.C. Cir. 1976) ............................................................................ 42, 44

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................................................. 31

*Bd. of Trs. of Univ. of Ill. v. United States*,
    289 U.S. 48 (1933) ................................................................................................... 12

*Beacon Prods. Corp. v. Reagan*,
    633 F. Supp. 1191 (D. Mass. 1986) .......................................................................... 32

*Biden v. Missouri*,
    595 U.S. 87 (2022) ................................................................................................... 24

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ................................................................................................. 24

*Biden v. Texas*,
    597 U.S. 785 (2022) ................................................................................................. 33

*B-W. Imports, Inc. v. United States*,
  75 F.3d 633 (Fed. Cir. 1996)................................................................19, 22

*Cardinal Health, Inc. v. Holder*,
  846 F. Supp. 2d 203 (D.D.C. 2012)........................................................38, 39

*Chang v. United States*,
  859 F.2d 893 (Fed. Cir. 1988)..................................................................36

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)..............................................................36, 38

*City and County of San Francisco v. Trump*,
  896 F.3d 1225 (9th Cir. 2018)..................................................................42

*City of Chicago v. Barr*,
  961 F.3d 882 (7th Cir. 2020)....................................................................43

*Coal. for Renewable Nat. Gas v. EPA*,
  108 F.4th 846 (D.C. Cir. 2024)................................................................24

*Consarc Corp. v. OFAC*,
  71 F.3d 909 (D.C. Cir. 1995)....................................................................30

*Corbett v. TSA*,
  19 F.4th 478 (D.C. Cir. 2021)...................................................................15

*Corus Grp. PLC v. Bush*,
  217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002)...............................................37

*Corus Grp. PLC v. Int'l Trade Comm'n*,
  352 F.3d 1351 (Fed. Cir. 2003)................................................................35

*Ctr. for Biological Diversity v. Trump*,
  453 F. Supp. 3d 11 (D.D.C. 2020)........................................................32, 34

**Dames & Moore v. Regan*,
  453 U.S. 654 (1981)..........................................................................passim

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988)..........................................................................22, 24

*Diginet, Inc. v. Western Union ATS, Inc.*,
  958 F.2d 1388 (7th Cir. 1992)..................................................................15

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010)........................................................31, 33, 34

*FAA v. Cooper,*
566 U.S. 284 (2012)................................................................................14

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
426 U.S. 548 (1976)...........................................................................15, 25

*Fid. & Deposit Co. of Maryland v. Helvering,*
112 F.2d 205 (D.C. Cir. 1940) ..............................................................43

*Florida v. HHS,*
19 F.4th 1271 (11th Cir. 2021)..........................................................24, 43

*Florsheim Shoe Co., Div. of Interco v. United States,*
744 F.2d 787 (Fed. Cir. 1984) ...........................................................19, 33

*Forest Grove Sch. Dist. v. T.A.,*
557 U.S. 230 (2009) ...............................................................................16

*Georgia v. PublicResource.Org, Inc.,*
590 U.S. 255 (2020)................................................................................17

*Gibbons v. Ogden,*
22 U.S. 1 (1824).....................................................................................12

*Global Relief Found., Inc. v. O'Neill,*
315 F.3d 748 (7th Cir. 2002)...................................................................30

*Groves v. Slaughter,*
40 U.S. 449 (1841).................................................................................12

*Gundy v. United States,*
588 U.S. 128 (2019)...........................................................................25, 29

*Haig v. Agee,*
453 U.S. 280 (1981) ...............................................................................28

*Hanson v. D.C.,*
120 F.4th 223 (D.C. Cir. 2024) ........................................................passim

*Helsinn Healthcare S. A. v. Teva Pharm. USA, Inc.,*
586 U.S. 123 (2019) ...............................................................................17

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
333 F.3d 156 (D.C. Cir. 2003) ................................................................30

*Htet v. Trump,*
No. 24-1446, 2025 WL 522033 (D.D.C. Feb. 18, 2025)...................32, 34

*Humane Soc. of U.S. v. Clinton*,
  236 F.3d 1320 (Fed. Cir. 2001) ................................................................. 20

*In re 650 Fifth Ave. & Related Props.*,
  777 F. Supp. 2d 529 (S.D.N.Y. 2011) ........................................................ 32

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  522 F. Supp. 2d 557 (S.D.N.Y. 2007) ........................................................ 14

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) .................................................................................... 31

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .................................................................................... 20

*John Doe Co. v. CFPB*,
  235 F. Supp. 3d 194 (D.D.C. 2017) ............................................. 36, 37, 40

*\*Labat-Anderson, Inc. v. United States*,
  346 F. Supp. 2d 145 (D.D.C. 2004) ........................................................... 10

*Lee v. Garland*,
  120 F.4th 880 (D.C. Cir. 2024) .................................................................. 31

*Lorillard v. Pons*,
  434 U.S. 575 (1978) .................................................................................... 16

*Loving v. United States*,
  517 U.S. 748 (1996) .................................................................................... 29

*Martin v. Mott*,
  25 U.S. 19 (1827) ........................................................................................ 31

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ...................................................................................... 8

*McGoldrick v. Gulf Oil Corp.*,
  309 U.S. 414 (1940) .................................................................................... 15

*Nat'l Cable Television Ass'n v. United States*,
  415 U.S. 336 (1974) .................................................................................... 15

*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) ............................................................. 39

*NFIB v. Dep't of Lab.*,
  595 U.S. 109 (2022) .................................................................................... 21

*Ninestar Corp. v. United States*,
   687 F. Supp. 3d 1308 (Ct. Int'l Trade 2024) .................................................. 38

*Nken v. Holder*,
   556 U.S. 418 (2009) ....................................................................................... 41

*Penn. Mun. Auths. Ass'n v. Horinko*,
   292 F. Supp. 2d 95 (D.D.C. 2003) ................................................................. 10

*PrimeSource Bldg. Prods., Inc. v. United States*,
   59 F.4th 1255 (Fed. Cir. 2023) ...................................................................... 20

*Pulsifer v. United States*,
   601 U.S. 124 (2024) ....................................................................................... 13

*Regan v. Wald*,
   468 U.S. 222 (1984) ............................................................................ 3, 16, 30

*S. Corp. v. United States*,
   690 F.2d 1368 (Fed. Cir. 1982) ..................................................................... 12

*Sampson v. Murray*,
   415 U.S. 61 (1974) ......................................................................................... 40

*Sebelius v. Auburn Reg'l Med. Ctr.*,
   568 U.S. 145 (2013) ....................................................................................... 14

*Sec. Pac. Nat. Bank v. Gov't & State of Iran*,
   513 F. Supp. 864 (C.D. Cal. 1981) ........................................................... 16, 17

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) ....................................................................................... 17

*Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*,
   576 U.S. 519 (2015) ....................................................................................... 16

*Touby v. United States*,
   500 U.S. 160 (1991) ....................................................................................... 29

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) ........................................................................ 25

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ............................................................................ 22, 31, 35

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
   106 F. Supp. 3d 125 (D.D.C. 2015) ............................................................... 42

*United States v. Amirnazmi*,
  645 F.3d 564 (3d Cir. 2011)....................................................................26, 27, 33

*United States v. Arch Trading Co.*,
  987 F.2d 1087 (4th Cir. 1993).........................................................................27

*United States v. Bush & Co.*,
  310 U.S. 371 (1940)..........................................................................................33

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936)..........................................................................................28

*United States v. Dhafir*,
  461 F.3d 211 (2d Cir. 2006)........................................................................26, 27, 29

*United States v. Mazurie*,
  419 U.S. 544 (1975)..........................................................................................29

*United States v. Shih*,
  73 F.4th 1077 (9th Cir. ...............................................................................passim

*United States v. Spawr Optical Rsch., Inc.*,
  685 F.2d 1076 (9th Cir. 1982)...................................................................12, 25

*United States v. White*,
  97 F.4th 532 (7th Cir. 2024)...........................................................................24

*United States v. Yoshida Int'l, Inc.*,
  526 F.2d 560 (C.C.P.A. 1975)......................................................................passim

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)..........................................................................................21

*Webber v. DHS*,
  2025 WL 1207587 (D. Mont. Apr. 25, 2025).............................................9, 10

*West Virginia v. EPA*,
  597 U.S. 697 (2022).....................................................................................passim

*West Virginia v. EPA*,
  No. 24-1120, 2024 WL 3542546 (D.C. Cir. July 19, 2024)...........................24, 32

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)................................................................................................9

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985).........................................................................37

*Yakus v. United States,*
   321 U.S. 414 (1944)..................................................................................27, 41

*Yellen v. Confederated Tribes of Chehalis Rsrv.,*
   594 U.S. 338 (2021)..................................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)..................................................................................22

*Zarmach Oil Serv. v. Dep't of Treasury,*
   750 F. Supp. 2d 150 (D.D.C. 2010)..........................................................30

*Zemel v. Rusk,*
   381 U.S. 1 (1965)......................................................................................28

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017)..................................................................................24

**Statutes**

7 U.S.C. § 624................................................................................................14

19 U.S.C. § 1862(c)........................................................................................14

19 U.S.C. § 1338(a)........................................................................................14

50 U.S.C. § 1621(a).....................................................................................2, 3

50 U.S.C. § 1622(a)(1)...............................................................................3, 33

50 U.S.C. § 1701.........................................................................................4, 33

50 U.S.C. § 1702(a)(1)...........................................................................passim

50 U.S.C. § 1702(b)........................................................................18, 33, 38

50 U.S.C. § 1703(d)..........................................................................................4

50 U.S.C. § 4302...............................................................................................3

50 U.S.C. § 4305(b)(1)(B).............................................................................18

Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917) ........................2

First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941) ....................................2

**Executive Orders and Implementing Notices**

*Amended Notice of Implementation of Additional Duties on Products of the
    People's Republic of China Pursuant to the President's February 1, 2025
    Executive Order Imposing Duties To Address the Synthetic Opioid Supply
    Chain in the People's Republic of China*,
    90 Fed. Reg. 9,431 (Feb. 12, 2025) ........................................................ 6

Executive Order 14195 of February 1, 2025,
    *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's
    Republic of China*,
    90 Fed. Reg. 9,121 (Feb. 7, 2025) ........................................................ 5

Executive Order 14228 of March 3, 2025,
    *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain
    in the People's Republic of China*,
    90 Fed. Reg. 11,463 (Mar. 7, 2025) ...................................................... 6

Executive Order 14257 of April 2, 2025,
    *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices
    That Contribute to Large and Persistent Annual United States Goods
    Trade Deficits*,
    90 Fed. Reg. 15,041 (Apr. 7, 2025) ............................................. 5, 6, 11

Executive Order 14259 of April 8, 2025,
    *Amendment to Reciprocal Tariffs and Updated Duties as Applied to
    Low-Value Imports From the People's Republic of China*,
    90 Fed. Reg. 15,509 (Apr. 14, 2025) ................................................ 7, 8

Executive Order 14266 of April 9, 2025,
    *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation
    and Alignment*,
    90 Fed. Reg. 15,625 (Apr. 15, 2025) .............................................. 8, 41

*Further Amended Notice of Implementation of Additional Duties on
    Products of the People's Republic of China Pursuant to the President's
    Executive Order 14195, Imposing Duties to Address the Synthetic Opioid
    Supply Chain in the People's Republic of China*,
    90 Fed. Reg. 11,426 (Mar. 6, 2025) ...................................................... 6

*Implementation of Additional Duties on Products of the People's Republic
    of China Pursuant to the President's February 1, 2025 Executive Order
    Imposing Duties To Address the Synthetic Opioid Supply Chain in the
    People's Republic of China*,
    90 Fed. Reg. 9,038 (Feb. 5, 2025) ........................................................ 6

## Other Authorities

Cong. Research Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 (Jan. 30, 2024)............................................................34

H.R. Rep. No. 95-459 (1977)............................................................................... passim

*Legal Authorities Available to the President to Respond to A Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982).......................................19

Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012)............................................17

Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Governmental Relations, 94th Cong. (Mar. 6, 1975)..........................................3

*Regulate*, American Heritage Dictionary (1976)....................................................11

*Regulate*, Black's Law Dictionary (12th ed. 2024)................................................11

*Regulate*, Black's Law Dictionary (5th ed. 1979).................................................11

*Regulate*, Random House College Dictionary 1112 (rev. ed. 1975) .........................11

*Regulate*, Webster's Third New International Dictionary (1976)..............................11

Richard Woldenberg, *Enough already! It's time to amend the lead law*, The Hill, https://thehill.com/blogs/congress-blog/economy-a-budget/87845-enough-already-its-time-to-amend-the-lead-law/ (Apr. 6, 2011, 6:51 PM) ......................................40

## Rules

Fed. R. Civ. P. 65(c)..............................................................................................43

## INTRODUCTION

In the International Emergency Economic Powers Act of 1977 (IEEPA), Congress confirmed the President's power to, among other things, "regulate importation" of foreign goods during a national emergency.  President Trump, acting under IEEPA, has regulated importation by imposing tariffs on foreign goods through a series of Executive Orders, to deal with unusual and extraordinary threats to the United States's national security, foreign policy, and economy. Plaintiffs challenge the President's authority to impose tariffs under IEEPA on both statutory and constitutional grounds.  The Court should transfer this case to the Court of International Trade, which has exclusive jurisdiction over this case.  But if the Court concludes that it has jurisdiction, it should deny a preliminary injunction.

Plaintiffs are unlikely to succeed on the merits. To start, this Court lacks subject-matter jurisdiction.  Regardless, IEEPA clearly authorizes the President to impose tariffs, as courts interpreting IEEPA's predecessor statute have already held.  Through IEEPA, Congress lawfully delegated to the President authority to regulate importation through the imposition of tariffs under specified circumstances.  To the extent that plaintiffs challenge the emergency declarations underlying the challenged IEEPA tariffs themselves, those declarations are unreviewable political questions.  Plaintiffs' remaining arguments likewise fail.  Plaintiffs are thus unlikely to succeed on the merits of any of their claims.

Nor have plaintiffs established that they will be irreparably harmed without an injunction, or that the equities favor them rather than a President taking foreign-affairs actions to protect our nation's national security and economy.  The Court should thus transfer the case without ruling on the preliminary injunction motion or deny plaintiffs' motion outright.

## BACKGROUND

I.     **The President's Authority Under IEEPA To Regulate Importation During National Emergencies**

Before IEEPA, the Trading With the Enemy Act (TWEA), Pub. L. No. 65-91, 40 Stat. 411 (1917), authorized the President to "regulate . . . importation" of foreign goods during wartime. Later, Congress expanded the authority to apply during times of peace as well. *See* First War Powers Act, Pub. L. No. 77-354, 55 Stat. 838, 839-40 (1941). In 1971, President Nixon invoked TWEA's "regulate . . . importation" authority to impose tariffs during peacetime. Proclamation 4074, *Imposition of Supplemental Duty for Balance of Payments Purposes*, 36 Fed. Reg. 15,724 (Aug. 17, 1971). Because a "prolonged decline in the international monetary reserves" of the United States had seriously threatened the nation's "international competitive position" and potentially impaired its ability to assure national security, he "declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports" and called on the public and private sector to "make the efforts necessary to strengthen the international economic position of the United States." H.R. Rep. No. 95-459, at 5 (1977); Proclamation 4074, 36 Fed. Reg. at 15,724. The Federal Circuit's predecessor upheld the lawfulness of those tariffs, rejecting that TWEA did not authorize the President to impose tariffs and that TWEA violated the nondelegation doctrine. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 575-76, 580-83 (C.C.P.A. 1975).

Against that backdrop, Congress modified TWEA through two new laws: the National Emergencies Act (NEA) and IEEPA. *See* H.R. Rep. No. 95-459, at 6-7. First, NEA, Pub. L. No. 94-412, 90 Stat. 1255 (1976), "authorized" "the President" "to declare [a] national emergency" "[w]ith respect to Acts of Congress authorizing the exercise, during the period of a national emergency, of any special or extraordinary power." 50 U.S.C. § 1621(a). Congress placed no

substantive conditions on the President's ability to declare a national emergency. Instead, it committed this determination to the President, as "it would be wrong to try to circumscribe with words with what conditions a President might be confronted." Nat'l Emergencies Act: Hr'gs Before the Subcomm. on Admin. Law and Gov't Relations, 94th Cong. 27 (Mar. 6, 1975) (statement of Sen. Mathias); *see id.* at 31 ("[W]e didn't attempt to define it specifically because we were afraid we would circumscribe the President's constitutional powers."); *id.* at 27 (statement of Sen. Church) (similar).

Recognizing that emergency declarations would be political questions, Congress gave itself oversight authority over national-emergency declarations. National-emergency declarations must be "immediately . . . transmitted to the Congress and published in the Federal Register." 50 U.S.C. § 1621(a); *see id.* § 1641(a)-(c). Congress is authorized to terminate a national emergency by enacting a joint resolution into law. 50 U.S.C. § 1622(a)(1). Fast-track procedures accelerate congressional review when a resolution is introduced. *Id.* § 1622(c). And Congress is directed to meet within six months of the declaration of a national emergency to consider terminating the emergency. *Id.* § 1622(b). In addition, national-emergency declarations automatically terminate after one year unless the President notifies Congress that the emergency "continue[s]." *Id.* § 1662(d).

Second, IEEPA separated the President's authority to act in wartime and peacetime. Congress limited TWEA to apply only in periods of declared wars. *See* 50 U.S.C. § 4302. IEEPA then extended the President's authority to periods of declared national emergencies during peacetime. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). The broad powers granted to the President under IEEPA are "essentially the same as" those granted under its predecessor TWEA. *Id.* Indeed, IEEPA's operative language was "directly drawn" from TWEA. *Dames &*

*Moore v. Regan*, 453 U.S. 654, 671-72 (1981).  IEEPA authorizes the President to exercise those powers during peacetime "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States."  50 U.S.C. § 1701(a).  Once the President declares a national emergency relating to such a threat, IEEPA empowers the President to "regulate . . . importation . . . with respect to any property, subject to the jurisdiction of the United States."  *Id.* § 1702(a)(1)(B).  Unlike TWEA, IEEPA contains narrow exceptions to this broad grant of authority.  Among other things, the President cannot regulate or prohibit "the importation from any country . . . of any information or informational materials . . . ."  *Id.* § 1702(b)(1)-(4).  Despite Congress's awareness of President Nixon's action and *Yoshida* upholding the tariffs, none of IEEPA's exceptions involve the President's authority to impose tariffs to deal with a declared national emergency.

Congress gave itself additional oversight authority over exercises of IEEPA powers beyond that afforded by NEA.  50 U.S.C. § 1703(d).  The President "shall consult regularly with the Congress so long as [IEEPA] authorities are exercised."  *Id.* § 1703(a).  The President is also directed to "immediately transmit to the Congress a report" on the national emergency, to be updated every six months.  *Id.* § 1703(b)-(c).  Even so, Congress, in enacting IEEPA, recognized that its "new authorities should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies."  H.R. Rep. No. 95-459, at 10 (1977).  For instance, Congress rejected a proposal "that it place a definite time limit on the duration of any state of national emergency."  *Id.*

II.    **Factual Background**

A.    **Executive Order 14195 And Modification**

In January 2025, the President declared the flow of contraband drugs like fentanyl to the United States through illicit distribution networks, and the resulting public-health crisis, to be a national emergency. *See* Proclamation 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 20, 2025); Executive Order 14157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8,439 (Jan. 20, 2025).

On February 1, 2025, the President took additional action under IEEPA to specifically address the unusual and extraordinary threat from the People's Republic of China (PRC), including the PRC's failures to stem the flow of contraband drugs to the United States. Executive Order 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025). The President found that the PRC had failed "to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [Transnational Criminal Organizations], criminals at large, and drugs." *Id.* at 9,122. To address the national emergency, the President took "decisive and immediate action" under IEEPA and "decided to impose, consistent with law, ad valorem tariffs on [certain] articles that are products of the PRC." *Id.*

The President then imposed a 10 percent *ad valorem* duty rate on most goods imported from the PRC and authorized the U.S. Department of Homeland Security (DHS) to take any necessary actions to implement the order. *Id.* at 9,122-23. DHS, through U.S. Customs and Border Protection, did so shortly thereafter. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025*

*Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,038 (Feb. 5, 2025) (implementing the 10 percent duty through amendments to the Harmonized Tariff Schedule of the United States set out in an Annex to the Federal Register notice)*; Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,431 (Feb. 12, 2025). On March 3, 2025, the President amended the order to increase the amount of duty to 20 percent. Executive Order 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,426 (Mar. 6, 2025) (implementing the 20 percent duty through amendments to the Harmonized Tariff Schedule of the United States set out in an Annex to the Federal Register notice).

### B.    Executive Order 14257 And Modification

On April 2, 2025, the President declared a national emergency based on the trade deficit's effect on the country's economy and security. The President found "that underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits, constitute an unusual and extraordinary threat to the national security and economy of the United States." Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices*

*That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025).  He deemed the emergency to "ha[ve] its source in whole or substantial part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system."  *Id.*

These "large and persistent annual U.S. goods trade deficits" have "atroph[ied]" our nation's "domestic production capacity" to the point where, now, the United States' "military readiness" and "national security posture" are "compromise[d]"—an "especially acute" emergency given "the recent rise in armed conflicts abroad."  *Id.* at 15,044-45.  The Executive Order explains that "U.S. stockpiles of military goods are too low to be compatible with U.S. national defense interests."  *Id.* at 15,043.  Additionally, "[i]ncreased reliance on foreign producers for goods also has compromised U.S. economic security by rendering U.S. supply chains vulnerable to geo-political disruption and supply shocks."  *Id.* (noting the existence of supply disruptions currently being caused by "Houthi rebels . . . attacking cargo ships in the Middle East").  "The future of American competitiveness depends on reversing" the hemorrhaging of manufacturing and manufacturing jobs to create "the industrial base" the nation "needs for national security," as well as safeguarding the vitality of the nation's food and agriculture sectors.  *Id.* at 15,044.

Citing IEEPA, the President acted to deal with this threat by imposing duties ranging from 10 percent to 50 percent *ad valorem* on most imported goods.  *Id.* at 15,045.  The 10 percent baseline took effect on April 5, 2025, with increased duty rates for select countries taking effect on April 9, 2025.  *Id.*  Since the initial declaration, the President has twice taken additional actions to address this national emergency.  One executive order addressed retaliatory tariffs imposed by the PRC.  Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated*

*Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025).  Another executive order paused for 90 days the country-specific increased additional duty rates listed in Executive Order 14257, except as to the PRC (for which the Executive Order raised the rate).  Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 15, 2025).

### C.  Plaintiffs Sue To Enjoin The Executive Orders

On April 22, 2025, plaintiffs—Learning Resources, Inc. and hand2mind, Inc.—sued in this Court rather than the United States's specialized trade court.  Compl., ECF No. 1.  Two days later, they moved for a preliminary injunction.  *See generally* Mot., ECF No. 9.  Plaintiffs allege that they are importers who "develop their products . . . in the United States, but outsource most manufacturing to factories in other countries."  Compl. ¶ 10.

Plaintiffs argue that "Congress has not authorized the President to exercise [tariff] power through IEEPA," the underlying national emergency is not an "'unusual' or 'extraordinary' circumstance that Congress made a prerequisite for action under IEEPA," the challenged tariffs are not "reasonably related to addressing the declared national emergencies," and the "President's interpretation lacks any 'intelligible principle' necessary to make IEEPA constitutional."  Mot. 2-3.  As a remedy, plaintiffs ask the Court to "preliminarily enjoin the agency Defendants from taking any action to implement or enforce the tariffs announced in the President's unlawful executive orders."  Mot. 15.

### STANDARD OF REVIEW

This Court should deny plaintiffs' preliminary-injunction motion.  Preliminary relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997). Plaintiffs must show that they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tips in their favor, "and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs satisfy none of the factors.

## ARGUMENT

### I.    Plaintiffs Are Unlikely To Succeed On The Merits

#### A.    This Court Lacks Jurisdiction Because The Court Of International Trade Has Exclusive Jurisdiction Over Challenges To Tariffs

Plaintiffs' request fails at the outset because they filed this case in the wrong court. As our motion to transfer explained, the Court of International Trade has exclusive jurisdiction over all of plaintiffs' claims, including those relating to IEEPA. *See* ECF No. 8. In a similar case brought by different plaintiffs, that court has already denied a temporary restraining order, and, on May 13, it will hold a hearing on those plaintiffs' motion for a preliminary injunction and summary judgment. *See V.O.S. Selections, Inc. v. Trump*, No. 25-00066, ECF No. 13 (Ct. Int'l Trade). That court has also invited plaintiffs in another similar challenge, *Oregon v. Trump*, No. 25-00077 (Ct. Int'l Trade), to file a brief before the argument. *Id.*, ECF No. 10. And that court is considering two other similar cases challenging the President's imposition of tariffs under IEEPA. *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 25-00078 (Ct. Int'l Trade); *Barnes v. United States*, No. 25-0043 (Ct. Int'l Trade).

In addition, since defendants filed their motion to transfer, the United States District Court for the District of Montana has concluded that it lacked jurisdiction over a materially indistinguishable IEEPA challenge and transferred the case to the Court of International Trade. *Webber v. DHS*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025) (appeal pending). That court held that "the decision of whether to transfer this matter is not a discretionary one; where, as here, a

matter falls within the exclusive jurisdiction of the Court of International Trade, the district court is divested of its jurisdiction and the matter *must* be transferred." *Id.* at *6. As that court also explained, its conclusion that the Court of International Trade has exclusive jurisdiction does not require any merits determinations. *Id.* at *5 & n.2. The same is true here: This Court lacks jurisdiction and must transfer the case to the Court of International Trade.

The Court's lack of jurisdiction means that it cannot enter a preliminary injunction. "[W]hen presented with a motion for a preliminary injunction and a competing motion [challenging the Court's jurisdiction], the Court must address the jurisdictional issues first, and may reach the merits of the motion for preliminary injunction only once, and only if, jurisdiction is established." *Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 149 (D.D.C. 2004); *see also, e.g.*, *Penn. Mun. Auths. Ass'n v. Horinko*, 292 F. Supp. 2d 95, 101 (D.D.C. 2003) ("[P]laintiffs' preliminary injunction motion does not take priority over defendants' motion to dismiss for lack of jurisdiction. Jurisdiction, of course, is a threshold matter; without it, this court has no authority to decide other potentially dispositive issues in this case."). Thus, a court may not entertain an application for an injunction where it lacks jurisdiction, and it must assess its jurisdiction first. *Labat-Anderson*, 346 F. Supp. 2d at 149, 155 (denying injunctive relief due to lack of jurisdiction, and transferring action to the appropriate court). The Court should accordingly hold that it lacks jurisdiction and grant defendants' motion to transfer before the hearing set on plaintiffs' preliminary-injunction motion.

### B. IEEPA Constitutionally Authorizes The President To Impose Tariffs, Including The Tariffs Contested Here

#### 1. IEEPA Includes Tariff Authority

President Trump imposed the challenged tariffs under the authority granted to him by IEEPA to "regulate . . . importation" to deal with a national emergency. 50 U.S.C.

§ 1702(a)(1)(B); Executive Order 14257, 90 Fed. Reg. 15,041. Text, context, and history compel the conclusion that IEEPA clearly authorizes the President to impose tariffs.

### a.    Text And Context

IEEPA's plain text authorizes the President to impose tariffs. When a national emergency is declared:

> [T]he President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise . . . investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in . . . *any property* in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

50 U.S.C. § 1702(a)(1)(B) (emphases added). Imposing tariffs falls within the power to "regulate . . . importation" of foreign goods. *Id.* Tariffs set the terms on which foreign goods enter the United States. That is consistent with the definition of "regulate," both now and when IEEPA was enacted. *See Regulate*, Black's Law Dictionary (12th ed. 2024) ("To control (an activity or process) esp. through the implementation of rules"); *Regulate*, Black's Law Dictionary 1156 (5th ed. 1979) ("[F]ix, establish or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws"); *Regulate*, Random House College Dictionary 1112 (rev. ed. 1975) ("[T]o control or direct by a rule, principle, method, etc."); *Regulate*, American Heritage Dictionary (1976) ("To control or direct according to a rule"); *Regulate*, Webster's Third New International Dictionary (1976) ("[T]o govern or direct according to rule; to bring under the control of law or constituted authority"); *see* Mot. 18 (citing similar definitions).

Precedent confirms this straightforward reading of IEEPA's language. Interpreting identical language in TWEA, the Federal Circuit's predecessor upheld a tariff imposed by President Nixon, explaining that the phrase "regulate importation" authorized the President to "impos[e] an import duty surcharge." *Yoshida*, 526 F.2d at 576; *accord Alcan Sales v. United States*, 693 F.2d 1089, 1093 (Fed. Cir. 1982); *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 n.10 (9th Cir. 1982). That decision remains binding precedent in the court in which this case should have been filed. *See S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982) (Federal Circuit adopting the body of law of the Court of Customs and Patent Appeals).

Courts have likewise long held that tariffs are a form of "regulation" of commerce. *See, e.g.*, *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933) (recognizing that it is "well established" that import duties may be imposed "in the exercise of the power to regulate commerce"); *Groves v. Slaughter*, 40 U.S. 449, 505 (1841) (McLean, J., concurring) ("Under the power to regulate foreign commerce, [C]ongress [may] impose duties on importations."); *Gibbons v. Ogden*, 22 U.S. 1, 202 (1824) ("[D]uties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce."); *Yoshida*, 526 F.2d at 575 n.20 ("it is well established that" the power to "lay duties upon imports" "can be employed in the exercise" of "the power to regulate commerce" (collecting cases)); *contra* Mot. 19. And if that left doubt, tariffs are certainly a way of regulating *importation*—the terminology IEEPA uses. IEEPA's authorization to "regulate . . . importation" of "any property in which any foreign country or a national thereof has any interest" accordingly vests the President with authority to impose tariffs on such property, as the Federal Circuit's predecessor already held when considering the same language in IEEPA's predecessor statute. *Yoshida*, 526 F.2d at 576. IEEPA further authorizes the

President to regulate any property "subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).

Statutory context reinforces this conclusion.  The power to "regulate" imports by imposing tariffs is similar to the other powers granted in IEEPA's subparagraph (a)(1)(B), like the power to "block" the import of goods during an investigation, or the power to "prevent or prohibit" those imports.  *Id.* § 1702(a)(1)(B).  Each of these terms grants the President a significant power over foreign commerce.  And many of them partially or fully overlap, suggesting that Congress entrusted the President with wide-ranging powers with respect to imports rather than carefully picking and choosing isolated types of interventions.  For example, the list of powers includes two obvious pairs of belt-and-suspenders terms: "direct and compel" and "prevent or prohibit."  *Id.*  It confers the overlapping powers to "nullify" and "void" various transactions.  *Id.*  Similarly, the power to "prevent or prohibit" imports could be used to "block" imports during an investigation, but the statute goes out of its way to grant both powers.  *Id.*

Regardless, attempting to read section 1702(a)(1)(B)'s list as enumerating discrete powers instead of providing broad Presidential authority would lead to the same conclusion about "regulation."  If each power articulated in the list is distinct, then "regulation" of imports must include actions such as tariffs; otherwise, it would mean little, if anything, other than the power to "prevent or prohibit" imports—leaving the term largely superfluous.  *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 141-43 (2024) (rejecting reading that would leave a provision "superfluous," "without any operative significance").

Plaintiffs argue that the existence of *other* statutes authorizing the imposition of "duties" prohibits the President from invoking his powers under IEEPA, simply because it does not use

13

the same term.  Mot. 17-18 (citing 19 U.S.C. §§ 1338(a), 2132(a), 2411(c)).[1]  But plaintiffs cite

no court that has endorsed their magic-words requirement.  *See* Mot. 17 (requiring "unmistakable

language").  To the contrary, as a general matter, Congress need not "incant magic words," like

specifying that a statute authorizes "tariffs" in particular, "in order to speak clearly."  *Sebelius v.*

*Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013); *see FAA v. Cooper*, 566 U.S. 284, 291 (2012)

(similar).  In IEEPA, Congress made its intentions clear by authorizing the President to "regulate

. . . importation"—a term that Congress knew allows the President to impose import duties.

*Yoshida*, 526 F.2d at 576.  Regardless, the fact that Congress has elsewhere used narrower

language to convey a power says little about the meaning of the broader language it used in

TWEA or IEEPA.  Plaintiffs' examples, sections 122 and 301 of the Trade Act of 1974 and

section 338 of the Tariff Act of 1930, permit non-emergency tariffs to address specific concerns;

IEEPA, by contrast, provides for broad emergency powers, including tariffs, to address a variety

of threats.  Indeed, *Yoshida* already rejected the idea that statutes applicable in non-emergency

situations can narrow the powers available in an emergency.  *See* 526 F.2d at 578 ("trade acts"

that do not involve "national emergency powers" did not narrow TWEA's scope).

    In any event, plaintiffs do not capture the breadth of those other provisions.  For example,

section 232 of the Trade Expansion Act of 1962 authorizes the President to "adjust . . . imports"

where national security is threatened.  19 U.S.C. § 1862(c).  This language is similar to, and no

more specific than, IEEPA's authorization to "regulate . . . importation."  But there is no question

---

[1]  Plaintiffs also suggest that IEEPA does not authorize tariffs because it is not found in
Title 19 of the U.S. Code, Mot. 2, 4, 20, but they forget that courts give little weight "to where a
law is located within the United States Code in determining the meaning of a statute because
Congress votes on particular bills rather than the United States Code."  *In re Methyl Tertiary
Butyl Ether Prods. Liab. Litig.*, 522 F. Supp. 2d 557, 567 n.66 (S.D.N.Y. 2007).  Indeed, other
statutes authorizing tariffs can be found elsewhere in the U.S. Code.  *See, e.g.*, 7 U.S.C. § 624
(authorizing the President to impose "fees and limitations" on certain imports that "shall be
treated . . . as duties").

that section 232 allows the President to "adjust . . . imports" through tariffs. *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 562 (1976) (Section 232's "adjust . . . imports" means that "the President's authority extends to the imposition of monetary exactions, i.e., license fees and duties"). Instead, both IEEPA and section 232 show that, in times of national emergency or when national security is threatened, Congress uses broad language to entrust the President with broad powers to take precisely the kind of flexible, tailored measures necessary to protect the nation. *See Corbett v. TSA*, 19 F.4th 478, 488 (D.C. Cir. 2021) ("Congress' choice of 'broad language' in the Act 'reflects an intentional effort to confer the flexibility necessary' for TSA to address yet unknown threats to transportation security and safety as they arise.").

Finally, plaintiffs' reliance on *Diginet, Inc. v. Western Union ATS, Inc.* (Mot. 18) is misplaced because that case analyzes Illinois law and whether the state of Illinois granted "explicit authority" to a municipality to enact a tax. 958 F.2d 1388, 1399 (7th Cir. 1992). This is inapposite to a Congressional delegation of authority to the President to respond to emergencies. Plaintiffs' reliance on *National Cable Television Ass'n v. United States* (Mot. 20) is likewise misplaced because, there, the concern was the power of an administrative agency to establish fees. 415 U.S. 336, 338-40 (1974). Neither case concerns the President's authority over foreign affairs. And neither calls into doubt that tariffs are inherently a form of regulating foreign commerce. *See McGoldrick v. Gulf Oil Corp.*, 309 U.S. 414, 428 (1940) ("The laying of a duty on imports, although an exercise of the taxing power, is also an exercise of the power to regulate foreign commerce."). Plaintiffs' argument suggests that Congress granted the President unfettered authority to embargo goods or set quotas, but not to resolve an emergency with the lesser remedy of tariffs. It would be strange for Congress to grant the President authority to impose embargoes, but not the flexibility to resolve an emergency with tariffs that, "[u]nlike

quotas and other forms of action," can "be quickly imposed and removed" and are "administratively less complex." *Yoshida*, 526 F.2d at 580.

### b.     History

IEEPA's history further confirms that it authorizes the President to impose tariffs. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see Tex. Dep't of Housing & Comm. Affairs v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536 (2015); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009). Congress drew the relevant language directly from TWEA, and it did so *after* the Federal Circuit's predecessor (in *Yoshida*) interpreted that identical language to permit the President to impose tariffs in 1975. During the legislative process for IEEPA, Congress was well aware of the relevant language and the *Yoshida* decision interpreting the language to authorize the President to impose tariffs, but chose to keep the language when it enacted IEEPA in 1977.

The key language in IEEPA, "regulate . . . importation," was borrowed verbatim from TWEA. *See* Dec. 18, 1941, ch. 593, title III, § 301, 55 Stat. 839 (authorizing the President to "investigate, *regulate*, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in . . ." (emphases added)); 50 U.S.C. § 1702(a)(1)(B). Courts, including the Supreme Court, have repeatedly recognized the close relationship between the substantive powers conferred by IEEPA and TWEA. *See, e.g.*, *Dames*, 453 U.S. at 671-72 (the pertinent section of IEEPA's language was "directly drawn" from TWEA); *Regan*, 468 U.S. at 227-28 ("[T]he authorities granted to the President [under] IEEPA are essentially the same as those [under] TWEA."); *Sec. Pac. Nat. Bank v. Gov't & State of Iran*, 513 F. Supp. 864, 875, 877 (C.D. Cal.

16

1981) (Section 1702 of "IEEPA is, except for stylistic changes, a reenactment of the powers previously conferred on the President by § 5(b) of the TWEA.").

Plaintiffs present *Yoshida* as a blip to be ignored, Mot. 18, 25-26, but Congress was well aware of *Yoshida*'s interpretation of TWEA when it chose to use the same language in IEEPA. President Nixon's use of TWEA to impose tariffs was well known—widely called the "Nixon shock." *See, e.g.*, Nat'l Bureau of Econ. Research, Douglas A. Irwin, *The Nixon Shock after Forty Years: The Import Surcharge Revisited* (2012). And TWEA's role and interpretation were familiar to Congress. Indeed, the House Report on IEEPA cited *Yoshida* and explained its holding. H.R. Rep. No. 95-459, at 5. It recounted that "section 5(b) [of TWEA] came into play when . . . President Nixon declared a national emergency . . . and under that emergency imposed a surcharge on imports," that the Customs Court invalidated the action after holding that "section 5(b) . . . did not" permit "imposition of duties," but that "the Appeals Court reversed." *Id.* Aware of that history, Congress chose to adopt the same language in IEEPA.

The language Congress drew directly from TWEA carries the same meaning in IEEPA. "[W]hen Congress 'adopt[s] the language used in [an] earlier act,'" courts "presume that Congress 'adopted also the construction given'" to that language. *Georgia v. PublicResource.Org, Inc.*, 590 U.S. 255, 270 (2020) (quoting *Helsinn Healthcare S. A. v. Teva Pharm. USA, Inc.*, 586 U.S. 123, 131 (2019)); *see Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'"). Courts, including the Supreme Court, have recognized this by applying TWEA precedent to interpret IEEPA. *See Dames*, 453 U.S. at 672 ("[W]e think both the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power [*i.e.*, IEEPA].");  *Sec. Pac. Nat. Bank*, 513 F. Supp.

at 877 ("[T]he substantial body of judicial interpretation of the TWEA should be applied to interpret the powers of the President under the IEEPA.").

Plaintiffs read this history backwards. They argue that Congress passed IEEPA to take away power previously asserted by the President. Mot. 24-26. But Congress limited the President's power by including new procedural directives and delineating specific exceptions to the otherwise broad grant of authority under IEEPA—none of which curtailed the President's authority to impose tariffs to deal with a declared national emergency. Congress *knew* that TWEA had been used to impose tariffs, yet it chose to use the same language that had conferred that authority without modifying it or expressly precluding their imposition. *See* 50 U.S.C. § 1702(b) (listing "Exceptions to Grant of Authority," none of which involve imposing tariffs); *Am. Int'l Grp., Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 440 (D.C. Cir. 1981) ("The House Report accompanying that legislation states that the language in question [in IEEPA] 'basically parallels' section 5(b) of the Trading with the Enemy Act."). That would be an unusual way to go about repudiating a judicial interpretation or taking away an emergency power.

Plaintiffs also view Presidents' use of other statutory authorities to impose tariffs as evidence of *Yoshida*'s subordination. Mot. 26-27. That is speculation: Plaintiffs cite no authority whatsoever suggesting an Executive Branch view that the President *lacked* authority to impose tariffs under IEEPA. *See id.* And plaintiffs' theory would mean that TWEA itself does not authorize the President *in times of war* to impose tariffs, as TWEA still has the same relevant language plaintiffs claim does not authorize the President to impose tariffs under IEEPA. 50 U.S.C. § 4305(b)(1)(B); *see Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021) (rejecting interpretation that would have a "highly counterintuitive result").

### c.    Purpose

Finally, IEEPA's evident purpose confirms that it includes the power to impose tariffs. The purpose of emergency statutes like IEEPA is to give the President broad and flexible powers to effectively address problems associated with a national emergency.  As the Federal Circuit's predecessor explained, "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully."  *Yoshida*, 526 F.2d at 573.  "The delegation in [TWEA] is broad and extensive; it could not have been otherwise if the President were to have, within constitutional boundaries, the flexibility required to meet problems surrounding a national emergency with the success desired by Congress."  *Id.*  Indeed, "the legislative history of [IEEPA] notes that the authorities available to the President should be sufficiently broad and flexible to enable the President to respond as appropriate and necessary to unforeseen contingencies."  *Legal Authorities Available to the President to Respond to A Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Prods.*, 6 U.S. Op. Off. Legal Counsel 644, 681 (1982) (quotation omitted).  Interpreting IEEPA to include the power to impose tariffs furthers Congress's purpose to give the President the necessary tools and flexibility to effectively handle national emergencies.

Especially in this context.  When it comes to foreign affairs, "broad grants by Congress of discretion to the Executive are common."  *Florsheim Shoe Co., Div. of Interco v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984).  IEEPA "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders."  *Id.* at 793 (cleaned up); *see, e.g.*, *B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996) (reiterating "the principle that statutes granting the President authority to act in matters touching

on foreign affairs are to be broadly construed"); *Al-Bihani v. Obama*, 619 F.3d 1, 39 (D.C. Cir. 2010) (Kavanaugh, J., concurring).  When foreign affairs and national security are involved, "the President plays a dominant role," and "it is generally assumed that Congress does not set out to tie the President's hands; if it wishes to, it must say so in clear language."  *Humane Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001).  Plaintiffs cannot point to clear language cabining the President's authority.  Just the opposite—text, history, and context all show that IEEPA authorizes the President to impose tariffs.

Plaintiffs seek a narrower reading by invoking constitutional avoidance.  Mot. 36-37.  But, as explained below, there is no nondelegation problem to avoid.  Nor would a constitutional-avoidance reading be possible here.  Plaintiffs complain of a nondelegation problem with IEEPA's lack of "limiting guidance" on "products" and "countries" on which the President can impose tariffs, "amount[s]" and "duration[s]" of those tariffs, or "process[es]" for presidential decisionmaking, Mot. 37, but they identify no statutory text that the Court could plausibly construe to impose any of those restrictions.  *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (constitutional avoidance only appropriate when a statute has "more than one plausible construction").  No constitutional-avoidance reading is available to avoid plaintiffs' (unfounded) nondelegation concerns.

In sum, plaintiffs cannot show that the President's actions here are a "clear misconstruction" of IEEPA.  *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023).

### d.    The Major-Questions Doctrine

In plaintiffs' view, the Court should not presume that Congress delegated authority to the President because of the "unprecedented" nature of the tariffs.  Mot. 27-28.  But the major-questions doctrine does not apply here and, even if it did, it would not help plaintiffs anyway.

"Where the statute at issue is one that confers authority upon an administrative agency . . . there are extraordinary cases that . . . provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up). In such cases, under the major-questions doctrine, the agency "must point to clear congressional authorization" for the proposed regulation. *Id.* at 723 (quotation omitted).

      1.      At the threshold, the major-questions doctrine does not apply because "the statute at issue" does not "confer[] authority upon an administrative agency." *Id.* at 721. Instead, it confers authority on the President. The Supreme Court has never applied the major-questions doctrine to a statute delegating power to the President. Rather, it has described the doctrine as applicable to statutes giving authority to agencies: "[T]he major questions doctrine label . . . took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: *agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 724 (cleaned up) (emphasis added). That distinction matters. Agencies lack political accountability, but "the Framers made the President the most democratic and politically accountable official in Government." *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020). The political-accountability justification for the major-questions doctrine thus does not apply— especially where, as here, the President directs an action in an executive order. *See NFIB v. Dep't of Lab.*, 595 U.S. 109, 125 (2022) (Gorsuch, J., concurring) (raising concerns of "government by bureaucracy").

      Similarly, the major-questions doctrine does not apply to national-security and foreign-policy matters. A major-questions approach treats a decision with a "measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That approach is irreconcilable with

longstanding precedent compelling the opposite approach in these contexts. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on these matters); *Dep't of Navy v. Egan*, 484 U.S. 518, 529-30 (1988) (recounting the "utmost deference to Presidential responsibilities" that courts have "traditionally shown" in these matters); *B-West Imports*, 75 F.3d at 636. So, in this area, unlike in cases where courts have taken a major-questions approach, there is no "reason to hesitate before concluding that Congress meant to confer" significant authority to regulate foreign commerce on the President. *West Virginia*, 597 U.S. at 721 (cleaned up). That is especially so when the statute speaks to the President in this area. The President's overlapping powers in the national-security and foreign-affairs realm diminish any concerns of unauthorized overreach—the basic thrust of the major-questions doctrine. The President's "authority is at its maximum" when he acts pursuant to the "authorization of Congress," and in those circumstances he "may be said" to "personify the federal sovereignty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-36 (1952) (Jackson, J., concurring in the judgment).

**2.**     Even if the major-questions doctrine were not categorically inapplicable, plaintiffs press no persuasive argument that it would apply to the challenged tariffs. Plaintiffs focus almost exclusively on the economic significance of the President's tariffs. Mot. 27-29. No one doubts the significance of the challenged tariffs, but significance alone does not implicate the major-questions doctrine; otherwise, it would apply to countless government actions, including every emergency statute. Instead of looking only to dollar values, the Supreme Court has identified several traits of regulatory action that, in combination, implicate the major-questions doctrine when an agency takes a sufficiently significant action. None of the remaining indicia of major questions—let alone an adequate combination—are present here.

Plaintiffs argue that the President's use of IEEPA to impose tariffs is "a previously 'unheralded power'" that he has just "discover[ed]," Mot. 27 (quoting *West Virginia*, 597 U.S. at 722). They likewise argue that the Executive Branch has long interpreted IEEPA not to authorize tariffs. Those claims are not accurate. The President exercised his tariff power under materially identical language in IEEPA's predecessor statute. *See Yoshida*, 526 F.2d at 576. And the President's challenged actions accord with a robust history of similar exercises of power under IEEPA to achieve foreign-policy objectives by regulating imports and exports—often with even more complete measures like total or near-total embargoes. *See, e.g.*, Executive Order 13873, *Securing the Information and Communications Technology Services Supply Chain*, 84 Fed. Reg. 22,689 (May 17, 2019) (invoking IEEPA to bar the importation of certain technology that was "designed, developed, manufactured, or supplied" by anyone "subject to the jurisdiction or direction of a foreign adversary"); Executive Order 12959, *Prohibiting Certain Transactions With Respect to Iran*, 60 Fed. Reg. 24,757 (May 9, 1995) (invoking IEEPA to bar "the importation into the United States or the financing of such importation of any goods or services of Iranian origin," with certain exceptions). Presidents have exercised the power to regulate imports and exports dozens of times before—once or more in nearly every year since 1979. *See* Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 at 58-62 (Jan. 30, 2024) (collecting uses of IEEPA).

Nor do the tariffs represent a "transformative expansion" in the President's authority under IEEPA. Mot. 28 (quoting *West Virginia*, 597 U.S. at 724). Unlike the plaintiffs' example—the CDC's attempt to regulate "the landlord-tenant relationship" in response to the COVID-19 pandemic, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)—IEEPA directs the President to exercise power well within his expertise and ordinary purview. Matters of

23

national security and foreign policy are "the prerogative of Congress and the President." *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see Egan*, 484 U.S. at 527 (discussing the "constitutional investment of power in the President" over matters of national security). Little could be more clearly within the President's core duties and competencies, and the President's exercise of statutorily-conferred authority over foreign policy and national security is unsurprising. *Cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (action not "surprising," despite unprecedented scope, because "addressing infection problems in Medicare and Medicaid facilities is what [the Secretary of HHS] does"); *West Virginia v. EPA*, No. 24-1120, 2024 WL 3542546, at *1 (D.C. Cir. July 19, 2024) (rejecting application of "major question" doctrine because the action "falls well within [the agency's] bailiwick"); *Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 853 (D.C. Cir. 2024) (rejecting application of "the major questions doctrine" because there was "no 'reason to hesitate'" that Congress authorized the action).

Even if the major-questions doctrine were implicated here, the Executive Orders would still be supported by the "clear congressional authorization for the power" they exercised to impose and modify tariffs in response to unfair foreign trade practices. *West Virginia*, 597 U.S. at 723 (quotation omitted). The major-questions doctrine provides no basis to invalidate an action where the statute "specifically authorizes the [agency] to make decisions like th[e] one" under review. *United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024). That remains true when the authorization is couched in clear but broad language. *See Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) (major-questions doctrine did not apply because "a broad grant of authority" that "plainly encompasses the [agency's] actions . . . does not require an indication that specific activities are permitted"); *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not require "an

'unequivocal declaration' from Congress authorizing the *precise* agency action under review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis for the agency action is necessary" (emphasis added)). Indeed, the Ninth Circuit has found the relevant language here to be "*unambiguous*" and to "*clearly* show[] that the President's actions [imposing tariffs] were in accordance with the power Congress delegated." *Spawr Optical*, 685 F.2d at 1081 n.10 (emphases added). The major-questions doctrine is no basis for this Court to enjoin the challenged tariffs.

### 2.    IEEPA Is A Valid Delegation Of Congressional Authority

Congress's delegation to the President does not violate the nondelegation doctrine. *See* Mot. 36-38. "The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019). That standard is "not demanding." *Id.* at 146. "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive." *Id.* Courts, including the Supreme Court, have "over and over upheld even very broad delegations." *Id.*

The Supreme Court and lower courts have repeatedly rejected nondelegation challenges to the President's imposition of trade regulations, including tariffs, under similar statutory language. *See, e.g.*, *Algonquin*, 426 U.S. at 559-60 (concluding that the President's imposition of a license fee system under his authority to "adjust imports" in section 232 of the Trade Expansion Act was not an improper delegation of Congress's power to regulate commerce); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1332-33 (Fed. Cir. 2021) (same); *United States v. Shih*, 73 F.4th 1077, 1092 (9th Cir. 2023) ("[a]gree[ing] with every Circuit to have considered the issue that IEEPA" does not "run afoul of the nondelegation doctrine") (collecting cases).

Most on point, in *Yoshida*, the Federal Circuit's predecessor upheld Congress's delegation of tariff authority to the President against a similar nondelegation challenge to TWEA.  526 F.2d at 582.  There, the Court identified the intelligible principles: (1) "Presidential exercise is limited to actions consistent with the national emergency purpose" of the statute, a purpose that requires the President "to take a political step, the declaring of a national emergency, before acting"; and (2) "that the power delegated therein shall be applied only to 'property in which any foreign country or a national thereof has any interest.'"  *Id.* at 581-83.  IEEPA provides at least the same intelligible principles *Yoshida* identified as lawful—a limitation to actions consistent with the national-emergency purpose applying only to property in which there is a foreign interest.  *See id.*

If anything, this case is easier than *Yoshida* because IEEPA has even more limitations than TWEA, meaning that Congress provided intelligible principles that "meaningfully constrain the President's discretion."  *United States v. Dhafir*, 461 F.3d 211, 216 (2d Cir. 2006) (cleaned up).  In IEEPA, Congress added "several procedural restrictions" not present in TWEA, "including congressional consultation, review, and termination" of declared emergencies.  *United States v. Amirnazmi*, 645 F.3d 564, 577 (3d Cir. 2011).  Those restrictions "struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input."  *Id.*  Congress thus guarded against any nondelegation concerns by positioning itself as the body to determine whether the President's use of IEEPA authority is permissible, assuring that IEEPA "should not be hemmed in or cabined, cribbed, confined by anxious judicial blinders."  *Yoshida*, 526 F.3d at 583.

Contrary to plaintiffs' contention, IEEPA does not "obviat[e] Congress's role as ultimate

26

arbiter of emergency trade policy." *Amirnazmi*, 645 F.3d at 576; *accord Yoshida*, 526 F.2d at 582. The "powers" IEEPA grants "to the President are explicitly defined and circumscribed." *United States v. Arch Trading Co.*, 987 F.2d 1087, 1093 (4th Cir. 1993) (citing 50 U.S.C. § 1702); *accord Dhafir*, 461 F.3d at 217 (similar); *Shih*, 73 F.4th at 1092 (similar). And they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." *Dhafir*, 461 F.3d at 216-17 (citing 50 U.S.C. § 1701(b)).

Those are meaningful restrictions that have been upheld as sufficient by every circuit to consider the question. *See Shih*, 73 F.4th at 1092 (collecting cases). In fact, the Supreme Court has upheld Congress's delegations where the intelligible principles were much broader than those for IEEPA. For example, in *Yakus v. United States*, the Court held that there was no nondelegation problem with a statute directing the Price Administrator to establish "fair and equitable" prices. 321 U.S. 414, 419 (1944). Likewise, in *Am. Power & Light Co. v. SEC*, the Court approved a statute directing the SEC to "ensure that the corporate structure or continued existence of any company in a particular holding company system does not 'unduly or unnecessarily complicate the structure' or 'unfairly or inequitably distribute voting power among security holders.'" 329 U.S. 90, 104 (1946). The Court remarked that these "standards are certainly no less definite in nature than those speaking in other contexts in terms of "'public interest,' 'just and reasonable rates,' 'unfair methods of competition' or 'relevant factors.'" *Id.* at 105 (citing cases).

Plaintiffs contend that IEEPA lacks an intelligible principle because it does not provide granular standards for "the products on which" tariffs may be imposed, "the permissible amount or range of the tariff," or its "duration," among other things. Mot. 37. But Congress is not constitutionally required to enact such exacting standards, as "[t]he legislative process would

frequently bog down if Congress were constitutionally required to appraise before-hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation." *Am. Power & Light*, 329 U.S. at 105; *see, e.g.*, *Dames*, 453 U.S. at 678 ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act. Such failure of Congress specifically to delegate authority does not, especially in the areas of foreign policy and national security, imply congressional disapproval of action taken by the Executive." (cleaned up)); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas."); *Haig v. Agee*, 453 U.S. 280, 291 (1981). This is especially so here, where Congress delegated power to react to emergencies. "It cannot be lightly dismissed that IEEPA is operative only during declared "national emergencies, which inherently preclude prior prescription of specific detailed guidelines," and "[t]he need for prompt action, another essential feature of a national emergency, precludes the otherwise oft-provided requirement for prior hearings, extensive fact finding, Tariff Commission reports to the President, and the like." *Yoshida*, 536 F.2d at 581-82.

In addition, IEEPA involves an area where the President has independent authority— national security and foreign affairs—making the intelligible-principle standard even easier to meet. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (in nondelegation challenges, "congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved"); *United States v. Mazurie*, 419 U.S. 544, 556-57 (1975) ("This

Court has recognized limits on the authority of Congress to delegate its legislative power. Those limitations are, however, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter." (citation omitted)); *Loving v. United States*, 517 U.S. 748, 772 (1996) (similar); *Gundy*, 588 U.S. at 159 (Gorsuch, J., dissenting) (similar); *Dhafir*, 461 F.3d at 215; *Am. Inst. for Int'l Steel v. United States*, 806 F. App'x 982, 990 (Fed. Cir. 2020).[2]

Given that every circuit to address a nondelegation challenge to IEEPA or TWEA has upheld the statutes, and given the intelligible principles guiding the President's exercise of his delegated authority and the President's independent authority in the realm of foreign affairs and national security, plaintiffs' nondelegation argument fails.

### 3.    The Challenged Orders Do Not Violate IEEPA As Applied To Plaintiffs

Plaintiffs contend that the imports on which they paid the challenged tariffs are not "property in which any foreign country or national thereof has any interest[,]" 50 U.S.C. § 1702(a)(1)(B), because they "purchase and take title to the products in the foreign country and thus own the merchandise at the time of importation," Mot. 36. Plaintiffs' arguments fail because IEEPA's reach is not constrained by mere ownership.

IEEPA's text does not limit "interest" to foreign ownership or even a possessory interest but rather broadly applies where there is "*any* interest." 50 U.S.C. § 1702(a)(1)(B) (emphasis added); *see also Regan*, 468 U.S. at 225-26 (upholding the President's authority to impose a

---

[2] Moreover, other circuits have rejected nondelegation challenges to the use of IEEPA to "define criminal conduct," an area where courts assume a *higher* nondelegation standard applies. *See, e.g.*, *Shih*, 73 F.4th at 1092 (relying on *Touby v. United States*, 500 U.S. 160, 166 (1991), which assumed, without deciding, that "greater congressional specificity is required in the criminal context" for nondelegation purposes). The delegation of authority here easily passes the even less demanding standard that applies here.

comprehensive embargo of Cuba—prohibiting both importation and exportation—under TWEA). Here, where foreign nationals are selling property to plaintiffs who are domestic importers, the foreign nationals (and the foreign countries) involved clearly have "any interest" in that property, regardless of who actually owned the property at the time it was imported. *See Regan*, 468 U.S. at 232 n.16 (rejecting an argument seeking to narrow this "sweeping statutory language" as "border[ing] on the frivolous"). Courts have also repeatedly upheld IEEPA's application to property owned or controlled by domestic parties because IEEPA is not limited to "legally enforceable" interests. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162-63 (D.C. Cir. 2003) (IEEPA applied to organization that raised funds for the terrorist organization Hamas, even though Hamas lacked a "legally protected" interest in the organization's assets); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) (IEEPA applies to property "even if a U.S. citizen is the legal owner"); *Zarmach Oil Serv. v. Dep't of Treasury*, 750 F. Supp. 2d 150, 156 (D.D.C. 2010) (rejecting argument that IEEPA did not confer authority over transaction where foreign country had "no ownership interest" in the blocked funds); *Consarc Corp. v. OFAC*, 71 F.3d 909, 914 (D.C. Cir. 1995) (IEEPA's "extensive statutory grant of power cannot be read to bar OFAC from promulgating a regulation that requires a corporation to freeze either the goods it manufactured for Iraq or any payments received for these goods from Iraq. Although Iraq may no longer have any interest in its down payment, it still has some interest in the goods for which the down payment was paid and some interest in the transaction."). That result is the only sensible one. Otherwise, anyone could structure transactions to transfer ownership and avoid paying tariffs. That domestic importers formally purchased the property by the time of importation does not render IEEPA inapplicable.

### C.    The National Emergency Is A Political Question And Valid If Subject To Review

Plaintiffs argue that IEEPA, even if it authorizes tariffs in some circumstances, does not authorize the challenged tariffs because plaintiffs disagree with the President's declared emergency and how he chose to address the emergency.  Mot. 29-31.  But whether a threat is unusual or extraordinary is reviewable only by Congress, not by the courts, as NEA and IEEPA make clear.  The same is true for the means the President chooses to deal with the emergency.

"Cases" and "controversies" that contain "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217 (1962), or "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986), are political questions beyond the courts' authority to resolve, *see Baker*, 369 U.S. at 217.  Such deference is particularly critical in cases involving national emergencies, where courts have a long history of declining to review the political branches' responses.  *See, e.g.*, *Martin v. Mott*, 25 U.S. 19, 31 (1827) (The President "is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of the facts."); *Hawaii*, 585 U.S. at 708 ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.").  Indeed, the D.C. Circuit has "consistently held . . . that courts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security."  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010); *see, e.g.*, *Lee v. Garland*, 120 F.4th 880, 890-91 (D.C. Cir. 2024) ("[T]he Constitution commits national-security judgments to the political branches.").

More to the point, courts have consistently held that the President's emergency declarations under NEA, and the adequacy of his policy choices addressing those emergencies under IEEPA, are unreviewable. "Although presidential declarations of emergencies . . . have been at issue in many cases, *no* court has ever reviewed the merits of such a declaration." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020); *accord Yoshida*, 526 F.2d at 579 ("courts will not normally review the essentially political questions surrounding the declaration or continuance of a national emergency"). Indeed, a declaration of an emergency under IEEPA in particular "represents a quintessential political question that this Court lacks jurisdiction to address." *Htet v. Trump*, No. 24-1446, 2025 WL 522033, at *3 (D.D.C. Feb. 18, 2025) (Contreras, J.); *see id.* at *3-8 (explaining that executive order pursuant to IEEPA implicated a political question under D.C. Circuit precedent); *see also, e.g., Shih*, 73 F.4th at 1092 (refusing to review declaration of emergency under IEEPA); *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 575 n.16 (S.D.N.Y. 2011) (concluding that whether Iran's actions and policies constituted an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" was an unreviewable judgment "reserved to the executive branch"); *Beacon Prods. Corp. v. Reagan*, 633 F. Supp. 1191, 1194-95 (D. Mass. 1986) (concluding that whether Nicaragua posed sufficient threat to trigger the President's IEEPA power to impose an embargo on the country was a nonjusticiable political question).

Reviewing the fact of the underlying emergency—a foreign-affairs and national-security matter constitutionally and statutorily committed to the President—would require "the court to assess the wisdom of the President's judgment concerning the nature and extent of that threat, a matter not susceptible to judicially manageable standards." *Beacon Prods.*, 63 F. Supp. at 1195. Thus, the President's "motives, his reasoning, his finding of facts requiring the action, and his

judgment, are immune from judicial scrutiny." *Florsheim*, 744 F.2d at 796; *see United States v. Bush & Co.*, 310 U.S. 371, 380 (1940) ("For the judiciary to probe the reasoning which underlies this Proclamation would amount to a clear invasion of the legislative and executive domains."). Unsurprisingly, the D.C. Circuit has held that whether circumstances "constitute threats to the United States" is an unreviewable "political judgment[]." *El-Shifa*, 607 F.3d at 843.

The President's emergency declarations do not go unreviewed. Congress designated *itself*—not the judiciary—as the body to supervise emergency declarations and the adequacy of the President's response. *See* 50 U.S.C. § 1622(c) (creating fast-tracked procedures for review and disapproval of emergency declarations); *Amirnazmi*, 645 F.3d at 577 (in IEEPA, "Congress reaffirmed its essential legislative function, and struck a careful balance between affording the President a degree of authority to address the exigencies of national emergencies and restraining his ability to perpetuate emergency situations indefinitely by creating more opportunities for congressional input" (cleaned up)). So any challenge to the fact of the emergency itself— particularly the claim that the emergency is not "unusual" or "extraordinary" enough, in plaintiffs' view—is a nonjusticiable political question that this Court lacks jurisdiction to consider.

The same is true of the means the President has chosen to deal with the declared national emergency. Mot. 32-35. IEEPA, by using "may," 50 U.S.C. § 1701, and authorizing a variety of actions, *id.* § 1702(a)(1)(B), gives the President discretion over whether and how to deal with the relevant threat. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 802 (2022) ("This Court has repeatedly observed that the word 'may' clearly connotes discretion.") (cleaned up). How the President uses that discretion is again not subject to judicial review and is instead a matter for the political branches to work out. *See, e.g.*, *El-Shifa*, 607 F.3d at 843 ("that the strategic choices directing

the nation's foreign affairs are constitutionally committed to the political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters"); *Htet*, 2025 WL 522033, at *7 (finding unreviewable the means chosen under IEEPA to address a declared emergency because "[t]he Court would then need to opine on whether the President's action effectively counters the threat"). At a minimum, the above establishes that the drastic remedy of a preliminary injunction is inappropriate here.

If the Court were to break with uniform precedent and review the merits of the President's declaration of national emergencies and the appropriate responses, it still would have to reject plaintiffs' arguments. These national emergencies exist for the reasons explained in the President's Executive Orders. Plaintiffs ignore (Mot. 31-33) that the basis for the declared emergency in Executive Order 14257 is not just "persistent annual U.S. goods trade deficits," but also the currently acute "*effect*" of such persistent trade deficits. 90 Fed. Reg. at 15,044 (emphasis added). As noted, the President found that these deficits have "atroph[ied]" our nation's "domestic production capacity" such that, now, the United States' "military readiness" and "national security posture" are "compromise[d]." *Id.* at 15,044-45. That finding of an abnormal state of affairs, *cf.* H.R. Rep. No. 95-459, at 10, besides being unreviewable, is unchallenged by plaintiffs. Nor does the President lack authority under IEEPA to address continuing emergencies. *See, e.g.*, Notice of Mar. 7, 2025, *Continuation of the National Emergency With Respect to Iran*, 90 Fed. Reg. 11,887 (Mar. 12, 2025) (continuing a national emergency dating back to 1995 with respect to Iran); Cong. Rsch. Serv., *The International Emergency Economic Powers Act: Origins, Evolution, and Use*, R45618 at 17 (Jan. 30, 2024) ("The average length of an emergency invoking IEEPA . . . [is] 15 years for emergencies declared in the 2000s."). That is precisely why Congress rejected a proposal "that it place a

definite time limit on the duration of any state of national emergency" in IEEPA. H.R. Rep. No. 95-459, at 10. The currently abnormal state of affairs is likewise true for the PRC's failure to stem the flow of contraband drugs into the United States—the emergency declared in Executive Order 14195.

Similarly, even if the Court could second-guess the President's chosen means, that review would be limited to whether they are reasonably related to addressing the national emergency. The imposed tariffs easily pass that undemanding standard. The tariffs under Executive Order 14257 have a "direct effect" on the United States' trade deficit, *Yoshida*, 526 F.2d at 580, and on improving this nation's "domestic production capacity," "military readiness," and "national security posture," 90 Fed. Reg. at 15,044-45. The President's action thus bears "an eminently reasonable relationship to the emergency confronted." *Yoshida*, 526 F.2d at 580. So do additional tariffs on the PRC for its failure to "arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." 90 Fed. Reg. at 9,122. These tariffs are reasonably related to the desired change in behavior the President seeks from the PRC because they place pressure on the PRC to address the crisis. The Government of Mexico, for instance, took "immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions" in response to the announcement of similar tariffs. *See* Executive Order 14198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9,185 (Feb. 10, 2025).

Plaintiffs assert that the President's true goal is to generate revenue. Mot. 34-35. This argument is foreclosed for the same reason as any attack on the legitimacy of the emergencies. *See, e.g.*, *Hawaii*, 585 U.S. at 708; *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1358 (Fed. Cir. 2003); *Chang v. United States*, 859 F.2d 893, 896 n.3 (Fed. Cir. 1988); *Yoshida*,

526 F.2d at 579. And it fails regardless. IEEPA does not say that actions taken to deal with a national emergency must not generate revenue, let alone do so incidentally. Quite the opposite: "licenses," for example, typically cost money. 50 U.S.C. § 1702(a)(1). That the tariffs at issue have been touted as revenue-generating is thus no revelation.

Thus, even if the Court determines it can review the fact of the underlying emergency—and it should not—plaintiffs' arguments must nonetheless fail.

## II.    Plaintiffs Cannot Establish The Likelihood Of Immediate, Irreparable Harm

Plaintiffs also fail to show entitlement to a preliminary injunction because they cannot "make a *clear showing* that [they] will likely suffer irreparable harm before the district court can resolve the merits of the case." *Hanson v. D.C.*, 120 F.4th 223, 243 (D.C. Cir. 2024) (emphasis added) (cleaned up). The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Plaintiffs' injury must be "certain," "great," "actual" rather than "theoretical," *id.* (cleaned up), and "so imminent as to be irreparable if a court waits until the end of trial to resolve the harm," *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 202 (D.D.C. 2017) (quotation omitted). The injury must truly be "beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (quotation omitted). The Federal Circuit and Court of International Trade, which regularly hear claims of irreparable harm stemming from tariffs, have made clear that "[e]very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," so permitting mere "revenue shortfalls" and the like to suffice would "effectively create a *per se* irreparable harm rule" in tariff challenges. *Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l

Trade 2002) (summarizing cases). That would run "contrary to the extraordinary nature" of preliminary injunctions. *Id.*

Plaintiffs' evidence—a single declaration from their CEO, Richard Woldenberg, ECF No. 9-1—falls well short of these two high hurdles. To start, the declaration is speculative. The challenged tariffs, Mr. Woldenberg says, "may" lead to rising loan balances and "could" make it harder to obtain financing; they "may" cause customers to stop purchasing from plaintiffs, and those customers "may not" return; and the tariffs "could" or "may" lead to other "potential" consequences. *See, e.g.*, Woldenberg Decl. ¶¶ 19, 20, 27. The D.C. Circuit has held that similarly speculative assertions are inadequate. For example, in *Wisconsin Gas Co. v. FERC*, assertions that plaintiffs would "probably" lose contracts were not enough, where no plaintiff "provided any evidence that a single supplier has stated an intention to cease contracting . . . ." 758 F.2d 669, 674 (D.C. Cir. 1985). The same is true here—fears of lost business are not enough to establish immediate irreparable harm where there is no specific evidence to that effect. Nor have plaintiffs tried to quantify the harms they expect to face between now and the time that a court can rule on the merits.[3] *See John Doe Co.*, 235 F. Supp. 3d at 202.

Plaintiffs' qualitative descriptions of anticipated harms are not sufficient, either. For example, although Mr. Woldenberg "anticipate[s]" a number of "negative consequences" from tariffs on Chinese goods, Woldenberg Decl. ¶ 27, only about "60% of the products [plaintiffs] sell or consume as components (by cost) are manufactured in China," *id.* ¶ 6. According to the declaration, plaintiffs "manufacture toys and other products" not just in the PRC but also

---

[3]  The time to a final judgment may be especially short if the Court transfers this case to the Court of International Trade. That Court will hold a hearing on summary judgment on May 13, and it has already begun directing responsive briefing in follow-on cases. *See supra* at 9. Thus, plaintiffs have not shown that their alleged injury "is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Hanson*, 120 F.4th at 244.

"Taiwan, Korea, Vietnam, Thailand, India, and other countries . . . ."  *Id.* ¶ 5.  Given plaintiffs' business, those other products may well include "informational materials" not subject to the challenged tariffs.  *See* 50 U.S.C. § 1702(b)(3); 90 Fed. Reg. at 9,123 (excluding "articles . . . encompassed by 50 U.S.C. 1702(b)" from the scope of the tariffs imposed by Executive Order 14195); 90 Fed. Reg. at 15,045 (same, regarding Executive Order 14257).  Plaintiffs have also recently moved 16 percent of their manufacturing away from the PRC at a comparatively minimal cost.  *Id.* ¶ 24.  Injury is not "certain" or "great," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, if it affects only about half of plaintiffs' business and can be mitigated at marginal cost.

Plaintiffs also fail to show that their alleged harms are irreparable.  As plaintiffs concede, an importer "may recover from the federal government" any duties "that were unlawfully assessed" through an action in the Court of International Trade.  Mot. 40.  That availability of a refund accounts for the harm plaintiffs say they will suffer in the absence of an injunction.  It accounts for the approximately $100 million Mr. Woldenberg says plaintiffs will have to pay in extra duties over this year.  Woldenberg Decl. ¶ 8.  And it accounts for the negative consequences Mr. Woldenberg speculates will follow from these refundable expenditures, like loss of business opportunities and goodwill, *id.* ¶¶ 10, 11, 20, albeit indirectly.  *See Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1340-41 (Ct. Int'l Trade 2024) (no irreparable harm when plaintiff failed to show permanent "loss of its reputation," despite evidence that businesses intended to distance themselves due to allegations of forced labor).

That there is no action against the government in the Court of International Trade for lost business or goodwill does not absolve plaintiffs of demonstrating irreparable harm.  "The loss of business opportunities, market share, and customer goodwill are typically considered to be

economic harms," which, as a "general rule," do "not constitute irreparable injury" in this Court. *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) (quotation omitted). That a "claimed economic loss is unrecoverable" due to sovereign immunity is merely "one factor the court must consider in assessing alleged irreparable harm"—it "does not, in and of itself, compel a finding of irreparable harm." *Id.* (quoting *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011)).  Accordingly, in *National Mining Association*, this Court denied a motion for a preliminary injunction where, like here, the plaintiff's "only support for its claim" that it would "be driven out of business" was a single declaration from a company president who asserted that his "company is in a crisis," would "need to lay off more employees," and would "be out of business within [eighteen] months." 768 F. Supp. 2d at 51-52.  Plaintiffs offer similarly conclusory projections about their loss of business opportunities and goodwill—Mr. Woldenberg does not "explain with any specificity how he arrived at" his conclusions. *Id.* at 52. But "[s]omething more than" Mr. Woldenberg's "conclusory projection is necessary to show" that his companies "currently face certain, imminent business closings" or other unrecoverable economic losses.  *Id.*

Even if a refund could not adequately remedy these speculative, intangible harms, plaintiffs fail to explain any harm to their competitive position.  Mr. Woldenberg thinks that "foreign competitors" could "attack [plaintiffs'] market share and capitalize on a competitive advantage springing from the new tariffs," Woldenberg Decl. ¶ 17, but these competitors must also pay tariffs to bring their goods into this country.  The same goes for domestic competitors— they too must pay tariffs to import goods from the PRC.  Without any indication of which competitors plaintiffs think will steal their market share or some explanation as to how the challenged tariffs would not also affect them—that is, any explanation as to why plaintiffs are

uniquely situated—the mere existence of competitors is insufficient to establish irreparable harm. *See John Doe Co.*, 235 F. Supp. 3d at 205 (no irreparable harm where, among other things, the challenged government action affected "the industry" as a whole).

Moreover, even if plaintiffs' one declaration did demonstrate imminent injury (it does not), the court still "should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Atari Games Corp. v. Nintendo of America*, 897 F.2d 1572, 1575 (Fed. Cir. 1990). Illustrating the problems with such reliance, Mr. Woldenberg warned that a previous government action—a law designed to keep lead out of children's toys—would "crush" his business and had already lost him customers, but those predictions have not been borne out as his business has since thrived. Richard Woldenberg, *Enough already! It's time to amend the lead law*, The Hill (Apr. 6, 2011, 6:51 PM), https://thehill.com/blogs/congress-blog/economy-a-budget/87845-enough-already-its-time-to-amend-the-lead-law/.

Accordingly, plaintiffs have shown nothing more than a "temporary loss of income" as a result of the tariffs they challenge, which does not constitute irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). Their speculative allegations of harm from a single self-interested declarant, combined with the availability of a refund were the challenged tariffs held unlawful, preclude a finding that the extraordinary remedy of a preliminary injunction is necessary to prevent imminent irreparable injury.

Finally, plaintiffs challenge two separate actions under IEEPA: one imposing a 145 percent tariff on the PRC (Executive Order 14257, as amended) and another from a separate emergency that imposes a 20 percent tariff on the PRC (Executive Order 14195, as amended). But plaintiffs' threadbare evidence, at best, supports that the 145 percent tariff is causing harm. *E.g.*, Woldenberg Decl. ¶ 6 ("These rates [together] are now so high as to effectively prevent

importation."). Plaintiffs have not shown irreparable harm from the tariff imposed to address the illegal-drug emergency. This alone dooms plaintiffs' drastic request for relief against those actions.

## III.   The Remaining Injunctive Factors Do Not Favor Plaintiffs

Even if plaintiffs could establish that they would suffer irreparable harm absent a preliminary injunction, plaintiffs have not "clear[ly] show[n]" that "'the balance of equities favors preliminary relief,' and that 'an injunction is in the public interest.'" *Hanson*, 120 F.4th at 243. These factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and strongly favor the government.

Plaintiffs' purported irreparable harm is far outweighed by the public interest in maintaining the challenged executive actions. The President has declared a national emergency in light of threats to the United States' economy, military preparedness, and national security. In these circumstances, the NEA and IEEPA all authorize the President to take all appropriate and feasible action to address the emergency. The equities and public interest lie there, not with plaintiffs. Moreover, where, as here, the President acts with Congress's authorization, adding its constitutional authority to regulate trade to the President's constitutional authority over foreign affairs, the "public interest" is the policy underlying the specific legislation. *Yakus*, 321 U.S. at 442. Injunctive relief interfering with action authorized by Congress and taken by the President, after following all the applicable procedures, would contravene the public interest.

As for the balance of hardships, plaintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution. *See* U.S. Const. art. II, § 2. This is particularly so given that the United States is currently in sensitive trade negotiations with a multitude of countries—

41

discussions that preliminary relief would likely short-circuit. *See* Executive Order 14266 (since the issuance of Executive Order 14257, "more than 75 other foreign trading partners . . . have approached the United States to address the lack of trade reciprocity in our economic relationships and our resulting national and economic security concerns"). Plaintiffs' request to import merchandise without paying the applicable tariffs would undermine the President's goals, and a preliminary injunction would weaken the effectiveness of the President's chosen action. By contrast, plaintiffs have not shown any hardship beyond compensable economic harm. Moreover, plaintiffs' concerns about cost and competitiveness are far from unique. In considering the public interest, the Court should also consider the broader implications if the thousands of other companies subject to similar tariffs requested the same relief. *Cf. Hanson*, 120 F.4th 223, 247-48 ("[W]e cannot simply rebalance the equities by limiting injunctive relief to the four appellants in this case. Were this court to direct the issuance of such a preliminary injunction, a follow-on class-action suit seeking the same relief would inevitably follow and almost inevitably have to be granted."). At bottom, plaintiffs have not made a "clear showing" that preliminary relief is "clearly indispensable to the ends of justice." *Id.* at 243.

## IV.    Any Preliminary Injunction Should Be Limited Only To Plaintiffs And Would Require Them To Post A Bond

If this Court were to issue a preliminary injunction, its order must be limited in scope to the plaintiffs. Plaintiffs concede as much. *See* Mot. 1 (moving for an injunction "to prevent agency Defendants from taking any action to implement or enforce *against Plaintiffs* the tariffs announced in the [challenged] executive orders" (emphasis added)); Proposed Order (same). And rightly so: "An injunction must be narrowly tailored to remedy the specific harm shown." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976); *see U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015). Moreover,

nationwide injunctions are only available in "exceptional cases." *City and County of San Francisco v. Trump*, 896 F.3d 1225, 1244 (9th Cir. 2018); *see Florida*, 19 F.4th at 1282 (appropriate circumstances for issuing a nationwide injunction "are rare"); *City of Chicago v. Barr*, 961 F.3d 882, 916 (7th Cir. 2020) ("Such injunctions present real dangers, and will be appropriate only in rare circumstances."). Here, plaintiffs cannot show why a preliminary injunction is necessary at all, let alone a nationwide one. Certainly, they cannot show that they will be deprived of complete relief in the absence of a nationwide injunction. *Cf. Florida*, 19 F.4th at 1281.

The Court should also order plaintiffs to quantify their harm—for instance, specify what tariffs they would otherwise have paid, which must not be speculative—and post a bond in that amount. Fed. R. Civ. P. 65(c) (requiring "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). "Setting an appropriate bond is necessary because 'a party injured by an erroneous injunction has no action for damages in the absence of a bond and is limited to recovering the amount of a bond.'" *Atlas Air, Inc. v. Int'l Brotherhood of Teamsters*, 280 F. Supp. 3d 59, 106 (D.D.C. 2017).

Here, should the Court enter a preliminary injunction, (i) any order should be limited to the plaintiffs to this litigation; (ii) as a condition of relief, plaintiffs should identify the entries, by entry number, importer name, and importer number, that would be covered by any such order; and (iii) the Court should order plaintiffs to post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the executive orders. *See, e.g.*, *Fid. & Deposit Co. of Maryland v.*

*Helvering*, 112 F.2d 205 (D.C. Cir. 1940) (bond in the amount of tax that would otherwise have

been paid is appropriate).  Such an order would ensure that the Court follows the directive that it

must "narrowly tailor[]" the remedy to "the specific harm shown," *Aviation Consumer Action

Project*, 535 F.2d at 108, while ensuring at least minimal protection of the United States'

interests.

### CONCLUSION

For these reasons, the Court should deny plaintiffs' motion for a preliminary injunction.

DATED: May 1, 2025

OF COUNSEL:

ALEXANDER K. HAAS
Director

STEPHEN M. ELLIOTT
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch

SOSUN BAE
Senior Trial Counsel
LUKE MATHERS
BLAKE W. COWMAN
COLLIN T. MATHIAS
Trial Attorneys
U.S. Department of Justice
Civil Division
Commercial Litigation Branch

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Catherine M. Yang
CATHERINE M. YANG
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 514-4336
catherine.m.yang@usdoj.gov
*Attorneys for Defendants*

44