## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC. and
HAND2MIND, INC.,

*Plaintiffs*,

v.

DONALD J. TRUMP, President of the United
States, in his official capacity; KRISTI NOEM,
Secretary of the Department of Homeland Security,
in her official capacity; U.S. DEPARTMENT OF
HOMELAND SECURITY; SCOTT BESSENT,
Secretary of the Treasury, in his official capacity;
U.S. DEPARTMENT OF TREASURY;
HOWARD LUTNICK, Secretary of Commerce, in
his official capacity; UNITED STATES
DEPARTMENT OF COMMERCE; PETE R.
FLORES, Acting Commissioner of Customs &
Border Protection, in his official capacity; U.S.
CUSTOMS & BORDER PROTECTION;
JAMIESON GREER, U.S. Trade Representative,
in his official capacity; and THE OFFICE OF THE
U.S. TRADE REPRESENTATIVE,

*Defendants*.

Civ. Action No. 25-cv-01248-RC

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................ 2

     A.    IEEPA Does Not Authorize The Executive To Impose Tariffs. ................. 2

           1.    *IEEPA's plain text does not support the government's interpretation.* ................................................................. 2

           2.    *Yoshida cannot salvage the IEEPA tariffs.* .................................... 9

           3.    *A clearer statutory basis is required to invoke an unheralded power of such economic and political magnitude.* ....................... 13

     B.    The Challenged Tariffs Fail To Comport With IEEPA's Requirements. ........................................................................... 16

           1.    *The Universal and Reciprocal IEEPA Order is not based on an "unusual" national emergency threat.* .................................... 16

           2.    *The challenged tariffs are not "reasonably related" to the claimed national emergency.* ........................................................ 18

II.    PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM .............................................................. 20

III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS ......................................................................... 22

IV.   THE COURT SHOULD NOT REQUIRE MORE THAN A NOMINAL BOND .................................................................................. 23

V.    THE COURT MAY TREAT THE PRELIMINARY INJUNCTION MOTION IN A MANNER THAT ALLOWS FOR ENTRY OF FINAL JUDGMENT ........................................................................... 24

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**C**ASES:

*Al-Tamimi v. Adelson,*
 916 F.3d 1 (D.C. Cir. 2019) ................................................................................18

*American Meat Inst. v. United States Dep't of Agric.,*
 760 F.3d 18 (D.C. Cir. 2014) ..............................................................................19

*Baker v. Carr,*
 369 U.S. 186 (1962) ................................................................................16, 17, 18

*Board of Trs. of Univ. of Ill. v. United States,*
 289 U.S. 48 (1933) ................................................................................................4

*Capital Area Immigrants' Rights Coal. v. Trump,*
 471 F. Supp. 3d 25 (D.D.C. 2020) ......................................................................25

*Cardinal Health, Inc. v. Holder,*
 846 F. Supp. 2d 203 (D.D.C. 2012) ....................................................................22

*Corus Grp. PLC v. Bush,*
 217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ......................................................22

*DSE, Inc. v. United States,*
 169 F.3d 21 (D.C. Cir. 1999) ..............................................................................24

*El-Shifa Pharm. Indus. Co. v. United States,*
 607 F.3d 836 (D.C. Cir. 2010) ............................................................................18

*Genus Med. Techs. LLC v. FDA,*
 994 F.3d 631 (D.C. Cir. 2021) ............................................................................17

*Georgia v. President of the U.S.,*
 46 F.4th 1283 (11th Cir. 2022) ...........................................................................14

*Georgia v. Public.Resource.Org, Inc.,*
 590 U.S. 255 (2020) .............................................................................................13

*Gibbons v. Ogden,*
 22 U.S. (9 Wheat) 1 (1824) ..............................................................................1, 2

*Gonzalez-Vera v. Kissinger,*
 449 F.3d 1260 (D.C. Cir. 2006) ..........................................................................19

*Hanson v. District of Columbia,*
 120 F.4th 223 (D.C. Cir. 2024) ...........................................................................23

*Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*,
    586 U.S. 123 (2019) ................................................................................................13

*Htet v. Trump*,
    No. 24-cv-1446 (RC), 2025 WL 522033 (D.D.C. Feb. 18, 2025) ...........................19

*In re Verifone Holdings, Inc. S'holder Derivative Litig.*,
    No. 07-cv-06347 (MHP), 2009 WL 1458233 (N.D. Cal. May 26, 2009) ...............17

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ..................................................................................14

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) .........................................................................................2, 15

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ................................................................................14

*Morris v. District of Columbia*,
    38 F. Supp. 3d 57 (D.D.C. 2014) ...........................................................................25

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
    142 F.3d 449 (D.C. Cir. 1998) .................................................................................6

*National Council of Nonprofits v. Office of Mgmt. & Budget*,
    No. 25-cv-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ........................24

*National Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................................3, 4

*Natural Res. Def. Council, Inc. v. Morton*,
    337 F. Supp. 167 (D.D.C. 1971) ............................................................................24

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) ....................................................................................14

*Real v. Simon*,
    510 F.2d 557 (5th Cir. 1975) ...................................................................................7

*Sacks v. Office of Foreign Assets Control*,
    466 F.3d 764 (9th Cir. 2006) .................................................................................12

*Trop v. Dulles*,
    356 U.S. 86 (1958) .................................................................................................17

*U.S. ex rel. Totten v. Bombardier Corp.*,
    380 F.3d 488 (D.C. Cir. 2004) .................................................................................7

*United States v. Collazo*,
  984 F.3d 1308 (9th Cir. 2021) ..................................................................13

*United States v. Hillie*,
  14 F.4th 677 (D.C. Cir. 2021) ...................................................................3

*United States v. Spawr Optical Rsch., Inc.*,
  685 F.2d 1076 (9th Cir. 1982) .................................................................19

*Van Loon v. Department of the Treasury*,
  122 F.4th 549 (5th Cir. 2024) ...................................................................5

*West Virginia v. EPA*,
  597 U.S. 697 (2022)..................................................................13, 14, 15

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................................20

*Yoshida Int'l, Inc. v. United States*,
  378 F. Supp. 1155 (Cust. Ct. 1974) .............................................9, 10, 11
  526 F.2d 560 (C.C.P.A. 1975)..................................................9, 11, 12, 19

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952)..................................................................................14

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012)..................................................................................19

## CONSTITUTION AND STATUTES:

U.S. CONST.
  art. I, § 8, cl. 1 .........................................................................................1, 2
  art. I, § 8, cl. 3 ...........................................................................................2

2 U.S.C.
  § 622(8)(B)(1) ............................................................................................5

15 U.S.C.
  § 78k(a)(2) ...............................................................................................4, 6

16 U.S.C.
  § 460bbb-9(a)..............................................................................................5

19 U.S.C.
  § 1484(a)(2)(B) ...........................................................................................8
  § 2132(a) ..................................................................................................12
  § 2411(c) ..................................................................................................12

21 U.S.C.
§ 360bbb-2(a) ................................................................................................4

49 U.S.C.
§ 40117(j) ....................................................................................................4

50 U.S.C.
§ 1621(a) ....................................................................................................17
§ 1701(a) ...............................................................................................16, 17
§ 1701(b) ..............................................................................................18, 19
§ 1702(a)(1) ................................................................................................6
§ 1702(a)(1)(B) ....................................................................................3, 6, 7
§ 1702(a)(2) .................................................................................................8

Securities Exchange Act of 1934, Pub. L. No. 73-291, § 11(a)(1), 48 Stat. 881,
891 ...............................................................................................................4

**OTHER AUTHORITIES:**

CASEY, CHRISTOPHER A. & PAUL K. KERR, R46814, CONG. RSCH. SERV., THE
U.S. EXPORT CONTROL SYSTEM AND THE EXPORT CONTROL REFORM ACT OF
2018 (2021) ...............................................................................................5, 6

Collins, Michael '*Two Dolls Instead of 30': Trump Acknowledges Prices Will
Force Consumers to Cut Back*, USA TODAY (Apr. 30, 2025) ..................21

*Compel*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1973) ...............................3

*Direct*, BLACK'S LAW DICTIONARY 546 (4th ed. 1968) .........................................3

Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify
Trade Practices that Contribute to Large and Persistent Annual United States
Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) ......................16

FED. R. CIV. P.
65(a)(2) ......................................................................................................25
65(c) ...........................................................................................................24

H. REP. NO. 95-459 (1977) ...........................................................9, 12, 15, 17

*Investigate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE
ENGLISH LANGUAGE UNABRIDGED (1971) ....................................................3

*Nullify*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1973) ...................................3

*Prevent*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH
LANGUAGE UNABRIDGED (1971) ..................................................................3

Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971) .....................................................10

Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971).....................................................10

*Prohibit*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH
    LANGUAGE UNABRIDGED (1971).............................................................................................4

*Regulate*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975)............................3

*Tariff*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1973)....................................3

*Tax*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1973).........................................3

The Toy Association, *Christmas and Toy Companies are at Risk! Toy Association
    Member Survey Reveals Alarming Impact of 145% Tariffs* (Apr. 18, 2025).........................21

U.S. Customs & Border Protection, *Entry Summary and Post Release Processes*
    (last modified Apr. 10, 2025)...............................................................................................8

*Unusual*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE (1975) ............................17

*Void*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1973) .....................................3

Young, Liz, *A Step-by-Step Look at How Trump's New Tariffs Will Be
    Implemented*, WALL ST. J. (Apr. 9, 2025)................................................................................8

**INTRODUCTION**

The text of IEEPA does not support the imposition of tariffs at all—much less the unprecedented and astronomical tariffs at issue causing extraordinary harm to Plaintiffs' educational toy businesses. Plaintiffs are entitled to a preliminary injunction to stop any further irreparable damage before it is too late.

The critical question in this case is whether Congress intended to authorize the President to impose tariffs—or, as our Constitution says, the "[p]ower [t]o lay and collect Taxes, Duties, Imposts," U.S. Const. art. I, § 8, cl. 1—when it authorized him to "regulate" importation. The answer is no. The power to regulate and the power to tax have long been understood as distinct powers, "not *** similar in their terms or their nature." *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 198-199 (1824). That understanding persisted at the time of IEEPA's enactment, with the former contemporaneously defined as concerned with rules and the latter with raising revenue. It is thus no surprise that the government is unable to point to any other statute where the term "regulate" has been understood to include the power to tax. Nor can the government point to any other President that has understood IEEPA to grant the power to impose tariffs—even this President in his first term. Courts require a sturdier reed on which to rest unheralded powers of such grave economic and political consequence.

Given its thin textual justification, the government leans heavily on *Yoshida*, a single 50-year-old panel decision from the predecessor to the Federal Circuit involving a different statute. But there is nothing settled about that non-binding decision, which reversed a three-judge court concluding that the President *lacked* statutory power to impose tariffs. Nor is the appellate decision persuasive on its own terms. *Yoshida*'s purposive approach, in conflict with the Supreme Court's modern text-based doctrines, reasoned that the President must have adequate tools to deal with a

national emergency. What it failed to appreciate was that Congress placed limits on what the President's toolbox contains.

The government's plea for deference is misplaced. This case rises and falls on a judicial determination of exactly what powers, within what limits, Congress delegated to the Executive. That exercise in statutory interpretation is "exclusively a judicial function," which courts are "not at liberty to surrender, or to waive[.]" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 387 (2024).

Finally, there can be no doubt that Plaintiffs are irreparably harmed by the challenged tariffs: as their declaration details, their business cannot avoid real, immediate, and devastating injury from 145% tariffs on imports from the source of 60% of their products. The government's concerns about nationwide injunctions have no traction here, where Plaintiffs seek injunctive relief only for themselves—limited relief that saves their small business without jeopardizing the "public interest."

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    IEEPA Does Not Authorize The Executive To Impose Tariffs.

#### 1.    *IEEPA's plain text does not support the government's interpretation.*

Congress uses unmistakable language when delegating its constitutional "Power to lay and collect Taxes, Duties, and Excises" to the President. Pls.' Br. 17. Yet the government concedes (as it must) that the words "taxes," "duties," or "tariffs" (or anything similar) appear nowhere in IEEPA. Resp. 11. The government instead contends that the term "regulate" implies the authority to impose tariffs. But the power to "regulate" is categorically different from the power to "tax" or "tariff." That is why the Constitution itself separates them. *See* U.S. CONST. art. I, § 8, cls. 1 and 3. As Chief Justice Marshall explained over two centuries ago, "the two grants are not *** similar in their terms or their nature." *Gibbons*, 22 U.S. at 198-199.

The plain meaning of "regulate" versus "tax" (or "tariff") at the time of IEEPA's enactment confirms the distinction between the two. Regulation concerns the imposition of "rules or restrictions" with an eye to controlling or governing a matter. *E.g.*, *Regulate*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 1264 (1975) ("to govern by or subject to certain rules or restrictions"). By contrast, taxes are "sum[s] of money demanded by a government for its support or for specific facilities or services, levied upon incomes, property, sales, etc." *Tax*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1456 (1973). And tariffs are simply schedules of "duties or customs"—*i.e.*, taxes—"imposed by a government on imports or exports." *Tariff*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1454 (1973). As the Supreme Court recently explained, "the essential feature of any tax" is that "[i]t produces at least some revenue for the Government." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012).

Nothing in section 1702(a)(1)(B) of IEEPA suggests an intent to deviate from the traditional distinction between the power to regulate (*i.e.*, establish rules governing conduct) and the power to tax (*i.e.*, raise revenue). To the contrary, the rest of section 1702(a)(1)(B) indicates that Congress did not understand the general term "regulate" to encompass the latter power. Notably, no other verb employed in the relevant provision—"investigate," "direct," "compel," "nullify," "void," "prevent," and "prohibit"[1]—indicates the power to raise revenue. *See United*

---

[1] To "investigate" is to "observe or study closely; inquire into systematically." *Investigate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1189 (1971). To "direct" is to "guide; order; command; instruct." *Direct*, BLACK'S LAW DICTIONARY 546 (4th ed. 1968). To "compel" is to "force or drive, esp[ecially] to a course of action." *Compel*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 300. To "nullify" is to "render or declare legally void or inoperative," as in the case of a "contract." *Nullify*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 988. To "void" is to "make ineffectual; invalidate; nullify." *Void*, RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1599. To "prevent" is to "hinder the progress, appearance, or fulfillment of." *Prevent*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1798. And to

*States v. Hillie*, 14 F.4th 677, 688 (D.C. Cir. 2021) (A statutory term's "meaning[ ] [is] narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated." (alterations in original)).

To be sure, taxation can sometimes be viewed as a "regulat[ory]" tool in a broad sense. *See* Resp. 12 (citing *Board of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 58 (1933)); *cf. Sebelius*, 567 U.S. at 564 (concluding Affordable Care Act's individual mandate was constitutional under Congress's power to tax but not its power to regulate commerce). But Defendants cite no authority for the proposition that Congress's bare grant to the Executive of the power to "regulate" somehow encompasses the unilateral power to demand discretionary sums of money from U.S. citizens. They cannot cite a single other statute in which a grant to the Executive of the power to "regulate" is understood as authority to impose taxes or tariffs. The Securities and Exchange Commission has had the power to "regulate" certain "transactions on a national securities exchange" for nearly a century. 15 U.S.C. § 78k(a)(2); *see also* Securities Exchange Act of 1934, Pub. L. No. 73-291, § 11(a)(1), 48 Stat. 881, 891 ("The Commission shall prescribe *** rules and regulations *** to *regulate* or prevent floor trading by members of national securities exchanges." (emphasis added)). Yet the SEC has never thereby asserted a power to tax such transactions. Nor has the Food and Drug Administration claimed the power to tax any "drug, biological product, device, or *** combination product" based on that agency's authority to "regulate" such products. 21 U.S.C. § 360bbb-2(a). No surprise that when Congress does seek to address the authority to regulate and the authority to tax in a single provision, it names the two as individually distinct powers. *See, e.g.*, 49 U.S.C. § 40117(j) (state actors may not "*tax, regulate, or prohibit *** the

---

"prohibit" is to "forbid by authority or command." *Prohibit*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1813.

imposition or collection of a passenger facility charge or the use of the revenue from the passenger facility charge" (emphasis added)); 16 U.S.C. § 460bbb-9(a) (specifying state still had power "to *tax* \*\*\* private property on the lands and waters included in the recreation area, or to *regulate* the private lands within the recreation area" (emphases added)); *see also* 2 U.S.C. § 622(8)(B)(1) ("government-sponsored enterprise" does not have "power to tax *or* to regulate interstate commerce" (emphasis added)).

The government has little response to the fact that IEEPA's plain language does not empower the Executive Branch to impose tariffs. It argues that section 1702 of IEEPA grants the President "wide-ranging powers." Resp. 13. But that grant "is not limitless." *Van Loon v. Department of the Treasury*, 122 F.4th 549, 571 (5th Cir. 2024). Section 1702 is a reticulated scheme that lists a number of distinct methods by which the President can control property in which a foreign country or person has an interest. When the property is subject to U.S. jurisdiction, those powers allow the President to temporarily "block" or permanently "prohibit" the acquisition, importation, or exportation of such property. They allow him to "nullify" a transaction involving that property or "compel" its transfer. And they allow him to "regulate" such property transactions through, for instance, the Export Administration Regulations ("EAR"), which establish licensing policies and conditions for dual-use and certain defense articles (transferred from IEEPA to another statute since 2001). CHRISTOPHER A. CASEY & PAUL K. KERR, R46814, CONG. RSCH. SERV., THE U.S. EXPORT CONTROL SYSTEM AND THE EXPORT CONTROL REFORM ACT OF 2018 (2021).[2] But nothing in IEEPA authorizes the President to impose revenue-raising tariffs on that property. *See* Amicus Brief of Former Senators, Attorney General, Federal Judges, and Scholars

---

[2] https://www.congress.gov/crs-product/R46814.

6-26, *V.O.S. Selections, Inc. v. Donald J. Trump*, No. 1:25-cv-00066-GSK-TMR-JAR (Ct. Int'l Trade Apr. 28, 2025), ECF No. 31.

The verb "regulate" thus grants the President powers related to but distinct from the powers to block, prohibit, compel, and direct that section 1702(a)(1)(B) also grants. The government nonetheless argues that "regulat[e]" must mean "tariff[]" because otherwise "it would mean little, if anything, other than the power to 'prevent or prohibit' imports—leaving the term largely superfluous." Resp. 13. But the government elsewhere admits that "many" of "the[] terms grant[ing] the President" power in IEEPA 1702(a)(1)(B) "partially or fully overlap," *id.*, so there would be nothing anomalous if "regulate" overlapped with other terms too. Regardless, the notion that "regulate" means only "prohibit" or "tariff," and nothing else, blinks reality. As explained, it is well understood that the power to regulate includes the power to control an object's quality or quantity, to establish reporting obligations, or to impose licensing requirements. *See, e.g.*, *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 452 (D.C. Cir. 1998) (describing how the Clean Air Act "*regulates* air pollution by establishing air quality standards for certain pollutants and controlling the emissions of approximately 189 hazardous pollutants" (emphasis added)). That is why other statutes distinguish between the power to "regulate" and the power to "prohibit." *See* 15 U.S.C. § 78k(a)(2) (authorizing the Securities and Exchange Commission to "regulate *or* prohibit" certain "transactions on a national securities exchange") (emphasis added)). And that is why IEEPA has been invoked as authority for the EAR— which, in establishing a licensing regime for dual-use exports, does far more than merely "prevent or prohibit." *See* CASEY & KERR, *supra*.

It is the government's interpretation that would render much of section 1702(a)(1) superfluous. If "regulate" has as broad a meaning as the government contends, there would be no need for the provision to specify the President's power to "investigate, block during the pendency

6

of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit *** any property in which any foreign country or a national thereof has any interest." Under the government's reading, Congress would have accomplished the exact same thing by simply authorizing the President "to regulate any property in which any foreign country or a national thereof has any interest." The government's construction thus suffers from the "fatal flaw" of "yield[ing] exactly the same meaning that would result if [the statute] did not contain the [additional] words *** at all." *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 498 (D.C. Cir. 2004). Indeed, if IEEPA's use of "regulate" authorized tariffs upon the President's designation of a national emergency (which the government contends is unreviewable), then it would also render nugatory the multiple laws that Congress enacted in Title 19 specifically to channel the President's imposition of tariffs. *See* Pls.' Br. 20-21.

That the President purports to "regulate" property in which no foreign person or country has any "interest" whatsoever underscores that IEEPA does not authorize tariffs. IEEPA does not apply to all property, but only "property in which any *foreign country or a national thereof has any interest.*" 50 U.S.C. § 1702(a)(1)(B) (emphasis added). To fall under section 1702(a)(1)(B), there must be some foreign "interest" in the relevant "property," and the interest must be one that the foreign country or national "has"—that is, it must be a *present* interest in the property. *See Real v. Simon*, 510 F.2d 557, 562 (5th Cir. 1975) (concluding the Trading with the Enemy Act ("TWEA") did not apply because no foreign national "*retains* an interest" in the relevant property (emphasis added)). Had Congress wished to include property in which a foreign country or national *previously* had an interest, Congress could easily have done so—exactly as it did in the same subsection, specifying that the President could require individuals to keep records of property in

which a foreign country or national "has *or has had* any interest." 50 U.S.C. § 1702(a)(2) (emphasis added).

Defendants cannot dispute that much imported property (including Plaintiffs' own property, *see* Woldenberg Decl. ¶ 5) is property in which no foreign country or national thereof has any present "interest" at the time the duty is paid domestically by U.S. importers, which often already have taken full title and control all interests in the imported goods. *See* 19 U.S.C. § 1484(a)(2)(B) (generally authorizing only "owner or purchaser of the merchandise" to be importer of record). Tariffs on imported goods are typically paid *after* the merchandise is entered into the United States. *See* U.S. Customs & Border Protection, *Entry Summary and Post Release Processes*, https://www.cbp.gov/trade/programs-administration/entry-summary (last modified Apr. 10, 2025) ("Within 10 days of the release of the cargo, the importer must pay the estimated duties on their imported goods."); *see also* Liz Young, *A Step-by-Step Look at How Trump's New Tariffs Will Be Implemented*, WALL ST. J. (Apr. 9, 2025), https://www.wsj.com/economy/trade/trump-reciprocal-tariffs-work-guide-47527fbc ("Levies aren't collected at a tollbooth as goods cross the border. Instead, importers must calculate and pay the duties electronically or by check after the fact."). It also makes no difference that IEEPA's reach extends beyond "mere ownership." Resp. 29. Whatever "ownership" entails, all agree that there must be *some* actual foreign interest in the relevant property, which is all Defendants' unremarkable authority confirms. *See id.* at 29-30. Defendants' interpretation of "regulate" as encompassing the power to levy tariffs would empower the President to tax property wholly owned and controlled by U.S. persons on American soil—something IEEPA does not allow.

The government also invokes legislative history and context as purported support for its interpretation. Resp. 19-20. But it does not (and cannot) refute the fact that there is *zero* mention

(explicitly or implicitly) of a power to levy tariffs in any of the history leading to either TWEA or IEEPA. *See* Pls.' Br. 16-28; *see also* Opp'n to Defs.' Mot. to Transfer to the U.S. Court of Int'l Trade 9, *State of Cal. v. Donald J. Trump*, No. 3:25-cv-03372-JSC (N.D. Cal. May 1, 2025), ECF No. 12. And, as discussed next, the government misunderstands the sole historical example on which it relies.

### 2. *Yoshida* **cannot salvage the IEEPA tariffs.**

Tellingly, it is not section 1702's text that the government leans on most heavily, but instead a decades-old decision from the United States Court of Customs and Patent Appeals ("CCPA") analyzing a different statute. *See* Resp. 2, 4, 12, 14, 16-19, 23, 26-28, 32, 35. That *Yoshida* decision, in turn, reversed a decision from a three-judge panel of the U.S. Customs Court (which the government elsewhere refers to as an expert court). The customs court had concluded that TWEA did *not* authorize President Nixon to impose tariffs. *Yoshida Int'l, Inc. v. United States (Yoshida I)*, 378 F. Supp. 1155, 1162 (Cust. Ct. 1974), *rev'd*, *Yoshida II*, 526 F.2d 560 (C.C.P.A. 1975)*.* The CCPA's contrary decision holds no precedential value for this Court, was wrongly decided, and in any case is inapposite.

At the threshold, the government errs in saying President Nixon "invoked TWEA" or "use[d] *** TWEA to impose tariffs." Resp. 2, 17; *see id.* at 23. As the House Report on IEEPA explains, "[TWEA] was *not* among the statutes cited in the President's proclamation as authority for the surcharge[.]" H. REP. NO. 95-459, at 5 (1977) (emphasis added). Instead, TWEA was only "cited later by the Government in response to a suit brought in Customs Court by Yoshida International challenging the surcharge." *Id.* Although Plaintiffs' motion made that clear, Pls.' Br. 25, the government misleadingly implies otherwise by selectively quoting the same legislative history. *Compare* Resp. 17 (House Report "recounted that 'section 5(b) [of TWEA] came into play

when *** President Nixon declared a national emergency *** and under that emergency imposed a surcharge on imports[.]" (first alteration and ellipses in original)).

In reality, President Nixon's August 1971 proclamation imposing a tariff on imported goods, Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971)—which was rescinded four months later, Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971)—cited only the Tariff Act of 1930 and the Trade Expansion Act of 1962. When an importer later challenged those tariffs in the U.S. Customs Court (the predecessor to the Court of International Trade), the government in litigation relied on the two acts the Proclamation had cited but also advanced an alternative argument that the tariffs were authorized by section 5(b) of the TWEA. *Yoshida I,* 378 F. Supp. at 1157.

A three-judge Customs Court panel held that section 5(b) of TWEA could *not* authorize the tariffs because "regulate" as used in section 5(b) did not include the imposition of tariffs. 378 F. Supp. at 1172. Among other reasons, TWEA contained "delineating and restrictive phraseology" that "was employed in order to preclude the all-encompassing construction" of "regulate" urged by the government. *Id.* Otherwise, TWEA would grant the President the power to impose tariffs "at will, without regard to statutory rates prescribed by the Congress and without the benefit of standards or guidelines which must accompany any valid delegation of a constitutional power by the Congress." *Id.* Judge Maletz's concurring opinion comprehensively reviewed section 5(b)'s history, concluding that "nowhere in the Congressional debates, committee hearings or reports on section 5(b) and the amendments thereto is there even a glimmer of a suggestion that Congress ever intended—or even considered—this section as a vehicle for delegating any of its tariff-making authority." *Id.* at 1176-1184 (Maletz, J., concurring). He further

noted that Congress had affirmatively *rejected* prior attempts to allow the President "carte blanche authority" to impose tariffs. *Id.* at 1184.

On appeal, however, the CCPA reversed. In doing so, the CCPA took an explicitly purposive rather than textualist approach to conclude that the President could impose tariffs under TWEA's grant of the "power to 'regulate importation.'" *Yoshida*, 526 F.2d at 573. The CCPA acknowledged that "no undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency," *id.* at 572; that "nothing in the TWEA or in its history *** specifically either authorizes or prohibits the imposition of a surcharge," *id.* at 572-573; and that "Congress did not specify that the President could use a surcharge in a national emergency." *Id.* at 576. The CCPA nevertheless concluded that because nothing in the legislative history of section 5(b) indicated an intent to *prohibit* tariffs, section 5(b) necessarily must have authorized the imposition of tariffs. *Id.* Looking to TWEA's purpose, the CCPA emphasized that "the primary implication of an emergency power is that it should be effective to deal with a national emergency successfully." *Id.* at 573. Rather than analyze TWEA's list of specific powers, the CCPA simply noted that the statute's grant of authority was "broad indeed." *Id.* And while purporting to agree with the Customs Court regarding the "necessity of determining the scope and extent of delegated regulatory power," *id.* at 574, the CCPA placed no parameters on the meaning of "regulate" at all—including vis-à-vis tariffs, *id.* at 578-579. But as the Customs Court explained, recognizing that tariffs sometimes serve regulatory purposes (broadly speaking) does not answer the crucial question of whether Congress intended "*th[is]* statutory language" to authorize the Executive Branch to impose tariffs. 378 F. Supp. at 1171 (emphasis added).

At the same time, the CCPA's decision betrayed concern about the constitutional tension its holding created: IEEPA "do[es] not here sanction the exercise of an unlimited power, which,

we agree with the Customs Court, would be to strike a blow to our Constitution." *Yoshida*, 526 F.2d at 583. The CCPA thus stressed certain limitations: that the 1971 tariffs did not actually apply to all imports but only to imports where there had been prior tariff concessions, *id.*; that the tariffs were capped at tariff rates that had been set by Congress (and that, if the new rates exceeded congressionally set rates, Congress's rates would control), *id.* at 577-578; and that the tariffs were short-lived (less than five months), *id.* at 582 n.33; *see also id.* at 577 (heading called "Limited Nature of Proclamation 4074"). None of these caveats would be necessary if TWEA truly granted the President broad and expansive tariffing authority to deal with any declared emergency.

In any event, the CCPA's decision in *Yoshida* is ultimately inapposite—not just because it is not binding on this Court, but also because it did not in fact analyze IEEPA. IEEPA was enacted "to counter the perceived abuse of emergency controls by presidents to *** interfere with international trade in non-emergency, peacetime situations." *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 776 (9th Cir. 2006); *see also* H. REP. NO. 95-459, at 1 (describing IEEPA as "redefin[ing] the power of the President to regulate international economic transactions in future times of war or national emergency" and, compared with TWEA, providing "somewhat narrower powers subject to congressional review in times of 'national emergency' short of war"); H. REP. NO. 95-459, at 10 (Congress wanted IEEPA "standby authority" powers to be "more restricted than those available during time of war"). Moreover, just before enacting IEEPA, Congress passed Section 122 of the Trade Act of 1974, which specifically addressed trade exigencies and authorized the President to impose an "import surcharge *** in the form of duties *** on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a), and to respond to other countries' burdensome trade practices by imposing "duties or other import restrictions," *id.* § 2411(c). There would have been no need for Section 122

if Congress understood TWEA—and then IEEPA—to cover the same ground. These developments make clear that Congress did not intend to lodge any tariff power in IEEPA at all.

The government nonetheless suggests that Congress must have intended to empower the President to impose tariffs under IEEPA simply because IEEPA carried over some of TWEA's language, and Congress was aware of the *Yoshida* decisions when it enacted IEEPA. Resp. 17. But courts assume that Congress adopts an "earlier judicial construction of [a] phrase" only "[w]here there is *settled* precedent"—such as Supreme Court precedent—"on the interpretation of a statute." *United States v. Collazo*, 984 F.3d 1308, 1328 (9th Cir. 2021) (emphasis added); *see Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 270 (2020) ("[W]e presume that Congress 'adopted also the construction given by *this* Court to such language, and made it a part of the enactment.'") (emphasis added) (quoting *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 131 (2019)). Two conflicting lower court decisions from a single case taking opposite stances on the construction of a statute hardly count as "settled precedent." And Congress's other legislative responses to President Nixon's actions confirm that it was creating different, more-limited tools, not blessing the President's actions.

### 3.  *A clearer statutory basis is required to invoke an unheralded power of such economic and political magnitude.*

The magnitude of the IEEPA tariffs' economic and political consequences—combined with the fact that no President has ever previously relied on IEEPA (or even TWEA) to impose a tariff—requires the government to point to a "clear" statutory basis for that power. *West Virginia v. EPA*, 597 U.S. 697, 722-724 (2022); *see* Pls.' Br. 27-29. The government cannot make that showing. In fact, it hardly tries, primarily arguing that the "major questions" doctrine does not apply.

For one, the government claims (Resp. 21) that the doctrine does not apply to presidential actions at all. But in the doctrine's short history, three appellate courts have already said otherwise. *See Kentucky v. Biden*, 23 F.4th 585, 606-608 (6th Cir. 2022) (applying major questions doctrine to exercise of President's proprietary authority); *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022) (same); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1295-1296 (11th Cir. 2022) (same); *see also Nebraska v. Su*, 121 F.4th 1, 17-22 (9th Cir. 2024) (Nelson, J., concurring) (closely analyzing whether "major questions doctrine" applies to presidential delegations and concluding that "nothing excuses the President from its commands"). Defendants unsurprisingly cite no contrary authority. The major questions doctrine is fundamentally concerned with the question of delegation of congressional authority; that is, whether Congress intended "to confer [the] authority" now claimed by the Executive Branch. *West Virginia*, 597 U.S. at 721; *see also id.* (asking whether Congress could "have intended to delegate *** sweeping and consequential authority in so cryptic a fashion" (internal quotation marks omitted)). After all, absent vigilance over limits on delegated authority, "[l]egislation would risk becoming nothing more than the will of the current President[.]" *Id.* at 739 (Gorsuch, J., concurring).

The government next suggests that the major questions doctrine does not apply to national-security and foreign-policy matters because presidents are typically afforded deference in those areas. Resp. 21-22. But when the President assumes powers "the Constitution has expressly confided to the Congress and not to the President," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952)—like the power to tariff—deference is afforded only so long as the President acts "pursuant to the 'authorization of Congress,'" Resp. 22 (quoting *Youngstown*, 343 U.S. at 635-636). The major questions doctrine is a tool for determining the parameters of any such authorization. And while deference might be afforded to the President when it comes to factfinding

14

or where Congress has unambiguously left a decision to the President's discretion, no deference is otherwise owed the President's statutory interpretation. *See Loper Bright*, 603 U.S. at 388-389. That is particularly so when the interpretation concerns the scope of delegated authority—"perhaps the occasion on which abdication *** is *least* appropriate." *Id.* at 401.

The government moreover conflates the President's goal (foreign policy) with his means (tariffs). Resp. 23-24. He may have constitutional power and delegated authority for the former, but what matters is his constitutional power and delegated authority for the latter. *See West Virginia*, 597 U.S. at 730 ("Forbidding evictions may slow the spread of disease, but the CDC's ordering such a measure certainly raise[s] an eyebrow. We would not expect the Department of Homeland Security to make trade or foreign policy even though doing so could decrease illegal immigration." (alteration in original) (internal quotation marks and citation omitted)). When Congress does delegate its tariff authority to the Executive Branch, it enacts carefully tailored laws that expressly permit the President or an agency to impose tariffs in specified circumstances after following required procedures. *See* Pls.' Br. 17, 20-21. It does not trust the Executive with the unbridled authority he now claims under IEEPA.

The government finally contends that the President's exercise of tariff power under IEEPA is not unprecedented given that "[t]he President exercised his tariff power under materially identical language in IEEPA's predecessor statute." Resp. 23. But again, that is false: President Nixon did *not* invoke TWEA to support his authority to impose peacetime tariffs; instead, government counsel cited it only after the fact to defend his actions in court. H. REP. NO. 95-459, at 5. Such *post hoc*, made-for-litigation justification is hardly a compelling "assertion of power by those who presumably would be alert to exercise it." *West Virginia*, 597 U.S. at 725. As for the

rest of the government's purportedly "robust" history (Resp. 23), none involves an imposition of tariffs pursuant to IEEPA.

If this Court has any doubts as to whether IEEPA authorizes the President to impose tariffs, it should rely on the doctrine of constitutional avoidance to conclude it does not. *See* Pls.' Br. 36-38. The government's interpretation—granting the President unfettered and unreviewable discretion to declare emergencies and remake the American and global economies by imposing tariffs of any size or duration—raises far more than a "serious doubt" about the constitutionality of IEEPA.

**B.    The Challenged Tariffs Fail To Comport With IEEPA's Requirements.**

**1.    *The Universal and Reciprocal IEEPA Order is not based on an "unusual" national emergency threat.***

Beyond IEEPA's lack of tariff authority, IEEPA limits the President to addressing only a threat that is "unusual and extraordinary." 50 U.S.C. § 1701(a). The annual U.S. goods trade deficits the President invoked to justify the Universal and Reciprocal IEEPA Order are anything but: they have existed for 50 years. Pls.' Br. 31. The President's own Order characterizes those deficits as "persistent." Exec. Order No. 14,257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041, 15,041 (Apr. 2, 2025). The President cannot claim a national emergency is "unusual" when his own description concedes it is not.

The government's main response is that the decision to declare a "national emergency" is a question reserved to the political branches. Resp. 31-36. But none of the traditional *Baker* factors counsels against judicial determination here. *See Baker v. Carr*, 369 U.S. 186, 217 (1962).

For one, Plaintiffs do not ask this Court to make an "initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. To be clear, Plaintiffs do not ask this

Court to adjudicate whether the U.S. goods trade deficits constitute a national emergency—a determination arguably left to the President's discretion. *See* 50 U.S.C. § 1621(a). But IEEPA places additional requirements for the President's exercise of power. Under IEEPA's text, the President can act only in the case of a national emergency threat that is "unusual and extraordinary." *Id.* § 1701(a). To be "unusual" is to be "rare," *Unusual*, NEW WEBSTER'S DICTIONARY OF THE ENGLISH LANGUAGE 1698 (1975)—something the long-standing trade deficit is not.

Legislative context confirms that Congress intended to limit the President's IEEPA powers to truly unique circumstances. *See Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 643 (D.C. Cir. 2021) (legislative history can help "confirm [a court's] reading of the text"). In enacting IEEPA, Congress expressed concern that the President had previously been given "essentially an unlimited grant of authority *** in both the domestic and international economic arena" whenever there was an "unterminated declaration of national emergency on the books." H. REP. NO. 95-459, at 7. Congress thus insisted that any emergency that could justify the exercise of IEEPA powers had to be one that would be "rare and brief" and not "equated with normal, ongoing problems." *Id.* at 10. IEEPA's statutory language reflects that intent.

There are also "judicially discoverable and manageable standards" to resolve whether a declared national emergency threat is "unusual." *Baker*, 369 U.S. at 217. In asking whether a punishment is "unusual" in the Eighth Amendment context, courts ask whether a punishment is "different from that which is generally done." *Trop v. Dulles*, 356 U.S. 86, 100 n.32 (1958). To determine whether stock sales are "unusual" in the securities context, courts look to amounts and timing to determine whether the sales are "significantly different *** from the directors' previous trading practices." *In re Verifone Holdings, Inc. S'holder Derivative Litig.*, No. 07-cv-06347

(MHP), 2009 WL 1458233, at *9 (N.D. Cal. May 26, 2009). Determining whether the national emergency is "unusual" does not require the Court to decide whether the President's "action was wise." *Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019) (internal quotation marks omitted). It presents a distinct "legal issue[]," requiring this Court to determine only whether the concededly longstanding U.S. trade deficit is different from challenges routinely faced by the United States.

Lastly, the fact that the application of IEEPA implicates issues of national security and foreign affairs does not remove the President's decisionmaking from this Court's review. *Contra* Resp. 35. The Supreme Court has long cautioned that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211; *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 n.3 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("[F]rom the time of John Marshall to the present, the Court has decided many sensitive and controversial cases that had enormous national security or foreign policy ramifications.").

### 2.    The challenged tariffs are not "reasonably related" to the claimed national emergency.

For the reasons described in Plaintiffs' opening brief, the challenged tariffs are not "reasonably related" to the claimed national emergency threat. *See* Pls.' Br. 32-35. The government argues that, too, is a political question. But again, Congress placed limits on the President's ability to exercise his IEEPA powers, and it is within this Court's power to adjudicate whether he has stayed within those limits. Specifically, Congress made clear that the President may exercise his IEEPA powers only "to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared" and that those powers may "not be exercised for any other purpose." 50 U.S.C. § 1701(b). By requiring that the exercise of power actually

"deal" with the threat and not be exercised for "any other purpose," IEEPA's text limits the President's actions to those that have a reasonable nexus to the national emergency.

Assessing whether there is a reasonable relationship between the government's ends and its means "is a familiar judicial exercise." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012); *see, e.g.*, *American Meat Inst. v. United States Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (inquiring into whether there was a "reasonable fit between means and ends" (internal quotation marks and citation omitted)). In the TWEA context, courts have thus been ready to assess whether "the President's action [is] rationally related to the national emergencies invoked." *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1081 (9th Cir. 1982); *see also Yoshida II*, 526 F.2d at 579 n.29 ("[T]he courts stand ready to inhibit actions not reasonably related to the authority granted[.]"). This Court can also easily assess whether the President exercised his emergency powers for a purpose "other" than the claimed national emergency threat: in this case, the Court need only look to the President's own articulated justifications explaining the "other" reasons for the IEEPA tariffs. *See* Pls.' Br. 34-35.[3]

---

[3] In a different IEEPA case, this Court concluded that the political question doctrine applied to the question of whether the President's actions "deal[t] with" the stated national emergency. *See Htet v. Trump*, No. 24-cv-1446 (RC), 2025 WL 522033, at *8 (D.D.C. Feb. 18, 2025). But the Court acknowledged that section 1701(b) "deliberately places at least some boundaries on the President's use of Section 1702 powers" and cautioned that "the political question doctrine m[ight] not apply to a more extreme fact pattern." *Id.* at *6 n.3 (citing *Gonzalez-Vera v. Kissinger*, 449 F.3d 1260, 1264 (D.C. Cir. 2006)). This is that fact pattern. In *Htet*, the plaintiff asked this Court to determine whether authorizing sanctions against the adult children of designated individuals "effectively counters the threat to democracy and political rights in Burma." *Id.* at *7. Here, by contrast, Plaintiffs ask this Court to determine only the reasonableness of the relationship between the President's goal of reducing the overall U.S. trade deficit and, for instance, his imposition of tariffs on countries that already help reduce that deficit. *See* Pls.' Br. 33. The disconnect here is glaring.

## II.    PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM

Plaintiffs have easily demonstrated that "irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The declaration accompanying Plaintiffs' Preliminary Injunction Motion describes several concrete and wholly unrecoverable harms, both actual and imminent, arising from the challenged tariffs.

Defendants dismiss those harms as "speculative," trivialize their significance, and assert that they amount to nothing more than a "temporary loss of income." Resp. 36-40. These arguments defy reality. The companies' CEO painstakingly recounts how the tariffs are *already* causing Plaintiffs to lose substantial sales and suffer other debilitating harm. For example, he explains:

- "As of April 21st, we have received cancellations and 'stop shipment' instructions for direct import orders totaling more than $1 million because of the new tariffs." Woldenberg Decl. ¶ 10.

- "Because of the tariffs, we have already had to cancel shipments and delay production in China." *Id.* ¶ 21.

- "The Companies have collectively already paid over $1 million based on the new 2025 tariff rates," *id.* ¶ 7, and "the total estimated duties and tariffs on all of the merchandise in" shipments en route "is greater than $1 million," "which constitutes an extraordinary and unplanned expense." *Id.*

- "To address the financial impact of the sudden, unbudgeted and massive tariff cost[,]" Plaintiffs "have been working to cut [their] operating expenses by 10% since January and will need to cut those expenses even further," including costs "on cash expenditures like advertising, CapEx, and hiring." *Id.* ¶ 13.

- Plaintiffs "have no realistic way to cover these [tariff] costs, which means the tariffs act as an immediate ban on the products we import." *Id.* ¶ 15.

The CEO's predictive judgment about the snowballing impacts of continuing IEEPA tariffs is based on articulated experience and data. For instance, in addition to the cancellations and stop shipment orders, he explains that Plaintiffs have lost sales in the past based on price increases of

less than 2%. Woldenberg Decl. ¶ 18. That the far greater (70%+) price hikes necessitated by massive new tariffs are likely to lead to permanently lost sales follows as a matter of common sense. *Id.* ¶ 9. The CEO explains how he determined that paying the tariffs in 2025 would result in more than $100 million in cash expenditures—an amount exceeding the amount Plaintiffs budgeted for every non-salary expense combined. *Id.* ¶ 14. His expectation of a year-over-year sales decline of at least 25% and perhaps as much as 50% is based on these realities, not speculation. *Id.* ¶ 11. Even President Trump recently acknowledged what everyone (except Defendants' brief) already understands: these tariffs will lead to empty shelves, fewer sales, and higher prices. *See* Michael Collins, '*Two Dolls Instead of 30': Trump Acknowledges Prices Will Force Consumers to Cut Back*, USA TODAY (Apr. 30, 2025), https://www.usatoday.com/story/news/politics/2025/04/30/trump-china-tariffs-toys/83372961007/ (President: "You know, somebody said, 'Oh, the shelves are going to be open.'" "Well, maybe the children will have two dolls instead of 30 dolls" and "maybe the two dolls will cost a couple of bucks more than they would normally.").[4]

Defendants nonetheless make the astonishing argument that the harms from the 145% IEEPA tariffs on China are "not sufficient" because "only" about "'60% of the products [plaintiffs] sell or consume as components (by costs) are manufactured in China.'" Resp. 37 (quoting Woldenberg Decl. ¶¶ 6, 27). "*Only*"? The notion (as any business owner can confirm) that an "[i]njury is not 'certain' or 'great' if it affects only about half of plaintiffs' business," *id.* at 38

---

[4] Of course, Plaintiffs are hardly alone in facing these harms. According to a recent survey of 410 small- and medium-sized members of the Toy Association, more than 80% are delaying orders, well more than half are cancelling orders, and nearly half have reported that they would go out of business within weeks or months. The Toy Association, *Christmas and Toy Companies are at Risk! Toy Association Member Survey Reveals Alarming Impact of 145% Tariffs* (Apr. 18, 2025), https://www.toyassociation.org/PressRoom2/News/2025_News/toy-association-member-survey-reveals-alarming-impact-of-145-percent-tariffs.aspx.

(citation omitted), is both deeply misguided and (unsurprisingly) unsupported by any precedent. This is not a situation in which a Fortune 20 company is claiming irreparable harm based upon losses of less than 1 percent of its total sales. *See* Resp. 38-39 (citing *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012)).[5]

The specified harms, moreover, are neither temporary nor remediable later. Defendants acknowledge that any financial remedy available to Plaintiffs would be limited to a refund of the duties paid (though they cryptically suggest that "loss of business opportunities and goodwill" may be recovered "indirectly," Resp. 38). But a refund is wholly inadequate when no products can be imported feasibly and thus no duties are ever paid. Regardless, it takes no great imagination to understand that a someday possible refund could not come close to making Plaintiffs whole on their loss of income or their inability to import products, fill customer orders, obtain critical financing, and maintain feasible pricing *right now*. Floating an extra $100 million is not something Plaintiffs can do. Recognizing that undeniable fact hardly creates a "'*per se* irreparable harm rule' in tariff challenges." *Id.* at 36-37 (quoting *Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002)). Instead, it simply acknowledges that the devastating harms posed by these specific tariffs, on these specific family-owned U.S. businesses, are irreparable.

## III. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFFS

Defendants' discussion of the equities and public interest rests on inapplicable concerns associated with nationwide preliminary injunctions. *See* Resp. 42-43. Plaintiffs here are seeking to

---

[5] Defendants claim that Plaintiffs "recently moved 16 percent of their manufacturing away from the PRC at a comparatively minimal cost," and thus any injury from the tariffs on China "can be mitigated at marginal cost." Resp. 38. That is a gross distortion of the CEO's statement, which explains that it took the company years and $2 million in out-of-pocket costs to move that small share of the companies' manufacturing out of China to other countries (all of which are now subject to at least 10% baseline IEEPA tariffs and larger suspended IEEPA tariffs).

enjoin the application of the challenged tariffs as to their own imports only. Prohibiting Defendants from applying the (unlawful) tariffs to Plaintiffs temporarily, pending further litigation, will have next to no impact on Defendants' ability to pursue its asserted "foreign affairs" interests. *Id.* at 41.

Relying on *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024), Defendants make speculative arguments about what would happen if other parties sought similar relief. But in *Hanson*, the court had already held that plaintiff had a weak argument on the merits; plaintiff failed to show irreparable harm in the absence of the injunction; and defendant would suffer long-term harm even if the injunction were later lifted. *Id.* at 242-248. The plaintiff thus could not overcome the case's other shortcomings simply by asking the court to "rebalance the equities by limiting injunctive relief" to the named parties. *Id.* at 247. By contrast, because Plaintiffs' success and harm showings here are strong and the relief they seek is limited, the Court need not speculate about how the balance might play out differently in a different case.

## IV.    THE COURT SHOULD NOT REQUIRE MORE THAN A NOMINAL BOND

Defendants ask the Court to limit the preliminary injunction to Plaintiffs, which is all Plaintiffs seek. But Defendants also ask the Court to order Plaintiffs "to post Single Transaction Bonds" for all such entries "in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, *including the duties that would otherwise have been deposited pursuant to the executive orders*." Resp. 43 (emphasis added). In other words, Defendants demand a costly self-defeating bond that would cover amounts beyond even the sums Plaintiffs are seeking to enjoin and that would still leave Plaintiffs at risk of paying the 145% tariffs after the fact, either to the government directly or to the surety as reimbursement for collections on the bond. Just like the

tariffs themselves, such bonding conditions would act as an effective prohibition on Plaintiffs' importing from China.[6]

The Court should reject Defendants' request to impose a bond that would nullify the benefit of any preliminary injunction. Rule 65(c) of the Federal Rules of Civil Procedure "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). That discretion includes the option of not requiring a bond at all, *see, e.g.*, *National Council of Nonprofits v. Office of Mgmt. & Budget*, No. 25-cv-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025), including "where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action," *Natural Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). Moreover, in considering whether to impose a bond and its amount in cases involving the government as the defendant, "[i]t would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party." *Id.* at 169.

Under those principles, the Court should exercise its discretion to impose no more than a nominal bond. Given the untenable costs and risks to Plaintiffs, imposing the oppressive bond the government seeks would essentially leave them in the same position they are in now—unable to import the majority of their products and suffering irreparable harm.

## V.    THE COURT MAY TREAT THE PRELIMINARY INJUNCTION MOTION IN A MANNER THAT ALLOWS FOR ENTRY OF FINAL JUDGMENT

Ultimately, the Court may avoid grappling with the government's suspect arguments on irreparable harm, the balancing of the equities, and the bonding requirement by deciding the ultimate merits instead of ruling on a preliminary injunction. That is because, as both parties'

---

[6] Defendants also seek other burdensome and infeasible requirements, such as forcing Plaintiffs to "identify the entries, by entry number, importer name, and importer number, that would be covered by any such order." Resp. 43.

24

briefing has confirmed, there are no factual or evidentiary disputes on the dispositive legal issue of whether IEEPA permits the imposition of tariffs. One procedural option is to "advance the trial on the merits." FED. R. CIV. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."); *see, e.g.*, Minute Order, *Dellinger v. Bessent*, No. 25-cv-00385 (D.D.C. Feb. 15, 2025) ("In the absence of opposition on the part of either party, it is hereby further ORDERED that the Court's consideration of the motion for preliminary injunction will be consolidated with consideration of the merits pursuant to Federal Rule of Civil Procedure 65(a)(2)."). Another option is to treat the preliminary injunction motion as one for (partial) summary judgment. *See, e.g.*, *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) (issuing summary judgment after converting motion for preliminary injunction); *Morris v. District of Columbia*, 38 F. Supp. 3d 57 (D.D.C. 2014) (same). Either consolidating the preliminary injunction hearing with a "trial on the merits" or treating it as a summary judgment motion would permit the Court to make a definitive merits ruling regarding Defendants' IEEPA authority and afford injunctive relief in a final judgment (without the need to resolve the remaining preliminary injunction-specific issues, including bond).

## <u>CONCLUSION</u>

This Court should preliminarily enjoin the agency Defendants and their agents, employees, and all persons acting under their direction and control, from taking any action to collect tariffs from Plaintiffs under the Challenged Orders.[7]

---

[7] The government argues that this Court should "grant defendant's motion to transfer before the hearing on plaintiffs' preliminary injunction motion." Resp. 10. As explained in Plaintiffs' transfer response (ECF No. 18 at 12 n.7), the principal merits argument for a preliminary injunction is coextensive with the jurisdictional question, and the Court has already scheduled a hearing to consider both motions. Accordingly, the sensible course is for the two overlapping motions to be decided together.

Dated: May 7, 2025

Respectfully submitted,

*/s/ Pratik A. Shah*
Pratik A. Shah
  D.C. Bar No. 497108
James E. Tysse
  D.C. Bar No. 978722
Matthew R. Nicely
   D.C. Bar No. 430564
Daniel M. Witkowski (*admission pending*)
  D.C. Bar No. 1028791
Kristen E. Loveland
  D.C. Bar No. 1684978
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
Tel: (202) 887-4000
pshah@akingump.com

*Counsel for Plaintiffs*