Page 1

1   UNITED STATES COURT OF INTERNATIONAL TRADE

2

3   Case No. 1:25-cv-00066-GSK-TMR-JAR

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   V.O.S. SELECTIONS, INC., et al.,

7                    Plaintiffs,

8            v.

9   DONALD J. TRUMP, et al.,

10                   Defendants,

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                   U.S. Court of International Trade

14                   One Federal Plaza

15                   New York, NY 10278

16

17                   May 13, 2025

18                   11:00 a.m.

19

20  B E F O R E :

21  HON. GARY S. KATZMANN

22  HON. TIMOTHY M. REIF

23  HON. JANE A. RESTANI

24  U.S. INTERNATIONAL TRADE JUDGES

25

Page 2

```
 1   A P P E A R A N C E S :

 2

 3   LIBERTY JUSTICE CENTER

 4        Attorneys for V.O.S. Selections, Inc.

 5        7500 Rialto Boulevard, Suite 1-250

 6        Austin, TX 78735

 7

 8   BY:  JEFFREY MICHAEL SCHWAB

 9        REILLY WALSH STEPHENS

10

11   GEORGE MASON UNIVERSITY

12        Attorney for V.O.S. Selections, Inc.

13        3301 Fairfax Drive

14        Arlington, VA 22201

15

16   BY:  ILYA SOMIN

17

18

19

20

21

22

23

24

25
```

```
                                              Page 3
 1   U.S. DEPARTMENT OF JUSTICE

 2        Attorney for Donald J. Trump, in his official capacity

 3        as President of the United States

 4        U.S. Department of Justice - Commercial Litigation

 5        Branch - Civil Division

 6        P.O. Box 480

 7        Ben Franklin Station

 8        Washington, D.C. 20044

 9

10   BY:  SOSUN BAE

11        CLAUDIA BURKE

12   U.S. DEPARTMENT OF JUSTICE

13        Attorney for Donald J. Trump, in his official capacity

14        as President of the United States

15        Senior Trial Counsel

16        International Trade Field Office

17        U.S. Department of Justice - Civil Division

18        26 Federal Plaza, Room 346

19        New York, NY 10278

20

21   BY: JUSTIN R. MILLER

22

23

24

25
```

```
                                                    Page 4

 1   U.S. DEPARTMENT OF JUSTICE

 2        Attorney for Donald J. Trump, in his official capacity

 3        as President of the United States

 4        U.S. Department of Justice - Federal Programs Branch -

 5        Civil Division

 6        950 Pennsylvania Avenue, N.W.

 7        Washington, D.C. 20530

 8

 9   BY:  ERIC J. HAMILTON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                            Page 5
 1                        P R O C E E D I N G S
 2              CLERK:  All rise.  The United States Court of
 3    International Trade is now in session.  The Honorable Gary
 4    S. Katzmann, Timothy M. Reif, and Jane A. Restani presiding
 5    before Court Number 25-00066, V.O.S. Selections, Inc. et al
 6    v. Donald J. Trump et al.
 7              Will the attorneys please state their names for
 8    the record, starting with the Plaintiffs?
 9              MR. SCHWAB:  Jeffrey Schwab on behalf of the
10    Plaintiffs.
11              MR. STEPHENS:  Reilly Stephens on behalf of the
12    Plaintiffs.
13              MR. SOMIN:  Ilva Somin on behalf of the
14    Plaintiffs.
15              MR. HAMILTON:  Eric Hamilton for Defendants.
16              MS. BAE:  Sosun Bae for Defendants.
17              MS. BURKE:  Claudia Burke for Defendants.
18              MR. MILLER:  Justin Miller for the Defendants.
19              CLERK:  Please be seated.
20              HON. GARY S. KATZMANN:  Welcome to the United
21    States Court of International Trade.  At today's hearing, we
22    will hear two motions by Plaintiffs, V.O.S. Selections,
23    Plastic Services and Products, and Terry Precision versus
24    Donald J. Trump and other defendants.
25              Before we begin, I would say, as many of you know,
```

Page 6

1   that it is indeed appropriate that we are meeting here in a
2   courthouse in New York, a national courthouse with exclusive
3   jurisdiction.  And it is also appropriate to remember that
4   indeed the first federal trial in New York was conducted in
5   front of Judge Duane and there is a nearby street named for
6   Duane.
7          And it is also important to remember in terms of
8   the history that Alexander Hamilton lived much of his life
9   as an adult in New York and worked in New York and as
10  Secretary of the Treasury was very much concerned with
11  questions of trade and constitutional governance.  And his
12  report on manufacturers is still cited and referenced to
13  this day.
14         Now, today's hearing will address two motions, as
15  you well know. The first is a motion for preliminary
16  injunction filed on April 18th, 2025.  The second is a
17  motion for summary judgment filed on the same day.  Both
18  motions involved Plaintiffs' challenges to the present
19  imposition of tariffs under the International Emergency
20  Economic Powers Act, IEEPA of 1977.
21         This particular action involves challenges to two
22  recent executive orders.  The President imposed Executive
23  Order 14257 entitled Regulating Imports With a Reciprocal
24  Tariff to Rectify Trade Practices That Contribute to Large
25  and Persistent Annual United States Goods Trade Deficits on

Page 7

1    April 2nd, 2025.

2            The order states that, "Underlying conditions,

3    including a lack of reciprocity in our bilateral trade

4    relationships, disparate tariff rates and non-tariff

5    barriers, and U.S. trading partners' economic policies that

6    suppress domestic wages and consumption, as indicated by

7    large and persistent annual U.S. goods trade deficits,

8    constitute an unusual and extraordinary threat to the

9    national security and economy of the United States. That

10   threat has its source in whole or substantial part outside

11   the United States in the domestic economic policies of key

12   trading partners and structural imbalances in the global

13   trading system."

14           The President further stated, "It is the policy of

15   the United States to rebalance global trade flows by

16   imposing an additional ad valorem duty on all imports from

17   all trading partners except as otherwise provided herein.

18   The additional ad valorem duty on all imports from all

19   trading partners shall start at 10 percent and shortly

20   thereafter, the additional ad valorem duty shall increase

21   for trading partners enumerated in Annex I to this order at

22   the rates set forth in Annex I to this order."

23           The President subsequently issued Executive Order

24   14266 on April 9th, 2025 entitled Modifying Reciprocal

25   Tariff Rates to Reflect Trading Partner Retaliation and

                                                            Page 8

1    Alignment.  He stated that, "The Council Tariff Commission

2    of the People's Republic of China announced that, in

3    response to the Executive Order dated April 8, 2025, an 84

4    percent tariff would be imposed on all goods imported into

5    the PRC originating from the United States."  And that --

6    this is the President's quote, "I have determined that it is

7    necessary and appropriate to address the national emergency

8    declared in Executive Order 14257 by modifying the

9    Harmonized Tariff Schedule of the United States and taking

10   other actions to increase the duties imposed on the People's

11   Republic of China in response to this latest retaliation.

12   In my judgment, this modification is necessary and

13   appropriate to effectively address the threat to the U.S.

14   national and economic security posed by the PRC's

15   contribution to the conditions reflected in large and

16   persistent trade deficits, including PRC industrial policies

17   that have produced systemic excess manufacturing capacity in

18   the PRC and suppressed U.S. domestic manufacturing capacity,

19   which conditions are made worse by the PRC's recent

20   actions."

21         Plaintiffs seek a declaration that IEEPA does not

22   authorize the President's imposition of tariffs on China as

23   well as all trading partners worldwide through these orders.

24         They accordingly seek a permanent injunction

25   against the order's operation and damages in the amount of

Page 9

1    any tariffs collected by Defendants pursuant to the
2    challenged orders.
3            A three-judge panel has been convened.  And my
4    colleagues are to my immediate left, Judge Jane Restani and
5    to my right, Judge Timothy Reif.  And I am Gary Katzmann.
6    And that three-judge panel was convened because this is an
7    action that raises an issue of the constitutionality of the
8    act of Commerce or proclamation of the President or an
9    executive order or has broader significant implications in
10   the administration or interpretation of the customs laws.
11   And that three-judge panel was convened by the chief judge
12   of the Court.
13           The Court has already, as you know, denied
14   Plaintiff's application for a temporary restraining order
15   upon determining that Plaintiffs have not clearly shown a
16   likelihood that immediate and irreparable harm would occur
17   before consideration of their motion for preliminary
18   injunction.
19           The Court now moves to the remaining preliminary
20   injunction and summary judgment motions.  And I would also
21   note just as a matter of housekeeping, as many of you are
22   aware, that there have been other actions filed regarding
23   the executive orders and that in fact next week we will be
24   coming back in a case, State of Oregon et al v. Donald J.
25   Trump and Defendants.  And the argument in that case will be

Page 10

1    held on May 21st, Wednesday, at 2:15 involving different

2    executive orders and some different policy justifications.

3              So we will proceed with the argument and the

4    parties know what the time allocations are.  We intend to

5    take a break of about five minutes after the arguments have

6    been presented by the Plaintiff and the Defendant.  I

7    understand that the parties have also reserved time for

8    rebuttal.  And the break will be about five minutes or so.

9              So let's commence the argument.

10             MR. SCHWAB:  Thank you, Your Honor.  May it please

11   the Court.  Jeffrey  Schwab on behalf of the Plaintiffs.

12             The President's imposition of the so-called

13   Liberation Day  Tariffs represents an unprecedented and

14   unlawful expansion of executive authority.

15             The Defendant's position would allow the President

16   to impose tariffs on any country at any rate at any time

17   simply by declaring a national emergency without meaningful

18   judicial review.  This is not what Congress intended.

19             There are six ways that the Liberation Day Tariffs

20   are unlawful.  The Court need only accept one of these six

21   reasons to rule in favor of Plaintiffs and enjoin the

22   Liberation Day Tariffs.  First --

23             HON. GARY S. KATZMANN:  Just to be clear, we are

24   not dealing here with questions regarding efforts to address

25   fentanyl flow into the country.

```
                                                       Page 11
 1          MR. SCHWAB:  Correct.  This challenge is simply to
 2     the Liberation Day Tariffs, the justification of which was
 3     the trade deficit in goods.
 4          HON. GARY S. KATZMANN:  Thank you.
 5          MR. SCHWAB:  The first reason that this Court
 6     should enjoin the Liberation Day Tariffs is that IEEPA
 7     doesn't authorize the President to impose tariffs at all.
 8          Second, if IEEPA does allow tariffs, it still
 9     requires that the President declare an emergency.  And
10     there's no emergency in this situation.  America's trade
11     deficit and goods is not an emergency.
12          HON. TIMOTHY M. REIF:  Mr. Schwab, are there
13     judicially manageable standards that the Court can apply to
14     determine whether an emergency is unusual and extraordinary?
15          MR. SCHWAB:  Well, first of all, Your Honor, I
16     think that the determination of whether something is an
17     emergency is a separate issue from whether something is
18     unusual and extraordinary.  But I think that in this case,
19     even if there are not -- even if the Court can't come up
20     with very specific reason or definitions of what an
21     emergency is, this case is so far outside of what an
22     emergency is and what an unusual and extraordinary threat is
23     that this Court could easily say that it is not an
24     emergency.
25          HON. TIMOTHY M. REIF:  How would the Court define
```

Page 12

1    that line?  How would the Court draw that line?

2         MR. SCHWAB:  Well, for one, in the history of

3    IEEPA, in the legislative history, the House Committee

4    Report talks about how they expected the emergencies to be

5    rare, brief, and not of a normal ongoing circumstance.

6    Under those three things, the trade deficit doesn't meet any

7    single one of those.

8         HON. TIMOTHY M. REIF:  What's the emergency that -

9    - as Nixon declared?  Building, trade deficits, just as we

10   have in this circumstance?

11        MR. SCHWAB:  No, because that situation involved a

12   specific circumstance that was temporary, which was the

13   United States was coming off of the Gold Standard and the

14   President was concerned about the consequences of that.  The

15   intention of that was that it would be temporary.

16        Also subsequently, or at least in 1974 Congress

17   passed the Trade Act which gave the President that specific

18   power that President Nixon used in that case.  Subsequently

19   when they passed IEEPA, I think it's pretty clear that they

20   weren't intending to also give the President that power

21   because they had already done so.

22        HON. TIMOTHY M. REIF:  You're referring -- sorry.

23   Go ahead.

24        HON. JANE A. RESTANI:  Your opponent says that

25   Yoshida dealt with that and said that the 122 was basically

                                                      Page 13

1    -- their interpretation is 122 applies to non-emergency

2    situations.  And that if it's not an emergency situation,

3    the President is restricted by 122, but not if it's an

4    emergency situation.  They said that's -- that what Yoshida

5    says.

6               MR. SCHWAB:  A couple of responses to that.

7    First, I don't think Yoshida -- Yoshida involved a different

8    statute.  And so whether -- I don't think Yoshida applies

9    here because we're talking about is IEEPA, not the TWEA.

10              So I would say first in response to that is IEEPA

11   doesn't authorize tariffs.  Yoshida doesn't apply.  And

12   there's other reasons for that, too.  The history of IEEPA,

13   as I was mentioning, Congress was very specifically

14   intending to restrict the power of the President after the

15   Presidents had previously in Congress's view abused the

16   power to declare emergencies.  And so Congress was very

17   concerned about expanding Presidential power.  They wanted -

18   -

19              HON. JANE A. RESTANI:  Going back to my question,

20   do you think Yoshida actually says that, that 122 applies to

21   non-emergency situations?

22              MR. SCHWAB:  I think that IEEPA -- IEEPA does not

23   apply to tariffs at all.  I think that 122 is a different

24   question.

25              HON. JANE A. RESTANI:  Yes, it was my question.

```
                                                          Page 14
 1              MR. SCHWAB:  And it would obviously would I think
 2    -- I think it -- I don't know if Yoshida says that, but I
 3    think even if it does, it doesn't matter in this case.
 4              HON. JANE A. RESTANI:  Thank you.
 5              HON. GARY S. KATZMANN:  Could you give us some
 6    help regarding the language in IEEPA and comparing the
 7    language in IEEPA to the language in the Trading With the
 8    Enemy Act as interpreted by Yoshida?
 9              Now, the language is essentially identical.  So
10    the language in IEEPA stating the President may regulate
11    importation of transactions and property in IEEPA in which
12    any foreign country or national (indiscernible) has an
13    interest by any person is identical, is it not, to the
14    language in Trading With the Enemy Act.
15              So why does the Court's analysis of that language
16    in Yoshida apply here where the court in Yoshida found that
17    to impose duties can be to regulate?  Why do you suggest we
18    come to an opposite conclusion when the statutory language
19    is identical?
20              MR. SCHWAB:  Well, they're different statutes.
21    They were passed I think 50 or 60 years apart.  The Supreme
22    Court has warned courts not to interpret Congress's silence
23    to mean acquiescence to a particular court's interpretation
24    of language.  And I think that if -- so I think the response
25    there or the result is that this Court needs to take a fresh
```

1   look at what IEEPA means and what the term -- in that case

2   the defendants say that the term regulate includes the power

3   to tariff.

4           I think that taking a fresh look at that term, the

5   term regulate does not mean the power to tax or to tariff.

6   There are plenty of court cases we cite in our reply brief

7   particularly where the Court has said that the power to

8   tariff or the power to tax and the power to regulate are

9   separate powers.  And of course the Constitution itself

10  authorizes Congress -- gives Congress the power to regulate

11  international and interstate commerce but also has a

12  separate provision that allows Congress to pass tariffs.  So

13  if regulate always included the power to tariff, then that

14  provision -- those provisions would obviously be redundant.

15  So that's a reason to think that regulate does not include

16  the power to tariff.

17          And then even if it could, I think looking at the

18  history of IEEPA would show that we shouldn't assume that

19  and we shouldn't conclude that regulate does include the

20  power to tariff because --

21          HON. JANE A. RESTANI:  Well, I thought Congress

22  knew about Yoshida.  And one of the proposals was to not use

23  that language, use different language.  And they stuck with

24  it.

25          MR. SCHWAB:  I don't know if that's true or not.

Page 16

1    But I still think that, again, even if -- the term regulate

2    --

3            HON. JANE A. RESTANI:  We know one part.  They

4    knew about Yoshida.

5            MR. SCHWAB:  Right.  They did know about Yoshida,

6    but they had passed -- during Yoshida they had passed the

7    Trade Act of 1974 which gave the President the power that

8    was at issue in Yoshida.  And so in 1977 when they passed

9    IEEPA, they could have thought, well, Yoshida dealt with

10   this power that we gave the President and so we're giving

11   the President separate powers that doesn't have anything to

12   do with what's in Yoshida.  It's a different act.

13           And, you know, there -- yeah.

14           HON. JANE A. RESTANI:  I got your answer.

15           HON. TIMOTHY M. REIF:  If your thesis is that

16   Congress in passing IEEPA understood that the landscape --

17   the landscape in this situation predominantly reserved to

18   the Article I branch -- had -- in that Article I branch had

19   passed the Trade Act of '74, (indiscernible) pass Section

20   301 the first time in its form at that time and it had

21   passed the balance off payments provision.

22           If your thesis is that Congress when it enacted

23   IEEPA understood that IEEPA was to occupy only a special

24   part of the playing field involving issues related to unfair

25   trade or balance of payments, why didn't it say it?

1              MR. SCHWAB:  Well, I guess I would turn the

2     question around and say if Congress intended IEEPA to

3     include the power to tariff, then why didn't it say it?

4     Because it knew in other -- in previous acts it knew it

5     could say that, and it did.  And so it's unusual to think

6     that having said that the President has these limited powers

7     to tariff with certain procedural requirements that it would

8     allow the President the power to tariff when it doesn't

9     explicitly say that.

10             And I think another point is that even if you

11    disagree with me about Yoshida, Yoshida is very explicit

12    that it applies to the very specific power to tariff that

13    the President alleged in that case.  But if the President

14    had alleged the power to tariff at any rate that he wanted,

15    that that would not have been authorized under the TWEA.

16    And so given that Congress wanted to restrict the

17    President's power, it's very strange to conclude that IEEPA

18    would somehow expand the power that was -- that Yoshida said

19    would not have been given to the President.

20             HON. GARY S. KATZMANN:  So Yoshida states that the

21    declaration of a national emergency is not a talisman

22    enabling the President to rewrite the tariff schedules, as

23    it was not in this case.  That's the Yoshida language.

24             Is it your position that the challenged orders in

25    this case are actions to rewrite the tariff schedules?

1          MR. SCHWAB:  Yes.  The power that the President

2     claims under IEEPA is virtually unchecked.  Even the limited

3     restrictions that the President acknowledged, like the power

4     -- the requirement that he declare a national emergency, the

5     Defendants in their brief say that the courts can't even

6     review that.  So effectively what the President is saying is

7     that IEEPA gives it a unilateral power, the President

8     unilateral power to impose tariffs on any country at any

9     rate at any time for any reason.  And I think that the facts

10    show that that's what the President thinks he can do because

11    the tariff rates have been changed multiple times since we

12    filed this case.  And our plaintiffs have no certainty when

13    it comes to what the rates are going to be.  It's very

14    difficult -- this is part of the irreparable harm that they

15    are suffering.  It's very difficult for them to operate a

16    business when they have to make decisions about imports that

17    are going to happen in the future 20, 60, 90 days when we

18    don't know what the tariffs are going to be.  And that's of

19    course one of the reasons that one person, the President,

20    shouldn't have this unchecked tariff power, is that without

21    any kind of restrictions, it can be changed on a whim.

22          HON. JANE A. RESTANI:  Can I go back to Judge

23    Reif's question?  You just said that the Government said the

24    declaration of an emergency is unreviewable.  We have

25    specific language in IEEPA, unusual and extraordinary threat

Page 19

1    from outside that causes the President to declare a national

2    emergency.  Is there anything there that gives us a

3    standard?  Is it we can rule against the President if he

4    miscomprehends his authority?  You know, the triumvirate in

5    the cases.  What kind of standard is there if you want us to

6    look at whether there is the unusual and extraordinary thing

7    that caused the emergency?  What do we do?

8            MR. SCHWAB:  That's a good question, Your Honor.

9    I don't think the Court has to come up with a very precise

10   standard to decide in this case because the fact on the

11   ground is that it's so outside of what an emergency is, it's

12   so outside off what an unusual or extraordinary threat is

13   that the court doesn't --

14           HON. JANE A. RESTANI:  Well, can I have some

15   words?  You know, you know it when you see it doesn't work.

16   So give me some words.

17           MR. SCHWAB:  That's not what I'm saying.  So in

18   the legislative history I think I mentioned that there was

19   the three parts about rare, brief, and not a normal ongoing

20   circumstance.  I know those aren't precise terms, but I

21   don't think that the trade deficit fits any one of those

22   three terms.

23           HON. JANE A. RESTANI:  So you're saying the

24   President -- I don't know what the standard is.  Totally

25   misunderstood what the situation was?  I mean, what is the

```
                                                Page 20
 1    standard?

 2            MR. SCHWAB:  I think another thing that the Court

 3    could do is just look at general definitions of what an

 4    emergency is.  And so, for example, if you look at

 5    definitions --

 6            HON. JANE A. RESTANI:  But you keep going back to

 7    the facts.  I'm looking for a legal standard.

 8            MR. SCHWAB:  I understand that, Your Honor.  And I

 9    guess my point is that I'm litigating the facts of this

10    case, and I think that it's so outside of what is normally

11    considered an emergency or an unusual circumstance.

12            I guess what I would say is that this Court -- I

13    am asking this Court to be an umpire and call a strike.  And

14    you're asking me, well, where is the strike zone?  Is it at

15    the knees or slightly below the knees?  And I'm saying it's

16    a wild pitch and it's on the other side of the batter and

17    hit the backstop, so we don't need to debate the difference

18    between the strike zone at the knees or slightly below.

19            HON. GARY S. KATZMANN:  You cite, Counsel, you

20    note that Judge Arthur Garrity's reasoning under Beacon

21    Products v. Reagan case, that to address in that case the

22    claim that Nicaragua does not pose an unusual and

23    extraordinary threat to the United States would be an

24    imprudent exercise of judicial review because in effect such

25    review would require the Court to assess the wisdom of the
```

```
                                          Page 21
 1   President's judgment concerning the nature and extent of
 2   that threat, a matter not susceptible to judicially-
 3   manageable standards.  My colleagues have invoked that
 4   phrase, judicially-manageable standards.  Did that opinion
 5   get it wrong?  And can we rule in your favor on the unusual
 6   and extraordinary point without diverging from its
 7   reasoning?
 8            MR. SCHWAB:  I think so.  And in part because,
 9   again, this is so far outside of what is unusual and
10   extraordinary.  And that is I think that courts have -- even
11   when there might be a political question, courts have a role
12   of sort of keeping the emergency or the unusual and
13   extraordinary threat within the range of what is normally
14   considered or should be considered an unusual or
15   extraordinary threat.
16            We cite some cases from the Supreme Court about --
17   on the political question about whether the court -- dealing
18   with issues of whether a war -- war is declared.  And there,
19   the court says, well, although it's a political question, we
20   can still decide whether it actually is a declared war.  And
21   I think that is what we're saying.  We're not asking the
22   Court to second guess a close question of whether something
23   is an emergency or not.  We're saying, well, when it's
24   clearly not an emergency, this Court can still say we're not
25   going to second-guess the President, but in this case it's
```

Page 22

1    so far outside of what is considered an emergency that we

2    have to stop you.  Because otherwise the result would be

3    that there would be no limits on what the President can do

4    under IEEPA.  If there's no -- if the court can't do --

5              HON. TIMOTHY M. REIF:  Let me ask you, what about

6    the congressional limits?  There are opportunities for

7    Congress to act.  The Senate attempted to do so.  I think it

8    was last week.  Isn't that sufficient for control of the

9    President's authority?

10              MR. SCHWAB:  It's not sufficient for a couple of

11    reasons.  First, Congress can always act when the President

12    does something that it doesn't like.  And so that can't be a

13    reason why the court can't intervene in a case.

14              Second, I think it's important to note that

15    originally IEEPA allowed Congress to act concurrently, which

16    would mean that they wouldn't -- they could act without the

17    executive veto.  That was struck down by the Supreme Court I

18    think in 1981.  And so now in order to act, Congress has to

19    act with a veto-proof majority, which is of course extremely

20    difficult to do, especially now.

21              And so effectively Congress is not going to be

22    able to really rein in the power of the President.  And

23    that's exactly why this Court should act.

24              HON. TIMOTHY M. REIF:  So that should be in our

25    decision, that because Congress won't be able to actually

Page 23

1    enact a concurrent resolution, this Court should say that

2    therefore that restriction in IEEPA is not meaningful?

3              MR. SCHWAB:  No.  I just -- my point is that I

4    don't think that just because Congress can act, something

5    that Congress can always do no matter what the President

6    does, just because he can act is not a sufficient reason why

7    this Court does not have the authority to act itself.

8              HON. GARY S. KATZMANN:  So looking at Yoshida, the

9    court referenced the potential role of Congress.  And as you

10   note, that role has been substantially diminished arguably

11   in the aftermath of Chadha and the elimination of the

12   legislative veto.

13             So can you speak to that, sort of the impact --

14   you've begun to talk about it -- of Chadha's elimination of

15   the legislative veto.  And does that also suggest that

16   perhaps Yoshida should be revisited in light of the change

17   of the dynamic, potential dynamic between the congress and

18   the executive?

19             MR. SCHWAB:  Well, yes.  I think that's another

20   reason why this Court need not rely on Yoshida.  It's a

21   different act.  And subsequent to Yoshida and the passage of

22   IEEPA, the legislative veto is no longer allowed.  That

23   significantly changes the dynamic.  That's another reason to

24   be skeptical of the broad assertion of power by the

25   President because it's -- there's even less check than there

Page 24

1   was prior when it was passed.  So I think the Court should

2   be more discerning and more active I guess in adjudging

3   whether the President has overstepped his authority.

4           HON. JANE A. RESTANI:  While we're giving you

5   arguments, I haven't heard you say anything about non-

6   constitutional delegation of tariff-making authority.  I

7   don't know that I heard the unconstitutional out of your

8   mouth.

9           MR. SCHWAB:  You're right, Your Honor.  I didn't

10  get to that.  I think I started -- and I'm happy to answer

11  questions, so I'm glad that you asked that.  Yes.

12          So our position is if this Court were to accept

13  the position of the government that the President has this

14  virtually unchecked power to unilaterally issue tariffs

15  under IEEPA on any country, at any rate, at any time for any

16  reason as he has done, then that would be an

17  unconstitutional delegation of Congress's power.

18          There are two arguments that we have sort of

19  related to that.  One is the Major Questions Doctrine.  The

20  Major Questions Doctrine requires Congress to speak clearly

21  when it delegates a power of vast economic and political

22  significance.  I think it's pretty clear that the power to

23  unilaterally tariff any country at any rate is of vast

24  economic and political significance.  And so the question is

25  whether Congress spoke clearly in IEEPA to give the

1    President that power.  That's what we've been debating.  It

2    clearly has not because it didn't say that specifically.

3    And we've already talked about many of those reasons.  And

4    therefore under the Major Questions Doctrine, this Court

5    should be very skeptical and say that Congress did not give

6    the President that power.

7              HON. GARY S. KATZMANN:  One of the amici briefs

8    discussing the Major Questions Doctrine references not only

9    the impact, the economic impact for example, but also the

10   role of history.  Can you speak to that?

11             MR. SCHWAB:  Well, I think we did speak a little

12   bit about history.  I think I talked about the history of

13   IEEPA itself as something that Congress was intending to

14   restrict executive power.  I think that goes to the major

15   question of whether Congress spoke clearly.  And so I think

16   that's another reason under the Major Questions Doctrine to

17   reject the President's assertion of power under IEEPA given

18   that history.

19             HON. JANE A. RESTANI:  Talking about major

20   questions, if we're going to say, well, that's a reason to

21   not pay attention to Yoshida because now we have the Major

22   Questions Doctrine, is the Major Questions Doctrine actually

23   something really new?

24             MR. SCHWAB:  I don't think that the Court would

25   say that it's new, but I think the Supreme Court has spoken

Page 26

```
1    a little more clearly on the Major Questions Doctrine in
2    recent years.  And so I think that's a reason for this Court
3    to take notice of that and try to apply the Major Questions
4    Doctrine in a way that's consistent with what the Court has
5    said in recent years.
6                HON. JANE A. RESTANI:  Sorry if I stepped on your
7    --
8                HON. GARY S. KATZMANN:  No, that was my question
9    actually.
10               HON. TIMOTHY M. REIF:  To seek to distinguish
11   Yoshida with respect to the Nixon administration's move to
12   close the gold window, can you talk a little bit more about
13   that particular distinction and its relationship to the ten
14   percent surcharge that was imposed at the time?  The two
15   appear to have come from different places.  And further,
16   it's not clear that the Nixon administration was clear that
17   the surcharge would apply for only a certain number of
18   months.
19               MR. SCHWAB:  Again, I think that there is a
20   distinction because they're different statutes.  The history
21   I think in context means that it's not clear that IEEPA
22   means the exact same thing as the TWEA.
23               And I think what's -- in Yoshida I think what the
24   court was saying is that it wasn't clear that the Nixon
25   administration had overturned Congress's intent because it
```

Page 27

1   stayed within the lines, it didn't exceed the limits of

2   tariff --

3            HON. JANE A. RESTANI:  You mean it stayed within

4   Column Two?

5            MR. SCHWAB:  Yes.

6            HON. JANE A. RESTANI:  Okay.  Of the HTSUS?

7            MR. SCHWAB:  Yes.  Yes, exactly.

8            HON. JANE A. RESTANI:  Okay.

9            MR. SCHWAB:  We don't have that situation here

10  because the President has obviously asserted a power to

11  impose a tariff rate on whatever he wants.  Yes, he has

12  stayed the retaliatory tariffs for 90 days, but that doesn't

13  mean that they're going away.  They can be revived at any

14  time.  And those tariff rates are vastly higher than

15  anything Congress has authorized or considered.  And so I

16  think that's a reason to be -- another reason to be

17  skeptical of the comparison between Yoshida in this case.

18            HON. GARY S. KATZMANN:  But looking at the

19  language in Yoshida and also referencing IEEPA -- and this

20  takes us to Section 1702, related to this -- of actions to

21  emergency, following up on the questions of my colleagues

22  and to the question how similar is the national emergency

23  that President Trump declared relating to persistent trade

24  deficits to the national emergency that President Nixon

25  declared in Yoshida, the court in Yoshida held that

Page 28

1    President Nixon's surcharge, and this is the quote, "Had a

2    direct effect on our nation's balance of trade and in turn

3    on its balance of payments deficit and its international

4    monetary reserves" and that they "Bore an eminently

5    reasonable relationship to the emergency confronted."  Why

6    should we find differently here?

7              MR. SCHWAB:  Well, because the President's

8    assertion is the existence of a trade deficit that has

9    existed for 50, 60 years, basically most of America's

10   history post-World War II.  The Defendants point to no

11   specific thing that has somehow shifted that ongoing

12   circumstance.

13             HON. JANE A. RESTANI:  I think that's a different

14   question.  You're talking now about extraordinary, unusual,

15   national emergency.  I think the question related to the

16   relationship between the duty and the deficit.  And

17   apparently Yoshida found there was a relationship between

18   the surcharge and the balance of payments.  And I think the

19   question was why was this any different.

20             MR. SCHWAB:  I'm sorry, Your Honor.  I think I did

21   misunderstand your question.

22             HON. JANE A. RESTANI:  Okay.

23             MR. SCHWAB:  I do think it's different.  I think

24   if we look at the rates that the President has set, they

25   don't seem to -- they don't appear to be related to anything

Page 29

1    having to do with the deficit.  I forget the exact way that

2    they calculated the retaliatory tariffs, but it was a very

3    simple I think mathematical formula.  It didn't really have

4    anything to do with the justification that the President has

5    given for them.  And so I do think that that situation is

6    different in this case.

7            HON. JANE A. RESTANI:  Yeah.  I'm not so sure how

8    different it is.  You know, what President Nixon was doing

9    was part of a three-part strategy to -- all having to do

10   with the run on Fort Knox, really.  And this was part of the

11   three-party strategy.  I am not sure how closely related it

12   was there, either.

13           MR. SCHWAB:  Well, again, you know, that had to do

14   with a specific -- the gold -- you know, coming off the gold

15   standard, a specific event that is only going to happen one

16   time.  There's no specific event in this case that said oh,

17   well, you know, yes we have a trade deficit, but this one

18   thing happened, or we did this one thing and that's going to

19   change everything and so we need to act.  There's nothing

20   like that.  It's just we've had a trade deficit.

21           And even -- it's not even the most significant

22   trade deficit we've had.  I think we point out in our reply

23   brief that  at least as a percent of GDP, the trade deficit

24   hit its peak in 2006.  And since then it's been below that.

25   So it's not the most -- you know, it's not the highest trade

```
                                                    Page 30
 1    deficit that we've ever had.

 2           So there's nothing specific that the Defendants

 3    point to that's like, well, this is the reason that we have

 4    to do this.  This thing happened, we've got to -- it's just

 5    we've had a trade deficit, that thing -- you know, we've had

 6    a trade deficit for 50, 60 years.  There's nothing to

 7    distinguish that from 20 years ago or 25 years ago or

 8    whenever.

 9           HON. JANE A. RESTANI:  He can reserve some time if

10    he wants.

11           MR. SCHWAB:  Yes.

12           HON. GARY S. KATZMANN:  Any other -- anything else

13    that you would like to say?  I know you've reserved time.

14           MR. SCHWAB:  I did reserve time, and I will do

15    that.  You know, unless there's other questions, I would

16    just sort of like to reiterate my main point, which is that

17    there are six reasons -- I think we went over all six, but

18    let me just go through the list really quickly so it's

19    clear.

20           The first is IEEPA doesn't authorize tariffs at

21    all.  The second is that even if it does, it requires that

22    there be an emergency.  There is no emergency here. The

23    third is that it requires an unusual and extraordinary

24    threat.  The trade deficit isn't unusual, extraordinary, or

25    a threat.  The fourth is the Major Questions Doctrine.
```

Page 31

```
1    Congress has to speak clearly when granting or delegating
2    power of vast economic and political significance.
3    Obviously that includes the power to tariff any country at
4    any rate.  And Congress did not speak clearly under IEEPA to
5    give the President that power.  Fifth is the nondelegation
6    doctrine, which requires if -- I'm sorry.  If the President
7    -- if we accept the President's assertion of power, that he
8    has effectively unfettered discretion to issue tariffs at
9    any rate at any time, that clearly would violate the
10   nondelegation doctrine.  And then finally, constitutional
11   voidance.  The Court should avoid issues of, you know,
12   ruling -- interpreting a statute that is clearly
13   unconstitutional.  And so the court could use --
14            HON. TIMOTHY M. REIF:  Mr. Schwab, before we let
15   you go, on your fourth point on the Major Questions
16   Doctrine, IEEPA reads, "Any unusual and extraordinary threat
17   to the national security, foreign policy, or economy of the
18   United States."  That's pretty clear it seems.
19            And then in Section 203 we get "Regulate
20   importation or exportation."  So why is that not clear?  Why
21   was Congress not being clear in the breadth of power it was
22   delegating to the President?
23            MR. SCHWAB:  Well, because the President is
24   asserting the power to import -- I'm sorry, to tariff
25   imports.  The term regulate does not clearly imply that
```

Page 32

1    power.  I talked a little bit about that.  In particular --

2            HON. TIMOTHY M. REIF:  What would they have been

3    thinking of other than tariffs?

4            MR. SCHWAB:  Well, lots of things.  There could be

5    increased inspections based on certain countries -- concerns

6    about certain countries or concerns about specific products.

7    It doesn't just -- regulate can mean a lot of different

8    things.  And it doesn't just mean -- obviously I don't think

9    it means tariff or tax at all.  But it doesn't mean --

10           HON. TIMOTHY M. REIF:  You just contradicted

11   yourself.  If regulate can mean a lot of different things,

12   it could mean tariffs.  Right?

13           MR. SCHWAB:  No.  It means a lot of different

14   things, but it doesn't mean tariffs.  I think that's pretty

15   clear from --

16           HON. TIMOTHY M. REIF:  It doesn't mean tariffs

17   because of Article 1, Section 8?  Why does it not mean

18   tariffs?

19           MR. SCHWAB:  Well, because the power to regulate

20   is not the same as the power to -- the power to regulate a

21   product or the importation of a product is different than

22   the Government's power to tax the importation of that

23   product or to tax the sale of a product.  Those are two

24   different things.  Regulate implies, you know, limiting or

25   prohibiting or having some sort of process that checks a

1    product for safety, things like that.  Taxes or tariff tax

2    or tariff is we're going to raise revenue because you've

3    imported or sold or -- those are -- I think those are two

4    distinct concepts.

5              HON. GARY S. KATZMANN:  Could I also ask you as

6    we're also considering a motion for summary judgment, in

7    your view are there any actual issues, material issues in

8    dispute here so that we could not move to summary judgment?

9              MR. SCHWAB:  No.  We don't think there are any

10   disputes of fact, which is why we've phrased our motion sort

11   of as a two-part either motion for preliminary injunction or

12   a motion for summary judgment.  The only real difference is

13   whether there's disputes of fact and the different standards

14   of likelihood of success versus actual success.  We think

15   that we not only have shown a likelihood of success, but we

16   have shown actual success.  And because there's no material

17   disputes of fact, the Court could if it wanted to grant us

18   summary judgment and enter a permanent injunction instead of

19   just a preliminary injunction and then later litigate the

20   summary judgment motion.

21             HON. GARY S. KATZMANN:  And then going back to

22   Yoshida for a moment, which as you know, reversed the great

23   wisdom of the predecessor court here.  And one of the

24   judges, Judge Maletz, wrote a very thoughtful concurrence.

25   And it was described as a very thoughtful concurrence.  And

Page 34

1   I think he was building upon his own understanding of the

2   way Congress works and legislation works.

3           And the court, the predecessor of the federal

4   circuit noted that this was a very thoughtful analysis.  But

5   the court said -- and I just want to return again to the

6   whole question of separation of powers -- said that the

7   customs court perceived a constitutional flaw in Section

8   5(b) of the TWEA.  If it were interpreted as permitting the

9   surcharge here, viewing such interpretation as a denial of

10  the people's right to a government of separated powers, that

11  Congress's delegation unless restricted to licensing, would

12  be a violation of the Delegation Doctrine.

13          What the Court of Appeals said was whatever may be

14  the current viability of that doctrine, we find no conflict

15  with the TWEA as applied to the proclamation.  It cannot be

16  lightly dismissed that (indiscernible) relation to tranquil,

17  non-emergency matters, the more modern view of the

18  delegation doctrine was stated by the Supreme Court in

19  American Power.  A move for prompt action, another essential

20  nature or natural emergency precludes the otherwise

21  (indiscernible) to provide a requirement for prior hearings,

22  extensive fact-finding.

23          Going back in history.  It's a bit of archaeology.

24  Wondering if you could comment on that -- those passages by

25  the Federal Circuit predecessor.

Page 35

```
1              MR. SCHWAB:  I guess what I would say is that
2     although we have raised a non-delegation argument, we've
3     raised other arguments, the Court doesn't even need to get
4     to that.  But I think that if the Court were to interpret
5     the IEEPA as the Defendant claims with this unbridled,
6     unlimited power to impose tariffs on any country at any time
7     at any rate, then I think that would raise a nondelegation
8     argument.  It would be a power far in excess of what the
9     Court was considering in Yoshida.  And I'm at a loss to
10    really think of many assertions of Presidential or executive
11    power under a statute that exceed this power that have been
12    considered by courts since Schechter Poultry.
13             So I would say that if the Court thinks that the
14    Defendant's interpretation of IEEPA is right, then there is
15    a nondelegation problem and it should find that this
16    violates -- this is unconstitutional under the nondelegation
17    doctrine.
18             HON. GARY S. KATZMANN:  Thank you.  Any questions?
19             HON. JANE A. RESTANI:  No.
20             HON. GARY S. KATZMANN:  No.  Thank you.
21             MR. SCHWAB:  Thank you.  I'll reserve the rest of
22    my time.
23             HON. GARY S. KATZMANN:  Right.  Thank you.
24             MR. HAMILTON:  Good morning, Your Honors, and may
25    it please the Court.
```

```
 1              This Court should deny Plaintiff's motion and
 2      enter judgment for Defendants.
 3              Last Month, President Trump found that the effects
 4      of the persistent trade deficit on this country --
 5              HON. GARY S. KATZMANN:  Before you -- you are Mr.
 6      Hamilton.
 7              MR. HAMILTON:  I am, yes.
 8              HON. GARY S. KATZMANN:  Not Alexander Hamilton,
 9      but Eric Hamilton.
10              MR. HAMILTON:  Yes.  Eric Hamilton.  Thank you,
11      Your Honor.
12              As I was saying last month, President --
13              HON. TIMOTHY M. REIF:  Before you begin, Mr.
14      Hamilton, has the President transmitted his report to the
15      Congress under Section 204(b)?
16              MR. HAMILTON:  I do not know, Your Honor.
17              HON. TIMOTHY M. REIF:  Does one of your colleagues
18      know?
19              MR. HAMILTON:  I'm seeing yes from USTR.
20              HON. TIMOTHY M. REIF:  And it's a public report?
21              MR. HAMILTON:  Yes, it is.
22              HON. TIMOTHY M. REIF:  Okay.  Thank you.
23              MR. HAMILTON:  On April 2nd the President signed
24      an executive order finding that the trade deficit and its
25      effect on the economy had reached a level of a national
```

Page 37

1    emergency.

2            Our supply chain is vulnerable because of this

3    Country's dependence on --

4            HON. JANE A. RESTANI:  Is that actually the

5    biggest trade deficit that had ever existed?

6            MR. HAMILTON:  I think that last year's might have

7    been less than the years before -- the year before.  But

8    what the executive order notes is that in the last five

9    years, the trade deficit has increased by 40 percent.  And

10   it isn't just the existence of a trade deficit that is

11   justifying the declaration of a national emergency.

12   Instead, it is the cumulative effects of the persistent

13   trade deficit on the nation's economy and the fact that the

14   trade deficit has threatened the supply chain, it has caused

15   a state of affairs where the National Defense Industrial

16   Base is not adequately prepared to meet the challenges that

17   the country faces in this --

18           HON. JANE A. RESTANI:  If we were not going to

19   accept the Government's argument that a declaration of an

20   unusual and extraordinary situation from an outside threat

21   causing an emergency was an unreviewable question, what

22   standard could be applied?

23           MR. HAMILTON:  Well --

24           HON. JANE A. RESTANI:  I mean, there are some

25   cases out there that have some kinds of standards for

Page 38

1    reviewing executive action of an emergency-type nature.

2              MR. HAMILTON:  I am not aware of one in the

3    emergency context, at least since Baker v. Carr.  My friend

4    on the other side cites some case law that he says involved

5    the review of emergencies.  I believe those cases preceded

6    Baker V. Carr's creation of the modern political question

7    standard.

8              If the Court did find that it could review that

9    though, I would --

10             HON. JANE A. RESTANI:  Let's assume it's not a

11   political question or that there's ways to view it as not a

12   political question.  Then what's the standard?

13             MR. HAMILTON:  If that were the case, then I think

14   the Court would have to grapple with what unusual and

15   extraordinary means.  Because that is what the -- that's of

16   course an element of IEEPA.  And my friend on the other side

17   doesn't cite any dictionary --

18             HON. JANE A. RESTANI:  You don't want to go to

19   something like the President totally grossly misconstrued

20   his authority, that kind of standard?

21             MR. HAMILTON:  We still have the -- we still thin,

22   that Maple Leaf is of course the right standard and that,

23   you know, as that court recognizes, it has to be a clear

24   misconstruction of the governing statute for the court to

25   determine that the President did not exercise an IEEPA

Page 39

```
1    authority correctly.  And that standard remains especially
2    applicable here, as Maple Leaf explains, that standard
3    applies in international trade controversies of a highly
4    discretionary kind involving the President and foreign
5    affairs.  All three of those elements are checked by the
6    President's IEEPA executive order.
7              HON. JANE A. RESTANI:  Does it apply to both parts
8    under viewing IEEPA as applicable to tariffs as well as the
9    extraordinary and unusual threat to national security?  Does
10   that standard apply to both parts?
11             MR. HAMILTON:  It would.  I don't see anything in
12   Maple Leaf that would give a reason to carve up IEEPA and
13   find it appliable to some parts of the court's statutory
14   interpretation but not others.
15             But since no one has yet cited a dictionary
16   definition for unusual or extraordinary, I thought I would
17   offer one.
18             Unusual just means not usual.  That's the Merriam-
19   Webster dictionary definition.  And extraordinary is going
20   beyond what is unusual, regular, or customary.  That fits
21   with the state of affairs that this executive order
22   describes.  It explains again the cumulative effects of the
23   trade deficit, the fact that other countries have policies
24   within their countries that suppress U.S. exports and how
25   over time we are now in a situation where the supply chain
```

                                                        Page 40

1    is threatened.  The executive order notes that the COVID-19

2    pandemic exposed some of those supply chain weaknesses.  All

3    of us remember struggling to find --

4              HON. TIMOTHY M. REIF:  Isn't that what Congress

5    created Section 301, the balance of payments section, other

6    trade remedies to address?

7              MR. HAMILTON:  No, Your Honor.  Congress enacted

8    IEEPA after it enacted 301.  And when it enacted IEEPA, it

9    carried over the regulate importation term that appeared in

10   the TWEA.  And it did so against the backdrop of Yoshida,

11   the legislative record materials from IEEPA's enactment

12   referenced the Yoshida case and so Congress had to

13   understand that through its decision to continue to have a

14   regulate importation power in the U.S. Code for the

15   President, that would include a tariff power.  This is also

16   an argument --

17             HON. TIMOTHY M. REIF:  So the President's

18   application of IEEPA should be considered without regard to

19   the fact that Congress has occupied this space in other

20   respects such as Section 301 or the balance of payments

21   provision.

22             MR. HAMILTON:  That's right.  And actually the

23   U.S. Supreme Court has spoken on this quite recently in

24   Trump v. Hawaii.  That's a case where plaintiffs challenged

25   the President's exercise of a broad immigration authority.

Page 41

1    It's 8 U.S.C. 1182(f) power to suspend the entry of aliens

2    based on the President's determination that those aliens'

3    entry into the United States is against the national

4    interest.

5              And an argument there was that the specific policy

6    that the President was trying to address, which were

7    problems with information sharing within countries, the

8    Plaintiff said that's a problem that another statute in the

9    INA already dealt with.  And that would be a reason to

10   narrow the --

11             HON. TIMOTHY M. REIF:  It's not just the statute,

12   right?  It's the constitution provides primary authority in

13   this area to the Congress under Article 1, Section 8 in two

14   different clauses.  Isn't that the case?  That's not similar

15   to the case you just cited.

16             MR. HAMILTON:  Well, but it's a power that

17   Congress has then delegated to the President through

18   statutes like 232, IEEPA, and --

19             HON. TIMOTHY M. REIF:  Could the President declare

20   an emergency, comparable to the documents that he used here,

21   citing only massive dumping and subsidized imports?

22             MR. HAMILTON:  I beg your pardon, Your Honor?

23             HON. TIMOTHY M. REIF:  Could the President declare

24   an emergency on the basis not of anything other than dumped

25   and subsidized imports and utilize the powers of IEEPA to

```
                                                    Page 42
1    bypass those two statutes and apply tariffs separately?

2           MR. HAMILTON:  I think it's possible, Your Honor.

3    And a relevant previous IEEPA executive order, I would note,

4    is Executive Order 13222.  This was an executive order

5    signed in 2001.  And there was an expiring act, the Export

6    Administration Act of 1979.  And the President signed an

7    executive order that under IEEPA that continued that act.

8           HON. TIMOTHY M. REIF:  I don't think that example

9    addresses this circumstance.  We have an ongoing statute,

10   antidumping and countervailing duty laws.  President issues

11   an executive order saying there's an emergency with respect

12   to dumping and subsidized imports.  And I'm going to apply

13   tariffs of whatever decision the President were to make.

14   The President could do that?

15          MR. HAMILTON:  I think he could.  This is I think

16   though an even clearer case  where we have the President

17   identifying both domestic -- you know, a domestic situation,

18   affecting the economy and national security, but also

19   multiple causes outside the United States, including the

20   policies of foreign countries that are --

21          HON. TIMOTHY M. REIF:  That have been specifically

22   addressed by Congress in statute and in its legislative

23   history with respect to Section 301 of the Trade Act of

24   1974, no?  Lack of reciprocity, disparate tariff rates, non-

25   tariff values, large and persistent trade goods deficits,
```

```
                                                     Page 43
 1    all the things that previous Presidents have used Section
 2    301 to address.
 3              MR. HAMILTON:  Well, I don't know that 301 --
 4              HON. TIMOTHY M. REIF:  The President tied it
 5    directly to the 2025 national trade estimate.  I understand
 6    we have some distinguished guests from the USTR here who
 7    work hard to prepare that report every year.  The President
 8    tied his decision here specifically to the NTE report.
 9    Isn't that where Section 301 from the 1988 act, those two
10    statutes came out of the same place.
11              HON. TIMOTHY M. REIF:  And yet when Congress then
12    enacted IEEPA, it didn't create any exception for things
13    that could arguably be covered by 301.  IEEPA does have
14    exceptions.  1702, it has an entire subsection devoted to
15    exceptions.
16              So Congress was mindful of the need to carve out
17    certain types of possible exercises of IEEPA authority.  But
18    it didn't do anything with respect to --
19              HON. TIMOTHY M. REIF:  So how does the Court
20    determine when those statutes are being used in a normal
21    circumstance versus an unusual and extraordinary
22    circumstance?  How does this Court deal with that particular
23    line?  We gave your colleague on the other side some efforts
24    to try to help us with that.  How would you answer the
25    question?
```

Page 44

1             MR. HAMILTON:  Well, Your Honor, our answer ends

2      with the political question doctrine.  Baker v. Carr says

3      that the lack of judicially-discoverable and manageable

4      standards for resolving a question is a non-justiciable

5      political question.

6             HON. TIMOTHY M. REIF:  So then the unusual

7      extraordinary standard is non-justiciable?

8             MR. HAMILTON:  That's right.  That's right.  It is

9      the sort of question that Congress intended for the

10     political branches to resolve.  We think that's clear from

11     1702 and the National Emergencies Act itself.  But that

12     understanding is confirmed by the fact that Congress was

13     sensitive to a need to create some sort of review process

14     for the exercise of IEEPA authorities, which is why it

15     created a congressional review scheme that fast-tracks the

16     consideration of house-senate resolutions that, you know,

17     through that process --

18             HON. JANE A. RESTANI:  My colleagued said that

19     that's just not the same thing it was when it was enacted.

20             MR. HAMILTON:  I disagree.  In fact, in 2023 this

21     process worked.  The COVID-19 national emergency declaration

22     was terminated in 2023 through the congressional review

23     process for legislative review of national emergency

24     declarations.  And Congress has even considered using this

25     authority in connection with the national emergency that

Page 45

1    President Trump declared on April 2.  A vote was taken in

2    the senate on that national emergency and it failed.

3              HON. JANE A. RESTANI:  Can I ask a question about

4    -- I am confused by Yoshida in one of your arguments.  One

5    of your arguments is that the balance of payments statute,

6    Section 122, really is for non-emergency situations and not

7    emergency situations.  I think that was in one of your

8    briefs.  And I was reading this Footnote 33 of Yoshida.  And

9    it says, well, we don't really care whether there is an

10   emergency or not.  Everybody knows that "A surcharge imposed

11   after January 3rd, 1975 must of course comply with the

12   statute now governing such action, referring to the

13   limitations in 122."

14             I couldn't -- I was having trouble squaring that

15   with the more general reading on Page 30 of Yoshida.  Can

16   you help me with Note 33?

17             MR. HAMILTON:  I don't remember that footnote

18   specifically.  But I think our point here is that the --

19             HON. JANE A. RESTANI:  Everybody is going to read

20   this while we have the break, and then somebody will tell me

21   the answer during the rebuttal.  Okay.  So you don't

22   remember 33.  All right.

23             MR. HAMILTON:  Well, I think I have something

24   responsive I can say.  I think the point we were trying to

25   make in our brief is that IEEPA is different than the

Page 46

1    statute enacted in the mid-seventies.  You know, there's

2    this whole checklist of things that the President has to

3    find, a situation that has to exist.  There has to be an

4    unusual and extraordinary threat.  Source has to be in whole

5    or substantial part outside the United States.  Has to be a

6    threat to - -

7            HON. JANE A. RESTANI:  The balance of payments was

8    specifically dealt with in 122.  Right?

9            MR. HAMILTON:  It was.

10           HON. JANE A. RESTANI:  It kind of implied to me

11   that congress didn't think it was an ongoing or qualified as

12   unusual and extraordinary.  Your argument seems to be it's

13   unusual and extraordinary at some point where it falls off

14   the cliff.

15           MR. HAMILTON:  Well, so again, we just have

16   trouble reconciling that with the fact that Congress enacted

17   IEEPA just a few years later.  Talking about Yoshida, it

18   knew that Yoshida existed and yet --

19           HON. JANE A. RESTANI:  Well, maybe it knew

20   Footnote 33 existed that said we all know now after January

21   3rd, 1975 for balance of payments you must comply with 122.

22   Anyway, that's how I read 33.  You can tell me I've got it

23   all wrong after the break.

24           HON. GARY S. KATZMANN:  And Counsel, could I

25   return for a moment to what you described as a political

                                                        Page 47

1    questions issue?

2            So when we go back and look at the language of

3    1701, right, and it states the authority granted to the

4    President may be exercised to deal with any unusual and

5    extraordinary threat.  That's in the statute, right?

6            MR. HAMILTON:  Yes.

7            HON. GARY S. KATZMANN:  So it would be

8    superfluous, would it not or, I mean, what would be the

9    point of having that language in the statute if it were not

10   reviewable by a court?

11           MR. HAMILTON:  Well, the point would be that it

12   still binds the President.  The President still has to look

13   at and faithfully apply that statute, which is exactly what

14   happened with the executive order that he signed on April

15   2nd.

16           The executive order notes that there is an unusual

17   and extraordinary threat.  So that is the point, to control

18   the President's exercise of this power.  And it also informs

19   legislative review of any national emergency declared under

20   IEEPA.

21           HON. GARY S. KATZMANN:  So you're saying there's

22   no role for the courts.

23           MR. HAMILTON:  Correct.  The exercise of an IEEPA

24   power, declaring a national emergency, determining whether

25   an exercise of IEEPA authority deals with a foreign threat,

1    those are non-justiciable political questions of the sort

2    that Baker v. Carr identifies as beyond judicial review.

3    They are things for the political branches to resolve.

4                HON. JANE A. RESTANI:  I'm going to go to the

5    peanut butter situation.  We have a problem with peanut

6    butter.  We have a national shortage of peanut butter.  And

7    so can the President declare an extraordinary emergency?

8                MR. HAMILTON:  Well, I think it probably depends

9    on a number --

10               HON. JANE A. RESTANI:  Do you like peanut butter?

11   There's no limit.  What you're saying is there's no limit.

12               MR. HAMILTON:  No, no, not at all.  As I said

13   earlier, there --

14               HON. JANE A. RESTANI:  But it's a political

15   question.  Peanut butter becomes a political question.

16               MR. HAMILTON:  I disagree, Your Honor.  Again, I

17   think Congress was very clear in setting these standards for

18   the exercise of Presidential power.  And those standards

19   mean something to the executive branch.

20               HON. JANE A. RESTANI:  There was never before a

21   shortage of peanut butter.  It's unusual and extraordinary.

22               MR. HAMILTON:  Perhaps it would be helpful --

23               HON. JANE A. RESTANI:  Of course it's not an

24   outside threat.  But anyway, that's another matter.

25               MR. HAMILTON:  Well, I think it depends on what

Page 49

1    all is going on, right?  Like part of this executive order

2    discusses the fact that five million manufacturing jobs have

3    been lost in recent decades.  That viewed in isolation might

4    look domestic, but as the excessive order explains, it's

5    because of policies of foreign countries --

6              HON. JANE A. RESTANI:  Going back to my thing, you

7    believe that situations that exist over time can get to a

8    point where they fall off the cliff and become something

9    that can trigger IEEPA.

10             MR. HAMILTON:  Absolutely.  And we have previous

11   IEEPA executive orders that fit in that category perfectly.

12   Consider for example EO 13581 from 2011.  That was an EO

13   declaring that activities of transnational criminal

14   organizations threatened the stability of international,

15   political, and economic systems.  Another is EO 14105 from

16   2023.  There the President concluded that recent

17   advancements in Chinese technology critical to military

18   intelligence and surveillance capabilities merited an IEEPA

19   executive order.

20             And my friend on the other side cites the Iran

21   hostage crisis IEEPA executive order from 1979.  But that's

22   an executive order that President Biden on November 1, 2024

23   continued.  So the Iran hostage crisis --

24             HON. TIMOTHY M. REIF:  None of those -- with

25   respect, none of those engages powers specifically delegated

```
                                                   Page 50
 1   by the Constitution to Congress.
 2             MR. HAMILTON:  I'm not as familiar with the
 3   specific applications of the IEEPA authorities looked like -
 4   -
 5             HON. TIMOTHY M. REIF:  But none of the ones that
 6   you cited or the Iran Hostage matter deals with the two
 7   clauses in  Article 1 Section 8 that are given to the
 8   Congress, the power to apply taxes and tariffs and the power
 9   to regulate foreign commerce.  You're suggesting that there
10   is nothing different about this executive order and this
11   invocation of IEEPA given that it is squarely in the domain
12   of the Congress.
13             MR. HAMILTON:  Well, Congress has in multiple
14   statutes delegated that power.  And Yoshida recognizes that
15   there is no constitutional problem with that.  It rejected a
16   nondelegation challenge, it interpreted the exact same words
17   that appear in IEEPA today, regulate importation to
18   encompass that --
19             HON. GARY S. KATZMANN:  But Yoshida also stated
20   that a finding that the President has the power to impose
21   whatever tariff rates he deems desirable simply by declaring
22   an act of emergency would not only render our
23   (indiscernible), it would (indiscernible) the manifest
24   congressional intent to maintain control over its
25   constitutional power to levy tariffs.
```

Page 51

1          So the argument is that the (indiscernible) here

2     is what the court warned us against in Yoshida.

3          MR. HAMILTON:  That language in Yoshida is dicta.

4     And the much newer authority from the U.S. Supreme Court on

5     this issue is Trump v. Hawaii, where it was argued that the

6     problem that the President was attempting to address through

7     the exercise of broad Presidential statutory powers was

8     something that Congress had already legislated on, made a

9     decision about.  And the U.S. Supreme Court refused to

10    consider that as something limiting or making the exercise -

11    -

12         HON. JANE A. RESTANI:  But no constitutional, you

13    know, Article 1 Section 8.

14         MR. HAMILTON:  I think Section 8 actually does

15    include immigration authority.  And so the -- we'll confirm

16    that during the break.  But we think Trump v. Hawaii is a

17    very helpful case in this context.

18         Also wanted to make a few notes on the Major

19    Questions Doctrine.  Judge Restani had a question about the

20    applicability of the Major Questions Doctrine here since, as

21    Your Honor noted, it really was not a new doctrine.  When

22    the U.S. Supreme Court has talked about this doctrine, as my

23    friend on the other side acknowledged, it has cited cases

24    that preceded the recent innovation of giving this

25    contextual canon of interpretation the Major Questions

Page 52

1    Doctrine label.  And in the end, Yoshida is interpreting the

2    same words that appear in IEEPA today.  And nothing about

3    the Major Questions Doctrine labeling this contextual canon

4    that has been understood for some time would change

5    Yoshida's outcome or its binding nature here.

6         HON. JANE A. RESTANI:  You know, the thing that

7    you have going for your argument about Yoshida is it's the

8    same words in IEEPA although there are so many things that

9    are different in Yoshida.  The tariffs did not go above the

10   congressional limit.  Right?  So that was different.  And

11   you had a situation where -- that was really -- really was

12   extraordinary at the time.  Nobody can argue that it was

13   going on for a long time and then dropped off a cliff.  It

14   was new.  An extraordinary situation.  I don't think anybody

15   would have argued it was extraordinary.

16        So I think what you have from Yoshida is your

17   argument that those are the words, look at those words,

18   that's where we come out on the statutory interpretation.

19   And I think that's what you get out of Yoshida because

20   Yoshida itself is a very different context, quite limited.

21   And I think that's what you have from Yoshida.

22        MR. HAMILTON:  So Yoshida is, as Your Honor noted,

23   interpreting the exact same words that appear here, there is

24   no limitation within IEEPA that Plaintiffs even -- you know,

25   other than the national emergency part --

Page 53

1           HON. JANE A. RESTANI:  Well, you may have 122,

2     which may say basically balance of payments is not a

3     national emergency.  That's how I'm reading Yoshida.  But

4     that was then.  That's the whole problem with Yoshida.  That

5     was then.

6           MR. HAMILTON:  And Congress has acted since then.

7     IEEPA follows that.  And it continued the broad authority

8     existing under the TWEA.  But again, I have to highlight the

9     President did find and the current state of affairs with

10    respect to the trade deficit is extraordinary and very

11    problematic as the EO explains.  It's had effects on the

12    economy as well as our national security readiness.  And the

13    President identifies both recent events and events that have

14    occurred over time in articulating that.

15           And on top of that --

16           HON. GARY S. KATZMANN:  Could I -- can I ask you

17    about Executive Order -- following up on this -- 14257.  And

18    this relates to the relatedness of actions to emergency.

19    And so the Executive Order 14257 for setting the reciprocal

20    tariffs, the President set a 41 percent tariff on the

21    Falkland Islands and a 50 percent tariff on Lesotho.

22           Additionally, the President imposed tariffs on the

23    British Indian Ocean Territory, which only contains a joint

24    military base and uninhabited islands.  How are these

25    tariffs calculated that help meet the particular national

```
                                                    Page 54
 1   emergency?
 2            MR. HAMILTON:  So I don't think Plaintiffs have
 3   put any of those specific countries into issue.  But the way
 4   the policy works is it sets a ten percent baseline tariff
 5   and then there are 57 countries that have an additional
 6   higher tariff.  That is calculated by dividing the trade
 7   deficit for a particular country by the imports that are
 8   received from that country to the United States and then
 9   having the resulting ratio.  And the goal of this policy is
10   to stimulate U.S. exports while also decreasing our reliance
11   on imports and creating an environment where the President
12   is able to negotiate trade deals that put our country on a
13   more secure footing going forward.  That's happening right
14   now.  In recent days progress has been announced with China
15   and --
16            HON. JANE A. RESTANI:  Okay, well, now you're
17   arguing that, hey, this is great policy.  But we don't deal
18   with policy; we deal with law.
19            MR. HAMILTON:  We agree.  And to be clear, we
20   think that all of this is a political question as trying to
21   be responsive to Judge Katzmann's question about how the
22   policy worked.  We think that the --
23            HON. JANE A. RESTANI:  No, you switched to we got
24   a deal from the tariffs themselves effect the balance of
25   payments in the trade deficit and other problems in this
```

Page 55

```
 1   way.  That's a separate question from we've got a deal.  Do
 2   you understand the difference?
 3            MR. HAMILTON:  I think so.  I mean, I think they
 4   are related.  But I don't know that the point is material to
 5   the resolution of --
 6            HON. JANE A. RESTANI:  Well, I think the point is
 7   don't argue policy to the Court.  I mean, that's not our
 8   business.
 9            MR. HAMILTON:  I'll return to the Major Questions
10   Doctrine.  The Major Questions Doctrine is inapplicable for
11   many reasons that we identify in our brief.
12            HON. GARY S. KATZMANN:  Does the Major Questions
13   Doctrine apply to the President?
14            MR. HAMILTON:  It does not apply to the President.
15   The U.S. Supreme Court has of course decided a number of
16   major questions cases.  It has used terms like
17   administrative agency.  In  Alabama Association of Realtors
18   it just said agency in describing who the doctrine applies
19   to.  Mayes v. Biden in the Ninth Circuit thoroughly
20   considers whether the Major Questions Doctrine applies to
21   the President.  That was a decision vacated as moot, but its
22   analysis we think is very persuasive.
23            HON. JANE A. RESTANI:  Why wouldn't it apply to
24   the President?  I mean, look, if you say here's an agency,
25   it has an organic statute, it operates in this field.  Okay,
```

Page 56

1 but Major Questions where, you know, we're not going to

2 assume Congress gave it to him unless they really gave it to

3 them.  Why wouldn't it apply doubly to the President, who is

4 not operating within an organic statute?

5     MR. HAMILTON:  The reason, Your Honor, is that at

6 bottom the Major Questions Doctrine is a familiar contextual

7 canon.  It's the idea that Congress, through vague terms, is

8 not going to give agency heads authority to opine on huge

9 questions that we would normally think Congress would

10 handle.  Things like whether the CDC director can create an

11 eviction moratorium.  That same context is the opposite in

12 the context of statutes delegating foreign affairs powers to

13 the President.

14     We cite the B-West Imports v. United States case

15 from the Federal Circuit in 1996.  And that case articulates

16 a different contextual canon.  In a statute dealing with

17 foreign affairs, a grant to the President which is expansive

18 to the reader's eye should not be hemmed in or cabined,

19 cribbed, confined by judicial blinders.

20     And so in the context of foreign affairs and

21 delegations to the President, it is entirely normal for

22 Congress to delegate broad powers to the President,

23 something that has --

24     HON. JANE A. RESTANI:  Just a second.  Tariffs are

25 the business of Congress and they're the business of

Page 57

1    Congress to give away.  It doesn't matter that there is an

2    effect on foreign policy, foreign affairs.  This is the way

3    that the Constitution divided these things up.  So it's

4    Congress's business and Congress can give it away.  And so

5    the question is did they give it away with tough

6    restrictions, with enough standards?  Isn't that the real

7    question?

8        MR. HAMILTON:  I think that is at least part of

9    the question.  And they did give it away.  232, the relevant

10   language there is adjust imports.  And the standard is even

11   more open-ended than the standard in IEEPA.  Here with IEEPA

12   we've got multiple elements.

13       HON. JANE A. RESTANI:  I think we -- well, 232 has

14   a number of standards.  It's a little different from IEEPA

15   as regards to tariffs.  I mean, we have the whole section

16   on, you know, economic security, which has been upheld by

17   the Supreme Court in Algonquin, right?

18       MR. HAMILTON:  Yes.  And the statues are

19   different.  But we think that if 232 delegated the power to

20   impose tariffs by adjusting imports, regulating imports,

21   which is the same term that appears in the Foreign Commerce

22   Clause in Article 1 Section 8 --

23       HON. JANE A. RESTANI:  You think that IEEPA with

24   regard to tariffs has standards that are equal to those of

25   232.

Page 58

```
 1              MR. HAMILTON:  Not equal.  My point was to convey
 2      that IEEPA does have meaningful limits and standards --
 3              HON. JANE A. RESTANI:  What are the limits?
 4              MR. HAMILTON:  I beg your pardon?
 5              HON. JANE A. RESTANI:  What are the limits on
 6      tariffs in IEEPA?
 7              MR. HAMILTON:  There are a number of exceptions to
 8      IEEPA in I think it's Subsection 2, or (b) rather, 1702(b)
 9      is devoted to exceptions to IEEPA authority.  And then
10      there's the language in 1701 about it needing to be an
11      unusual and extraordinary threat.
12              HON. TIMOTHY M. REIF:  But you're saying we can't
13      -- you're saying the Court cannot interpret that.  The
14      exceptions are pretty narrow as I recall.  So if we focused
15      on the unusual and extraordinary, you say that is -- I think
16      there's an inconsistency in your position.  You're saying
17      that that is the restriction that Congress passed on the
18      present use of tariffs in your view under IEEPA.  But the
19      Court can't review that -- cannot review that standard, r?
20              MR. HAMILTON:  Yes, but I don't think that the
21      meaningfulness of a statute depends on whether it implicates
22      say a political question.  These are statues that the
23      executive branch interprets and faithfully implements.  The
24      presumption of regularity holds that it is presumed that
25      public officials honestly apply statutes and legal duties
```

Page 59

1    absent a clear showing to the contrary, which is not present

2    here.

3            Another point on the major questions doctrine.

4    This doctrine does not hold that broad delegations of

5    authority are impermissible.  Instead, it holds that a clear

6    statement is required.  And there is a clear statement in

7    IEEPA.  This isn't something that the reply brief that my

8    friend on the other side filed really disputes too much.

9    But IEEPA has nine expansive and overlapping verbs that

10   convey broad authority.  And as I noted earlier, regulate is

11   itself a very broad term, the same term that appears in the

12   Foreign Commerce Clause of the Constitution.  And the fact

13   that IEEPA creates an emergency power heightens the extent

14   to which we would think a --

15           HON. TIMOTHY M. REIF:  The framers dealt with

16   tariffs separately from regulation of foreign commerce,

17   right?

18           MR. HAMILTON:  Yes, but there's case law

19   recognizing that tariffs are also within the power to

20   regulate foreign commerce.  And again, we think that the

21   emergency power is important because it heightens that

22   context that it would be understandable for Congress to

23   delegate to the President expansive authorities that he can

24   exercise when IEEPA's conditions are satisfied.

25           HON. GARY S. KATZMANN:  Mr. Hamilton, let me ask

Page 60

1    you the same questions that I asked your brother.  Quoting

2    again from Yoshida.  So the Yoshida court in upholding

3    President Nixon's actions stated the tariffs there did not,

4    "attempt to tear down or supplant the entire tariff scheme

5    of Congress.  Rather, the President imposed a limited

6    surcharge as a temporary measure calculated to help meet a

7    particular national emergency."  And the Court further said

8    that the declaration of a national emergency is not a

9    talisman enabling the President to rewrite the tariff

10   schedules as it was not in this case.

11          So again, I think you can talk me through this

12   point, but I just want to be clear in my own mind.  Why is

13   the actions here, why are the actions not effectively an

14   effort to rewrite the tariff schedules?

15          MR. HAMILTON:  There are multiple statutes that

16   give the President tariff authority.  He's operating under

17   multiple of those authorities.  You know, outside the

18   executive order that we're talking about here today.  But

19   IEEPA fits within the scheme of those other tariff

20   authorities.

21          And again, this is a point that we think is

22   addressed and dealt with in Trump v. Hawaii where the same

23   argument was made that Congress had already dealt with a

24   specific problem and the Court did not see that as a reason

25   to give 1182's broad language a narrowing construction.

```
                                                    Page 61
 1              HON. JANE A. RESTANI:  Could I just be a bit of a
 2      nerd a second?  I want to make sure I have your
 3      interpretation of 1702 correctly.  It's (a)(1)(B).  So the
 4      President may under such regulations as he may prescribe by
 5      means of instructions, licenses, or otherwise.  Then in (B),
 6      regulate.  And then we go down, any property in which any
 7      foreign country or national thereof has an interest by any
 8      person or with respect to any property subject to the
 9      jurisdiction of the United States.  So is that how we put
10      the words together to get -- to read it?
11              MR. HAMILTON:  I want to make sure we got in the
12      word importation as well.
13              HON. JANE A. RESTANI:  Maybe it didn't --
14              MR. HAMILTON:  Regulate importation of any
15      property --
16              HON. JANE A. RESTANI:  Regulate -- okay, regulate
17      importation --
18              MR. HAMILTON:  Exactly.
19              HON. JANE A. RESTANI:  -- of -- okay, importation
20      or exportation of any property.  Okay, you're right.  I
21      skipped over that.  So it's the regulate in (B), not the
22      regulation -- not the regulate in (A).
23              MR. HAMILTON:  Correct.
24              HON. JANE A. RESTANI:  Okay.  It's not easy to
25      read this statute, I must say.  Okay.
```

```
                                                    Page 62
 1              MR. HAMILTON:  If the Court has no further
 2    questions right now, I'll reserve my remaining time for
 3    rebuttal.
 4              HON. JANE A. RESTANI:  Should we give him ten
 5    minutes?  I don't know how many people can fit in --
 6              HON. GARY S. KATZMANN:  Thank you, Counsel.  We'll
 7    take ten minutes for recess.  Thank you.
 8              CLERK:  All rise.  Court stands in recess.
 9              (Recess)
10              CLERK:  All rise.  This Honorable Court now
11    resumes its session.
12              HON. GARY S. KATZMANN:  Counsel, let's resume.
13              Mr. Schwab -- Mr. Gold, how many minutes does Mr.
14    Schwab --
15              CLERK:  Nine minutes.
16              HON. GARY S. KATZMANN:  nine minutes.
17              MR. SCHWAB:  I started my argument by talking
18    about the assertion of Defendants that the President has
19    unlimited -- essentially unlimited power to impose tariffs
20    on any country at any rate at any time.  And Defendant's
21    argument does nothing to contradict that.  In fact, they
22    doubled down on it.  They said this Court can't review
23    whether there is an emergency or whether there is an unusual
24    or extraordinary threat.  Those are the only limitations in
25    the statute on the President.  So effectively what this --
```

Page 63

1    what Defendants are arguing is that they have unlimited

2    discretion under IEEPA to issue tariffs however they want.

3    I think that is a big problem.

4              Judge Restani, we talked  a little bit about the

5    standard, and I think you were a little frustrated by my

6    lack of trying to articulate a standard on what an emergency

7    is and what an unusual and extraordinary threat is.  I think

8    that we can -- the Defendant says that unusual means not

9    usual and extraordinary means not ordinary.  I think those

10   are fine standards.  And by those standards, this does not

11   meet -- this doesn't meet the unusual and extraordinary

12   threat.

13             HON. GARY S. KATZMANN:  What is your home run case

14   to support your analysis?

15             MR. SCHWAB:  That this is not unusual and

16   extraordinary?

17             HON. GARY S. KATZMANN:  Right, yeah.

18             MR. SCHWAB:  I'm not sure that there is a case.

19   I'm just saying that --

20             HON. GARY S. KATZMANN:  Is there a triple case or

21   a double case?

22             MR. SCHWAB:  I'm sorry?

23             HON. GARY S. KATZMANN:  Is there a doubles case or

24   a triple case or a singles case?

25             MR. SCHWAB:  I'm not sure, Your Honor.  I'm just

Page 64

1    going by the standard that they suggested using the

2    dictionary definitions.  And under that standard, I think

3    it's pretty clear that this is not -- this is not usual.

4    This is not ordinary.

5         With respect to an emergency in -- I mentioned a

6    little bit of the legislative history.  And they mentioned

7    the not a normal state of affairs that has to -- an

8    emergency has to be rare, brief, and not a normal state of

9    affairs.  This is a normal state of affairs.  The Defendant

10   talks about -- I think Trump v. Hawaii came up, and they

11   relied a little bit on that.

12        An important point about that is that the

13   immigration power is not an enumerated power in Section --

14   in Article 1 Section 8.  The tariff power is an enumerated

15   power.  So whatever reliance the Defendant has on Trump v.

16   Hawaii should be restricted based on that important fact.

17        I think also when we're talking about an

18   emergency, we can -- I think we can look to what the

19   President did.  I think the Defendants explain what they

20   think are problems.  But not all problems are emergencies.

21   And the actions of the President I think undermine the claim

22   that these are emergencies.

23        For example, there is the 90-day pause on

24   retaliatory tariffs.  There is a carveout for specific

25   products.  In fact, some of those products based on the

Page 65

1    national -- the security justifications, you would think

2    that if there were national security justifications would

3    not be carved out.

4              And also it's an across-the-board tariff.  There

5    are tariffs on countries that we have a trade surplus with.

6    That doesn't gel with the justification that we have a trade

7    deficit.  Why impose a tariff on countries that we have a

8    trade surplus with?

9              The Defendant argues that the cumulative effects

10   of the trade deficit is the emergency.  But the problem is

11   the Defendant provides no proof that there is -- that -- of

12   what these cumulative effects are or that those  result in

13   an emergency. And without proof, there's no standard.  So

14   there's no way for this Court to review.

15             And that goes back to, Judge Restani, your peanut

16   butter example.  If there's -- if there's no proof that

17   there's a cumulative effect, then there's no standard and

18   the justification can be virtually anything.

19             HON. GARY S. KATZMANN:  So if hypothetically a

20   case like this were remanded for a determination as to a

21   showing of acute effects of persistent trade deficits and

22   that was established (indiscernible) by the government,

23   would that cure whatever deficiency exists?

24             MR. SCHWAB:  No, Your Honor, because that only

25   really address -- again, I have six reasons why this Court

Page 66

```
1   should rule in my favor.  That doesn't address every single
2   one.  It just addresses the justification under what either
3   an emergency or an unusual circumstance is.  This Court
4   doesn't have to take those arguments.  It can rule on the
5   other arguments.
6            I do want to get to the major questions doctrine
7   because that was brought up in -- and I think one thing that
8   was missing from the discussion is that at least three
9   circuit courts have said that the Major Question Doctrine
10  applies to the President.  The Fifth Circuit, the Sixth
11  Circuit, and the Seventh -- or in the Eleventh Circuit.  The
12  Fifth Circuit is Louisiana v. Biden.  Kentucky v. Biden is
13  the Sixth Circuit.  And then Georgia v. President of the
14  United States is the Eleventh Circuit.  And I should also
15  mention that in Nebraska v. Sioux, which is the Ninth
16  Circuit, they implicitly accept that the Major Questions
17  Doctrine applies to the President.
18           And of course I think as Your Honors mentioned, if
19  it doesn't apply to the President, then it could just be
20  avoided because the President could just issue an executive
21  order to the agency ordering them to do whatever and then
22  say, well, you can't review it under a Major Questions.
23           And even the President's sort of unitary theory of
24  the executive says that there's not really a difference
25  between the President and an agency, that the President has
```

Page 67

1   the power over those agencies.  So just under that logic

2   alone, the distinction for Major Questions doesn't make

3   sense.

4            Also the Maple Leaf case was mentioned.  And Maple

5   Leaf does allow this Court to review the President's actions

6   and find that they are not acceptable if -- there were three

7   standards.  I think two were relevant.  One is the clear

8   misconception of a governing statute.  Well, we have that

9   here.  This is not a tariff power that gives the President

10  unlimited tariffs.  But also if the action is outside the

11  delegated authority of the President, then the court can

12  act.

13           I think that's also important to recognize that

14  that implies that there has to be some standard of what the

15  delegated authority is.  And if there --

16           HON. JANE A. RESTANI:  The clear misconstruction,

17  maybe your argument goes to the extraordinary, unusual,

18  whatever standard.  It can't really go to tariffs aren't

19  covered because then the court of appeals clearly

20  misconstrued those words.  Don't I have a little problem

21  there?

22           MR. SCHWAB:  You mean in Yoshida?

23           HON. JANE A. RESTANI:  Yeah.  Because it has the

24  words.  And how could the President have clearly

25  misconstrued that part of the statute if the court of

Page 68

1    appeals said those words mean that?

2         MR. SCHWAB:  Even if that's true, I think you

3    could say that the President clearly misconstrued the

4    statute to say that he has this unlimited power to tariff at

5    any rate, at any time, on any country.

6         HON. JANE A. RESTANI:  All right.  I got your

7    answer.

8         MR. SCHWAB:  So -- and also of course to the

9    emergency and the unusual powers.

10        Those were the main points that I wanted to

11   address.  And I see I have a minute left.  So if there's any

12   other questions, I'll be happy to answer those.  Otherwise,

13   I'll sit down.

14        HON. GARY S. KATZMANN:  Thank you, Counsel.

15        MR. SCHWAB:  Thank you, Your Honors.

16        MR. HAMILTON:  Thank you, Your Honors, just a few

17   points on rebuttal.

18        I first wanted to get back on my homework.

19   Footnote 33, we've looked at that.  I think the first level

20   answer is that this is dicta in a footnote.  And I think

21   it's difficult to really say exactly what the court is

22   trying to express there.  Another important point though is

23   that the emergency that we're talking about here is

24   different from the emergency that was declared in 1971 with

25   the balance of payments crisis.  The executive order spells

Page 69

1    out in detail through multiple pages the complexity of this

2    emergency, the way that the policies of foreign countries

3    are suppressing American exports and the way that it is

4    affecting us domestically with military readiness as well as

5    supply chain reliability.

6            But I think maybe the most important point about

7    the Yoshida footnote is that it doesn't anticipate or speak

8    to what happened after Yoshida, which is that Congress then

9    enacted IEEPA and through that language carried over the

10   regulate importation term which includes the power to set

11   tariffs.

12           A question also came up about immigration

13   authority under the constitution.  Article 1 Section 8 gives

14   the Congress a power to set a uniform rule of naturalization

15   that includes immigration authority.

16           I'm going to respond to something my friend said

17   about circuit precedent in the Major Questions Doctrine.  I

18   think he overstates the state of play there.  Nebraska v.

19   Sioux, the Ninth Circuit decision, has a footnote, Footnote

20   6, that says that it is not expressing any opinion on the --

21   whether the Major Questions Doctrine applies to delegations

22   of authority to the President.

23           The Eleventh Circuit's decision is an opinion of a

24   single judge.  There were three separate opinions there.

25   The opinion concurring in the result does not speak to the

Page 70

1    Major Questions Doctrine.

2          To sum up, we think this is really a pretty simple

3    case.  The relevant question of statutory interpretation is

4    what regulate importation means.  Yoshida interpreted that

5    exact same term.  It concluded that it includes the power to

6    set tariffs.  Federal Circuit's B-West Imports case

7    recognizes that statutes delegating powers to the President

8    in the space of foreign affairs merit a broad construction

9    because of the context against which they are legislated.

10   The Major Questions Doctrine does not apply.  The contextual

11   clothes underpinning that doctrine have been around as long

12   as the constitution's separation of powers have.  As my

13   friend acknowledged, it goes back before this recent

14   labeling of the Major Questions Doctrine.

15          And as for the declaration of a national

16   emergency, that is a political question.  In 2020, the DDC

17   District Court recognized that no court has ever reviewed

18   the merits of a national emergency declaration.  We cite

19   Chang v. United States in the Federal Circuit, recognizing

20   that examining the justifications --

21          HON. JANE A. RESTANI:  Did those national

22   emergencies have the IEEPA unusual and extraordinary

23   additional gloss on them?

24          MR. HAMILTON:  I think that Chang was an IEEPA

25   case.  I'm not sure about Center for Biological Diversity v.

```
                                                     Page 71
 1    Trump.
 2              HON. JANE A. RESTANI:  Okay.
 3              MR. HAMILTON:  It would be a break with precedent
 4    for the Court to hold that there is not a political question
 5    here.  And the fact that there exists a political question
 6    comes not only from the fact that there are no judicially-
 7    discoverable and manageable standards for resolving the
 8    question, but also the fact that Congress anticipated the
 9    need for some sort of review of the exercise of IEEPA
10    authorities.  And that's why it created a detailed,
11    expedited scheme for legislative review.  It's a scheme that
12    is working right now.  And as I noted, the Senate took a
13    vote on this declaration in April.
14              HON. GARY S. KATZMANN:  So if we look at -- check
15    the boxes with respect to the scheme, your understanding is
16    that each of the boxes has been checked?
17              MR. HAMILTON:  Each of the boxes has been checked.
18    The preamble to the executive order, the April 2 executive
19    order explains the different conditions that make IEEPA --
20    this invocation of IEEPA authority appropriate.
21              HON. JANE A. RESTANI:  Let me ask a question.  The
22    congressional role that exists after the emergency is
23    declared.  I don't know how that relates to delegation from
24    Congress.  That is, don't they have to put the standards and
25    the restrictions on before the President acts, not after?
```

                                                        Page 72

1            MR. HAMILTON:  Well, I hope I am understanding the

2   question.  The procedures for legislative review are in

3   IEEPA and the National Emergencies Act.

4            HON. JANE A. RESTANI:  Right.

5            MR. HAMILTON:  So the President is exercising his

6   authority against that backdrop and then he is obligated to

7   consult with Congress, to notify Congress when this power is

8   exercised.  All of that reflects the Congress's recognition

9   of their desire for a review process and that that process

10  be with the Congress.  It's a process --

11           HON. JANE A. RESTANI:  Okay.  Assuming we have a

12  delegation issue, you have to -- Congress has to delegate

13  its tariff-making authority with some kind of standards.

14  The review by Congress isn't really part of that, is it?

15           MR. HAMILTON:  I agree.  I mean, I think for

16  nondelegation we would just focus on whether there is an

17  intelligible principle under Gundy.

18           HON. JANE A. RESTANI:  Exactly.

19           MR. HAMILTON:  And we see that in 1702 and 1701 of

20  IEEPA.  That's the power that the President is exercising.

21  As for Congress's part, you know, I don't know that there

22  would be any delegation problem with Congress.

23           HON. JANE A. RESTANI:  Well, I'm just saying that

24  the action after the fact by Congress doesn't really give

25  you any intelligible principle or standards, correct?

1          MR. HAMILTON:  Sure.  But I think that Congress's

2     discretion, the reasons that it might go in a different

3     direction on a national emergency declaration could go

4     beyond the legal sufficiency of the President's executive

5     order.  It could include policy disagreement with the

6     President's executive order in addition to perceived legal

7     defects with the order.

8          HON. GARY S. KATZMANN:  So the scheme -- just to

9     review your position that you are suggesting is a scheme

10    where, yes, there are three branches of government, but the

11    judiciary is somehow omitted or deleted from that government

12    structure.  You know, just as interested in your response to

13    that.  Because again, Yoshida says the mere incantation of

14    national emergency cannot of course sound the death knell of

15    the Constitution.  And then says later on, however, here the

16    executive does not seek nor would it receive judicial

17    approval of a whole seal delegation of legislative power.

18          It also says the declaration of a national

19    emergency -- we've quoted this before and gotten your

20    response -- is not a talisman enabling the President to

21    rewrite the tariff schedules.  Why is -- again, that's --

22    I'm not suggesting that I have a position.  I'm just asking

23    that you respond again as you're finishing up here.  You

24    know, fundamentally, you know, why isn't this really a

25    separation of power issue.

Page 74

1              MR. HAMILTON:  Sure.  So to be clear, we think the
2    Court does have a role.  We are not arguing that regulate
3    importation is a political question.  We are only arguing
4    that the parts of the plaintiff's arguments that implicate
5    the six types of political questions that Baker v. Carr sets
6    out would be the sorts of questions that are beyond judicial
7    review.  We think that the fact that Congress anticipated
8    the need for review, it created a review scheme through the
9    legislative branch is also a reason that reinforces
10   Congress's judgment that this -- these would be questions
11   decided by the political branches in the end.
12             If there are no further questions, we ask the
13   Court would deny Plaintiff's motions and enter judgment for
14   Defendants.  Thank you.
15             HON. GARY S. KATZMANN:  Thank you.  Thank you.
16             HON. JANE A. RESTANI:  Okay.
17             HON. GARY S. KATZMANN:  So in conclusion, the
18   panel would like to thank counsel for your enlightening
19   arguments and your various briefings.  We also thank the
20   various amici for their briefs.  And of course our vigorous
21   questioning here should not be interpreted as suggesting any
22   views.  That is something that -- where we have obviously a
23   continuing open mind.  And also as has been noted, this is
24   not a case about trade policy preference, it's about
25   governance, the application of laws, the roles of the

```
                                              Page 75
 1    various branches of government.  And again, we very much
 2    appreciate your time.  And we will perhaps see some of you
 3    again next week on May 21st at 2:00.  So some aspect to be
 4    continued.  Yes.
 5              HON. TIMOTHY M. REIF:  We always -- the panel
 6    always likes to thank the clerk family, too.  We could not
 7    be here without the work of our security officers who do a
 8    fantastic job, one of whom has been with us all morning,
 9    without our custodial staff, without our fantastic IT, and
10    case management staff.  So we give them our thanks, and we
11    all owe them our thanks.
12              HON. GARY S. KATZMANN:  All right.  We are
13    adjourned.
14              CLERK:  All rise.
15              (Whereupon these proceedings were concluded)
16
17
18
19
20
21
22
23
24
25
```

Page 76

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  May 15, 2025