# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | Court No. 25-00078 |
| v. ) ) ) | |
| UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

# DECLARATION OF SECRETARY OF STATE MARCO RUBIO

I, Marco Rubio, hereby state as follows:

1.  I am the Secretary of State of the United States and head of the United States Department

of State, an Executive Department of the United States. *See* 22 U.S.C. § 2651. As

Secretary of State, I am the President's chief foreign affairs advisor. I carry out the

President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a.

2. The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, databases, State Department employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3. The purpose of this Declaration is to confirm, in my capacity as Secretary of State and head of the Department of State, that a ruling for the plaintiffs in this case would cause significant and irreparable harm to U.S. foreign policy and national security. Such a ruling would derail critical ongoing negotiations with our foreign trading partners and threaten broader U.S. strategic interests internationally.

4. In the International Emergency Economic Powers Act (IEEPA), *see* 50 U.S.C. § 1701 *et seq.*, Congress granted to the President dynamic, flexible authority to respond to crises on a global scale. President Trump has exercised that authority to impose tariffs in response to crises threatening America's national security.

5. In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal aliens across our southern and northern borders is an emergency for the United States and its citizens.

6. Likewise, the President found in Executive Order 14,195 that the encouragement by the People's Republic of China (PRC) of PRC businesses to export illegal drugs and precursors

for manufacturing those drugs in the United States is an emergency for the United States and its citizens.

7. Last, the President found in Executive Order 14,257 that our trade partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, and resulting large and persistent annual U.S. goods trade deficits have given rise to acute national security threats driven by our hollowed-out manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, a defense-industrial base that depends on foreign adversaries, and the sensitive geopolitical environment.

8. The United States is presently pursuing potential trade deals with Mexico, Canada, PRC, and dozens of other countries. These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

9. The negotiations are currently in a delicate state, with discussions ongoing and final deals not yet reached. In some cases, we have reached frameworks with our trading partners, while we continue to negotiate on details. In other cases, we have not yet reached a framework agreement or arrangement.

10. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, the negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined or limited from exercising his authority under

IEEPA to impose tariffs to address these urgent threats, that would cause irreparable harm to our efforts to secure the U.S. production and manufacturing base through our ongoing negotiations and other diplomatic efforts.

12. For example, if the Court were to enjoin the President from imposing tariffs, our trade partners would likely believe that the President lacks power under IEEPA to promptly respond to their actions during the ongoing negotiations. They may also perceive such a ruling as a vulnerability and encourage them to retaliate against the United States for attempting to impose tariffs and negotiate agreements to protect our national security. *See* Executive Order 14,266, § 3. Notably, other countries declined to retaliate against the United States after the President made clear he would exercise his authority under IEEPA to impose additional tariffs, as he did with PRC.

13. The political branches, not the courts, are appropriately situated to handle and intervene in matters of foreign policy and national security. This case and the real-world diplomacy inherent in it exemplify why the courts must not interfere in such foreign affairs. U.S. foreign policy has an exceptional need for consistent implementation of the decision the President has already made under IEEPA. A conflicting pronouncement by this Court on the same issue would lead to embarrassment of the United States on a global stage.

14. Beyond diplomatic embarrassment, which itself is dangerous as it emboldens allies and adversaries alike, the Court's interference would perpetuate the United States' industrial decline and unsustainable trade deficits. The President found in Executive Order 14,257 that the United States' large and persistent trade deficits are a structural imbalance in the global trading system that has hollowed out a number of critical industries. Without robust domestic production capacity, the United States will not be able to produce the weapons

and other resources necessary to defend itself or support the critical industries necessary to avoid being held hostage by foreign adversaries. That weakened position will have a direct impact on the President's ability to conduct foreign policy and advance the United States' interests.

15. Congress has reserved for itself the power to review the President's exercise of his powers under IEEPA. Exercising that role, Congress considered whether to terminate the President's emergency declaration, and it has appropriately declined to do so, recognizing the appropriateness of the President's exercise of powers and the delicate, ongoing international diplomacy that is unfolding as a result.

16. It is critical to the foreign policy and national security of the United States for the Court to decline to enjoin or restrain the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23rd day of May, 2025.

Marco Rubio
Secretary of State

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE
            THE HONORABLE TIMOTHY M. REIF, JUDGE
            THE HONORABLE JANE A. RESTANI, JUDGE

PRINCESS AWESOME, LLC; STONEMAIER,   )
LLC; 300 BELOW, INC.; UPWARD GLANCE,  )
LLC d/b/a QUENT CORDAIR FINE ART;   )
KINGSEAL CORPORATION D/B/A WESCO  )
ENTERPRISES, INC.; MISCHIEF, LLC d/b/a  )
MISCHIEF TOY STORE; SPIELCRAFT   )
GAMES, LLC; ROOKIE MAGE GAMES,   )
LLC; XYZ GAME LABS, INC.; TINKERHOUSE, )
INC.; RECLAMATION STUDIO, LLC   )
d/b/a WITSEND MOSAIC,   )
  )      Court No. 25-00078
    Plaintiffs,   )
  )
     v.   )
  )
UNITED STATES CUSTOMS AND BORDER  )
PROTECTION; PETE R. FLORES, Acting  )
Commissioner for U.S. Customs and   )
Border Protection; DEPARTMENT OF   )
HOMELAND SECURITY; KRISTI NOEM,  )
Secretary of the Department of Homeland  )
Security; UNITED STATES INTERNATIONAL )
TRADE COMMISSION; DONALD J. TRUMP, )
President of the United States; EXECUTIVE  )
OFFICE OF THE PRESIDENT; and the   )
UNITED STATES OF AMERICA,   )
  )
    Defendants.   )

## **DECLARATION**

I, Scott K. H. Bessent, hereby state as follows:

1.  I am the Secretary of the Treasury.  I have been the Secretary of the Treasury since January

    28, 2025.

2.  President Trump has exercised his IEEPA authority to impose tariffs in response to crises threatening America's national security and economy.

3.  In particular, the President found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is an emergency for the Nation and its citizens.

4.  The President also found in Executive Order 14,257 that our trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have given rise to a presently acute national security threat of large and persistent annual U.S. goods trade deficits, which have led to the hollowing out of our manufacturing base, lack of advanced domestic manufacturing capacity, vulnerable supply chains, and a defense-industrial base that depends on foreign adversaries.

5.  Tariffs are a crucial tool for protecting America's national security and advancing American foreign policy by addressing the unusual and extraordinary threats the President has identified.

6.  The tariffs have proven to be well-tailored to bring trading partners to the table to address these urgent threats. The United States is presently negotiating agreements with Mexico, Canada, PRC, and many of our key trading partners, in order to address the urgent threats at our northern and southern borders, posed by illegal drugs, and to our domestic production capacity caused in substantial part by the large and persistent annual U.S. goods trade deficient stemming from our trade partners' non-reciprocal trading practices.

7.  There are currently ongoing negotiations to address this emergency with dozens of countries. Those negotiations are presently in a delicate state, with discussions ongoing

and formal, final deals not yet reached.  In some cases, we have reached framework agreements with our trading partners, while we continue to negotiate on details.  In other cases, we have not yet reached a framework agreement.

8. For example, on May 8, 2025, the United States and the United Kingdom announced a framework agreement as a result of such negotiations. The U.S.-UK framework agreement will bolster U.S. economic and national security by enhancing market access for American exporters and lowering tariff and non-tariff barriers.

9. These negotiations have been one of the country's top foreign policy priorities since the reciprocal tariffs were announced on April 2.

10. In each case, those ongoing, delicate negotiations are premised on the President's tariffs at issue in this case.  If the President is enjoined from imposing these tariffs, it could shatter our negotiations with dozens of countries.

11. If the Court were to enjoin the President from imposing tariffs, our trading partners may feel a renewed boldness to take advantage of that new vulnerability by retaliating against the United States for attempting to impose tariffs and negotiate agreements to protect our national security.

12. In short, the maintenance of the tariffs is crucial to the President's ability to conduct real-world diplomacy and his ability to protect the national security and economy of the United States.

13. Congress considered whether to terminate the President's emergency declaration, and declined to do so.  *See* H.J.Res. 72 (2025); H.J.Res.73 (2025).  It is critical to the national security and economy of the United States for the Court to decline to block the President from imposing these tariffs as well.

I declare, under penalty of perjury, that the foregoing is true and correct.


Executed on this day of May 23, 2025.



/s/_____

Scott K. H. Bessent
Secretary
Department of the Treasury

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
              THE HONORABLE TIMOTHY M. REIF, JUDGE
              THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Court No. 25-00078 |

## <u>DECLARATION OF HOWARD W. LUTNICK,</u><br><u>UNITED STATES SECRETARY OF COMMERCE</u>

I, HOWARD W. LUTNICK, hereby state and declare as follows:

1. I am the Secretary of Commerce for the United States and the head of the United States

   Department of Commerce, an Executive Department of the United States. *See* 5 U.S.C.

   § 101. The purpose of this declaration is to assert, in my official capacity and opinion, the

1

irreparable harm that a ruling for plaintiffs in this case will have on President Donald J. Trump's constitutional power to conduct foreign affairs. Such a ruling will fundamentally impede President Trump's foreign-policymaking abilities to address national emergencies that threaten the national-security and economic-security interests of the United States and the American people. The statements made herein are based on my personal knowledge and on information provided to me in my official capacity as Secretary of Commerce.

2. I have been tasked by President Trump to lead his tariff and trade agenda. *See* Statement by President-elect Donald J. Trump Announcing the Nomination of Howard Lutnick as Secretary of Commerce, The American Presidency Project, https://www.presidency.ucsb.edu/node/375586. As part of my duties as Secretary of Commerce, I have strategized with President Trump and members of his cabinet, including United States Trade Representative Jamieson Greer, on policies to conduct trade diplomacy and address grave national emergencies. Many of these national emergencies, ranging from the hollowing out of our defense-industrial and manufacturing base to the illicit flow of narcotics and the national-security threats posed by authoritarian regimes, are caused by our foreign-trading partners.

3. For example, on February 1, 2025, President Trump found in Executive Orders 14,193 and 14,194 that the failure of the governments of Mexico and Canada to stop the influx of illegal drugs and illegal immigrants across our southern and northern borders is a national emergency, threatening the lives of our citizens.

4. Likewise, on the same day, President Trump found in Executive Order 14,195 that the People's Republic of China has encouraged Chinese businesses to export illegal drugs and

precursors for manufacturing those drugs to the United States, which constitutes a national emergency that threatens the lives of our citizens.

5. Then, on April 2, 2025, President Trump found in Executive Order 14,257 that our foreign-trading partners' non-reciprocal trading practices, including both tariff and non-tariff barriers, have produced persistent annual U.S. goods trade deficits, which has hollowed out our domestic manufacturing and defense-industrial base and has resulted in a lack of advanced domestic manufacturing capacity, a defense-industrial base dependent on inputs from foreign adversaries, vulnerable domestic supply chains, and a sensitive geopolitical environment. President Trump found the persistent annual U.S. goods trade deficits have resulted in a national emergency, threatening our national and economic security.

6. President Trump determined that it was in the foreign-policy interests of the United States to levy a 10 percent tariff for all trading partners. In addition, depending on the significance of the trade imbalances with foreign-trading partners, President Trump determined that some trading partners would receive higher duties.

7. Following President Trump's April 2, 2025, announcement, scores of countries immediately reached out to the Department of Commerce and the Office of the United States Trade Representative. President Trump's 10 percent tariffs for all trading partners went into effect at 12:01 a.m. on April 5, 2025—over two days after President Trump announced them. The country-specific tariff rates went into effect at 12:01 a.m. on April 9, 2025—nearly a week after they were announced. The vast majority of these countries saw it in their own national interests not to retaliate against the United States, as a matter of their own foreign-policy objectives. In short, the preliminary U.S. foreign-policy objectives of the tariffs worked—foreign-trading partners that have run trade deficits in

3

goods for years, and helped hollow out the American manufacturing base, immediately came to the negotiating table.

8. On April 9, 2025, after consultation with me and other members of his cabinet, President Trump announced a 90-day pause and lowered the country-specific tariffs on most countries to a temporary flat rate of 10 percent. *See* Exec. Order No. 14,266, 90 Fed. Reg. 15625. In that same announcement, President Trump declared that the tariff rate on China would increase to 125 percent. In doing this, President Trump furthered the foreign-policy objectives of the United States in two important ways.

9. *First*, countries that had approached his administration, including the Department of Commerce, without retaliating received the benefit of a pause designed to allow for substantive negotiations to remedy the national emergency. The pause has been a success.

10. On May 8, 2025, President Trump and Prime Minister Keir Starmer of the United Kingdom announced the terms of the first trade deal—a deal that had been illusory for years—which directly benefits the U.S. manufacturing base. These terms—which I helped construct—reflect extensive diplomatic effort to align United States and allied supply chains and eliminate foreign dependencies in sensitive sectors. The deal would not have happened but for the International Emergency Economic Powers Act tariffs.

11. Further, because of the IEEPA tariffs and the 90-day pause, I am, together with Ambassador Greer, participating in dozens of ongoing negotiations with foreign-trading partners. Again, such negotiations would not have happened but for the IEEPA tariffs.

12. *Second*, the increased tariff rate against China applied additional pressure to achieve the foreign-policy objective of bringing China—the greatest contributor to the national emergency and a well-known strategic adversary—to the negotiating table. In 2024 alone,

the United States had a trade deficit of $295 billion with China, and China's total trade surplus of nearly $1 trillion created excess export capacity that flooded the United States through other countries, as well. Yet, because of the IEEPA tariffs, the United States and China reached a 90-day agreement on May 12, 2025, to reduce China's tariffs on U.S. exports while the Trump administration works to address longstanding disputes with China. Under that asymmetrical agreement, reached because of the pressures of the IEEPA tariffs, China lowered its universal tariff rate on U.S. goods to 10 percent, while the United States maintained a higher rate of 30 percent.

13. An adverse ruling by this Court, enjoining the implementation of these IEEPA tariffs or circumscribing the President's authority to act in this domain, threatens all of these foreign-policy accomplishments and objectives. IEEPA gives the President of the United States a pivotal tool to express his foreign policy promptly and decisively to address national emergencies that manifest through economic and commercial channels. An adverse ruling would take away one of the most important tools the President possesses that is broad, immediate, and adaptable enough to counter emergency threats in real time.

14. IEEPA is a necessary tool given to the President to broadly and swiftly respond to national emergencies caused by the economic and commercial machinations of our foreign-trading partners. Other tools afforded to the President are not designed for national emergencies. For example, while Section 232 of the Trade Expansion Act of 1962 and Section 301 of the Trade Act of 1974 are indispensable tools of U.S. trade law, they are procedurally time-consuming and do not allow for immediate action, as IEEPA does. Under Section 232, the Department of Commerce has up to 270 days to conduct an investigation and submit a report to the President, who then has up to 90 additional days to decide whether to act, and

up to 15 additional days to implement that action.    19 U.S.C. §§ 1862(b)(3)(A),

(c)(1)(B).    Similarly, under Section 301, the United States Trade Representative must

complete an investigation within 12 months, with additional time to implement any

retaliatory action.    19 U.S.C. §§ 2414(a)(2)(B), 2415(a)(1).    IEEPA is different and

authorizes the President to take immediate action to protect national interests where all of

IEEPA's conditions are satisfied.    Without this tool, the President's foreign-policymaking

abilities would be severely constrained and our national security would be threatened.

15.  Beyond the practical effects that enjoining or circumscribing the President's IEEPA

authority would have on addressing ongoing national emergencies, the real-world foreign-

policy effects on this set of IEEPA tariffs would be monumental.    For one, an adverse ruling

would undermine the United States-United Kingdom trade deal that was negotiated in

reliance on the President's emergency tariff authority.    In addition, an adverse ruling would

jeopardize the dozens of similar arrangements with foreign-trading partners that I am

negotiating.    Each of these negotiations is premised on the credible threat of enforcement

of the IEEPA tariffs.    If this Court limits that authority, foreign counterparts will have

reduced incentives to reach meaningful agreements—resulting in the status quo that led to

the national emergency.    It would destroy the carefully crafted China trade agreement,

which is asymmetric in America's favor, in order to address the emergency of our persistent

goods trade deficit.

16.  What's more, an adverse ruling by this Court also will affect President Trump's authority

to invoke IEEPA to address other national emergencies of significant concern.    For

example, on February 1, 2025, President Trump invoked IEEPA to impose tariffs on China,

Mexico, and Canada, respectively, due to the national emergency caused by "the sustained

influx of synthetic opioids," which "kill[] approximately two hundred Americans per day." Exec. Order No. 14,195, 90 Fed. Reg. 9121; Exec. Order No. 14,194, 90 Fed. Reg. 9117; Exec. Order No. 14,193, 90 Fed. Reg. 9113. And, on March 24, 2025, President Trump invoked IEEPA to place "secondary" tariffs on countries that purchase oil from the Maduro regime in Venezuela, given the threat that the regime's policies pose to U.S. national security. Exec. Order No. 14,245, 90 Fed. Reg. 13829. Without IEEPA, the President could not quickly and effectively address grave national emergencies—caused by foreign actors—that directly threaten the lives of Americans.

17. The imposition of IEEPA tariffs signals to foreign governments that certain conduct—whether economic predation, trade manipulation, or narcotics trafficking—will incur serious consequences. Diluting this authority would not only unravel the current IEEPA actions but also would undermine future deterrence. Allies and adversaries alike monitor U.S. courts for signs of constraint on presidential power. A ruling that narrows IEEPA would have ripple effects across every domain in which economic instruments are used for strategic effect.

18. For example, India and Pakistan—two nuclear powers engaged in combat operations just 13 days ago—reached a tenuous ceasefire on May 10, 2025. This ceasefire was only achieved after President Trump interceded and offered both nations trading access with the United States to avert a full-scale war. An adverse ruling that constrains presidential power in this case could lead India and Pakistan to question the validity of President Trump's offer, threatening the security of an entire region and the lives of millions.

19. All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the

government's ability to respond to evolving foreign threats, and severely disrupt the Department of Commerce's coordination of foreign policy-related economic actions on behalf of the President.  It would jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security.  It also would come after the democratically elected United States Senate failed to garner the necessary votes to revoke President Trump's IEEPA emergency declaration on April 30, 2025.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this 23 day of May, 2025, in the City of Washington, District of Columbia.

_____

Howard W. Lutnick
41st United States Secretary of Commerce

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE
                 THE HONORABLE TIMOTHY M. REIF, JUDGE
                 THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| PRINCESS AWESOME, LLC; STONEMAIER, LLC; 300 BELOW, INC.; UPWARD GLANCE, LLC d/b/a QUENT CORDAIR FINE ART; KINGSEAL CORPORATION D/B/A WESCO ENTERPRISES, INC.; MISCHIEF, LLC d/b/a MISCHIEF TOY STORE; SPIELCRAFT GAMES, LLC; ROOKIE MAGE GAMES, LLC; XYZ GAME LABS, INC.; TINKERHOUSE, INC.; RECLAMATION STUDIO, LLC d/b/a WITSEND MOSAIC, <br><br>     Plaintiffs, <br><br>     v. <br><br> UNITED STATES CUSTOMS AND BORDER PROTECTION; PETE R. FLORES, Acting Commissioner for U.S. Customs and Border Protection; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, Secretary of the Department of Homeland Security; UNITED STATES INTERNATIONAL TRADE COMMISSION; DONALD J. TRUMP, President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; and the UNITED STATES OF AMERICA, <br><br>     Defendants. | Court No. 25-00078 |

## **DECLARATION**

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.  I am the United States Trade Representative.  I have been the United States Trade Representative since February 26, 2025.  In this capacity, I serve as the principal advisor

1

to the President on international trade policy and the chief representative for the United

States in international trade negotiations. *See* 19 U.S.C. § 2171(c)(1)(B)(C).

2.  In IEEPA, Congress granted to the President dynamic, flexible authority to respond to

    crises on a global scale.

3.  President Trump has exercised that authority to impose tariffs in response to crises

    threatening America's national security and the economy.

4.  The President found in Executive Order 14,257 that our trade partners' non-reciprocal

    trading practices, including both tariff and non-tariff barriers, have been an important

    driver of large and persistent annual U.S. goods trade deficits, which have grown over 40

    percent in the past five years, and created a presently acute threat to national security and

    the economy.  The President found that structural asymmetries in our bilateral trade

    relationships significantly constrain U.S. exports and artificially incentivize foreign

    production.  The President found further that these conditions have led to a hollowing out

    of the U.S. manufacturing and defense-industrial base, leaving the United States dependent

    upon foreign supply chains for national-security-sensitive products and with insufficient

    domestic manufacturing capacity to remain competitive in the global economy.

5.  Tariffs imposed under IEEPA are a crucial tool for protecting America's national security

    and advancing American foreign policy by addressing the unusual and extraordinary

    threats the President has identified.

6.  This case does not present an abstract question of law. The Court's ruling will have a

    concrete and immediate effect on United States national security and foreign policy.

7. The tariffs have proven to be well tailored to address these urgent threats. The United States is presently negotiating with Mexico, Canada, and the PRC in order to address the urgent threats at our northern and southern borders.

8. Furthermore, on April 9, the President issued a 90-day pause of the country-specific reciprocal tariffs so that he might negotiate with trading partners who are willing to take significant steps to remedy their non-reciprocal trading practices and align with the United States on national and economic security matters.

9. The United States is currently negotiating with dozens of countries regarding the terms of that alignment. Those negotiations are presently in a delicate state, with discussions ongoing and final deals not yet reached.  For example, on May 8, President Trump and United Kingdom (UK) Prime Minister Keir Starmer announced the general terms of an agreement that will provide U.S. companies with more than US$5 billion in expanded access to the UK market while bolstering United States national security.  Similarly, on May 12, President Trump reached an agreement with China to reduce retaliatory tariffs and non-tariff barriers imposed after his April 2 Executive Order and set a path for future discussions to open the Chinese market to more U.S. exports.  In many other cases, the United States continues to negotiate agreements in principle to structure final deals.

10. These negotiations have been one of the country's top foreign policy priorities since the tariffs were announced on April 2. Reflecting the urgency of the emergency, much of U.S. global diplomacy in the last six weeks has been focused on these negotiations.

11. In each case, those ongoing, delicate negotiations are premised on the ability of the President to impose tariffs under IEEPA. If the President is enjoined from exercising his

authority under IEEPA to impose tariffs to address these urgent threats, the premise of these important negotiations will be eliminated.

12. A decision enjoining the President from imposing tariffs under IEEPA would create a foreign policy disaster scenario.

13. If the Court disrupts U.S. trade policy imperatives by enjoining the President from imposing tariffs, the United States' ability to address national and economic security matters would suffer serious damage.

14. If the Court were to enjoin the President from imposing tariffs, it will signal to our trading partners that the President *lacks* power to promptly respond to future emergencies under IEEPA, and they may feel emboldened to further distort the conditions of competition for U.S. exporters.

15. It is critical to the national security of the United States for the Court to decline to enjoin the President from exercising his power under IEEPA to impose tariffs in recognition of the unusual and extraordinary threats at issue in this litigation.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 23d day of May, 2025.

/s/ _____

Ambassador Jamieson Lee Greer
United States Trade Representative

4