APPEAL,TYPE–D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:25–cv–01248–RC</u>
### *Internal Use Only*

| | |
|---|---|
| LEARNING RESOURCES, INC. et al v. TRUMP et al | Date Filed: 04/22/2025 |
| Assigned to: Judge Rudolph Contreras | Jury Demand: None |
| Cause: 05:0706 Judicial Review of Agency Actions | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: U.S. Government Defendant |

**<u>Plaintiff</u>**

**LEARNING RESOURCES, INC.**     represented by     **James Edward Tysse**
AKIN GUMP STRAUSS HAUER &
FELD LLP
DC Office
2001 K Street N.W.
Washington, DC 20006
202–887–4000
Email: jtysse@akingump.com
*ATTORNEY TO BE NOTICED*

**Kristen Loveland**
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street, NW
Washington, DC 20006
202–887–4154
Email: kloveland@akingump.com
*ATTORNEY TO BE NOTICED*

**Matthew R. Nicely**
AKIN GUMP STRAUSS HAUER &
FELD LLP
2001 K Street, NW
Washington, DC 20006
202–887–4046
Email: mnicely@akingump.com
*ATTORNEY TO BE NOTICED*

**Pratik Shah**
AKIN GUMP STRAUSS HAUER &
FELD LLP
Robert S. Strauss Tower
2001 K Street, NW
Washington, DC 20006
(202) 887–4210
Fax: (202) 887–4288
Email: pshah@akingump.com

1

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HAND2MIND, INC.**                    represented by    **James Edward Tysse**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Kristen Loveland**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Matthew R. Nicely**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Pratik Shah**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**                    represented by    **Catherine M. Yang**
*President of the United States, in his*                 1100 L Street NW
*official capacity*                                      Washington, DC 20005
                                                        202–514–4336
                                                        Email: catherine.m.yang@usdoj.gov
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Justin R Miller**
                                                        U.S. Department of Justice
                                                        International Trade Field Office
                                                        Civil Division, Commercial Litigation
                                                        Branch
                                                        26 Federal Plaza, Suite 346
                                                        New York, NY 10278
                                                        212–264–9241
                                                        Email: Justin.R.Miller@usdoj.gov
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Brett A. Shumate**
                                                        U.S. DEPARTMENT OF JUSTICE
                                                        950 Pennsylvania Ave. NW
                                                        Washington, DC 20530
                                                        202–514–2000
                                                        Email: brett.a.shumate@usdoj.gov
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**KRISTI NOEM**
*Secretary of the Department of Homeland Security, in her official capacity*

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF HOMELAND SECURITY**

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**
*Secretary of the Treasury, in his official capacity*

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE TREASURY**

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**HOWARD W. LUTNICK**                    represented by    **Catherine M. Yang**
*Secretary of Commerce, in his official*                   (See above for address)
*capacity*                                                 *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Justin R Miller**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Brett A. Shumate**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF**          represented by    **Catherine M. Yang**
**COMMERCE**                                               (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Justin R Miller**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Brett A. Shumate**
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**PETE R. FLORES**                       represented by    **Catherine M. Yang**
*Acting Commissioner of Customs &*                         (See above for address)
*Border Protection, in his official capacity*              *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Justin R Miller**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Brett A. Shumate**
                                                           (See above for address)

*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. CUSTOMS & BORDER**
**PROTECTION**

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMIESON GREER**
*U.S. Trade Representative, in his official*
*capacity*

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE U.S. TRADE**
**REPRESENTATIVE**

represented by **Catherine M. Yang**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin R Miller**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brett A. Shumate**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMERICA FIRST LEGAL**
**FOUNDATION**

represented by **R. Trent McCotter**
BOYDEN GRAY PLLC

800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
202–706–5488
Email: tmccotter@boydengray.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GEORGE F. ALLEN**                   represented by **Daniel W. Wolff**
                                      CROWELL & MORING
                                      1001 Pennsylvania Avenue, NW
                                      Washington, DC 20004–2595
                                      (202) 624–2500
                                      Email: dwolff@crowell.com
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**STEVEN G. CALABRESI**               represented by **Daniel W. Wolff**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**JOSHUA A. CLAYBOURN**               represented by **Daniel W. Wolff**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**JOHN C. DANFORTH**                  represented by **Daniel W. Wolff**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**RICHARD A. EPSTEIN**                represented by **Daniel W. Wolff**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**CHARLES T. HAGEL**                  represented by **Daniel W. Wolff**
                                      (See above for address)
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*

**Amicus**

**HAROLD HONGJU KOH**                    represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**GERRARD N. MAGLIOCCA**                 represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**MICHAEL W. MCCONNELL**                 represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**MICHAEL B. MUKASEY**                   represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**ALAN O. SYKES**                        represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**JOHN DANIEL TINDER**                   represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**PETER J. WALLISON**                    represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

**PHILIP ZELIKOW**                       represented by  **Daniel W. Wolff**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Amicus

| | |
|---|---|
| **EMILY LEY PAPER, INC.**<br>*doing business as*<br>SIMPLIFIED | represented by **John Julian Vecchione**<br>NEW CIVIL LIBERTIES ALLIANCE<br>4250 North Fairfax Dr.<br>Ste 300<br>Arlington, VA 22203<br>202−918−6902<br>Email: john.vecchione@ncla.legal<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | |
|---|---|
| **BAMBOLA LLC** | represented by **John Julian Vecchione**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | |
|---|---|
| **KILO BRAVA LLC** | represented by **John Julian Vecchione**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | |
|---|---|
| **KIM'S CLOTHES AND FASHION LLC** | represented by **John Julian Vecchione**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Amicus**

| | |
|---|---|
| **ROKLAND LLC** | represented by **John Julian Vecchione**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 04/22/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC−11636355) filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons)(Shah, Pratik) (Entered: 04/22/2025) |
| 04/22/2025 | 2 | NOTICE OF RELATED CASE by All Plaintiffs. Case related to Case No. 1:25−cv−00066; 4:25−cv−00026; 3:25−cv−03372; and 3:25−00464. (Shah, Pratik) (Entered: 04/22/2025) |
| 04/22/2025 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by HAND2MIND, INC., |

| | | LEARNING RESOURCES, INC. (Shah, Pratik) (Entered: 04/22/2025) |
|---|---|---|
| 04/23/2025 | 4 | NOTICE of Appearance by Pratik Shah on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Shah, Pratik) (Entered: 04/23/2025) |
| 04/23/2025 | 5 | NOTICE of Appearance by James Edward Tysse on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Tysse, James) (Entered: 04/23/2025) |
| 04/23/2025 | 6 | NOTICE of Appearance by Kristen Loveland on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Loveland, Kristen) (Entered: 04/23/2025) |
| 04/23/2025 | | Case Assigned to Judge Rudolph Contreras. (zsl) (Entered: 04/23/2025) |
| 04/24/2025 | 7 | NOTICE of Appearance by Justin R Miller on behalf of All Defendants (Miller, Justin) (Entered: 04/24/2025) |
| 04/24/2025 | 8 | MOTION to Transfer Case *to the U.S. Court of International Trade* by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Miller, Justin) (Entered: 04/24/2025) |
| 04/24/2025 | 9 | MOTION for Preliminary Injunction by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Shah, Pratik) (Entered: 04/24/2025) |
| 04/25/2025 | 10 | NOTICE of Appearance by Matthew R. Nicely on behalf of HAND2MIND, INC., LEARNING RESOURCES, INC. (Nicely, Matthew) (Entered: 04/25/2025) |
| 04/25/2025 | 11 | Unopposed MOTION for Leave to File Amicus Brief by AMERICA FIRST LEGAL FOUNDATION. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(McCotter, R. Trent) (Entered: 04/25/2025) |
| 04/25/2025 | 12 | NOTICE of Appearance by R. Trent McCotter on behalf of AMERICA FIRST LEGAL FOUNDATION (McCotter, R. Trent) (Entered: 04/25/2025) |
| 04/25/2025 | 13 | SUMMONS (13) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zsl) (Entered: 04/25/2025) |
| 04/25/2025 | 22 | AMICUS BRIEF by AMERICA FIRST LEGAL FOUNDATION. (mg) (Entered: 05/13/2025) |
| 04/28/2025 | 14 | NOTICE of Appearance by Catherine M. Yang on behalf of All Defendants (Yang, Catherine) (Entered: 04/28/2025) |

| 04/28/2025 | 15 | MOTION for Scheduling Order by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Attachments: # 1 Text of Proposed Order)(Shah, Pratik) (Entered: 04/28/2025) |
|---|---|---|
| 04/29/2025 | | MINUTE ORDER granting 15 Motion for Scheduling Order: Upon consideration of 15 the Motion for Scheduling Order, it is hereby ORDERED that Defendants' response to 9 the Motion for Preliminary Injunction shall be filed on or before May 1, 2025; Plaintiffs' reply in support of its Motion for Preliminary Injunction and Plaintiffs' response to 8 the Motion to Transfer Case shall be filed on or before May 7, 2025; and Defendants' reply in support of its Motion to Transfer Case shall be filed on or before May 12, 2025. It is FURTHER ORDERED that a hearing on 9 Plaintiffs' Motion for Preliminary Injunction and 8 Defendants' Motion to Transfer Case shall be scheduled for May 27, 2025, with the time to be confirmed by the Court. SO ORDERED. Signed by Judge Rudolph Contreras on 04/29/2025. (lcrc2) (Entered: 04/29/2025) |
| 04/30/2025 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear for a hearing on 9 Plaintiffs' Motion for Preliminary Injunction and 8 Defendants' Motion to Transfer Case on May 27, 2025 at 3:00 PM in Courtroom 23A before Judge Rudolph Contreras. SO ORDERED. Signed by Judge Rudolph Contreras on 04/30/2025. (lcrc2) (Entered: 04/30/2025) |
| 04/30/2025 | | Set/Reset Hearings: Motion Hearing set for 5/27/2025 at 03:00 PM in Courtroom 23A– In Person before Judge Rudolph Contreras. (tj) (Entered: 04/30/2025) |
| 04/30/2025 | | Set/Reset Deadlines: Responses due by 5/1/2025; Replies due by 5/7/2025; Reply in support due by 5/12/2025. (tj) (Entered: 04/30/2025) |
| 05/01/2025 | 16 | RESPONSE re 9 MOTION for Preliminary Injunction filed by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Yang, Catherine) (Entered: 05/01/2025) |
| 05/07/2025 | 17 | REPLY to opposition to motion re 9 Motion for Preliminary Injunction filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/07/2025) |
| 05/07/2025 | 18 | RESPONSE re 8 MOTION to Transfer Case *to the U.S. Court of International Trade* filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/07/2025) |
| 05/07/2025 | 19 | Unopposed MOTION for Leave to File Amicus Brief by GEORGE F. ALLEN, STEVEN G. CALABRESI, JOSHUA A. CLAYBOURN, JOHN C. DANFORTH, RICHARD A. EPSTEIN, CHARLES T. HAGEL, HAROLD HONGJU KOH, GERRARD N. MAGLIOCCA, MICHAEL W. MCCONNELL, MICHAEL B. MUKASEY, ALAN O. |

| | | |
|---|---|---|
| | | SYKES, JOHN DANIEL TINDER, PETER J. WALLISON, PHILIP ZELIKOW. (Attachments: # 1 Proposed Brief, # 2 Text of Proposed Order)(Wolff, Daniel) (Entered: 05/07/2025) |
| 05/07/2025 | 23 | AMICUS BRIEF by GEORGE F. ALLEN, STEVEN G. CALABRESI, JOSHUA A. CLAYBOURN, JOHN C. DANFORTH, RICHARD A. EPSTEIN, CHARLES T. HAGEL, HAROLD HONGJU KOH, GERRARD N. MAGLIOCCA, MICHAEL W. MCCONNELL, MICHAEL B. MUKASEY, ALAN O. SYKES, JOHN DANIEL TINDER, PETER J. WALLISON, PHILIP ZELIKOW. (mg) (Entered: 05/13/2025) |
| 05/08/2025 | | MINUTE ORDER granting 11 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that America First Legal Center's motion for leave to file a brief as *amicus curiae* in support of Defendants' Motion to Transfer is GRANTED because America First has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of April 25, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 5/8/2025. (lcrc1) (Entered: 05/08/2025) |
| 05/08/2025 | | MINUTE ORDER granting 19 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that George F. Allen, Steven G. Calebresi, Joshua A. Claybourn, John C. Danforth, Richard A. Epstein, Charles T. Hagel, Harold Hongju Koh, Gerard N. Magliocca, Michael W. McConnell, Michael B. Mukasey, Alan O. Sykes, Judge John Daniel Tinder, Peter J. Wallison, and Philip Zelikow's motion for leave to file a brief as *amicus curiae* in support of Plaintiffs' Motion for a Preliminary Injunction is GRANTED because these individuals have unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of May 7, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 5/8/2025. (lcrc1) (Entered: 05/08/2025) |
| 05/08/2025 | 20 | MOTION for Leave to File Amicus Brief by Emily Ley Paper, Inc. d/b/a Simplified, Kilo Brava LLC, Bambola LLC, Kilo Brava LLC, Kim's Clothes and Fashion LLC, Rokland LLC. (Attachments: # 1 Text of Proposed Order Proposed Order, # 2 Memorandum in Support Amicus Brief For Plaintiffs)(Vecchione, John) Modified event on 5/9/2025 (znmw). (Entered: 05/08/2025) |
| 05/08/2025 | 24 | AMICUS BRIEF by BAMBOLA LLC, EMILY LEY PAPER, INC., KILO BRAVA LLC, KIM'S CLOTHES AND FASHION LLC, ROKLAND LLC. (mg) Modified docket text on 5/13/2025 (mg). (Entered: 05/13/2025) |
| 05/09/2025 | | MINUTE ORDER granting 20 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that Emily Ley Paper, Inc. d/b/a Simplified, Kilo Brava LLC, Bambola LLC, Kilo Brava LLC, Kim's Clothes and Fashion LLC, and Rokland LLC's motion for leave to file a brief as *amicus curiae* in opposition to Defendants' Motion to Transfer is GRANTED because these businesses have unique |

| | | |
|---|---:|---|
| | | information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of May 8, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 5/9/2025. (lcrc1) (Entered: 05/09/2025) |
| 05/12/2025 | 21 | REPLY to opposition to motion re 8 Motion to Transfer Case, filed by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE. (Yang, Catherine) (Entered: 05/12/2025) |
| 05/19/2025 | 25 | NOTICE OF SUPPLEMENTAL AUTHORITY by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE (Attachments: # 1 Exhibit May 13, 2025 Hr'g Tr.)(Yang, Catherine) (Entered: 05/19/2025) |
| 05/22/2025 | 26 | NOTICE OF SUPPLEMENTAL AUTHORITY by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE (Attachments: # 1 Exhibit N.D. Fla. Transfer Order)(Yang, Catherine) (Entered: 05/22/2025) |
| 05/22/2025 | 27 | RESPONSE re 26 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/22/2025) |
| 05/22/2025 | 28 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/5/2025. Answer due for ALL FEDERAL DEFENDANTS by 7/4/2025. (Loveland, Kristen) (Entered: 05/22/2025) |
| 05/22/2025 | 29 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 5/19/2025. (Loveland, Kristen) (Entered: 05/22/2025) |
| 05/22/2025 | 30 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SCOTT BESSENT served on 5/6/2025; PETE R. FLORES served on 5/5/2025; JAMIESON GREER served on 5/9/2025; HOWARD W. LUTNICK served on 5/5/2025; KRISTI NOEM served |

| | | |
|---|---|---|
| | | on 5/5/2025; OFFICE OF THE U.S. TRADE REPRESENTATIVE served on 5/9/2025; DONALD J. TRUMP served on 5/9/2025; U.S. CUSTOMS & BORDER PROTECTION served on 5/5/2025; U.S. DEPARTMENT OF HOMELAND SECURITY served on 5/5/2025; U.S. DEPARTMENT OF THE TREASURY served on 5/6/2025; UNITED STATES DEPARTMENT OF COMMERCE served on 5/5/2025 (Loveland, Kristen) (Entered: 05/22/2025) |
| 05/23/2025 | 31 | NOTICE OF SUPPLEMENTAL AUTHORITY by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE (Attachments: # 1 Exhibit Ct. Int'l Trade Order)(Yang, Catherine) (Entered: 05/23/2025) |
| 05/24/2025 | 32 | RESPONSE re 31 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by HAND2MIND, INC., LEARNING RESOURCES, INC.. (Shah, Pratik) (Entered: 05/24/2025) |
| 05/27/2025 | 33 | NOTICE of Appearance by Brett A. Shumate on behalf of All Defendants (Shumate, Brett) (Entered: 05/27/2025) |
| 05/27/2025 | 34 | NOTICE *of Additional Exhibits* by SCOTT BESSENT, PETE R. FLORES, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, OFFICE OF THE U.S. TRADE REPRESENTATIVE, DONALD J. TRUMP, U.S. CUSTOMS & BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, UNITED STATES DEPARTMENT OF COMMERCE re 16 Response to motion, (Attachments: # 1 Exhibit Rubio, Bessent, Lutnick, Greer Declarations)(Yang, Catherine) (Entered: 05/27/2025) |
| 05/27/2025 | | MINUTE ORDER: The Court will connect the public−access telephone line for the motion hearing now scheduled for May 27, 2025 at 3:00 p.m. Any member of the public or media may access the public−access line by dialing (833) 990−9400, and using meeting ID 698780857. As a reminder, any use of the public−access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (So Ordered Judge Rudolph Contreras on 5/27/25) (tj) (Entered: 05/27/2025) |
| 05/27/2025 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Motion Hearing held on 5/27/2025 re 9 MOTION for Preliminary Injunction filed by HAND2MIND, INC., LEARNING RESOURCES, INC., 8 MOTION to Transfer Case *to the U.S. Court of International Trade* filed by U.S. CUSTOMS & BORDER PROTECTION, DONALD J. TRUMP, HOWARD W. LUTNICK, U.S. |

| | | |
|---|---|---|
| | | DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF THE TREASURY, KRISTI NOEM, UNITED STATES DEPARTMENT OF COMMERCE, PETE R. FLORES, JAMIESON GREER, OFFICE OF THE U.S. TRADE REPRESENTATIVE, SCOTT BESSENT. Oral argument heard, and the motions are taken under advisement. (Court Reporter: Tim Miller.) (tj) (Entered: 05/27/2025) |
| 05/29/2025 | 35 | ORDER denying Motion to Transfer Case 8 ; granting 9 Motion for Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 5/29/2025. (lcrc1) (Entered: 05/29/2025) |
| 05/29/2025 | 36 | TRANSCRIPT OF MOTION HEARING before Judge Rudolph Contreras held on 5−27−25; Page Numbers: 1−40; Date of Issuance: 5−29−25. Court Reporter/Transcriber Timothy R. Miller, Telephone number (202) 354−3111. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 6/19/2025. Redacted Transcript Deadline set for 6/29/2025. Release of Transcript Restriction set for 8/27/2025.(Miller, Timothy) (Entered: 05/29/2025) |
| 05/29/2025 | 37 | MEMORANDUM AND OPINION denying 8 Motion to Transfer Case; granting 9 Motion for Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 5/29/2025. (lcrc1) (Entered: 05/29/2025) |
| 05/29/2025 | 38 | ORDER setting preliminary injunction bond under Federal Rule of Civil Procedure 65(c). See document for details. Signed by Judge Rudolph Contreras on 5/29/2025. (lcrc1) (Entered: 05/29/2025) |
| 05/29/2025 | 39 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 37 Order, 35 Order on Motion to Transfer Case, Order on Motion for Preliminary Injunction by U.S. DEPARTMENT OF THE TREASURY, PETE R. FLORES, U.S. CUSTOMS & BORDER PROTECTION, OFFICE OF THE U.S. TRADE REPRESENTATIVE, SCOTT BESSENT, DONALD J. TRUMP, UNITED STATES DEPARTMENT OF COMMERCE, JAMIESON GREER, HOWARD W. LUTNICK, KRISTI NOEM, U.S. DEPARTMENT OF HOMELAND |

| | | SECURITY. Fee Status: No Fee Paid. Parties have been notified. (Yang, Catherine) (Entered: 05/29/2025) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEARNING RESOURCES, INC., et al.,    )
                                     )
              Plaintiffs,            )
                                     )
       v.                            )        Civil Action No. 1:25-cv-01248-RC
                                     )
DONALD J. TRUMP, President of the United    )
States, in his official capacity, et al.,    )
                                     )
              Defendants.            )

## NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3(a), all defendants hereby appeal, to the

U.S. Court of Appeals for the D.C. Circuit, the Court's May 29, 2025 order granting plaintiffs'

motion for a preliminary injunction, and accompanying opinion, ECF Nos. 35, 37.


DATED: May 29, 2025                      Respectfully submitted,

OF COUNSEL:                              YAAKOV M. ROTH
                                         Acting Assistant Attorney General
ALEXANDER K. HAAS
Director                                 ERIC J. HAMILTON
                                         Deputy Assistant Attorney General
STEPHEN M. ELLIOTT
Assistant Director                       PATRICIA M. McCARTHY
U.S. Department of Justice               Director
Civil Division
Federal Programs Branch                  /s/ Claudia Burke
                                         CLAUDIA BURKE
SOSUN BAE                                Deputy Director
Senior Trial Counsel
LUKE MATHERS                             /s/ Justin R. Miller
BLAKE W. COWMAN                          JUSTIN R. MILLER
COLLIN T. MATHIAS                        Attorney-In-Charge
Trial Attorneys                          International Trade Field Office
U.S. Department of Justice
Civil Division                           /s/ Catherine M. Yang
Commercial Litigation Branch             CATHERINE M. YANG

1

Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 514-4336
catherine.m.yang@usdoj.gov
*Attorneys for Defendants*

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1248 (RC) |
| | : | | |
| v. | : | Re Document No.: | 9 |
| | : | | |
| DONALD J. TRUMP, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**ORDER**

Under Federal Rule of Civil Procedure 65(c), courts may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The rule "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc., v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

Defendants request that the Court order Plaintiffs to post a bond in the amount of the tariffs they would pay but for the preliminary injunction. Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. at 43, ECF No. 16. Specifically, they want the Plaintiffs to "identify the entries, by entry number, importer name, and importer number, that would be covered" by a preliminary injunction, and to "post Single Transaction Bonds for all such identified entries during the pendency of any injunctive order in an amount equal to the total entered value, plus all applicable duties, taxes, and fees, including the duties that would otherwise have been deposited pursuant to the executive orders." *Id.*

The Court agrees with Plaintiffs that such a remedy would effectively defeat the purpose of the preliminary relief. *See* Pls.' Reply in Supp. of Mot. for Prelim. Inj. at 23–24, ECF No. 17; *see also Nat. Res. Def. Council, Inc., v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (holding

that a bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review"). Rule 65(c) has been interpreted to allow district courts to require no bond at all or only a nominal bond. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (no bond); *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (same); *Nat'l Res. Def. Council*, 337 F. Supp. at 169 (nominal bond). Because "[i]t would be a mistake to treat a revenue loss to the Government the same as pecuniary damage to a private party," the Court believes a nominal bond of $100.00 is appropriate. *See Nat'l Res. Def. Council*, 337 F. Supp. at 169.

Plaintiffs are **HEREBY ORDERED** to post bond under Rule 65(c) in the amount of $100.00.

**SO ORDERED**.

Dated: May 29, 2025                                    RUDOLPH CONTRERAS
                                                       United States District Judge

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| LEARNING RESOURCES, INC., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 25-1248 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 8, 9 |
| | : | | |
| DONALD J. TRUMP, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### Denying Defendants' Motion to Transfer Venue; Granting Plaintiffs' Motion for a Preliminary Injunction

## I. INTRODUCTION

Learning Resources, Inc. and hand2mind, Inc. ("Plaintiffs") are small businesses that develop educational toys and products for children. They manufacture most of their products in China, Taiwan, Korea, Vietnam, Thailand, and India. After President Donald Trump invoked the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, to impose sweeping tariffs on imports from those countries and others, the businesses initiated this lawsuit against President Trump and other government officials and agencies (collectively, "Defendants"). They claim that (1) IEEPA does not authorize the President to impose tariffs; (2) even if it does, it does not authorize the challenged tariffs; (3) the agency actions implementing the tariffs violate the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; and (4) to the extent that IEPPA can be interpreted to permit the President to impose the challenged tariffs, it violates the nondelegation doctrine.

Defendants have moved to transfer this action to the United States Court of International Trade, arguing that that court has exclusive jurisdiction under 28 U.S.C. §§ 1581(i) and 1337(c). Plaintiffs disagree. They have also moved for a preliminary injunction.

This case is not about tariffs *qua* tariffs. It is about whether IEEPA enables the President to unilaterally impose, revoke, pause, reinstate, and adjust tariffs to reorder the global economy. The Court agrees with Plaintiffs that it does not. For the reasons discussed below, the Court denies Defendants' motion to transfer and grants Plaintiffs' motion for a preliminary injunction.

## II.  BACKGROUND

Six months after the United States entered World War I, Congress passed the Trading with the Enemy Act of 1917 ("TWEA"), which gave the President a broad range of powers over international trade in times of war and, as amended in 1933, national emergencies. Pub. L. No. 65-91, 40 Stat. 411 (1917), codified as amended at 50 U.S.C. § 1 *et seq.*; *Regan v. Wald*, 468 U.S. 222, 226 n.2 (1984). The statute had "clear procedures for enhancing the authority of a President when an emergency arose," but no analogous procedures for withdrawing or winding down that power. *Regan*, 468 U.S. at 245 (Blackmun, J., dissenting). So, over time, TWEA came to operate as a "one-way ratchet to enhance greatly the President's discretionary authority over foreign policy." *Id.*

In 1977, Congress responded by limiting TWEA's application "solely to times of war." *Id.* at 227 (majority opinion); *see also* 50 U.S.C. § 4302. It also passed the International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 *et seq.* (1977), to "counter the perceived abuse of emergency controls by presidents to . . . interfere with international trade in non-emergency, peacetime situations." *Sacks v. Off. of Foreign Assets Control*, 466 F.3d 764, 766 (9th Cir. 2006). IEEPA regulates the President's "exercise of emergency economic powers

2

in response to peacetime crises." *Regan*, 468 U.S. at 227–28 (majority opinion).  It established "a new set of authorities for use in time of national emergency which are both more limited in scope than those of [TWEA] and subject to various procedural limitations."  H.R. Rep. No. 95-459, "Trading With the Enemy Act Reform Legislation," at 2 (1977).

Section 1701 of IEEPA provides that President can use the statute "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," if he declares a national emergency "with respect to such threat" pursuant to the National Emergencies Act, 50 U.S.C. §§ 1601–51.  50 U.S.C. § 1701(a).  The President's IEEPA powers "may not be exercised for any other purpose."  *Id.* § 1701(b).

When Section 1701's conditions are met, Section 1702(a)(1) establishes that the President may, "by means of instructions, licenses, or otherwise":

(A) investigate, regulate, or prohibit—

   i.   any transactions in foreign exchange,

   ii.  transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

   iii. the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and[]

> (C) when the United States is engaged in armed hostilities or has been attacked by
>      a foreign country or foreign nationals, [take additional actions].

*Id.* § 1702(a)(1).

Beginning in February 2025, President Trump issued a series of executive orders invoking IEEPA to unilaterally impose tariffs on many foreign goods. The executive orders used three other statutory provisions to implement the tariffs: the National Emergencies Act; Section 604 of the Trade Act of 1974, which authorizes the President to edit the Harmonized Tariff Schedule of the United States ("HTSUS"); and 3 U.S.C. § 301, which enables the President to delegate functions to subordinates. Five of President Trump's executive orders are challenged in this lawsuit (collectively, the "Challenged Orders").

*The February 1 China Order.* On February 1, the President issued an executive order imposing 10 percent *ad valorem* tariffs on Chinese goods. Exec. Order No. 14,195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) ("February 1 China Order"). The order was predicated on the influx of synthetic opioids into the United States through China, which exports fentanyl and "related precursor chemicals" to the U.S. *Id.* The order "expand[s] the scope of the national emergency" at the U.S.-Mexico border[1] to "cover the failure of the [Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.* § 1, 90 Fed. Reg. at 9122. In issuing the order, President Trump invoked "section 1702(a)(1)(B) of IEEPA." *Id.* § 2, 90 Fed. Reg. at 9122.

---

[1] *See* Proclamation No. 10,886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025); Exec. Order No. 14,157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439 (Jan. 20, 2025).

4

*The March 3 China Amendment.*  Around one month later, President Trump raised the China tariffs to 20 percent based on his determination that China had "not taken adequate steps to alleviate the illicit drug crisis through cooperative enforcement actions."  Exec. Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (Mar. 3, 2025) ("March 3 China Amendment"). Then he ordered the elimination of duty-free *de minimis* treatment for goods subject to the tariffs, contradicting a statutory program permitting duty exemptions for imported goods valued at less than $800.  Exec. Order No. 14,256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14899 (Apr. 2, 2025).  The Department of Homeland Security ("DHS") and Customs and Border Patrol ("CBP") implemented the President's China orders by modifying the HTSUS. *See Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's February 1, 2025 Executive Order Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9038-01 (Feb. 5, 2025) (implementing 10 percent tariff from February 1 China order); *Further Amended Notice of Implementation of Additional Duties on Products of the People's Republic of China Pursuant to the President's Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11426-01 (Mar. 6, 2025) (implementing 20 percent tariff from March 3 China Amendment).

*Universal and Reciprocal Tariff Order.*  On April 2, President Trump announced sweeping tariffs on virtually every U.S. trading partner.[2]  Exec. Order No. 14,257, *Regulating*

---

[2] Exempt from the tariffs were Canada, Mexico, Russia, North Korea, Cuba, and Belarus. *See* Mot. Prelim. Inj. at 10, ECF No. 9.  Separate executive orders had imposed a 25 percent tariff on goods from Mexico and Canada.  *See* Exec. Order No. 14,194, *Imposing Duties to*

5

*Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025) (the "Universal and Reciprocal Tariff Order").  These "Liberation Day" tariffs encompassed a 10 percent universal tariff plus additional country-specific tariffs ranging from 11 to 50 percent.  *Id.* at 15045, 15049–50.  The Universal and Reciprocal Tariff Order also announced a new national emergency "arising from conditions reflected in large and persistent annual U.S. goods trade deficits" that "have contributed to the atrophy of domestic production capacity, especially that of the U.S. manufacturing and defense-industrial base."  *Id.* at 15044; *see also* Defs.' PI Opp'n at 6 ("On April 2, 2025, the President declared a national emergency based on the trade deficit's effect on the country's economy and security.").  To the President, these trade asymmetries constitute an "unusual and extraordinary threat to the national security and economy of the United States," especially because of "the recent rise in armed conflicts abroad."  90 Fed. Reg. at 15041, 15044–45; *see also Fact Sheet: President Donald J. Trump Declares National Emergency to Increase Our Competitive Edge, Protect Our Sovereignty, and Strengthen Our National and Economic Security*, The White House (Apr. 2, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/04/fact-sheet-president-donald-j-trump-declares-national-emergency-to-increase-our-competitive-edge-protect-our-sovereignty-and-strengthen-our-national-and-economic-security/ [https://perma.cc/UK3L-JDEV].  The 10 percent tariff went into effect on April 5; the reciprocal tariffs were originally set to take effect on April 9.  Mot. Prelim. Inj. at 11, ECF No. 9.

---

*Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); Exec. Order No. 14,193, *Imposing Duties to Address the Flow of Illicit Drugs Across our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025).  The President later paused, reinstated, and amended the scope of those orders in ways not relevant here.

6

*April 8 Reciprocal China Amendment & April 9 Reciprocal Modification.*  But on

April 8, President Trump responded to retaliatory tariffs from China by raising the reciprocal

tariff rate for China from 34 percent to 84 percent.  Exec. Order No. 14,259, *Amendment to*

*Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's*

*Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) ("April 8 Reciprocal China

Amendment").  Then, on April 9, President Trump suspended for 90 days the reciprocal tariffs

listed in the Universal and Reciprocal Tariff Order for all countries but China.  Exec. Order

No. 14,266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and*

*Alignment*, §§ 2, 3, 90 Fed. Reg. 15625 (Apr. 15, 2025) ("April 9 Reciprocal Modification").

The April 9 Reciprocal Modification also increased the China reciprocal tariff rate to 125

percent.  *Id.*  At the highest level, the total tariffs on most Chinese goods reached a minimum of

145 percent.  Ana Swanson & Alan Rappeport, *Tariff Truce With China Demonstrates the Limits*

*of Trump's Aggression*, N.Y. Times (May 12, 2025), available at

https://www.nytimes.com/2025/05/12/business/economy/trump-trade-china-tariffs.html

[https://perma.cc/BKS4-NTGJ].  After trade talks in Geneva, the U.S. lowered the minimum

tariffs on Chinese goods to 30 percent.  *Id.*  The ten percent universal tariffs from the Universal

and Reciprocal Order are still in effect.  90 Fed. Reg. at 15626.

President Trump has stated that the tariffs originating in the Challenged Orders will raise

"billions of dollars, even trillions of dollars" in revenue.  Mot. Prelim. Inj. at 13 (quoting Bailey

Schulz, *Trump is Rolling Out More Tariffs This Month. Where Does the Tariff Money Go?*, USA

Today (Apr. 4, 2025), https://www.usatoday.com/story/money/2025/04/03/trump-tariffs-where-

will-money-go/82792578007/ [https://perma.cc/T5DN-73XL]).  Treasury Secretary Scott

Bessent estimated that the tariffs will enable the United States to collect up to $600 billion

annually, paid mainly by U.S. businesses and consumers.  *Id.* (citing Richard Rubin, *Bessent Says Tariff Revenue Could Reach $600 Billion Annually*, Wall St. J. (Apr. 4, 2025), available at https://www.wsj.com/livecoverage/stock-market-tariffs-trade-war-04-04-2025/card/bessent-says-tariff-revenue-could-reach-600-billion-annually-QJfDGCPYDY1C72Ljg1pt [https://perma.cc/R2RV-PNAW]**)**.

No other President has ever purported to impose tariffs under IEEPA.  Joint Br. of Amici Curiae Former Senator and Governor George F. Allen, *et al.* ("Law Professors' Amicus Br.") at 7 (citing Christopher A. Casey *et al.*, Cong. Rsch. Serv., *The International Economic Emergency Powers Act: Origins, Evolution and Use*, R45618 at 27 (2024)), ECF No. 23; Mot. Prelim. Inj. at 1 ("For five decades and across eight presidential Administrations, no President had ever invoked IEEPA to impose a tariff or duty.").  After President Trump issued the Challenged Orders, small businesses and other entities brought lawsuits in federal courts alleging that the tariffs are unlawful.  *See, e.g.*, *Emily Ley Paper, Inc. v. Trump*, No. 3:25-cv-465 (N.D. Fla.) (transferred to the United States Court of International Trade); *Webber v. U.S. Dep't of Homeland Security*, No. 4:25-cv-26 (D. Mont.) (appeal pending); *California v. Trump*, No. 3:25-cv-3372 (N.D. Cal.); *V.O.S. Selections, Inc. v. Trump*, No. 25-00066 (Ct. Int'l Trade); *Princess Awesome, LLC v. U.S. Customs & Border Prot.*, No. 25-00078 (Ct. Int'l Trade); *Oregon v. Trump*, No. 25-00077 (Ct. Int'l Trade); *Barnes v. United States*, No. 25-0043 (Ct. Int'l Trade) (dismissed for lack of standing).

Among that group are Plaintiffs.  Learning Resources and hand2mind are family-owned companies based in Illinois that sell award-winning toys that help young children develop verbal, counting, and fine motor skills, and that introduce older children to science, technology,

engineering, and math.[3]  Compl. ¶¶ 4, 10, ECF No. 1.  They have more than 500 employees and sell their products in over 100 countries.  *Id.*  Plaintiffs pay tariffs to the federal government pursuant to the Challenged Orders because they import most of their products from China and other countries subject to IEEPA tariffs.  *Id.* ¶ 24.  According to the companies' CEO, Richard Woldenberg, the new China tariff rates "are so high as to effectively prevent importation."  Decl. of Richard Woldenberg in Supp. of Pls.' Mot. for Prelim. Inj. ("Woldenberg Decl.") ¶ 6, ECF No. 9-1.  The "scale of the IEEPA tariff burden is unsustainable" for their businesses, which may be forced to raise prices by 70 percent or more "as a matter of pure survival."  *Id.* ¶¶ 6, 9.  Because Plaintiffs have "no realistic way" to cover the costs associated with the increased tariffs, "the tariffs act as an immediate ban on the products [they] import."  *Id.* ¶ 15.  They estimate that the tariffs will increase their annual costs over forty-fold.  Mot. Prelim. Inj. at 3.

Plaintiffs brought this lawsuit on April 22 against President Trump; Kristi Noem, Secretary of DHS; the Department of Homeland Security; Scott Bessent, Secretary of the Department of the Treasury; the Department of the Treasury; Howard Lutnick, Secretary of Commerce; the Department of Commerce; Pete R. Flores, Acting Commissioner of CBP; Customs and Border Patrol; Jamieson Greer, U.S. Trade Representative; and the Office of the U.S. Trade Representative (collectively, "Defendants").  *See* Compl.  Two days later, Defendants filed a motion to transfer this action to the United States Court of International Trade ("CIT").  Defs.' Mot. Transfer, ECF No. 8; Mem. of Law in Supp. of Defs.' Mot. Transfer ("Mot. Transfer"), ECF No. 8, and Plaintiffs filed a motion for a preliminary injunction.  Mot. Prelim. Inj.

---

[3] Although distinct legal entities, Plaintiffs are under common control and share over 100 employees, a single line of credit, and a single supply chain department.  Woldenberg Decl. ¶ 2.

9

The Court of International Trade is an Article III court that takes its current form from the Customs Court Act of 1980, Pub. L. 96-417, 94 Stat. 1727 (1980), and has "unique and specialized expertise in trade law." *Marmen Inc. v. United States*, 134 F.4th 1334, 1338 (Fed. Cir. 2025) (internal quotation omitted). Congress has given the CIT exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for," as relevant here, "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." 28 U.S.C. § 1581(i)(1). District courts do not have subject-matter jurisdiction over "any matter within the exclusive jurisdiction of the Court of International Trade." 28 U.S.C. § 1337(c).

Plaintiffs oppose the government's motion to transfer on the grounds that IEEPA is not a law providing for tariffs. *See* Pls.' Response to Mot. Transfer ("Pls.' Transfer Opp'n"), ECF No. 18. The government filed an opposition to Plaintiffs' preliminary injunction motion, Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' PI Opp'n"), ECF No. 16, and Plaintiffs filed a reply, Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' PI Reply"), ECF No. 17. The government also filed a reply in support of its motion to transfer. Reply in Supp. of Defs.' Mot. Transfer ("Defs.' Transfer Reply"), ECF No. 21.

Three groups submitted amicus briefs. America First Legal Foundation ("America First") filed a brief in support of Defendants' motion to transfer. Br. of Amicus Curiae America First Legal Foundation in Supp. of Defs.' Mot. Transfer ("America First Amicus Br."), ECF No. 22. A group of law professors, former politicians, and legal experts filed a brief in support of Plaintiffs' motion for a preliminary injunction. Law Professors' Amicus Br. And finally, a group of small businesses affected by the Challenged Orders filed a brief in opposition to Defendants' motion to transfer. Joint Br. of Amici Curiae Emily Ley Paper, Inc., D/B/A

Simplified; Kilo Brava LLC; Kim's Clothes and Fashion LLC; and Rokland LLC in Opp'n to

Defs.' Mot. Transfer ("Small Business Amicus Br."), ECF No. 24.

Defendants also submitted three notices of supplemental authority: a hearing transcript

from a similar case before the Court of International Trade, where a three-judge panel of the CIT

heard argument on a motion for a preliminary injunction and a motion for summary judgment; a

Florida district court's order granting the government's motion to transfer in a similar case; and a

CIT decision dismissing a similar case, brought by a *pro se* plaintiff, for lack of standing.  *See*

Notice of Suppl. Authority, ECF Nos. 25, 25-1 (CIT hearing transcript); Notice of Suppl.

Authority, ECF Nos. 26, 26-1 (decision in the Northern District of Florida transferring *Emily Ley*

*Paper* to the CIT); Notice of Suppl. Authority, ECF Nos. 31, 31-1; (decision of the CIT

dismissing for lack of standing in *Barnes*).  Plaintiffs filed responses to the two court opinions.

*See* Response to Notice of Suppl. Authority, ECF No. 27; Response to Notice of Suppl.

Authority, ECF No. 32.  Defendants also submitted as "additional exhibits" in support of their

preliminary injunction opposition four declarations of U.S. government officials originally filed

in a case pending before the CIT.  Notice of Add'l Exs., ECF No. 34; *see also* Decls., ECF No.

34-1 (declarations of Secretary of State Marco Rubio ("Decl. of Marco Rubio"), Secretary of

Treasury Scott Bessent ("Decl. of Scott Bessent"); Secretary of Commerce Howard Lutnick

("Decl. of Howard Lutnick"); and United States Trade Representative Jamieson Lee Greer).

The Court held a hearing on the motions to transfer and for a preliminary injunction on

May 27.  Both motions are now ripe for review.

11

### III.  LEGAL STANDARDS

### A.  Motion to Transfer for Lack of Jurisdiction

Federal courts, as courts of limited jurisdiction, have an obligation to ensure that the actions they consider are "limited to those subjects encompassed within a statutory grant of jurisdiction." *Ins. Corp. of Ireland, Ltd. v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).  A plaintiff bears the burden of establishing a court's subject-matter jurisdiction. *Sweigert v. Perez*, 334 F. Supp. 3d 36, 40 (D.D.C. 2018).  If a court where an action is filed finds "there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed."  28 U.S.C. § 1631; *see also Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1304 (Fed. Cir. 2008).

### B.  Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "The last two factors 'merge when the Government is the opposing party.'"  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing

*Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear

showing," *Cobell*, 391 F.3d at 258.  A district court must generally consider each of these factors

in deciding whether to issue a preliminary injunction.  *See Sherley v. Sebelius*, 644 F.3d 388,

392–93 (D.C. Cir. 2011).

## IV.  ANALYSIS

### A.  Subject-Matter Jurisdiction & Likelihood of Success on the Merits

At the outset, Plaintiffs must establish that the Court has subject-matter jurisdiction over

their claims.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  The CIT has exclusive

jurisdiction over "any civil action commenced against the United States, its agencies, or its

officers, that arises out of any law of the United States providing for," in relevant part, "tariffs,

duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of

revenue."  28 U.S.C. § 1581(i)(1)(B).

This is undisputably a civil action against agencies and officers of the United States that

"arises out of" IEEPA.  *See Kosak v. United States*, 465 U.S. 848, 854 (1984) (interpreting

"arising out of" to "include[] a claim resulting from"); *Int'l Lab. Rights Fund v. Bush*, 357 F.

Supp. 2d 204, 208 (D.D.C. 2004) (analyzing the CIT's jurisdiction based on "the substantive law

giving rise to [the plaintiffs'] claims").  So subject-matter jurisdiction turns on whether IEEPA is

a "law . . . providing for" "tariffs, duties, fees or other taxes on the importation of merchandise

for reasons other than the raising of revenue."  28 U.S.C. § 1581(i)(1).  If the answer is yes, then

the Court of International Trade has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1).  If the

answer is no, then this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346.  *See also K*

*Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 182–83 (1988).  The jurisdictional question is

tantamount to the principal merits question: whether IEEPA authorizes (or "provid[es] for") tariffs. *See* Pls.' Transfer Opp'n at 1.

Defendants argue that this Court must transfer the case to the CIT because "all of [P]laintiffs' arguments concern the imposition of tariffs." *E.g.*, Mot. Transfer at 1; *see also* Defs.' PI Opp'n at 10–20. They essentially take the position that all "tariff *cases*," "tariff *challenges*," and "tariff *matters*" must go to the CIT for that court to determine in the first instance whether it has jurisdiction. *See* Mot. Transfer at 9–10 (emphases added). That is not how the CIT's jurisdictional statute operates. The statute is categorical: the jurisdictional hook is the nature of the statute that a case arises out of, not the character of a plaintiff's claims. *See K Mart Corp.*, 485 U.S. at 188 ("Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations.") (emphasis in original); 28 U.S.C. § 1581(i)(1)(B); *Miami Free Zone Corp. v. Foreign Trade Zones Bd.*, 22 F.3d 1110, 1112 (D.C. Cir. 1994) (holding that "section 1581(i) grants the CIT exclusive jurisdiction over actions arising from laws *providing for*—not 'designed to deal with' or 'relating to'—revenue from imports") (emphasis in original). So the CIT has jurisdiction over this case if, and only if, IEEPA is a "law of the United States providing for . . . tariffs."[4] *See* 28 U.S.C. § 1581(i)(1)(B); Pls.' Transfer Opp'n at 2.

---

[4] Defendants argue in passing that the CIT has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(D), which applies to cases arising out of any law of the United States providing for the "administration and enforcement" of tariffs. *See* Mot. Transfer at 9, 11; Defs.' Transfer Reply at 5. They base this argument on the fact that the Challenged Orders modified the HTSUS, which is essentially a list of the applicable tariff rates for all goods imported into the United States. *See* Defs.' Transfer Reply at 5; 19 U.S.C. § 2483. This case "arises out of" the substantive law under which the President acted—IEEPA—not the HTSUS. *See Int'l Lab. Rights Fund*, 357 F. Supp. 2d at 208. So 28 U.S.C. § 1581(i)(1)(D) does not independently apply. *Cf. K Mart Corp.*, 485 U.S. at 190–91 (holding that the CIT's residual jurisdictional provision does not apply if the underlying substantive law is not one "providing for . . . administration and enforcement" of something that itself falls under the CIT's jurisdiction).

Defendants claim that this Court cannot consider whether IEEPA provides for tariffs because that necessarily involves deciding the underlying merits (or, at this stage of the litigation, whether Plaintiffs have shown a likelihood of success on the merits). But "courts always have jurisdiction to determine their jurisdiction," *Ilan-Gat Eng'rs, Ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 239 (D.C. Cir. 1981), including in instances where the CIT may ultimately have exclusive jurisdiction. *K Mart Corp.*, 485 U.S. at 191 (resolving circuit split by rejecting Federal Circuit's position that the CIT had exclusive jurisdiction over certain actions under 28 U.S.C. § 1581(i)). And when the merits and jurisdiction are intertwined, like here, a court "can decide all of the merits issues in resolving a jurisdictional question, or vice versa." *Brownback v. King*, 592 U.S. 209, 217 (2021) (cleaned up). The Court will therefore consider both whether it has jurisdiction and whether Plaintiffs are likely to succeed on the merits by deciding whether IEEPA is a law providing for tariffs.

Since the Founding, the Constitution has vested the "Power to lay and collect Taxes, Duties, Imposts and Excises" with Congress. U.S. Const. art. I, § 8, cl. 1. The President has no independent discretion to impose or alter tariffs. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Any Presidential tariffing authority must be delegated by Congress. *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 572 (C.C.P.A. 1975) ("[N]o undelegated power to regulate commerce, or to set tariffs, inheres in the Presidency."); Law Professors' Amicus Br. at 3 (stating that Congress's power to control taxation is a "structural safeguard of democratic accountability"). *See generally* 19 U.S.C.

Because courts "must enforce plain and unambiguous statutory language according to its terms," the Court looks to IEEPA's text to determine whether it is a law providing for tariffs. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010); 28 U.S.C.

§ 1581(i)(1)(B).  IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts."  It provides, as relevant here, that the President may, in times of declared national emergency, "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the "importation or exportation" of "property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  There is no residual clause granting the President powers beyond those expressly listed.  The only activity in Section 1702(a)(1)(B) that could plausibly encompass the power to levy tariffs is that to "regulate . . . importation."  *See* Defs.' PI Opp'n at 11 (relying on those words to argue that IEEPA authorizes the imposition of tariffs).

The Court agrees with Plaintiffs that the power to regulate is not the power to tax.  *See* Mot. Prelim. Inj. at 18.  The Constitution recognizes and perpetuates this distinction.  Clause 1 of Article I, Section 8 provides Congress with the "Power To lay and collect Taxes, Duties, Imposts and Excises."  Clause 3 of Article I, Section 8 empowers Congress "To regulate Commerce with foreign Nations."  If imposing tariffs and duties were part of the power "[t]o regulate [c]ommerce with foreign [n]ations," then Clause 1 would have no independent effect.  As Chief Justice Marshall put it in an early leading case, "the power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts."  *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824) (Marshall, C.J.).  The Constitution treats the power to regulate and the power to impose tariffs separately because they are not substitutes.  *See id.* at 198–99 (describing the power to tax and the power to regulate as "not . . . similar in their terms or their nature").

"Tariff" and "regulate" also take different plain meanings.  To regulate something is to "[c]ontrol by rule" or "subject to restrictions."  *Regulate*, The Concise Oxford Dictionary of Current English 943 (6th ed. 1976); *see also Regulate*, New Webster's Dictionary of the English

Language 1264 (1975) ("to govern by or subject to certain rules or restrictions"); *see also* Defs.' PI Opp'n at 11 (citing similar definitions).  Tariffs are, by contrast, schedules of "duties or customs imposed by a government on imports or exports."  *Tariff*, Random House Dictionary of the English Language 1454 (1973).  To regulate is to establish rules governing conduct; to tariff is to raise revenue through taxes on imports or exports.  Pls.' PI Reply at 3.  Those are not the same.[5]  *Cf.* Tom Campbell, *Presidential Authority to Impose Tariffs*, 83 La. L. Rev. 595 (2023) (arguing that "tariffs are economically different from quantitative import restraints").  If Congress had intended to delegate to the President the power of taxing ordinary commerce from any country at any rate for virtually any reason, it would have had to say so.  *See Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023) (requiring a clear statement from Congress when the interpretation of a provision would have a "question of 'deep economic and political significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

The other verbs in Section 1702(a)(1)(B) confirm that the President's power to "regulate . . . [the] importation or exportation" of property does not encompass the power to tariff.  Per the principle of *noscitur a sociis*, "a word is given more precise content by the neighboring words with which it is associated."  *E.g.*, *United States v. Williams*, 553 U.S. 285, 294 (2008).  Even if *regulate* may take a broad meaning in other contexts, *see* Defs.' PI Opp'n at 12, the words immediately surrounding it "cabin the contextual meaning of that term" here, *see*

---

[5] Defendants point out that in *McGoldrick v. Gulf Oil Corporation*, 309 U.S. 414, 428 (1940), the Supreme Court described "[t]he laying of a duty on imports" as both "an exercise of the taxing power" and "an exercise of the power to regulate foreign commerce."  Defs.' PI Opp'n at 15.  Both of those powers belong to Congress, not the President.  *See* U.S. Const. art. I, § 8, cls. 1, 3.  *McGoldrick* does not stand for the proposition that the President's delegated power to "regulate . . . importation" includes the ability to unilaterally impose tariffs at any rate on any goods from any country.

*Yates v. United States*, 574 U.S. 528, 543 (2015).  The President's IEEPA power to "regulate" is part of a list of verbs otherwise including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit."  50 U.S.C. § 1702(a)(1)(B).  Not one of those words deals with the power to raise revenue.  In the context of the words with which it is listed, "regulate" is appropriately read to refer to the President's power to issue economic sanctions, not to tariff.  *See* Law Professors' Amicus Br. at 8, 13; Mot. Prelim. Inj. at 27.

Nor does IEEPA include language setting limits on any potential tariff-setting power. Every time Congress delegated the President the authority to levy duties or tariffs in Title 19 of the U.S. Code, it established express procedural, substantive, and temporal limits on that authority.  *E.g.*, 19 U.S.C. § 2132.  For one example, Section 122 of the Trade Act of 1974 authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits," but those tariffs are capped at 15 percent and can last only 150 days without Congressional approval.  *Id.* § 2132(a).  For another example, Section 338 of the Tariff Act of 1930 grants the President the authority to "declare new or additional duties" of up to 50 percent on imports from countries that have imposed "unreasonable" charges, exactions, regulations, or limitations that are "not equally enforced upon the like articles of every foreign country," or that have "[d]iscriminate[d] in fact against the commerce of the United States."  19 U.S.C. § 1338(a), (d), (e).  Those tariffs cannot take effect for thirty days.  *Id.* § 1338(d), (e).  For yet another example, Section 301 of the Trade Act of 1974 authorizes an executive officer who serves under the President to "impose duties or other import restrictions on the goods of" a foreign country that has been found, after notice and investigation, to have committed unfair trade practices or

violated trade agreements with the United States. 19 U.S.C. § 2411(c). Unlike IEEPA, each of these statutes provides specific limitations on when the President may set or alter tariffs. *See also, e.g.*, 19 U.S.C. § 1862 (authorizing the President to impose tariffs only against specific products, and only after the Secretary of Commerce has conducted a predicate investigation into national security risks); *cf. Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559–60, 571 (1976) (interpreting the statutory phrase "adjust . . . imports" to give the President the power to impose license fees, but only after the Secretary of the Treasury independently determines that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," and other "clear preconditions to Presidential action").

Those comprehensive statutory limitations would be eviscerated if the President could invoke a virtually unrestricted tariffing power under IEEPA.[6] *See* Law Professors' Amicus Br. at 9 ("If IEEPA meant what the government says it means, it would enable the President to impose, revoke, or change tariffs for essentially any reason he describes as an emergency, without complying with any of the limitations that Congress attached to every statute delegating tariff authority."), *cf. Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) (discussing the principle that in statutory interpretation, the specific prevails over the general); *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) (same). The Court will not assume that,

---

[6] Of course the necessary predicate for the exercise of any authority under IEEPA is the President's declaration of a national emergency. 50 U.S.C. § 1701. But the President's power to declare a national emergency under the National Emergencies Act is broad, and Defendants take the position that courts cannot review presidential declarations of emergencies because they constitute nonjusticiable political questions. Defs.' PI Opp'n at 1, 31–36; *see also Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020) (noting that "*no court* has ever reviewed the merits of such a declaration") (emphasis in original); *Yoshida*, 526 F.2d at 581 n.32 ("[C]ourts will not review the bona fides of a declaration of an emergency by the President.").

in enacting IEEPA, Congress repealed by implication every extant limitation on the President's tariffing authority. *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936) ("The cardinal rule is that repeals by implication are not favored."). "Congress has enacted a comprehensive scheme" detailing the conditions where the President may impose tariffs. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)). "It would be anomalous," to say the least, "for Congress to have so painstakingly described the [President's] limited authority" on tariffs in other statutes, "but to have given him, just by implication," nearly unlimited tariffing authority in IEEPA. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

Historical practice further indicates that IEEPA does not encompass the power to levy tariffs. In the five decades since IEEPA was enacted, no President until now has ever invoked the statute—or its predecessor, TWEA—to impose tariffs. *See* Mot. Prelim. Inj. at 21, 27; Christopher A. Casey *et al.*, Cong. Rsch. Serv., R45618, *The International Emergency Economic Powers Act: Origins, Evolution and Use*, R45618 at 25–26, 58–62 (2024). IEEPA has been consistently understood by the Executive to authorize targeted economic sanctions on the person[7] or state responsible for the underlying threat to U.S. national security. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government . . . can inform a court's determination of what the law is.") (cleaned up) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)); Mot. Prelim. Inj. at 21–27. "This lack of historical precedent, coupled with the breadth of authority that the [President] now claims, is a telling

---

[7] The Court means "person" in the broad legal sense. *See* 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *see also* 50 U.S.C. §§ 1708(d)(6), 1709(g)(8) (defining "person" as "an individual or entity").

20

indication that the [tariffs] extend[] beyond the [President's] legitimate reach." *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin*, 595 U.S. 109, 119 (2022) (per curiam) (internal quotation marks omitted). Nor have IEEPA cases traditionally been filed in the CIT. Hundreds of district court cases cite IEEPA Sections 1701 and 1702, but excluding the cases recently filed challenging President Trump's IEEPA tariffs, not one CIT case cites either provision. *See* Pls.' Transfer Opp'n at 10. This makes sense because the mine run IEEPA case has nothing to do with the CIT's "unique and specialized expertise in trade law." *See, e.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003) (IEEPA case seeking to vacate Office of Foreign Asset Controls designations); *OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17 (D.D.C. 2015) (IEEPA case seeking to unblock a wire transfer); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020) (IEEPA case seeking to enjoin ban on social media application).

General administrative practice also illustrates—and demands—a distinction between the power to regulate and the power to tax. When a statute authorizes an agency to promulgate regulations on a topic, the agency can implement rules or restrictions relating to that topic. *See, e.g.*, 42 U.S.C. § 7412 (authorizing the Environmental Protection Agency to "promulgate regulations establishing emissions standards"). The agency cannot, however, use its standard regulatory powers to raise revenue by imposing fees, tariffs, or taxes. *See* Pls.' PI Reply at 4–5; *cf. Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) ("The legal power to regulate is not necessarily the legal power to tax."). Congress speaks clearly when it delegates to an agency the authority to impose fees on regulated entities. *See* 49 U.S.C. § 40117(j) (listing the powers to tax and to regulate separately); 16 U.S.C. § 460bbb-9(a) (same); 2 U.S.C. § 622(8)(B)(i) (same). The statutory term "regulate," on its own, is not so capacious.

That is true whether the power to regulate is delegated to an administrative agency or to the President.

Defendants' counterarguments cannot and do no overcome IEEPA's plain meaning. For one thing, their proposed interpretation of Section 1702(a)(1)(B) conflicts with the provision's textual limits. The President's IEEPA powers extend only to "any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(B); *see Real v. Simon*, 510 F.2d 557, 562 (5th Cir. 1975). Tariffs are typically assessed after U.S.-based importers have taken legal possession of imported goods. *See* 19 U.S.C. § 1484(a)(2)(B) (generally authorizing the "owner or purchaser" of goods to be the importer of record); U.S. Customs & Border Protection, *Entry Summary and Post Release Processes* (last modified Apr. 10, 2025), https://www.cbp.gov/trade/programs-administration/entry-summary [https://perma.cc/4U4F-7U6H] ("Within 10 days of the release of the cargo, the importer must pay the estimated duties on their imported goods."). Property wholly owned by U.S. nationals falls outside of IEEPA's scope. *See* 50 U.S.C. § 1702(a)(1)(B); *see also* Law Professors' Amicus Br. at 8–9 (describing how all the "permitted presidential actions" in IEEPA "have their effects abroad," while tariffs are "taxes paid by Americans").

And as Plaintiffs pointed out at oral argument, Defendants' interpretation could render IEEPA unconstitutional. IEEPA provides that the President may "regulate . . . importation or exportation." 50 U.S.C. § 1702(a)(1)(B). The Constitution prohibits export taxes. *See* U.S. Const. art. I, § 9, cl. 5 ("No Tax or Duty shall be laid on Articles exported from any State."). If the term "regulate" were construed to encompass the power to impose tariffs, it would necessarily empower the President to tariff exports, too. The Court cannot interpret a statute as

unconstitutional when any other reasonable construction is available.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012).

Defendants' interpretation would also create a jurisdictional split between IEEPA actions initiated by the government, which are not "commenced against the United States, its agencies, or its officers," and would fall under the jurisdiction of the district courts; and IEEPA actions initiated against the government, which would go to the CIT.  *See* 28 U.S.C. § 1581(i)(1); 50 U.S.C. § 1705(a)–(c) (establishing civil and criminal penalties for violations of IEEPA); *see, e.g.*, *United States v. Three Sums Totaling $612,168.23 in Seized U.S. Currency*, 55 F.4th 932, 935–36 (D.C. Cir. 2022) (IEEPA claim filed by the government in federal district court).  That would totally warp the principles of consistency and expertise that Defendants invoke to support their claim that the CIT has exclusive jurisdiction over this action.  *See* Mot. Transfer at 9–10.

Defendants lean heavily on *United States v. Yoshida International, Inc.* ("*Yoshida*"), 526 F.2d 560, a 1975 decision from the Court of Customs and Patent Appeals, the Federal Circuit's predecessor, but that case is not binding on this Court.  *See* Defs.' PI Opp'n at 2, 4, 12, 14, 16–19, 23, 26–28, 32, 35; *see also Coal. to Preserve the Integrity of Am. Trademarks v. United States*, 790 F.2d 903, 905–07 (D.C. Cir. 1986), *aff'd in part sub nom. K Mart. Corp.*, 485 U.S. at 190–91 (rejecting Federal Circuit's jurisdictional analysis).  Nor does the Court find it persuasive.[8]

---

[8] Two other district courts have, in cases materially similar to this one, granted the government's motion to transfer to the CIT largely in reliance upon *Yoshida*.  *See Webber v. U.S. Dep't of Homeland Sec.*, 2025 WL 1207587 (D. Mont. Apr. 25, 2025); *Emily Ley Paper v. Trump*, 2025 WL 1482771 (N.D. Fla. May 20, 2025).  This Court respectfully disagrees with their analyses.  And the Court finds it even less persuasive that the CIT, which is bound by *Yoshida*, is exercising jurisdiction over lawsuits raising similar claims.

The facts of *Yoshida* are as follows.  During the summer of 1971, the United States faced "an economic crisis" arising out of a balance of payments deficit.  *Yoshida*, 526 F.2d at 567. President Nixon responded by issuing a proclamation that, among other things, imposed a 10 percent surcharge on imported goods.  *Id.*; *see also* Proclamation No. 4074, 36 Fed. Reg. 15724 (Aug. 17, 1971).  The tariffs were known as the "Nixon shock," *see* Defs.' PI Opp'n at 17, and were withdrawn in less than five months, Law Professors' Amicus Br. at 11.  A zipper importer, Yoshida International, challenged the tariffs' legality in a refund suit.  *Yoshida*, 526 F.2d at 566. At the time Section 5(b) of the TWEA allowed the President to, in emergencies, "regulate . . . [the] importation . . . of . . . any property in which any foreign country or a national thereof has any interest."[9]  *Id.* at 570.  Although President Nixon had not invoked TWEA,[10] the Customs Court[11] analyzed whether that statute authorized the tariffs and concluded that it did not. *Yoshida Int'l, Inc. v. United States* ("*Yoshida I*"), 378 F. Supp. 1155, 1171 (Cust. Ct. 1974), *rev'd*, *Yoshida*, 526 F.2d at 576 (C.C.P.A. 1975) ("It cannot be said that the investiture of a power to 'regulate' necessarily includes, per se, the power to levy duties."); *see also id.* at 1172 ("If the words 'regulate . . . importation' were given the construction contended by the defendant, the President by the declaration of a national emergency could determine and fix rates of duty at will, without regard to statutory rates prescribed by the Congress and without the

---

[9] The same language appears in IEEPA.

[10] In issuing Proclamation 4074, President Nixon instead invoked the Tariff Act of 1930 and the Trade Expansion Act of 1962.  36 Fed. Reg. at 15724; *Yoshida*, 526 F.2d at 569; H.R. Rep. No. 95-459, at 5 (1977) ("[TWEA] was not among the statutes cited in the President's proclamation as authority for the surcharge."); *see also* Pls.' PI Reply at 9–10.  TWEA was first cited "later by the Government in response to a suit brought in Customs Court by Yoshida International"—*i.e.*, in *Yoshida*.  H.R. Rep. No. 95-459, at 5.

[11] The Customs Court is the CIT's predecessor.  *See* Customs Courts Act of 1980, Pub. L. No. 96-417, § 702, 94 Stat. 1727, 1748 (1980).

24

benefit of standards or guidelines which must accompany any valid delegation of a constitutional

power by the Congress." (alteration in original)).

The Court of Customs and Patent Appeals reversed based on "the intent of Congress" and

"the broad purposes of the [TWEA]."  *Yoshida*, 526 F.2d at 583; *see also id.* at 573 (emphasizing

that "the primary implication of an emergency power is that it should be effective to deal with a

national emergency successfully").  That is no longer how courts approach statutory

interpretation.  *See Am. Fed. of Gov. Empls., Nat'l Council of HUD Locals Council 222, AFL-

CIO v. FLRA*, 99 F.4th 585, 590 (D.C. Cir. 2024) (discussing how purposivism was, by the end

of the twentieth century, "largely rejected in favor of a stricter focus on a statute's text" (citing

John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 6–7 (2001)));

*Loper Bright*, 603 U.S. at 443 n.6 (Gorsuch, J., concurring) (describing how in 1984 "there were

many judges who abhorred plain meaning and preferred instead to elevate legislative history and

their own curated accounts of a law's purposes over enacted statutory text," but now courts have

"a more faithful adherence to the written law" (cleaned up)).  The Supreme Court could not be

more clear that courts must focus on a statute's text.  *E.g.*, *Jimenez v. Quarterman*, 555 U.S. 113,

118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain

language of the statute."); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well

established that 'when the statute's language is plain, the sole function of the courts—at least

where the disposition required by the text is not absurd—is to enforce it according to its terms.'"

(quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  So

*Yoshida*'s reasoning is not compelling on its own terms.

And in deciding that case, the Court of Customs and Patent Appeals acknowledged that

"nothing in the TWEA or in its history . . . specifically either authorizes or prohibits the

imposition of a surcharge," and that "Congress did not specify that the President could use a surcharge in a national emergency." *Yoshida*, 526 F.2d at 572–73, 576. *Yoshida* also expressly rejected the premise that the TWEA enabled the President to "impos[e] whatever tariff rates he deems desirable," *id.* at 578, which is the power President Trump has claimed in issuing the Challenged Orders. *Yoshida* is further distinguishable because the tariffs at issue there applied only to goods already subject to tariff reductions, and at rates that did not exceed the original statutory maximum set out by Congress. *See* Law Professors' Amicus Br. at 12 n.2.

As Plaintiffs point out, other events confirm that Congress did not intend for the language "regulate . . . importation" to delegate the authority to impose tariffs. *See* Pls.' PI Reply at 11–12. Just before enacting IEEPA, Congress passed Section 122 of the Trade Act of 1974. Pub. L. No. 93-618, 88 Stat. 1978 (1975). That statute specifically authorized the tariffs President Nixon had imposed in Proclamation 4074 by providing that the President may impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a); *see also id.* § 2411(c)(1)(B). Section 122 would have been pointless if Congress understood TWEA (and later, IEEPA) to allow that same tariffing authority. And in reaching its holding, the *Yoshida* court expressly relied on the fact that there was then no specific statute "'providing procedures' for dealing with a national emergency involving a balance of payments problem such as that which existed in 1971." *Yoshida*, 526 F.2d at 578; *see also id.* at 582 n.33 (expressly declining to determine what effect "the specific grant of the surcharge authority spelled out in the Trade Act of 1974" had on the President's TWEA powers in 1971). That is no longer true.

Finally, the President's IEEPA powers were designed to be "more limited in scope than those of [TWEA]." H.R. Rep. No. 95-459, at 2 (1977). The Court disagrees with Defendants

that, by adopting the TWEA's language in IEEPA, Congress endorsed *Yoshida*'s holding. *See* Pls.' PI Reply at 13 (arguing that courts only assume Congress adopts an earlier judicial construction of a phrase where there is "settled precedent" on the interpretation of a statute, and that conflicting lower court decisions do not constitute settled precedent (quoting *United States v. Collazo*, 984 F.3d 1308, 1328 (9th Cir. 2021))). *Contra* Defs.' PI Opp'n at 4, 12, 14. *Yoshida* is not a reason for this Court to reject IEEPA's plain meaning.

* * *

Two conclusions follow from the Court's analysis. First, because IEEPA is not a "law . . . providing for tariffs," this Court, not the CIT, has jurisdiction over this lawsuit.[12] The statutory phrase "regulate . . . importation," as used in IEEPA, does not encompass the power to tariff. The plain meaning of "regulate" is not "to tax." And historical practice, as well as Congress's actions in response to the "Nixon shock" tariffs, confirm that the statute is not so capacious. Second, because IEEPA does not authorize the President to impose tariffs, the tariffs that derive from the Challenged Orders are *ultra vires*. Plaintiffs have therefore shown that they are likely to succeed on the merits of their claim that the President, in issuing the Challenged Orders, acted *ultra vires*, and that the agency defendants, in implementing them, violated the

---

[12] Although Defendants do not raise this argument, Amicus America First takes the position that the CIT has exclusive jurisdiction over all IEEPA actions because it is a law "providing for . . . embargoes . . . for reasons other than protections of the public health or safety." *See* America First Amicus Br.; 28 U.S.C. § 1581(i)(1)(C). That would be a sea change in IEEPA practice, as district courts have exercised jurisdiction over hundreds of IEEPA cases brought against the government. *See* Pls.' Transfer Opp'n at 10. Such a jurisdictional shift would also run counter to the CIT's role as a "specialized court of limited jurisdiction." *See Horizon Lines, LLC. v. United States*, 414 F. Supp. 2d 46, 52 (D.D.C. 2006). Further, Presidents have used IEEPA to respond to threats to public health and safety. For example, the February 1 China Order challenged in this case expressly imposed IEEPA sanctions to address the illegal flow of fentanyl into the U.S. 90 Fed. Reg. at 9121. If IEEPA provides for embargoes, those embargoes could be to protect the public health or safety. That brings IEEPA outside the scope of Section 1581(i)(1)(C), so America First's jurisdictional argument fails.

27

Administrative Procedure Act.  The Court does not reach Plaintiffs' alternative arguments that IEEPA does not authorize these specific tariffs or that, if it does authorize these tariffs, it violates the nondelegation doctrine.

### B.  Irreparable Harm

Plaintiffs have established that they will likely suffer irreparable harm absent a preliminary injunction because the tariffs originating in the Challenged Orders pose an existential threat to their businesses.  *See, e.g.*, Woldenberg Decl. ¶ 28; Mot. Prelim. Inj. at 41; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (reiterating that "a preliminary injunction requires only a likelihood of irreparable injury").  They cannot offset the highest IEEPA tariffs without raising prices 70 percent or more "as a matter of pure survival," Woldenberg Decl. ¶ 9; their customers have already canceled over $1 million in orders, *id.* ¶ 10; and they face an immediate 40 or 50 percent decline in sales, year-over-year, *id.* ¶ 11.  The companies "cannot possibly absorb the costs of the increased tariffs" without "changing [their] pricing radically."  *Id.* ¶¶ 6, 14.  But they cannot pass price increases onto their customers without selling substantially fewer products.  *Id.* ¶¶ 16, 18.  Plaintiffs are not "massive entities that can withstand such losses in their core business[es]."  *See Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019).  Nor can they reduce the quality of their products to support lower prices: reducing quality is "unthinkable" for "premium brands" like Plaintiffs, and is practically unworkable because it would require them to "change the design and/or production of more than 2,000 products at once."  *Id.* ¶ 15.

Without an injunction, Plaintiffs may have to refinance loans on unfavorable terms; significantly scale back operations and product offerings; close facilities; lay off employees; or possibly sell their businesses.  Mot. Prelim. Inj. at 41.  Granted, financial losses typically do not

constitute irreparable harm. *E.g.*, *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

But that is not the case when "the loss threatens the very existence of the movant's business." *Id.*

The government argues that Plaintiffs' harms are speculative and conclusory. *See* Defs.'

PI Opp'n at 37–39. The Court disagrees. *See* Pls.' PI Reply at 20–21 (detailing, to the extent

possible, the specific costs that Plaintiffs have incurred because of the Challenged Orders). How

could Plaintiffs possibly describe the exact costs they will face from paying tariffs that the

President imposes, pauses, adjusts, and reimposes at will? *See* Woldenberg Decl. ¶¶ 7–8

(describing the "ever-changing situation with the IEEPA tariffs" and "considerable uncertainty

about future economic conditions and trade rules"). The instability and unpredictability of the

changing tariff rates cause "massive disruptions in [their] supply chain, business relations, and

business operations." *Id.* ¶ 8; *see Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242

(D.D.C. 2014). Without preliminary relief, Plaintiffs will be subjected to ongoing "supply chain

chaos, an incredibly burdensome and constantly shifting tariff landscape, and a very high price to

be paid for incorrect logistical judgments." Woldenberg Decl. ¶ 10. And because their financial

recovery is limited to the value of any tariffs they wrongly pay, *see* 19 U.S.C. § 1505(a)–(b),

Plaintiffs will not be able to recover lost profits, lost customers, or the "additional cost[s]" of

finding "replacement[s]" for high-tariff imports. *See Vaqueria Tres Monjitas, Inc. v. Irizarry*,

587 F.3d 464, 485 (1st Cir. 2009) ("[T]he inability to supply a full line of products may

irreparably harm a merchant by shifting purchasers to other suppliers."); *Nalco Co. v. EPA*, 786

F. Supp. 2d 177, 188 (D.D.C. 2011) (holding that agency action that would make it "difficult for

[the plaintiff] to attract new customers" is "at least some degree of irreparable injury").

As Plaintiffs stated at oral argument, to the extent the tariffs cause them not to import

goods in the first instance, they cannot recover the value of the resulting lost sales, business

opportunities, market share, or customer goodwill.  *See* Mot. Prelim. Inj. at 38–39.  In this context, those harms qualify as irreparable.  *See, e.g.*, *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("damage to [a company's] business reputation" can be "irreparable harm"); *Nalco Co.*, 786 F. Supp. 2d at 188 (finding irreparable harm where petitioner would "suffer the loss of '[l]ong-standing clients . . . [that may be] unwilling, or unable, to do business'" with them absent an injunction (alterations in original) (quoting *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008)).  *Contra* Defs.' PI Opp'n at 38 (stating, without support, that Plaintiffs' "loss of business opportunities and goodwill" could be "indirectly" redressed through refunds).  The Court is therefore satisfied that Plaintiffs have demonstrated irreparable harm.

### C.  Balance of Equities & Public Interest

Finally, the Court considers whether the balance of equities and the public interest favor a preliminary injunction.  When the government is the party to be enjoined, these two factors merge.  *See Nken*, 556 U.S. at 435.  The Supreme Court has instructed that "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter*, 555 U.S. at 32.  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

Without a preliminary injunction, Plaintiffs will sustain significant and unrecoverable losses.  They take the position that if the Court grants their motion, the government will face a pause of the IEEPA tariffs only as directed to two small businesses whose imports are relatively inconsequential to the national economy.  *See* Mot. Prelim. Inj. at 43 (requesting that the Court

"enjoin the agency Defendants and their agents, employees, and all persons acting under their direction and control, from taking any action to collect tariffs from *Plaintiffs* under the Challenged Orders") (emphasis added).  And "[t]he public interest is served when the legislation that Congress has enacted," like IEEPA, "is complied with."  *American Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 262 (D.D.C. 2003); *see also League of Women Voters*, 838 F.3d at 12 (holding that is there generally no public interest in unlawful agency action).

On the government's side, four Cabinet officials submitted declarations outlining the "catastrophic harm to American foreign policy and national security that would ensue from granting the relief requested in [P]laintiffs' motion."  Notice of Add'l Exs. at 1; *see also* Decl. of Howard Luntick ¶ 19 ("All told, an invalidation of President Trump's ability to use IEEPA would dismantle a cornerstone of President Trump's national security architecture, irreparably harm the government's ability to respond to evolving foreign threats, . . . jeopardize vital trade agreements, collapse ongoing negotiations, allow for Chinese aggression during a period of strategic competition, leave the American people exposed to predatory economic practices by foreign actors, and threaten national security.").  Secretary of State Marco Rubio stated that an order enjoining the tariffs "would cause significant and irreparable harm to U.S. foreign policy and national security" because negotiations with trading partners are "in a delicate state."  Decl. of Marco Rubio ¶¶ 3, 9.  "These negotiations could address the urgent threats of mass migration at our northern and southern borders, the flow of fentanyl into our country, and the erosion of our domestic production capacity," *id.* ¶ 8, and constitute "one of the country's top foreign policy priorities."  *Id.* ¶ 10.  According to Secretary Rubio, "much of U.S. global diplomacy has been focused on these negotiations."  *Id.* ¶ 10; *see also* Decl. of Scott Bessent ¶ 9.  Every ongoing

31

negotiation is "premised on the ability of the President to impose tariffs under IEEPA." Decl. of Marco Rubio ¶ 11.

The Cabinet officials claim that were a court to enjoin the tariffs announced in the Challenged Orders, U.S. trading partners could retaliate against the tariffs.; the U.S. would be embarrassed on the global stage; and the U.S.'s manufacturing position may be so weakened that the country may "not be able to produce the weapons and other resources necessary to defend itself." *Id.* ¶¶ 12–14. These consequences go to "critical" foreign policy and national security interests. *Id.* ¶ 16; *see also* Decl. of Howard Lutnick ¶¶ 4–4 (describing that the national emergencies underlying the Challenged Orders "threaten[] the lives of [U.S.] citizens"). The Court agrees with Defendants that the public has a compelling interest in the "President's conduct of foreign affairs and efforts to protect national security." *See* Defs.' PI Opp'n at 41; *see also Winter*, 555 U.S. at 24.

But on May 28, a three-judge panel of the CIT issued an order permanently enjoining the IEEPA tariffs. *See* Opinion, *V.O.S. Selections, Inc. v. Trump*, No. 25-00066, at 48–49 (Ct. Int'l Trade May 28, 2025). The consequences described by the government officials in their declarations will flow, if at all, from that court's sweeping order. Under the circumstances, enjoining the application of the Challenged Orders to two family-owned toy companies will have virtually no effect on the government. *Contra* Defs.' PI Opp'n at 41–42 (arguing that "[P]laintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect national security under IEEPA and the Constitution"). It will, however, protect those companies from irreparable injury should the CIT order be stayed or reversed. The Court concludes that the balance of equities and the public interest therefore favor Plaintiffs. Besides, "[i]t is emphatically the province and duty of the judicial department to say

what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (Marshall, C.J.).  The President cannot act unlawfully and then use the effects of having that action declared unlawful as a putative shield from judicial review.

## V.  CONCLUSION

Because IEEPA is not a law providing for tariffs and because Plaintiffs have satisfied the preliminary injunction factors, Defendants' motion to transfer venue is DENIED; and Plaintiffs' motion for a preliminary injunction is GRANTED.  The Court will stay operation of the preliminary injunction for 14 days.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 29, 2025                                                    RUDOLPH CONTRERAS
                                                                       United States District Judge

33